## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **CHAPTER 11** |
| | ) | |
| **STONE & WEBSTER, INC.,** *et al.,* | ) | |
| | ) | |
| | ) | **CASE NO. 00-02142 (PJW)** |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |
| **CONSOLIDATED SWINC ESTATE, and** | ) | |
| **SWE&C LIQUIDATING TRUST** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ACE USA, INC., and** | ) | |
| **CENTURY INDEMNITY COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | **ADVERSARY NO. 07-50390** |

## MOTION OF DEFENDANT CENTURY INDEMNITY COMPANY
## FOR WITHDRAWAL OF REFERENCE PURSUANT TO 28 U.S.C. § 157(d)

Defendant, Century Indemnity Company ("Century"), as successor to CCI Insurance Company as successor to Insurance Company of North American on its own behalf and as successor-in-interest to Indemnity Insurance Company of North America, by its attorneys, moves the United States District Court for the District of Delaware for the entry of an order pursuant to 28 U.S.C. § 157(d), Federal Rule of Bankruptcy Procedure 5011, and Del. Bankr. L.R. 5011-1,[1] withdrawing the reference with respect to this adversary proceeding, as follows:

---

[1] Pursuant to Del. Bankr. L.R. 5011-1:

A motion to withdraw the reference of a matter or proceeding shall be filed with the

## JURISDICTION AND VENUE

1.     The District Court has jurisdiction over this non-core matter and this motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

### Stone & Webster Bankruptcy Case

2.     Stone & Webster, Inc. ("S&W"), along with certain of its subsidiaries, (collectively, "Debtors"), commenced these Chapter 11 cases on June 2, 2000.

3.     On January 9, 2004, the Bankruptcy Court for the District of Delaware granted debtors' motion for an order approving the settlement of claims with Southern Union Company and Narragansett Electric Company as respects certain supposed environmental liabilities at seventeen sites, said settlement to be partially funded by insurance recoveries if recovery efforts are successful. (*See* "Settlement Order" attached as Exhibit "B").

4.     In advance of the Court's issuance of its January 9, 2004 Settlement Order, Century filed an objection to the approval of the settlement because, *inter alia*, it could potentially prejudice Century's rights under several alleged insurance policies purportedly issued between 1932 and 1961 (*see* "Objection of the ACE USA Companies to Debtor's Motion for Order Under Fed. R. Bankr. P. 9019 and 3018 Approving Settlement of Claims with Southern Union Company and Narragansett Electric Company " attached as Exhibit "C"), and pursuant to

---

Clerk.  The movant shall concurrently file with the Clerk a motion for a determination by the Bankruptcy Court with respect to whether the matter or proceeding is core or non-core.  All briefing shall be governed by the District Court Rules.

Contemporaneously herewith, Century has filed a Motion For Determination That The Proceeding Is Non-Core with the United States Bankruptcy Court for the District of Delaware. (See "Bankruptcy Court Motion" attached as Exhibit "A").

the terms of the Settlement Order, "The rights of the Debtors' insurers to contest coverage ... are fully preserved." (*See* Exhibit "B" at paragraph 11.)

5.      On January 16, 2004, the Bankruptcy Court entered Findings Of Fact, Conclusions Of Law And Order under 11 U.S.C. § 1129(a) and (b) confirming Third Amended Joint Plan Of Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of its Subsidiaries and Affiliates. (*See* "Plan Confirmation Order" attached as Exhibit "D").

6.      The Plan Confirmation Order, *inter alia*, reserves all rights, claims, and/or defenses of Century including all of Century's rights and/or defenses in any subsequent litigation seeking a declaration regarding the nature and/or extent of any insurance coverage under any policies of insurance issued by Century. (*See* Exhibit "D" at paragraph 40.)

## The Adversary Proceeding

7.      On January 26, 2007, Debtors commenced this Adversary Proceeding seeking a declaration regarding insurance coverage under defendants' supposed policies for the alleged environmental liabilities at the seventeen sites, and certain damages.   (*See* the Complaint attached as Exhibit "E".)  The Debtors seek a judgment as follows:

> (a)      declaring that Plaintiffs have complied with all terms and conditions of the Polices;
>
> (b) declaring that Defendants had a duty to defend Plaintiffs in connection with the SU/NEC Bankruptcy Claims or to compensate Plaintiffs for the reasonable costs of defending such claims, and that Defendants breached that duty;

(c) declaring that Plaintiff's claims in connection with the Allowed Remediation Claim is covered by the Policies;

(d) awarding damages, including punitive damages, to Plaintiffs, plus fees expenses, costs, and interest in an amount to be determined at trial; and

(e) awarding such other and further relief as the Court deems just and proper.

(*See* Exhibit "E".)

## LEGAL STANDARD FOR WITHDRAWAL OF REFERENCE

8.      The United States District Courts have original and exclusive jurisdiction over all cases under the Bankruptcy Code, as well as original, non-exclusive jurisdiction over all civil proceedings "arising under [the Bankruptcy Code]" or "arising in or related to cases under [the Bankruptcy Code]." 28 U.S.C. § 1334(a)-(b).  However, "[e]ach district court may provide that . . . any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a).  Pursuant to 28 U.S.C. § 157(d):

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.  The district court shall, on timely motion of a party, so withdraw a proceeding if the court   determines that resolution of the proceeding requires consideration of both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d).

9.      Section 157(d) contemplates two types of withdrawal: permissive and mandatory. *See McMillan v. Trans World Airlines, Inc. (In re Trans World Airlines)*, 280 B.R. 806, 807 (D. Del. 2002).  Withdrawal of the reference is mandatory when "resolution of that action necessitates consideration of Title 11 and non-Bankruptcy Code law which affects interstate

-4-

commerce." *Hatzel & Buehler, Inc. v. Orange & Rockland Utilities*, 107 B.R. 34, 38 (D. Del. 1989). When mandatory withdrawal is unwarranted, permissive withdrawal may nonetheless be appropriate where "cause" is shown. *Id.* at 39. Because the Adversary Proceeding involves insurance coverage issues that arise exclusively under state law and independently of the Bankruptcy Code and other federal law, the factors for mandatory withdrawal are not present. Cause exists, however, for permissive withdrawal.

10.    Although Congress provided no statutory definition of "cause," Third Circuit courts consider the following factors when conducting a discretionary withdrawal analysis:

> [1] whether the claim is a core bankruptcy proceeding or whether it is non-core; [2] whether the parties have requested a jury trial; and [3] whether withdrawal would serve judicial economy, such as the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process.

*NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 913 (D. Del. 1996). *See also In re Pruitt*, 190 F.2d 1160, 1168 (3d Cir. 1990) (district court failed to evaluate cause for withdrawal, which did not exist under facts of proceeding). Here, the relevant factors support withdrawal of the reference.

## THE NON-CORE NATURE OF THIS ADVERSARY PROCEEDING STRONGLY SUPPORTS WITHDRAWAL OF THE REFERENCE

11.    The threshold step in the analysis, which is to be performed by the Bankruptcy Court, is to classify the Adversary Proceeding as either core or non-core. *See NDEP Corp.*, 203 B.R. at 908. As stated in its Motion For Determination That The Proceeding Is Non-Core filed pursuant to Del. Bankr. L.R. 5011-1, attached hereto as Exhibit "A," and incorporated herein by reference, Century contends that the proceeding, which seeks to determine insurance coverage under insurance policies purportedly issued to a debtor pre-petition, is plainly non-core.

## ADDITIONAL FACTORS SUPPORT WITHDRAWAL OF THE REFERENCE

### Withdrawal of the Reference Promotes Judicial Economy and Efficiency

12.    Additional considerations supporting withdrawal of the reference include the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, minimizing delay and costs to the parties, and expediting the bankruptcy process. *See Pruitt*, 910 F.2d at 1168; NDEP *Corp.*, 203 B.R. at 908.

13.    When deciding whether to withdraw the reference, courts recognize that such decisions frequently hinge more on pragmatic concerns about judicial efficiency than strictly legal determinations. *See Travelers Ins. Co. v. Goldberg*, 135 B.R. 788, 792 (D. Md. 1992). In *Goldberg*, the court declined to refer the case to the bankruptcy court in view of the inescapable conclusion that the district court would "in all probability be required either to make *de novo* factual determinations or to hold a jury trial in the first instance." 135 B.R. at 792; *see also Travelers Indem. Co. v. Babcock & Wilcox Co.*, No. CIV.A. 01-3387, 2002 WL 100625, at *4 (E.D. La. Jan. 23, 2002) (granting motion to withdraw the reference and noting that "[t]he issues before the bankruptcy court are non-core issues, with which the bankruptcy court has no greater familiarity than does [the district court].").

14.    Similarly, in this action, considerations of judicial efficiency and costs to the parties weigh heavily in favor of having the Adversary Proceeding resolved in the District Court. A determination not to withdraw the reference will only add an additional layer of judicial review and require duplication of effort. Not only will judicial resources be wasted, but the parties will be forced to expend unnecessary sums on duplicative activity. What will otherwise involve the two-step process described above can be resolved in a single step if the District Court resolves the matter in the first instance.

15.     Considerations of judicial economy and efficiency favor withdrawal of the reference where the action is non-core regardless of whether or not the parties have requested a jury trial. *See NDEP Corp.*, 203 B.R. 913 (stating that, even absent right to jury trial, court would nonetheless have withdrawn the reference because case involved contract, tort, and restitution claims "somewhat removed from the bankruptcy court's realm of expertise"); *In re G-I Holdings, Inc.*, 295 B.R. 211, 218 (D.N.J. 2003) (court need not determine viability of defendants' jury trial right claims in proceeding where non-core issues predominate; issues surrounding jury trial claim as well as state law dispute more appropriately and economically decided in district court); *In re Pelullo*, 1997 U.S. Dist. LEXIS 12324, at *5 (E.D.Pa. Aug. 15, 1997) ("Since the bankruptcy court may not enter a final order or judgment in a non-core proceeding without the consent of the parties, keeping the proceeding in the bankruptcy court wastes judicial resources because the district court must review the bankruptcy court's proposed findings of fact and conclusions of law *de novo*.").

16.     Accordingly, even if the parties elect to waive their Seventh Amendment jury trial rights[2], permissive withdrawal is nevertheless appropriate in this non-core proceeding in the interest of judicial economy and expediting the bankruptcy process. Where, as here, the parties in a non-core proceeding have not consented to entry of final judgment by the bankruptcy court judge, this Court would have to review the Bankruptcy Court's findings and conclusion *de novo* in any event. *See* 28 U.S.C. § 157(c)(1). Therefore, considerations of judicial economy favor withdrawal of the reference, especially at this early stage of the proceeding. *Hatzel & Buehler*, 107 B.R. at 40 (D. Del. 1989).

---

[2]  Century has yet to respond to the Complaint in this Adversary Proceeding and reserves all rights to request a trial by jury.

## Withdrawal of the Reference Promotes Convenience
## and Expedites the Bankruptcy Process

17.     The reference also may be appropriately withdrawn where the proceeding at issue is sufficiently different from the kinds of cases that typically arise in the course of bankruptcy administration. Where, for example, extensive discovery or expert testimony may be required, or a lengthy or complex trial is anticipated, such as in this case, where there are seventeen environmental sites involved, withdrawal of the reference has been held to be appropriate. *See, e.g., Complete Management Inc. v. Arthur Andersen, LLP (In re Complete Management, Inc.),* 02 Civ. 01736, 2002 U.S. Dist. LEXIS 18344, \*12 (S.D.N.Y. Sept. 27, 2002). *See also G-I Holdings*, 295 B.R. at 217-18 (finding withdrawal serves the court's best interest by "adjudicating the non-bankruptcy dispute once, while the Bankruptcy Court continues to administer the Chapter 11 reorganization and conduct other common bankruptcy proceedings."). *Cf. Miller v. Harlow Credit & Clearing Corp.*, Adv. No. 91-0702F, 1992 U.S. Dist. LEXIS 1823, \*4-5 (E.D. Pa. Feb. 14, 1992) (noting that judicial economy might prove sufficient cause for withdrawal of even a core proceeding under certain circumstances).

18.     The other enumerated considerations — reducing forum shopping and confusion and fostering the economic use of debtors' and creditors' resources — either do not apply to the instant case or support withdrawal. Reducing forum shopping is not applicable here. If, however, the litigation was permitted to proceed in the Bankruptcy Court, even for pre-trial matters, this Court would still have to review the Bankruptcy Court's orders *de novo* without the benefit of having overseen the pre-trial stage of the proceeding, resulting in unnecessary duplication of effort. Accordingly, permissive withdrawal is appropriate because it fosters the economic use of the parties' resources as well as this Court's.

## **CONCLUSION**

19.     Reference should be withdrawn with respect to the Adversary Proceeding, which involves non-core, insurance-related claims arising exclusively under state law and entirely independent of the Bankruptcy Code.   Considerations of judicial economy likewise strongly favor withdrawal of the reference.  Accordingly, Century requests that this Court enter an order withdrawing the reference with respect to the Adversary Proceeding, and for such other and further relief as is just.

Respectfully submitted,

Dated: March 2, 2007

**WHITE AND WILLIAMS LLP**

/s/ Marc S. Casarino
Marc S. Casarino (No. 3613)
824 N. Market Street, Suite 902
Wilmington, DE 19801
(302) 467-4520


Thomas Going*
Joseph Gibbons*
John Lawson*
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19103
(215) 864-7000
*not yet admitted *pro hac vice*

**Attorneys for Century Indemnity  Company**

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **CHAPTER 11** |
| | ) | |
| **STONE & WEBSTER, INC.,** *et al.*, | ) | |
| | ) | |
| | ) | **CASE NO. 00-02142 (PJW)** |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |
| **CONSOLIDATED SWINC ESTATE, and** | ) | |
| **SWE&C LIQUIDATING TRUST** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ACE USA, INC., and** | ) | |
| **CENTURY INDEMNITY COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | **ADVERSARY NO. 07-50390** |

## MOTION OF DEFENDANT CENTURY INDEMNITY COMPANY PURSUANT TO DEL. BANKR. L.R. 5011-1 FOR DETERMINATION THAT THE PROCEEDING IS NON-CORE

Defendant, Century Indemnity Company ("Century"), as successor to CCI Insurance Company as successor to Insurance Company of North America on its own behalf and as a successor-in-interest to Indemnity Insurance Company of North America, by its attorneys, moves the United States Bankruptcy Court for the District of Delaware pursuant to Del. Bankr. L.R. 5011-1, and in connection with its Motion For Withdrawal of Reference Pursuant to 28 U.S.C. § 157(d) filed in the United States District Court For The District Of Delaware[1], for a

---

[1] Pending before the United States District Court for the District of Delaware is a motion seeking that Court to withdraw the reference with respect to this Adversary Proceeding. (*See* Exhibit "A".)

determination that this adversary proceeding is not a "core" proceeding as that term is defined by

28 U.S.C. § 157(b), and in support thereof, states as follows:

## JURISDICTION AND VENUE

1.      The Bankruptcy Court has jurisdiction over this case and this motion pursuant to

28 U.S.C. §§ 157 and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

### Stone & Webster Bankruptcy Case

2.      Stone & Webster, Inc. ("S&W"), along with certain of its subsidiaries,

(collectively, "Debtors") commenced these Chapter 11 cases on June 2, 2000.

3.      On January 9, 2004, the Bankruptcy Court for the District of Delaware granted

debtors' motion for an order approving the settlement of claims with Southern Union Company

and Narragansett Electric Company as respects certain supposed environmental liabilities at

seventeen sites, said settlement to be partially funded by insurance recoveries if recovery efforts

are successful. (*See* "Settlement Order" attached as Exhibit "B").

4.      In advance of the Court's issuance of its January 9, 2004 Settlement Order,

Century filed an objection to the approval of the settlement because, *inter alia*, it could

potentially prejudice Century's rights under several alleged insurance policies purportedly issued

between 1932 and 1961 (*see* "Objection of the ACE USA Companies to Debtor's Motion for

Order Under Fed. R. Bankr. P. 9019 and 3018 Approving Settlement of Claims with Southern

Union Company and Narraganssett Electric Company" attached as Exhibit "C"), and pursuant to

the terms of the Settlement Order, "The rights of the Debtors' insurers to contest coverage … are

fully preserved." (*See* Exhibit "B" at paragraph 11.)

5.    On January 16, 2004, the Bankruptcy Court entered Findings Of Fact, Conclusions Of Law And Order under 11 U.S.C. § 1129(a) and (b) confirming Third Amended Joint Plan Of Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of its Subsidiaries and Affiliates. (*See* "Plan Confirmation Order" attached as Exhibit "D").

6.    The Plan Confirmation Order, *inter alia*, reserves all rights, claims, and/or defenses of Century including all of Century's rights and/or defenses in any subsequent litigation seeking a declaration regarding the nature and/or extent of any insurance coverage under any policies of insurance issued by Century. (*See* Exhibit "D" at paragraph 40.)

## The Adversary Proceeding

7.    On January 26, 2007, Debtors commenced this Adversary Proceeding seeking a declaration regarding insurance coverage under defendants' supposed policies for the alleged environmental liabilities at the seventeen sites, and certain damages. (*See* the Complaint attached as Exhibit "E".) Debtors seek a judgment as follows:

(a)    declaring that Plaintiffs have complied with all terms and conditions of the Polices;

(b) declaring that Defendants had a duty to defend Plaintiffs in connection with the SU/NEC Bankruptcy Claims or to compensate Plaintiffs for the reasonable costs of defending such claims, and that Defendants breached that duty;

(c) declaring that Plaintiff's claims in connection with the Allowed Remediation Claim is covered by the Policies;

(d) awarding damages, including punitive damages, to Plaintiffs, plus fees expenses, costs, and interest in an amount to be determined at trial; and

(e) awarding such other and further relief as the Court deems just and proper.

(*See* Exhibit "E".)

## THE ADVERSARY PROCEEDING IS NON-CORE

8.      The threshold question in determining whether cause to withdraw the reference exists is whether the proceeding is core or non-core. *See* 28 U.S.C. § 157(c)(1). *See also NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 908 (D. Del. 1996) (citing *In re Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993), *cert. dismissed*, 511 U.S. 1026 (1994), for the proposition that "the initial determination should be whether the claim is a core bankruptcy proceeding or whether it is non-core."); *see also Valley Forge Plaza Assocs. v. Firemen's Fund Ins. Cos.*, 107 B.R. 514, 516 (E.D.Pa. 1989).  In non-core proceedings, the bankruptcy court can only submit proposed findings of fact and conclusions of law to the district court; in turn, the district court reviews the proposed findings and conclusions *de novo*.[2]  *See Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999).  A finding that a dispute is non-core weighs heavily in favor of withdrawing the reference. *In re G-I Holdings, Inc.*, 295 B.R. 211, 217 (D.N.J. 2003).

9.      The Adversary Proceeding, which seeks a declaration of the respective rights and obligations of Century and Debtors under the alleged insurance policies, clearly concerns issues that are non-core in relation to Debtors' bankruptcy cases.  In determining whether a matter is core, a court should first consult the non-exclusive list of fifteen examples of core proceedings set forth at 28 U.S.C. § 157(b)(2). *See Halper*, 164 F.3d at 836; *G-I Holdings, Inc. v. Hartford Accident & Indem. Co. (In re G-I Holdings, Inc.)*, 278 B.R. 376, 380 (Bankr. D.N.J. 2002) (finding that environmental insurance coverage action bore no resemblance to examples of core

---

[2] Pursuant to 28 U.S.C. § 157(c), "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under [the Bankruptcy Code]," but in such cases the bankruptcy judge must "submit proposed findings of fact and conclusions of law to the district court."  The district court then enters a final order "after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* the matters to which any party has timely and specifically objected."

proceedings under 28 U.S.C. § 157(b)). The subject matter of the Adversary Proceeding does not fall within any of the enumerated categories. Therefore, consideration of the Third Circuit's test for a core proceeding is required.

10.     The Third Circuit has held that a core proceeding is one that either (1) invokes a substantive right provided by title 11 or (2) by its nature, could arise only in the context of a bankruptcy case. *Corestates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 196 (3rd Cir. 1999)(*quoting Torkelson v. Maggio (In re Guild & Gallery Plus, Inc.*), 72 F.3d 1171, 1178 (3rd Cir. 1996)); *Halper*, 164 F.3d at 836; *G-I Holdings*, 278 B.R. at 381; *In re Donnington, Karcher, Salmond, Ronan & Rainone, P.A.*, 194 B.R. 750, 758 (D.N.J. 1996). "Core proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by some other body of law, normally state law." *Trans World Airlines v. Ichan (In re Trans World Airlines, Inc.)*, 278 B.R. 42, 50 (Bankr. D. Del. 2002), quoting *In re United States Brass Corp.*, 110 F.3d 1261 (7th Cir. 1997).[3]

11.     A declaratory judgment action against a debtor to determine insurance coverage is not a core proceeding. *See In re Amatex Corp.*, 107 B.R. 856, 863 (E.D.Pa. 1989), *aff'd*, 908 F.2d 963 (3d Cir. 1991). *See also United States Brass*, 110 F.3d at 1268 (reasoning that "the right to insurance coverage is a creation of state contract law and one that could be vindicated in an ordinary breach of contract suit if the insured were not a bankrupt"); *Allied Prod. Corp. v. Hartford Accident & Indem. Co.*, 2003 U.S. Dist. LEXIS 2596, *5 (N.D. Ill. Feb. 24, 2003) (withdrawing the reference in an adversary proceeding regarding the determination of insurance coverage, stating "The court fails to see how the insurance dispute at the heart of the adversary

---

[3] This distinction strongly resembles the Third Circuit's test: the claim is core if it "invokes a substantive right provided by [the Bankruptcy Code] or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Torkelson,* 72 F.3d at 1178.

proceeding arises is in any way related to the Bankruptcy Code."); *G-I Holdings*, 278 B.R. at 380 (action by debtor against insurers to determine environmental insurance coverage is non-core); *In re Ramex International, Inc.*, 91 B.R. 313 (E.D. Pa. 1988) (trustee's action for declaratory judgment under insurance policy is non-core).

12.    The Adversary Proceeding involves state law insurance coverage issues arising from the pre-petition environmental actions filed by Southern Union and Narragansett Electric Company. (See Exhibit "E", paragraphs 27-28.) Thus, these insurance coverage issues could have been and were, in fact, being addressed by S&W prior to the bankruptcy cases. Southern Union and Narragansett Electric Company having reiterated their pre-petition environmental actions as claims against the Debtors' estates does not transform those actions and the state law insurance coverage disputes related thereto into core bankruptcy matters. The subject of the Adversary Proceeding (i.e., the environmental claims and related state law coverage disputes) neither invoke a substantive right provided by title 11 nor by their nature could arise only in the context of a bankruptcy case. Accordingly, the Adversary Proceeding is non-core.

13.    Although resolution of the coverage claim may impact the size of a debtor's estate, that fact is immaterial to the core/non-core analysis. *United States Brass*, 110 F.3d. at 1269 (explaining that the "impact of a claim on the size of the debtor's estate is a criterion for whether a claim is related to the bankruptcy and is therefore a non-core proceeding"); *Phar-Mor v. Coopers & Lybrand*, 22 F.3d 1228, 1239 n.19 (3d Cir. 1994) (explaining that a breach of contract action that may bring property into the estate "is precisely the type of proceeding that is non-core and outside the power of the bankruptcy court to adjudicate"); *Donnington, Karcher*, 194 B.R. at 759 (holding that the possibility of a substantial recovery does not render a proceeding core). Thus, even though an action seeking insurance coverage declarations may

impact the size of the debtor's estate, that factor is irrelevant to the Third Circuit's test for finding core jurisdiction over a proceeding. *G-I Holdings*, 278 B.R. at 382.

14.    Under the foregoing analysis, the Adversary Proceeding is non-core. First, to the extent an insured has rights to insurance coverage under any insurance policies, its rights are state-law created; they do not spring from bankruptcy law.  The Bankruptcy Code merely provides a procedural mechanism through which those rights will be determined. *United States Brass*, 110 F.3d at 1268. Secondly, as in *United States Brass*, the key dispositive issues do not revolve around ownership of insurance policies (*i.e.*, whether the policies themselves are assets of the estate) or the mechanics of the distribution of policy proceeds, if any.  Rather, the issues concern whether such policies were ever issued to Debtors or any of them, the scope of the insurance coverage, and whether the policies cover certain claims against Debtors; *i.e.,* purely state law contract interpretation issues.  Finally, while resolution of these insurance issues may impact the size of Debtors' estates, the coverage action is not the "linchpin" of the reorganization effort.  Indeed, considering that the Plan has been consummated, the relatively limited economic scope of this dispute can hardly be considered the "linchpin" of the reorganization effort. Incidental impact on the size of the estate does not make the Adversary Proceeding core. *See Phar-Mor*, 22 F.3d at 1239 n.19; *G-I Holdings*, 278 B.R. at 384; *Donnington, Karcher*, 194 B.R. at 759.  Therefore, the Adversary Proceeding is a non-core proceeding that is, at most, only "related" to Debtors' bankruptcy cases.

15.    The fact that the all of the policies were allegedly issued pre-petition further supports the conclusion that the Adversary Proceeding is non-core.  *G-I Holdings,* 278 B.R. at 381-82; *Donnington, Karcher*, 194 B.R. at 758 (disputes regarding pre-petition insurance policies are non-core, whereas claims arising under post-petition policies may in some instances

be core). Other courts have held that actions to determine rights to insurance coverage under policies issued pre-petition are non-core. *Beard v. Braunstein*, 914 F.2d 434, 455 (3d Cir. 1990); *Ramex Int'l*, 91 B.R. at 315 (trustee's action for declaratory judgment under an insurance policy issued pre-petition is non-core).

## CONCLUSION

16.    The Adversary Proceeding raises issues exclusively under state insurance contract interpretation law and invokes no substantive rights created by the Bankruptcy Code. The overwhelming Third Circuit and other authority holds that insurance coverage actions of this sort are non-core proceedings, especially where, as here, the action seeks determination of rights under a pre-petition insurance policy. For the foregoing reasons, the Bankruptcy Court should issue a determination that the Adversary Proceeding is non-core.

Respectfully submitted,

Dated: March 2, 2007                     **WHITE AND WILLIAMS LLP**


     */s/ Marc S. Casarino*
Marc S. Casarino (No. 3613)
824 N. Market Street, Suite 902
Wilmington, DE 19801
(302) 467-4520

Thomas Going*
Joseph Gibbons, *pro hac vice*
John Lawson*
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19103
(215) 864-7000
*not yet admitted *pro hac vice*

**Attorneys for Century Indemnity Company**


-8-

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| STONE & WEBSTER, INC., *et al.*, | : | Case No. 00-02142 (PJW) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |
| CONSOLIDATED SWINC ESTATE, | : | |
| and SWE&C LIQUIDATING TRUST, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| ACE USA, INC. and CENTURY | : | |
| INDEMNITY COMPANY, | : | |
| | : | |
| Defendants. | : | Adv. Proc. No. 07-50390 |

### CERTIFICATE OF SERVICE

I, Marc S. Casarino, Esquire do hereby certify that on this 2nd day of March, 2007, copies

of the foregoing *Motion of Defendant Century Indemnity Company Pursuant to Del. Bankr.*

*L.R. 5011-1 for Determination Whether Proceeding is Core* were served upon all parties on the

electronic service list.

Under penalty of perjury, I declare that the foregoing is true and correct.


Dated:  March 2, 2007          */s/ Marc S. Casarino*
                              Marc S. Casarino (#3613)

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - x
                            :
In re:                      :   Chapter 11
                            :
STONE & WEBSTER, INCORPORATED, :   Case No. 00-02142 (PJW)
  et al.,                   :
                            :   Jointly Administered
          Debtors.         :
                            :
- - - - - - - - - - - - - - x   Related to: 4657
```

**ORDER UNDER 11 U.S.C. §§ 105 AND 502(e) AND FED. R.
BANKR. P. 9019 AND 3018 GRANTING DEBTORS' MOTION FOR
ORDER APPROVING SETTLEMENT OF CLAIMS WITH SOUTHERN
UNION COMPANY AND NARRAGANSETT ELECTRIC COMPANY**

Upon consideration of the Debtors'[1] motion for
an order approving settlement of claims with Southern
Union Company and Narragansett Electric Company (the
"Motion"); and the Court having reviewed the Motion and
having determined that granting the relief requested is
in the best interests of the Debtors, their estates,
creditors, and interest holders, and is a proper exercise
of the Debtors' business judgment; and it appearing that
proper and adequate notice of the Motion has been given

---

[1]    Unless otherwise defined herein, capitalized terms
shall have the meaning ascribed to them in the
Motion.

and that no other or further notice is necessary; and the
Court having considered the Motion and all objections
thereto; and upon the record herein; and after due delib-
eration thereon; and good and sufficient cause appearing
therefor,

IT IS HEREBY FOUND THAT:

A.    Adequate notice of the Motion and Settle-
ment was served upon all parties with an interest in this
contested matter, as well as upon all parties requesting
such notice under Fed. R. Bankr. P. 2002.

B.    The Settlement is in the best interests of
the Debtors, their estates, creditors, and interest
holders, and is also in the best interests of
Narragansett Electric Company and Southern Union Company
(together, the "Claimants"), and their ratepayers.

C.    The Settlement is the result of good-
faith, arms'-length negotiations and is a proper exercise
of the Debtors' business judgment, representing a fair
and reasonable compromise of the parties' claims and
defenses.

2

D.    All objections to the Motion not otherwise resolved should be overruled, and the Motion should be granted.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED.

2.    Pursuant to 11 U.S.C. §§ 105 and 502(e), Fed. R. Bankr. P. 9019 and 3018, and the provisions of the Third Amended Joint Plan, the Settlement annexed as Exhibit A to this Order is approved.

3.    The Debtors, or their successors, are authorized to execute any documents necessary or desirable to consummate the Settlement.

4.    All objections to the Motion not resolved or withdrawn are hereby overruled in their entirety.

5.    The Claimants are deemed to hold an allowed claim against the Consolidated SWINC Estate and the Consolidated SWE&C Estate, in the amount of $15,000,000.00 for actual response costs incurred to date at all of the sixteen (16) sites which are the subject of the Claimants' claims in this Court (the "Allowed Remediation Claim"), which Allowed Remediation Claim is

3

hereby deemed to be a vote to accept the Third Amended
Joint Plan in Class 5A and Class 5B.

6.    In order to effectuate the foregoing
provision, Valley Gas Claim numbers 2422 and 2438 are
reinstated and Fall River Claim numbers 5424 through 5429
are deemed timely filed.  The Allowed Remediation Claim
is an amendment to and a consolidation of claims numbered
2548, 2457, 4221, 2267, 2422, 2438, and 5424 through
5429.

7.    On the effective date of the Third Amended
Joint Plan, and in accordance therewith, the Claimants
will receive a cash distribution of $5,000,000.00 (the
"Cash Payment") in payment of the Allowed Remediation
Claim.  Notwithstanding any provision of the Settlement,
the Cash Payment is the maximum amount and sole portion
of the Allowed Remediation Claim that will be paid from
the Debtors' estates or their successor entities.

8.    The Debtors shall use reasonable efforts
to obtain recovery from their primary insurers.  To the
extent the Debtors, through settlement or otherwise,
recover any payments from their primary insurers with
regard to the Allowed Remediation Claim, the insurance

proceeds will be divided and disbursed 50% to the Claimants, and 25% to each of the Consolidated SWINC Estate and the Consolidated SWE&C Estate until such time as the Claimants are paid an additional $5,000,000.00 (the "Additional Cash Payment").  Until the Additional Cash Payment is received by the Claimants, any settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim will be subject to approval by the Claimants, whose approval will not be unreasonably withheld.  This Court shall retain jurisdiction to determine the reasonableness of any proposed settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim to the extent that the Claimants disapprove of any such settlement.

9.    Notwithstanding any provision of the Settlement, the Settlement shall not constitute an admission of liability by the Debtors for any purpose other than consummation of the Settlement, and shall not constitute an admission of liability by the Debtors with respect to any sites other than the sixteen (16) sites that are the subject of the Allowed Remediation Claim.

No third-party beneficiaries are intended in the Settlement, and no party other than the Claimants is a beneficiary thereof. Other than the Claimants, no party may rely on any admission of liability by the Debtors in the Settlement for any purpose whatsoever. The approval of the Settlement by this Order does not constitute a finding of any liability by the Debtors for any purpose whatsoever.

10.  It is not this Court's intention to cause the findings in paragraphs B and C of this Order to be given collateral estoppel, res judicata, or other claim or issue preclusion effects in any court presiding over any insurance coverage litigation. However, this Court makes no ruling as to the rights of any party in any insurance coverage litigation to contend that the findings in paragraphs B and C of this Order have collateral estoppel, res judicata, or other claim or issue preclusion effects, as well as the rights of any party in any insurance coverage litigation to contend that there are no such collateral estoppel, res judicata, or other claim or issue preclusion effects.

11.   The rights of the Debtors' insurers to contest coverage for the Allowed Remediation Claim or any remediation claims related to the sites set forth in recitals D and E of the Settlement, as well as the Debtors' rights to assert that such insurers are obligated to provide such coverage, are fully preserved.

12.   The rights, if any, of the Debtors' insurers to contend that the Debtors' are not jointly and severally liable to the Claimants for the payment of 66 and 2/3% of future response costs at the sites identified in recitals D and E of the Settlement, as well as the Debtors' right to contest such contention, are fully preserved.

13.   All motions, objections and other pleadings identified in Recital J of the Settlement are hereby deemed withdrawn.

14.   The failure of this order to include any provision of the Settlement shall not vitiate the validity or effect or such provision.

15.   The rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors regarding the allocation of the Allowed Remediation

7

Claim and the allocation of the insurance proceeds re-
ferred to in paragraph 8 of this Order between them are
fully preserved.

Dated:    Wilmington, Delaware
          January 9, 2004

          Honorable Peter J. Walsh
          United States Bankruptcy Judge

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | CHAPTER 11 |
| | ) | |
| STONE & WEBSTER | ) | |
| INCORPORATED, *et al.,* | ) | CASE NO. 00-02142 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

OBJECTION OF THE ACE USA COMPANIES
TO DEBTORS' MOTION FOR ORDER UNDER FED. R. BANKR. P.
9019 AND 3018 APPROVING SETTLEMENT OF CLAIMS WITH SOUTHERN
UNION COMPANY AND NARRAGANSSETT ELECTRIC COMPANY [DI 4657]

Century Indemnity Company, as successor to CCI Insurance Company, successor to Insurance Company of North America and as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company, Central National Insurance Company of Omaha, with respect to policies issued through Cravens, Dargan Pacific Coast as Managing General Agent, International Insurance Company, Pacific Employers Insurance Company and Westchester Fire Insurance Company (collectively, the "ACE USA Companies"), by their attorneys, object to Debtors' Motion for Order Under Fed. R. Bankr. P. 9019 and 3018 Approving Settlement of Claims with Southern Union Company and Narragansett Electric Company (the "Motion"), as follows:

Introduction[1]

1.     The ACE USA Companies purportedly issued certain primary and excess liability

---

[1] All capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Motion.

insurance policies to one or more Debtors (collectively, the "Policies").[2]  The Debtors and the ACE USA Companies are engaged in litigation regarding the availability of coverage under certain of the Policies.

2.      The Motion seeks approval of the Settlement with the Environmental Claimants, which provides, among other things:

(a)      The Debtors will be liable to Southern Union for 66-2/3% of all remediation costs actually paid by Southern Union with respect to the Fall River Sites and the BVG&E Sites after the date of the Settlement.  Any such costs shall be collectible by Southern Union from the proceeds of insurance and not from any property of the Debtors or their successor entities;

(b)      The Debtors will be liable to Narragansett for 66-2/3% of all remediation costs actually paid by Narragansett with respect to the BVG&E Sites after the date of the Settlement.  Any such costs shall be collectible by Narragansett from the proceeds of insurance and not from any property of the Debtors or their successor entities; and

(c)      The Debtors will assign to the Environmental Claimants, jointly, the right to control assertion and settlement of claims and the right to receive any proceeds from any of the Debtors' insurance policies other than the primary policies, and the Debtors will cooperate in good faith with the Environmental Claimants with respect to the pursuance of such policies.  *See,* Motion at ¶ 16(iv), (v), and (vi).

---

[2] Nothing contained herein shall be deemed an admission by the ACE USA Companies that such Policies were issued or of any coverage for the Environmental Claims under the Policies.

## Objections To Settlement

3.     The ACE USA Companies have not been provided adequate time to consider the final terms of the Settlement.  Based on the summary of the tentative terms set forth in the Motion, however, the Settlement would preclude the ACE USA Companies from asserting their contractual and statutory rights to object to allowance of the Environmental Claims or control the defense, negotiation, and settlement of the Environmental Claims.  Moreover, through the Settlement, the Debtors will vitiate any coverage otherwise available under the Policies to pay the Environmental Claims by breaching their duty to assist in the defense of such claims. Finally, because the Debtors did not obtain the prior consent of the ACE USA Companies, the Settlement will not trigger the obligations of the ACE USA Companies under the Policies, if any, with respect to the Environmental Claims.

### 1.     The Motion Violates The Notice Requirements Of LR 9006-1(c)

4.     The ACE USA Companies have not been provided adequate time to consider the terms of the Settlement; and for that reason alone the Motion should not proceed at the November 18, 2003 hearing.  The Motion represents that negotiations of the Settlement are ongoing.  Motion at n.1.  According to the Debtors, the final terms of the Settlement will remain unknown to interested parties, including the ACE USA Companies, until a minimum of ten days before the hearing to consider the Motion.  *Id.*  Since shortened notice has neither been requested nor granted, the Motion violates the minimum notice requirements of LR 9006-1(c).  If permitted to go forward as presently scheduled, the ACE USA Companies will not have been provided an opportunity to consider the final terms of the Settlement and formulate a response thereto before

the objection deadline.[3]    Accordingly, the Debtors have provided insufficient notice of the Settlement and the Motion should not proceed at the November 18, 2003 hearing.

5.    Furthermore, the general statement of the Settlement terms provided in the Motion is unacceptably vague and ambiguous.  For example, paragraph 16(i) of the Motion provides that the Environmental Claimants will have a single allowed claim against the Consolidated SWINC Estate and the Consolidated SWE&C Estate in the amount of $15 million. It is unclear whether Southern Union and Narragansett will each have a $15 million claim or whether they will share in only one $15 million claim.  Assuming the latter, the Motion fails to explain how the claim will be divided between the Environmental Claimants.  Moreover, paragraph 16(iii) of the Motion provides that the Debtors and Environmental Claimants will "share equally" in certain payments from the Debtors' primary insurers.  It is unclear whether "share equally" means 50% for the Debtors and 50% for the Environmental Claimants, or 1/3 for each of the Debtors, Southern Union and Narragansett. These ambiguities, among others, further impair the ACE USA Companies' ability to consider the merits of the Settlement on a fully informed basis.

6.    In addition to the fundamental unfairness caused by this insufficient notice and ambiguity, the uncertainty surrounding the final terms of the Settlement renders it impossible for this Court to adequately consider it as being fair, reasonable, and in the best interest of the estate. The Debtors allege that the Settlement is equitable and fair, but admit that its terms will be modified.  It is therefore inappropriate to consider approval of the Settlement until all of its terms

---

[3] Notice of the final Settlement terms ten days before the November 18th hearing would be on Saturday, November 8th.  As of November 11th at 2:00 p.m., the bankruptcy case docket does not indicate that the final Settlement terms as promised by the Debtors has been filed by November 8th.  November 11th is the deadline to file objections to the Motion, which gives the ACE USA Companies no time to consider the final Settlement terms.

are finally known and all interested parties have been afforded sufficient opportunity to make an informed judgment.

> 2. **The Settlement Violates The ACE USA Companies' Rights To Control And/Or Associate In The Defense, Investigation, And Settlement Of Claims**

7.    The ACE USA Companies have contractual and statutory rights to control and/or associate in the defense, investigation, and settlement of claims for which the Policies may provide coverage. Indeed, the Debtors admit that they have liability for the response costs being sought by the Environmental Claimants. Motion at ¶ 13. Without obtaining the consent of the ACE USA Companies, the Debtors are attempting to settle potentially covered claims by (a) agreeing that the Debtors are liable for virtually all of the remediation costs incurred to date by the Environmental Claimants and (b) agreeing to establish the liability of the Debtors for the Environmental Claimants' future remediation costs by stating that the Environmental Claimants shall be entitled to a claim against the Debtors in an amount equal to two-thirds of such future costs. Under the Policies, the ACE USA Companies are entitled to raise appropriate defenses to the Environmental Claims and/or otherwise seek the disallowance of such claims. By interfering with the ACE USA Companies' right to participate in the claims allowance process, the Settlement will void any coverage otherwise available under the Policies with respect to the Environmental Claims.

8.    Moreover, and crucial to the availability of insurance coverage, the Settlement interferes with the ACE USA Companies' statutory rights under section 502 of the Bankruptcy Code to prosecute objections to the allowance of unmeritorious claims. 11 U.S.C. §502(a); *See also In re Keck, Mahin & Cate*, 241 B.R. 583, 596 (Bankr.N.D.Ill. 1999); *In re Standard*

5

*Insulations, Inc.*, 138 B.R. 947 (Bankr.W.D.Mo. 1992).

>    3.   **The Settlement Violates Debtors' Continuing Duty To Cooperate**
>         **With ACE USA Companies' Defense And Investigation Of Claims**

9.     The Debtors have an affirmative, continuing duty to cooperate with the ACE USA Companies in the defense and investigation of all covered claims. A breach of the duty to cooperate relieves the ACE USA Companies of their obligation to defend against and pay otherwise covered claims. *See* 14 Couch on Ins. § 199:13 (2003)("As a general rule, an insured's breach of a cooperation clause precludes coverage and releases the insurer from its responsibilities . . ."). In direct violation of the Debtors' duty to cooperate with the ACE USA Companies, the Settlement provides that "the Debtors will cooperate in good faith *with the Environmental Claimants* with respect to the pursuance of" the Debtors' insurance coverage. Motion at ¶ 16(vi)(emphasis added). Essentially, the Debtors have colluded with the Environmental Claimants against the Debtors' insurers in exchange for the Environmental Claimants' support for the Third Amended Joint Plan.[4] Because the Settlement violates the Debtors' duty to cooperate with the ACE USA Companies, any insurance coverage otherwise available to pay otherwise covered claims will be vitiated. *See* 14 Couch on Ins. § 199:13 (2003) ("An insured will be deemed to have breached a cooperation clause of a liability insurance policy where he or she appears to be assisting the claimant in the maintenance of his or her action").

10.    The ACE USA Companies also have the right under the Policies and applicable non-bankruptcy law to demand that the Debtors, the SWINC Plan Administrator and/or the

---

[4] The Motion provides, at paragraph 16(vii), that the Environmental Claimants will change their votes from rejections to acceptances of the Third Amended Joint Plan in exchange for, in part, the Debtors' assisting the Environmental Claimants with their claims against the Debtors' insurance.

SWE&C Liquidating Trustee seek the disallowance of unmeritorious claims. To the extent that the Settlement prohibits the Debtors, the SWINC Plan Administrator and/or the SWE&C Liquidating Trustee from objecting to the allowance of the claims of the Environmental Claimants, it will constitute a further violation of the insureds' duty of cooperation.

### 4. No Insurance Coverage Will Be Available To Pay Amounts Due Under The Settlement

11. The Settlement contemplates triggering insurance coverage under the Policies by the partial liquidation and allowance of the Environmental Claims against the Debtors and funding the Debtors' obligations on account of such claims with insurance proceeds. The payment of insurance proceeds, however, cannot be accelerated by issuing a consensual "judgment" against the insured based upon hypothetical or unproven claims, especially where the insurer objects in the bankruptcy hearing to the propriety of the entry of such judgment.

12. Numerous courts have rejected the theory upon which the Settlement appears to rest vis-à-vis the ACE USA Companies as violating their contractual rights under state law. *See e.g., Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.),* 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom Amatex Corp. v. Stonewall Ins. Co.,* 102 B.R. 411 (E.D. Pa. 1989); *see also Cissell v. American Home Assur. Co.,* 521 F.2d 790, 792 (6th Cir. 1975) (holding that an insured's bankruptcy trustee could not sue an insurer for coverage absent a judgment against the insured or a settlement approved by the insurers).

13. In the absence of a settlement approved by the ACE USA Companies or a valid judgment in favor of the Environmental Claimants, no insurance proceeds will be available under the Policies to pay the Environmental Claims.

## Reservation Of Rights

14.    The ACE USA Companies expressly reserve, and do not waive, all of their rights, defenses, limitations and/or exclusions in connection with the Policies, applicable law, or otherwise. The ACE USA Companies further reserve all rights to assert any and all such rights, defenses, limitations and/or exclusions in any appropriate manner or forum whatsoever. Nothing contained herein shall be deemed to expand any coverage that may otherwise be available under any Policies or any rights to payment under settlements.

15.    The ACE USA Companies further reserve all of their rights to raise the issues contained herein and any other related issues in any procedurally appropriate contested matter and/or adversary proceeding including, without limitation, a separate adversary proceeding requesting any declaratory and/or injunctive relief with respect to any rights under the Policies that may be adversely affected by approval of the Settlement.

16.    The ACE USA Companies further reserve all of their rights to object to any claim for coverage under any Policies and/or any claim for payment under any settlement agreements and to seek declaratory and/or injunctive relief to the extent that treatment of their rights under the Policies and/or approval of the Settlement violates any terms or conditions of any Policies or gives rise to any defenses on behalf of the ACE USA Companies.

17.    Nothing in these Objections shall be construed as an acknowledgment that any Policies cover or otherwise apply to any claims, losses or damages on account of any claims or otherwise, or that any such claims or causes of action are eligible for payment. The ACE USA Companies reserve the right to seek an adjudication that the Debtors, individually or collectively, have waived or forfeited any available coverage under the Policies.

8

18.    Finally, the ACE USA Companies reserve their right to amend, modify or supplement this objection in response to, or as a result of, the filing of supplemental information pertaining to the Settlement, any discovery being conducted in connection with approval of the Settlement, and/or any submission in connection with the Settlement filed by any party-in-interest.  The ACE USA Companies also reserve the right to adopt any other objections to approval of the Settlement filed by any party.

<u>**Conclusion**</u>

19.    For the reasons set forth above, approval of the Motion with respect to the ACE USA Companies should be denied.

Dated:  November 11, 2003

/s/ *Marc S. Casarino*
Marc S. Casarino  (Bar No. 3613)
WHITE AND WILLIAMS LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE 19899-0709
Telephone: (302) 654-0424
Telecopier: (302) 654-0245

and

DOCS_PH 1503196v4

Leonard P. Goldberger
Joseph G. Gibbons
(Members of PA Bar)
1800 One Liberty Place
Philadelphia, PA 19103-7395
Telephone: (215) 864-7000
Telecopier: (215) 864-7123

Attorneys for Central Indemnity Company, as successor to CCI Insurance Company, successor to Insurance Company of North America and as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company, Central National Insurance Company of Omaha, with respect to policies issued through Cravens, Dargan Pacific Coast as Managing General Agent, International Insurance Company, Pacific Employers Insurance Company and Westchester Fire Insurance Company

## CERTIFICATE OF SERVICE

I, Marc S. Casarino, Esquire, hereby certify that I caused a true and correct copy of the attached Objection Of ACE USA Companies To Debtors' Motion for Order Under Fed.R.Bankr.P. 9019 and 3018 Approving Settlement of Claims with Southern Union Company and Narragansett Electric Company, to be served on November 11, 2003, via first class mail, postage prepaid, on the persons on the attached Service List as well as the 2002 Service List via electronic notification.


*/s/ Marc S. Casarino*
Marc S. Casarino

# EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re                                   : Chapter 11
                                        :
STONE & WEBSTER, INCORPORATED, et al.,  : Case No. 00-2142 (PJW)
                                        :
        Debtors.                        : (Related Docket Nos. 4473, 4478, 4625
                                        : and 4661)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER UNDER 11 U.S.C. § 1129(a) AND (b) CONFIRMING THIRD AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS IN POSSESSION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FEDERAL INSURANCE COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, AND THE OFFICIAL COMMIT-TEE OF EQUITY SECURITY HOLDERS FOR (I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF ITS SUBSIDIARIES AND AFFILI-ATES AND (II) STONE & WEBSTER ENGINEERS AND CONSTRUCTORS, INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES

WHEREAS, on August 27, 2003, Stone & Webster, Incorporated, and

certain of its subsidiaries and affiliates ("SWINC") and Stone & Webster Engineers

and Constructors, Inc. and certain of its subsidiaries and affiliates ("SWE&C"),

debtors and debtors in possession in the above-captioned cases  (collectively, the

"Debtors"),[1] filed the Third Amended Joint Plan of Reorganization Proposed by the

---

[1]    All capitalized terms not defined herein shall have the meanings ascribed to them in the Third Joint Plan.

Debtors in Possession, the Official Committee of Unsecured Creditors, Federal

Insurance Company, Maine Yankee Atomic Power Company, and the Official

Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and

Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and

Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Third Joint

Plan"), together with a related disclosure statement (the "Disclosure Statement"); and

WHEREAS, on September 4, 2003, the Court entered an order which,

among other things, (i) approved solicitation, voting and tabulation procedures,

notice of the hearing on confirmation of the Third Joint Plan (the "Confirmation

Hearing Notice"), and certain deadlines (the "Solicitation Procedures Order"); and

(ii) approved the adequacy of the Disclosure Statement in accordance with Bank-

ruptcy Code section 1125 (the "Disclosure Statement Order"); and

WHEREAS, the Confirmation Hearing Notice, the Disclosure

Statement, the Third Joint Plan, certain notices of non-voting status (the "Non-

Voting Notices"), and/or the appropriate Ballots (collectively, the "Solicitation

Package") were transmitted to all holders of Claims and Interests and other parties in

interest in accordance with Bankruptcy Rule 3017(d) and the Solicitation Procedures

Order, as set forth in the Affidavit of David Hartie of Innisfree M&A, Incorporated,

the equity voting agent, dated September 23, 2003 and filed on October 7, 2003

(Docket No. 4578) and the Affidavit of Service of Jon Thomas of St Ives Burrups,

2

dated September 17, 2003 and filed on September 23, 2003 (Docket No. 4541) (the "Solicitation Declarations"); and

WHEREAS, the Confirmation Hearing Notice was published on September 15, 2003 in the national edition of the <u>Wall Street Journal</u>, the <u>Boston Globe</u>, and the <u>Boston Herald</u>, as set forth in the Affidavit of The Trumbull Group LLC f/k/a/ Trumbull Associates LLC regarding Newspaper Publishing of Notice of Confirmation Hearing and Objection Deadline filed on September 28, 2003 (Docket No. 4550) (the "Publication Affidavit"); and

WHEREAS, on October 20, 2003, the Plan Proponents filed the Plan Supplement to Third Amended Joint Plan Of Reorganization Proposed by the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Plan Supplement") (Docket No. 4625); and

WHEREAS, on October 29, 2003, the Plan Proponents filed the Certification of Innisfree M&A Incorporated with Respect to Tabulation of Votes on the Debtors' Third Amended Joint Plan fo Reorganization (Docket No. 4652) (the

"Innisfree Voting Tabulation"), certifying the results of the ballot tabulation for Class

9A: SWINC Equity Interests voting to accept or reject the Third Joint Plan; and

WHEREAS, on October 29, 2003, the Plan Proponents filed the

Declaration of William R. Gruber, Jr. Certifying Vote on Tabulation of Ballots

Accepting and Rejecting the Third Amended Joint Plan Of Reorganization Proposed

by the Debtors in Possession, the Official Committee of Unsecured Creditors,

Federal Insurance Company, Maine Yankee Atomic Power Company, and the

Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated

and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and

Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (Docket No. 4656)

(the "Trumbull Voting Tabulation"), attesting and certifying the results of the ballot

tabulation for the classes of Claims voting to accept or reject the Third Joint Plan;

and

WHEREAS on December 9, 2003, the Plan Proponents filed the

Amended Declaration of William R. Gruber, Jr. Certifying Vote on Tabulation of

Ballots Accepting and Rejecting the Third Amended Joint Plan Of Reorganization

Proposed by the Debtors in Possession, the Official Committee of Unsecured

Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and

the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorpo-

rated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engi-

4

neers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (Docket
No. 4768) (the "Amended Trumbull Voting Tabulation"), which amended the
Trumbull Voting Tabulation to include the voting results for Class 4B as an accept-
ing Class under the Third Joint Plan; and

WHEREAS, nine (9) objections or purported objections to confirma-
tion of the Third Joint Plan were filed (the "Objections"); and

WHEREAS, on October 30, 2003, the Debtors filed a memorandum
of law in support of confirmation of the Third Joint Plan ("Docket No. 4661) (the
"Confirmation Memorandum"); and

WHEREAS, pursuant to Bankruptcy Code section 1128(a), the Court
held a hearing commencing on October 31, 2003, at 10:00 a.m. (the "Confirmation
Hearing"), which hearing was continued to November 18, 2003, at 9:30 a.m. and
further continued to December 18, 2003, at 9:30 a.m., and January 13, 2004, at 10:00
a.m., to consider confirmation of the Third Joint Plan and the Objections.

NOW THEREFORE, based upon the Court's review and consider-
ation of (i) the declarations and submissions previously filed with the Court, includ-
ing the Solicitation Declarations, the Innisfree Voting Tabulation, the Trumbull
Voting Tabulation, the Amended Trumbull Voting Tabulation, and the Publication
Declaration; (ii) the record of the Confirmation Hearing (including all of the evi-
dence proffered or adduced at the hearing, the pleadings, briefs, memoranda and

5

other submissions filed in connection therewith, and the arguments of counsel made

at the hearing); (iii) the Objections; and (iv) the entire record of these Chapter 11

Cases; and after due deliberation thereon, and good cause appearing therefor:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THE COURT FINDS AND CONCLUDES THAT:[2]

1. <u>Exclusive Jurisdiction; Venue; Core Proceeding – 28 U.S. C. §§
157(b)(2) and 1334(a)</u>.  This Court has jurisdiction over the Chapter 11 Cases

pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408

and 1409.  Confirmation of the Third Joint Plan is a core proceeding under 28 U.S.C.

§ 157(b)(2), and this Court has exclusive jurisdiction to determine whether the Third

Joint Plan complies with the applicable provisions of the Bankruptcy Code and

should be confirmed.

2. <u>Judicial Notice</u>.  Judicial notice is hereby taken of the docket of the

Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed

agent, including, without limitation, all pleadings and other documents filed, all

orders entered, and transcripts of, and all evidence and arguments made, proffered, or

adduced at, the hearings held before the Court during the pendency of the Chapter 11

Cases.

---

[2]     Findings of fact shall be construed as conclusions of law and conclusions of
law shall be construed as findings of fact when appropriate.  <u>See</u> Fed. R.
Bankr. P. 7052.

6

3.  Burden of Proof. The Plan Proponents have the burden of proving the elements of Bankruptcy Code sections 1129(a) and (b) by a preponderance of the evidence.

4.  Transmittal and Mailing of Materials; Notice. Due, adequate, and sufficient notice of the Disclosure Statement, the Third Joint Plan, and the Confirmation Hearing, along with all deadlines for voting on or filing objections to the Third Joint Plan, has been given to all known holders of Claims and/or Interests in accordance with the Bankruptcy Rules and the procedures set forth in the Solicitation Procedures Order and further orders of the Court.

5.  Solicitation. Votes for acceptance or rejection of the Third Joint Plan were solicited in good faith and in compliance with Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, all other applicable provisions of the Bankruptcy Code, and all other rules, laws and regulations.

6.  Distribution. All procedures used to distribute the Solicitation Packages to the applicable holders of Claims and to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and any other applicable rules, laws, and regulations.

7

7. Impaired Classes That Have Voted to Accept the Third Joint Plan. As evidenced by the Tabulation Declarations, which certified the results of the voting on the Third Joint Plan, Classes 5A, 9A, 3B, 4B and 5B have voted to accept or are deemed to have accepted the plan in accordance with the Solicitation Procedures Order and the requirements of sections 1124 and 1126 of the Bankruptcy code. Thus, at least one impaired class of Claims has voted to accept the Third Joint Plan, determined without including any acceptance of the Third Joint Plan by an insider.

8. Classes Deemed to Have Accepted the Third Joint Plan. Classes 1A, 2A, 1B and 2B are not impaired and are deemed to have accepted the Third Joint Plan under Bankruptcy Code section 1126(f).

9. Classes Deemed to Have Rejected the Third Joint Plan. Classes 6A, 10A, 6B, 7B, 8B, 9B and 10B will receive no distribution under the Third Joint Plan and are deemed to have rejected the Third Joint Plan under Bankruptcy Code section 1126(g). No votes were received in Classes 3A or 7A, and the votes cast in Class 8A were solely by insiders of the Debtors, thus Classes 3A, 7A, and 8A have been deemed to neither accept nor reject the Third Joint Plan.

10. Modifications to the Third Joint Plan. The modifications to the Third Joint Plan set forth on the record of the Confirmation Hearing and made by this Confirmation Order do not materially and adversely affect or change the treatment of any creditor who has not accepted such modifications. Accordingly, under Fed. R.

8

Bankr. P. 3019, these modifications neither require additional disclosure under

Bankruptcy Code section 1125 nor re-solicitation of acceptances or rejections under

Bankruptcy Code section 1126, nor do they require that holders of Claims be

afforded an opportunity to change previously cast acceptances or rejections of the

Third Joint Plan. Disclosure of the modifications on the record of the Confirmation

Hearing constitutes due and sufficient notice thereof under the circumstances of the

Chapter 11 Cases. Accordingly, pursuant to Bankruptcy Code section 1127 and

Bankruptcy Rule 3019, all holders of Claims that have accepted or are conclusively

deemed to have accepted the Third Joint Plan are deemed to have accepted such

modifications to the Third Joint Plan.

  11. <u>Plan Compliance with Bankruptcy Code – 11 U.S.C. §</u>

<u>1129(a)(1)</u>. The Third Joint Plan complies with the applicable provisions of the

Bankruptcy Code and the Bankruptcy Rules, thereby satisfying 11 U.S.C. §

1129(a)(1).

   a. <u>Proper Classification 11 U.S.C. §§ 1122, 1123(a)(1)</u>. In
addition to Administrative Claims and Priority Tax Claims, which
need not be classified, the Third Joint Plan designates ten Classes of
Claims and Interests at each of the Consolidated SWINC Estate and
the Consolidated SWE&C Estate. The Claims and Interests placed in
each Class are substantially similar to other Claims or Interests, as the
case may be, in each such Class, and such classification is therefore
consistent with Bankruptcy Code section 1122. Valid business,
factual and legal reasons exist for separately classifying the various
Classes of Claims and Interests created under the Third Joint Plan,
and such Classes and the Third Joint Plan's treatment thereof do not
unfairly discriminate between holders of Claims or Interests. The

9

Third Joint Plan satisfies Bankruptcy Code sections 1122 and 1123(a)(1).

b. Specified Treatment of Unimpaired Classes 11 U.S.C. § 1123(a)(2). Article II.D. of the Third Joint Plan specifies that Classes 1A, 1B, 2A, and 2B are not impaired under the Third Joint Plan, thereby satisfying Bankruptcy Code section 1123(a)(2).

c. Specified Treatment of Impaired Classes – 11 U.S.C. §1123(a)(3). Article II.E. of the Third Joint Plan specifies the treatment of the impaired Classes of Claims (Classes 3A through 8A and Classes 3B through 8B) and Interests (Classes 9A, 10A, 9B and 10B), thereby satisfying Bankruptcy Code section 1123(a)(3).

d. No Discrimination – 11 U.S.C. § 1123(a)(4). The Third Joint Plan provides the same treatment for each Claim or Interest within each respective Class unless the holder of a particular Claim or Interest has agreed to other treatment of such Claim or Interest, thereby satisfying Bankruptcy Code section 1123(a)(4).

e. Implementation of the Third Joint Plan – 11 U.S.C. § 1123(a)(5). Article VII of the Third Joint Plan provides adequate and proper means for implementing of the Third Joint Plan, thereby satisfying Bankruptcy Code section 1123(a)(5). Among other things, Article VII provides for (i) the substantive consolidation of the Debtors' Estates into the Consolidated SWINC Estate and the Consolidated SWE&C Estate; (ii) the cancellation of all Old Common Stock issued and outstanding or held in treasury; (iii) the amendment of the Debtors' organizational documents; and (iv) the issuance of new securities. Other articles of the Third Joint Plan provide means for implementation of the Third Joint Plan as well. For example, Article VIII describes the securities to be issued in connection with the Third Joint Plan; Article IX includes provisions regarding distributions under the Third Joint Plan; Article X provides for the treatment of executory contracts and unexpired leases; Article XI establishes procedures for resolving disputed, contingent, and unliquidated Claims; Article XII identifies conditions precedent to confirmation and consummation of the Third Joint Plan; and Article XIV provides for the continuing jurisdiction over matters arising out of or related to these Chapter 11 Cases and the Third Joint Plan.

f. Prohibition Against Issuance of NonVoting Equity Securities – 11 U.S.C. § 1123(a)(6). Article VII.E provides that the bylaws and certificate of incorporation of Reorganized SWINC shall, among other things, provide for the inclusion of provisions prohibiting the issuance of non-voting equity securities. Thus, the requirements of Bankruptcy Code section 1123(a)(6) are satisfied.

g. Selection of Officers and Directors – 11 U.S.C. § 1123(a)(7). The Plan Proponents properly and adequately disclosed the officers and directors of Reorganized SWINC, the members of the Consolidated SWINC Governing Board, and the members of the SWE&C Liquidating Trust Advisory Board or the manner of selection of such officers and directors, consistent with the interests of holders of Claims and Interests and with public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).

h. Additional Plan Provisions – 11 U.S.C. § 1123(b). The Third Joint Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

12. Identification of Plan Proponents – Fed. R. Bankr. P. 3016(a).

The Third Joint Plan satisfies Bankruptcy Rule 3016(a) by identifying the date of the Third Joint Plan and the proponents of the Third Joint Plan.

13. Notice of the Confirmation Hearing – Fed. R. Bankr. P. 3017.

The Debtors have given notice of the Confirmation Hearing as required by Fed. R. Bankr. P. 3017(d) and the Solicitation Procedures Order. The Solicitation Packages prescribed by the Solicitation Procedures Order were transmitted to the creditors and interest holders entitled to vote on the Third Joint Plan in accordance with Fed. R. Bankr. P. 3017(d) and, with respect to beneficial holders in Class 9A, pursuant to Fed. R. Bankr. P. 3017(e).

11

14. Solicitation of Votes – Fed. R. Bankr. P. 3018. The solicitation of votes to accept or reject the Third Joint Plan satisfies Fed. R. Bankr. P. 3018. The Third Joint Plan was transmitted to all creditors and interest holders entitled to vote on the Third Joint Plan, sufficient time was prescribed for such creditors and interest holders to accept or reject the Third Joint Plan, and the solicitation materials used and solicitation procedures followed comply with Bankruptcy Code section 1126, thereby satisfying the requirements of Fed. R. Bankr. P. 3018.

15. The Debtors' Compliance with the Bankruptcy Code – 11 U.S.C. § 1129(a)(2). The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2). Specifically:

    a. The Debtors are proper debtors under Bankruptcy Code section 109.

    b. The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

    c. The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Procedures Order in transmitting the Third Joint Plan, the Disclosure Statement, the Ballots and related documents and notices and in soliciting and tabulating votes on the Third Joint Plan.

16. Plan Proposed in Good Faith – 11 U.S.C. § 1129(a)(3). The Plan Proponents have proposed the Third Joint Plan in good faith and not by any means

12

forbidden by law, thereby satisfying Bankruptcy Code section 1129(a)(3).  This
Court has examined the totality of the circumstances surrounding the formulation of
the Third Joint Plan.  Based upon the evidence presented at the Confirmation
Hearing, the Court finds and concludes that the Third Joint Plan has been proposed
with the legitimate and honest purpose of restructuring the Debtors' debts and
making distributions pursuant to the Third Joint Plan and in accordance with the
priorities set forth in the Bankruptcy Code.  The Third Joint Plan is the product of
extensive arms'-length negotiations among the Debtors, the Creditors' Committee,
Federal, Maine Yankee, and the Equity Committee, which itself provides independent evidence of the good faith of the Debtors in proposing the Third Joint Plan.

17.  <u>Payment for Services or Costs and Expenses – 11 U.S.C. §
1129(a)(4)</u>.  Any payments made or to be made by the Debtors or Reorganized
SWINC for services or for costs and expenses accruing before confirmation or in
connection with the Chapter 11 Cases, or in connection with the Third Joint Plan and
incident to the Chapter 11 Cases, have been approved by, or are subject to the
approval of, the Court as reasonable, thereby satisfying Bankruptcy Code section
1129(a)(4).  Specifically, all fees and expenses incurred by Professionals will be
subject to the Court's final approval following the filing of final fee applications
under Bankruptcy Code section 330.

18.  Identification of Directors, Officers, and Insiders – 11 U.S.C. §
1129(a)(5).  The Debtors have complied with Bankruptcy Code section 1129(a)(5) by
disclosing at or before the Confirmation Hearing as required by the Third Joint Plan
(i) the identity and affiliations of any individual proposed to serve, after confirmation
of the Third Joint Plan, as a member of the initial board of directors of Reorganized
SWINC, (ii) the identity and affiliations of any individual proposed to serve, after
confirmation of the Third Joint Plan, as the SWINC Plan Administrator and as
members of the Consolidated SWINC Estate Governing Board, (iii) the identity and
affiliation of the individual proposed to serve, after confirmation of the Third Joint
Plan, as the Asbestos Trustee, and (iv) the identity and affiliations of any individual
proposed to serve, after confirmation of the Third Joint Plan, as the SWE&C
Liquidating Trustee and as members of the SWE&C Liquidating Trust Advisory
Board.  The appointment to such position of such individual(s) is consistent with the
interests of the creditors and Interest holders and with public policy.

19.  No Rate Changes – 11 U.S.C. § 1129(a)(6).  No governmental
regulatory commission has jurisdiction over rates of the Debtors after confirmation
of the Third Joint Plan.  Thus, Bankruptcy Code section 1129(a)(6) is not applicable
in these Chapter 11 Cases.

20.  Best Interests of Creditors Test – 11 U.S.C. § 1129(a)(7).  The
Third Joint Plan satisfies Bankruptcy Code section 1129(a)(7).  Specifically:

14

      a.     The Liquidation Analysis contained in the Disclosure Statement and other evidence regarding the subject thereof that has been proffered or adduced at or before the Confirmation Hearing have not been controverted by other evidence. The methodology used and assumptions made in connection with the Liquidation Analysis, as supplemented by other evidence at the Confirmation Hearing, are reasonable.

      b.     Each holder of a Claim or Interest in each Impaired Class either has accepted the Third Joint Plan or will receive or retain on account of such Claim or Interest property of a value, as of the Effective Date of the Third Joint Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

     21. <u>Acceptance by Certain Classes – 11 U.S.C. § 1129(a)(8)</u>. Except for the Classes deemed to reject the Third Joint Plan, each Class of Claims or Interests has accepted the Third Joint Plan or is not impaired under the Third Joint Plan and therefore is conclusively presumed to have accepted the Third Joint Plan without the need for solicitation of acceptances or rejections with respect to such Class, with the exception of Classes 3A, 7A, and 8A, which are deemed to have neither accepted nor rejected the Third Joint Plan. Because not all Impaired Classes of Claims and Interests have accepted the Third Joint Plan or are deemed to have accepted the Third Joint Plan, the requirements of Bankruptcy Code section 1129(a)(8) have not been met, thus requiring application fo Bankruptcy Code section 1129(b).

22.  Treatment of Administrative, Other Priority Claims and Priority Tax Claims – 11 U.S.C. § 1129(a)(9).  The treatment of Administrative Claims under Articles III and IV of the Third Joint Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9)(A); the treatment of Other Priority Claims under Article IV of the Third Joint Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9)(B); and the treatment of Priority Tax Claims under Article IV of the Third Joint Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9)(C).

23.  Acceptance by Impaired Classes – 11 U.S.C. § 1129(a)(10).  At least one Class of Claims that is impaired under the Third Joint Plan has accepted the Third Joint Plan, determined without including any acceptance of the Third Joint Plan by an insider of the Debtors holding a Claim in such Class, thereby satisfying Bankruptcy Code section 1129(a)(10).

24.  Feasibility – 11 U.S.C. § 1129(a)(11).  The projections set forth in Liquidation Analysis and other evidence proffered or adduced by the Debtors at the Confirmation hearing with respect to feasibility (i) are persuasive and credible, (ii) have not been controverted by other evidence or challenged in any objection, (iii) are based upon reasonable and sound assumptions, and (iv) establish that the Third Joint Plan is feasible, thus, satisfying the requirements of Bankruptcy Code section 1129(a)(11).

16

25. <u>Payment of Fees – 11 U.S.C. § 1129(a)(12)</u>. All fees payable under 28 U.S.C. § 1930 on or before the Effective Date, as determined by the Court, have been paid or will be paid on the Effective Date pursuant to Article XV.B of the Third Joint Plan, thus satisfying the requirements of Bankruptcy Code section 1129(a)(12).

26. <u>Continuation of Retiree Benefits – 11 U.S.C. § 1129(a)(13)</u>. The Debtors do not have any retiree benefits to be continued under the Third Joint Plan, although they are assuming the Pension Plan. The Pension Plan is part of the Debtors' defined benefits plan, and is not a retiree benefit plan, thus Bankruptcy Code section 1129(a)(13) is not applicable to the Debtors.

27. <u>Fair and Equitable: No Unfair Discrimination – 11 U.S.C. § 1129(b)</u>. Classes 10A, 6B, 7B, 8B, 9B, and 10B will not receive or retain any property under the Third Joint Plan, and, therefore, are deemed to have rejected the Third Joint Plan under Bankruptcy Code section 1126(g). The Debtors presented uncontroverted evidence at the Confirmation Hearing that the Third Joint Plan does not discriminate unfairly and is fair and equitable with respect to Classes 10A, 6B, 7B, 8B, 9B, and 10B, as required by Bankruptcy Code section 1129(b)(1). Thus, the Third Joint Plan may be confirmed notwithstanding the Debtors' failure to satisfy Bankruptcy Code section 1129(a)(8). Upon confirmation and the occurrence of the

17

Effective Date, the Third Joint Plan shall be binding upon the members of Classes 10A, 6B, 7B, 8B, 9B, and 10B.

28.  Principal Purpose of the Third Joint Plan – 11 U.S.C. § 1129(d). The principal purpose of the Third Joint Plan is neither the avoidance of taxes nor the avoidance of Section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Third Joint Plan on any such grounds.  The Third Joint Plan therefore satisfies the requirements of Bankruptcy Code section 1129(d).

29.  Good Faith Solicitation – 11 U.S.C. § 1125(e).  Based on the record before the Court in these Chapter 11 Cases, the Debtors, the Creditors' Committee, the Equity Committee, Federal, and Maine Yankee and their respective directors, officers, employees, partners, shareholders, members, agents, advisors, accountants, investment bankers, consultants, attorneys, and other representatives have acted in good faith within the meaning of Bankruptcy Code section 1125(e) in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Third Joint Plan and their participation in the activities described in Bankruptcy Code section 1125, and are entitled to the protections afforded by Bankruptcy Code section 1125(e) and the exculpation and injunctive provisions set forth in Article XIII of the Third Joint Plan.

18

30. <u>Impairment of Classes – 11 U.S.C. § 1123(b)(1)</u>. In accordance with Bankruptcy Code section 1123(b)(1), Article II of the Third Joint Plan impairs or leaves unimpaired, as the case may be, each class of Claims and Interests under the Third Joint Plan.

31. <u>Treatment of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2)</u>. The Third Joint Plan constitutes a motion by the Debtors to reject all executory contracts and unexpired leases in effect on the Confirmation Date, subject to the occurrence of the Effective Date, except those contracts and leases (i) that have previously (a) assumed or rejected by the Debtors (including, but not limited to, those executory contracts and unexpired leases assumed and assigned to Shaw) or (b) expired to terminated by their own terms, or (ii) identified on the list of assumed contracts and leases attached as Exhibit H to the Third Joint Plan. The Debtors' decision regarding the assumption or rejection of the executory contracts is based on and is within the sound business judgment of the Debtors, and is in the best interests of the Debtors, their Estates, and their creditors and interest holders. In accordance with the Third Joint Plan, any Claim resulting from the rejection of an executory contract or unexpired lease, which is not already the subject of a timely filed proof of claim, must be filed with the Bankruptcy Court and served upon counsel for the Plan Proponents within 30 days after service of notice of entry of the Confirmation Order, or such other date as prescribed by the Court. Any Claim not

19

filed by the deadline will be unenforceable and forever barred. Accordingly, the Third Joint Plan complies with Bankruptcy Code section 1123(b)(2).

32. <u>Releases and Discharges</u>. The releases and discharges of claims and causes of action described in Article XIII of the Third Joint Plan constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interests of holders of Claims or Interests, are fair, equitable, and reasonable and are integral elements of the restructuring and resolution of the Chapter 11 Cases in accordance with the Third Joint Plan. Each of the discharge, release, injunction, indemnification and exculpation provisions set forth in the Third Joint Plan: (1) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d); (2) is an essential means of implementing the Third Joint Plan pursuant to Bankruptcy Code section 1123(a)(5); (3) is an integral element of the transactions incorporated into the Third Joint Plan; (4) confers material benefit on, and is in the best interest of, the Debtors, their estates and their creditors; (5) is important to the overall objectives of the Third Joint Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization; and (6) is consistent with Bankruptcy Code sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

20

33. <u>Retention, Enforcement, and Settlement of Claims Held by the Debtors – 11 U.S.C. § 1123(b)(3)</u>. Article VII.R provides for the Debtors' preservation of certain rights of action. Accordingly, the Third Joint Plan complies with Bankruptcy Code section 1123(b)(3).

34. <u>Rights of Holders of Claims – 11 U.S.C. § 1123(b)(5)</u>. The Third Joint Plan does not propose to modify the rights of holders of Claims. Accordingly, Bankruptcy Code section 1123(b)(5) is inapplicable.

35. <u>Other Provisions Not Inconsistent with Title 11 – U.S.C. § 1123(b)(6)</u>. In accordance with Bankruptcy Code section 1123(b)(6), the Third Joint Plan includes appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code.

36. <u>Satisfaction of Confirmation Requirements</u>. The Third Joint Plan satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129. The Plan Proponents have represented to the court that the conditions precedent to confirmation set forth in Article XII.A of the Third Joint Plan have either been satisfied or waived.

37. <u>Objections</u>. All Objections to Confirmation of the Third Joint Plan have been withdrawn, settled, or overruled.

38. <u>Plan Settlements</u>. In accordance with Fed. R. Bankr. P. 9019, the Third Joint Plan is dependent upon and incorporates the terms of numerous compro-

mises and settlements among the Debtors, the Creditors' Committee, the Equity

Committee, Federal, and Maine Yankee, as to a myriad of significant and complex

issues in dispute in the Chapter 11 Cases, including the issues detailed in Article

XIII.G of the Third Joint Plan, including, but not limited to, (i) the Substantive

Consolidation Settlement, (ii) the Pension Plan Reversion Settlement, (iii) the

Federal Settlement, (iv) the Maine Yankee Settlement, and (v) the Isobord Settle-

ment. These compromises and settlements constitute good faith compromises and

settlements of the matters covered thereby. Such compromises and settlements are

made in exchange for consideration and are in the best interests of the Debtors, the

Estates and holders of Claims and Interests, are within the reasonable range of

possible litigation outcomes, are fair, equitable and reasonable and are essential

elements of the resolution of the Chapter 11 Cases in accordance with the Third Joint

Plan. Each of the compromises and settlements set forth in the Third Joint Plan:

> a. falls within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), (b) and (d);

> b. is an essential means of implementing the Third Joint Plan pursuant to Bankruptcy Code section 1123(a)(5);

> c. is an integral element of the transactions incorporated into the Third Joint Plan;

> d. confers material benefit on, and is in the best interest of the Debtors, their estates and their creditors;

22

e. is important to the overall objectives of the Third Joint Plan to finally resolve all claims among or against the parties in interest in the Chapter 11 Cases; and

f. is consistent with Bankruptcy Code sections 105, 510(a), 1123, 1129 and other applicable provisions of the Bankruptcy Code.

Each settlement and compromise has been negotiated at arms' length and has been entered into in good faith. The settlements and compromises avoid costly and time consuming litigation and pave the way toward achieving a successful reorganization.

39. Plan Modifications. The modifications to the Third Joint Plan set forth in the Modified Third Amended Joint Plan of Reorganization Proposed by the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates Joint Plan (the "Modified Third Joint Plan"), as shown on Exhibit A hereto, do not materially or adversely affect or change the treatment of any holder of a Claim or Interest who has not accepted in writing the modifications. Accordingly, pursuant to Fed. R. Bankr. P. 3019, such modifications do not require additional disclosure under Bankruptcy Code section 1125 or resolicitation of acceptances or rejections under Bankruptcy

23

Code section 1126, nor do they require that holders of claims be afforded an opportunity to change previously cast acceptances or rejections of the Third Joint Plan. Disclosure of the modifications on the record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of these Chapter 11 Cases.

## DECREES

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

1. <u>Confirmation of the Third Joint Plan</u>. The Third Joint Plan, which consists of the Third Joint Plan, the Modified Third Joint Plan, and modifications set forth in this Confirmation Order or on the record at the Confirmation Hearing, is approved and confirmed under Bankruptcy Code section 1129 in its entirety. The terms of the Third Joint Plan are incorporated by reference into and are an integral part of this Confirmation Order.

2. <u>Objections</u>. All objections that have not been withdrawn, waived or settled, and all reservations of rights pertaining to confirmation of the Third Joint Plan included therein, are overruled on the merits.

3. <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>. The provisions of the Third Joint Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

24

4. Plan Classification Controlling. The classification of Claims and Interests for purposes of the distributions to be made under the Third Joint Plan shall be governed solely by the terms of the Third Joint Plan. The classifications set forth on any ballots tendered to or returned by the Claim or Interest holders in connection with voting on the Third Joint Plan (a) were set forth on such ballots solely for purposes of voting to accept or reject the Third Joint Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Third Joint Plan for distribution purposes, (c) may not be relied upon by any Claim or Interest holder as representing the actual classification of such Claims or Interest under the Third Joint Plan for distribution purposes, and (d) shall not be binding on Reorganized SWINC, the Estates, or the Debtors.

5. Approval of Plan Modifications. The modifications set forth in the Modified Third Joint Plan are approved. The Modified Third Joint Plan shall constitute the Third Joint Plan and all references herein to the Third Joint Plan shall mean the Third Joint Plan as so modified.

6. Effects of Confirmation: Immediate Effectiveness: Successors and Assigns. The Court directs that Fed. R. Civ. P. 62(a) and the stay provided by Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order, and the Court authorizes the Debtors to consummate the Third Joint Plan after entry of this

Confirmation Order. Subject to the occurrence of the Effective Date as provided in

Article XII of the Third Joint Plan, and notwithstanding any otherwise applicable

law, immediately upon the entry of this Confirmation Order, the terms of the Third

Joint Plan (including the Plan Exhibits and all documents and agreements executed

pursuant to the Third Joint Plan) and this Confirmation Order shall be binding on (a)

the Debtors, (b) Reorganized SWINC, (c) all holders of Claims against and Interests

in the Debtors, whether or not impaired under the Third Joint Plan and whether or

not, if impaired, such holders accepted the Third Joint Plan, (d) each Person acquir-

ing property under the Third Joint Plan, (e) any other party in interest, (f) any Person

making an appearance in these Chapter 11 Cases, and (g) each of the foregoing's

respective heirs, successors, assigns, trustees, executors, administrators, affiliates,

officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

Upon the occurrence of the Effective Date with respect to each Debtor, the Third

Joint Plan shall be deemed substantially consummated as to each such Debtor.

    7. Continued Corporate Existence of Reorganized SWINC; Dissolu-

tion of SWE&C and the SWE&C Subsidiaries. On the Effective Date, Reorganized

SWINC shall emerge from the Consolidated SWINC Estate, in accordance with the

laws of the State of Delaware and pursuant to the certificate of incorporation and by-

laws of SWINC in effect before the Effective Date, as amended under the Third Joint

Plan. Reorganized SWINC may engage in any lawful activity for which corporations may be organized under the Delaware General Corporation Law.

8. On the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved.

9. No Revesting of Assets. On or following the Effective Date, the property of the Estates of SWINC and the SWINC Subsidiaries (except for any obligations and/or reversionary interest in the Pension Plan and the rights to Cash contributed to the Reorganized SWINC Operating Reserve in accordance with the Third Joint Plan) shall remain or become property of the Consolidated SWINC Estate and shall continue to be subject to the jurisdiction of the Court following confirmation of the Third Joint Plan until distributed to holders of Allowed Claims and Allowed Interests in accordance with the provisions of the Third Joint Plan, the SWINC Plan Administrator Agreement, and this Confirmation Order.

10. On or following the Effective Date, the property of the Estates of SWE&C and the SWE&C Subsidiaries (except for the right to Cash contributed to the Reorganized SWINC Operating Reserve in accordance with the Third Joint Plan) shall remain or become property of the SWE&C Liquidating Trust and shall continue to be subject to the jurisdiction of the Court following confirmation of the Third Joint Plan until distributed to holders of Allowed Claims and Allowed Interests in

27

accordance with the provisions of the Third Joint Plan, the SWE&C Liquidating Trust Agreement, and this Confirmation Order.

11. Release of Liens. Except as otherwise provided in the Third Joint Plan or this Confirmation Order, or in any contract, instrument, release or other agreement or document created in connection with the Third Joint Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Debtors' Estates are fully released and discharged.

12. Transfers of Property. To the extent the transfer of assets of the Debtors to Reorganized SWINC pursuant to Article VII.Q of the Third Joint Plan or the succession to assets of the Debtors by the Consolidated SWINC Estate or the SWE&C Liquidating Trust, as the case may be, are deemed to constitute a "transfer" of property, such transfers of property (a) are or shall be legal, valid, and effective transfers of property, (b) vest or shall vest with good title to such property, free and clear of all liens, charges, Claims, encumbrances, or interests, except as expressly provided in the Third Joint Plan or this Confirmation Order, (c) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable nonbankruptcy law, and (d) do not and shall not subject Reorganized SWINC, the Consolidated SWINC Estate, or the SWE&C Liquidating Trust to any liability by reason of such transfer under the Bankruptcy Code or under applicable

28

nonbankruptcy law, including, without limitation, any laws affecting successor transferee liability.

13. Discharge of Reorganized SWINC.   Except as expressly provided in the Third Joint Plan or this Confirmation Order, Reorganized SWINC is discharged effective upon the Effective Date from any claim or cause of action, and Reorganized SWINC's liability in respect thereof is extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, manifested or not, contingent or noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, or that arose from any agreement of any Debtor entered into or obligation of any Debtor incurred before the Effective Date, or from any conduct of any Debtor that occurred prior to the Effective Date, or that otherwise arose before the Effective Date, including, without limitation, successor liability for any conduct of any of the prepetition entities and all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date, and any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Petition Date.

14. Pursuant to Article XIII.C of the Third Joint Plan and 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Third Joint Plan or in this Confirmation Order, the distributions and rights that are provided for in the Third Joint Plan shall be in exchange for and in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims and causes of action (whether known or unknown) against, liabilities of, liens on, obligations of and Interests in Reorganized SWINC or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Third Joint Plan on account of such Claims, including, but not limited to, demands and liabilities that arose on or before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Petition Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code or (c) the Claimholder of such a Claim accepted the Third Joint Plan.

30

15. <u>Releases, Limitations of Liability, and Indemnification</u>. The releases set forth in Articles XIII.B, and the exculpation and limitation of liability provisions set forth in Article XIII.D are incorporated in this Confirmation Order as if set forth in full herein and are hereby approved in their entirety.

16. <u>Injunctions</u>. Except as otherwise specifically provided in the Third Joint Plan and except as may be necessary to enforce or remedy a breach of the Third Joint Plan, from and after the Confirmation Date, all entities that have held, hold or may hold a Claim or other debt or liability against or an Interest in any of the Debtors shall be precluded and permanently enjoined from: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Third Joint Plan; *provided, however,* that nothing contained in this Confirmation Order or the Third Joint Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Third Joint Plan, and *provided, further, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that

31

any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries; the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries solely in their capacity as fiduciaries or the Pension Plan or such other Plan. In addition, nothing in this provision will affect or impair the rights, if any, that a non-debtor entity has to take direct actions to recover under policies of insurance where such non-debtor entity is a "co-insured" or "additional insured" with a Debtor.

17. <u>Continuance of Injunctions and Automatic Stay</u>. Pursuant to Article XV.J of the Third Joint Plan, unless otherwise provided in the Third Joint Plan or this Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105, 362 or 524 or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all property of the Estate(s) of SWINC and the SWINC Subsidiaries and SWE&C and the SWE&C Subsidiaries has been distributed.

18. <u>Plan Implementation Authorization</u>. Pursuant to the Third Joint Plan, as to Reorganized SWINC, the chairman of the Reorganized SWINC Board, president, chief financial officer, or any other appropriate officer of Reorganized SWINC shall be authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may

32

be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Third Joint Plan. As to the Consolidated SWE&C Estate, the SWE&C Liquidating Trustee shall be authorized to execute, deliver, file or record such contracts, instruments, release, and any other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the Third Joint Plan. Any of all such documents shall be accepted by each of the respective state filing offices and recorded in accordance with applicable state law and shall become effective in accordance with their terms and the provisions of state law.

19. Binding Effect. On the Effective Date, except as expressly provided in this Confirmation Order, the Third Joint Plan and its provisions shall be binding upon (a) the Debtors, (b) Reorganized SWINC, (c) the SWINC Plan Administrator and the Consolidated SWINC Estate Governing Board, (d) the SWE&C Liquidating Trustee and the SWE&C Liquidating Trust Advisory Board, (e) the Asbestos Trustee, (f) any entity acquiring or receiving property or a distribution under the Third Joint Plan, (g) any present or future holder of a Claim against or Interest in the Debtors, including all governmental entities, whether or not the Claim or Interest of such holder is impaired under the Third Joint Plan and whether or not such holder or entity has accepted the Third Joint Plan, (h) any other party in interest, (i) any person making an appearance in the Chapter 11 Cases, and (j) any of the

33

foregoing's heirs, successors, assigns, trustees, executors, administrators, affiliates, directors, agents, representatives, attorneys, beneficiaries, or guardians.

20. Approval of Substantive Consolidation. The substantive consolidation of the Debtors' estates for the purposes and with the effects described in Article XIII.G.2 of the Third Joint Plan is approved.

21. Approval of Compromises and Settlements Embodied in the Third Joint Plan. The compromises and settlements of the issues described in Article XII.G of the Third Joint Plan, and the terms and provisions of the Third Joint Plan reflecting such compromises and settlements, including without limitation Article XIII.G of the Third Joint Plan are approved, including the Substantive Consolidation Settlement, the Pension Plan Reversion Settlement, the Federal Settlement, the Maine Yankee Settlement, and the Isobord Settlement.

22. Rejection of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2). Pursuant to Article X of the Third Joint Plan, all executory contracts and unexpired leases to which any of the Debtors are a party shall be automatically rejected as of the Effective Date, unless such executory contract or unexpired lease (a) shall have been previously assumed by the Debtors, (b) is the subject of a motion to assume filed on or before the Confirmation Date, or (c) is listed on the schedule of assumed contracts and leases annexed as Exhibit H to the Third Joint Plan.

23. <u>Bar Date for Rejection Damage Claims</u>. Pursuant to Article X.B of the Third Joint Plan, if the rejection of an executory contract or unexpired lease pursuant to Article X.B of the Third Joint Plan or otherwise gives rise to a Claim, such Claim shall be forever barred and shall not be enforceable against the Debtors, the SWINC Plan Administrator, the SWE&C Liquidating Trustee, or their respective successors or properties, unless a proof of claim is filed and served no later than thirty (30) calendar days after the service of a notice of entry of the Confirmation Order. Article X.B shall not extend any prior deadline to file a proof of claim for damages arising from the rejection of an executory contract or unexpired lease.

24. <u>Governmental Approvals Not Required</u>. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any State or any other governmental authority with respect to implementation or consummation of the Third Joint Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Third Joint Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

25. <u>Exemption from Certain Taxes</u>. Pursuant to 11 U.S.C. § 1146(c), neither (a) the issuance, transfer or exchange of notes or equity securities under the Third Joint Plan, (b) the creation of any mortgage, deed of trust, lien, pledge or other

35

security interest, (c) the making or assignment of any contract, lease or sublease, nor
(d) the making or delivery of any deed or other instrument of transfer under, in
furtherance of, or in connection with, the Third Joint Plan, including, without
limitation, any merger agreements, any agreements of consolidation, restructuring,
disposition, liquidation, or dissolution, any deed, any bills of sale, or any transfers of
tangible or intangible property, shall be subject to any ~~document recording tax~~, stamp
tax, ~~conveyance fee, intangible~~ or similar tax, ~~mortgage tax, stamp act, real estate~~
~~transfer tax, sales or use tax, mortgage recording tax, or other similar tax or govern-~~
~~mental assessment~~. State and local governmental officials or agents are hereby
directed to forego the collection of any such tax or governmental assessment and to
accept for filing and recordation any of the foregoing instruments or other documents
without the payment of any such tax or governmental assessment.

     26.  Exemption from Securities Laws.  The exemption from the
requirements of Section 5 of the Securities Act of 1933, and any state or local law
requiring registration for the offer, sale, issuance, exchange or transfer of a security
provided for in the Third Joint Plan in exchange for Claims against or Interests in the
Debtors, or registration or licensing of an issuer of, underwriter of, or broker dealer
in, such security is authorized by 11 U.S.C. § 1145. The issuance of the Reorganized
SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock,

and Reorganized SWINC New Series B Preferred Stock is exempt from registration under 11 U.S.C. § 1145.

27. Plan Supplement. There being no objections to any of the documents contained in the Plan Supplement and any amendments, modifications and supplements thereto and all documents and agreements introduced therein (including all exhibits and attachments thereto and documents referred to therein), the execution, delivery and performance thereof is authorized and approved. Without need for further order or authorization of the Court, the Reorganized SWINC Board, the Consolidated SWINC Governing Board, the SWINC Plan Administrator, the SWE&C Liquidating Trust Advisory Board, SWE&C Liquidating Trustee, and the Asbestos Trustee, as appropriate, are authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement that may be agreed to by the parties thereto and are consistent with the Third Joint Plan.

28. Final Fee Applications. Pursuant to Article XV.A.2 of the Third Joint Plan (but subject to the provisos set forth therein), Professionals or other entities asserting Professional Fee Claims must file and serve on Reorganized SWINC, the SWINC Plan Administrator and the SWE&C Liquidating Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, an application for final allowance of such Profes-

37

sional Fee Claim no later than 90 days after the Confirmation Date (the "Professional

Fee Bar Date"); *provided, however,* that any Professional who may receive compen-

sation or reimbursement of expenses pursuant to the Ordinary Course Professionals

Order may continue to receive such compensation and reimbursement of expenses

for service rendered before the Confirmation Date, without further Court review or

approval. Holders of Professional Fee claims that are required to file and serve

applications for final allowance of their Professional Fee claims and that do not file

and serve such applications within the time period set forth herein shall be forever

barred from doing so. Objections to any Professional Fee Claim must be filed and

served on the SWINC Plan Administrator and the SWE&C Liquidating Trustee and

the requesting Professional or other entity no later than 60 days after the Professional

Fee Bar Date.

29. Resolution of Claims and Interests. Except as otherwise ordered

by the Court, any Claim that is not an Allowed Claim shall be determined, resolved,

or adjudicated in accordance with the terms of the Third Joint Plan. The SWINC

Plan Administrator, the SWE&C Liquidating Trustee, and/or the Interestate Over-

sight Board, as provided in the Third Joint Plan, may (a) until 240 days after the

Confirmation Date (unless extended by order of the Court) file objections in the

Court to the allowance of any Claim or Interest (whether or not a proof of Claim or

Interest has been filed) and (b) prosecute objections to Claims or Interests that have

been filed before the Confirmation Date but not finally resolved by the Court before the Confirmation Date.  Any request for an extension of the 240-day post-confirmation period to object to Claims or Interests shall be served upon all parties requesting notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

30.  Cancellation of Existing Securities.  All Old Securities are canceled and terminated upon the occurrence of the Effective Date as provided in Article VII.H of the Third Joint Plan.

31.  Reserves.  The following Reserves shall be established as provided in the Third Joint Plan:

(a)  General Administrative Claims Reserve in the amount of $13.9 million, to be used to pay Allowed General Administrative Claims, including General Professional Fee Claims;

(b)  SWINC Professional Fee Reserve in the amount of $2 million, to be used to pay Allowed Professional Fee Claims hereby (i) counsel and any advisers to the Equity Committee and (ii) any professionals working exclusively on behalf of SWINC or any SWINC Subsidiary;

(c)  SWINC Operating Reserve in the amount of $1.8 million, to be used to pay the administrative and other costs and expenses associated with the Consolidated SWINC Estate, including all fees and expenses of the SWINC Plan Administrator and its professionals;

(d)  SWINC Disputed Claims Reserve in the amount of $42.9 million, to be used to pay (i) the holders of Allowed Class 4A: SWINC Convenience Class Claims in full, (ii) the holders of Allowed Class 5A: SWINC General Unsecured Claims their Pro Rata share of the Disputed Claims Reserve until all such

39

Claims are paid in full, (iii) the holders of Allowed Class 7A: SWINC Subordinated Claims their Pro Rata share of the Disputed Claims Reserve remaining after Class 4A and Class 5A have been paid in full, and (iv) the holders of Allowed Class 8A: SWINC Securities Claims and Allowed Class 9A: SWINC Equity Interests their Pro Rata share of the Disputed Claims Reserve remaining after holders in Allowed Class 7A: SWINC Subordinated Claims have been paid in full;

(e) The SWE&C Professional Fee Reserve in the amount of $1.5 million, to be used to pay Allowed SWE&C Professional Fee Claims held by (i) counsel and any advisers to the Creditors' Committee and (ii) any professionals working exclusively on behalf of SWE&C or any SWE&C Subsidiary;

(f) The SWE&C Operating Reserve in the amount of $2.2 million, to be used to pay the administrative and other costs and expenses associated with the Consolidated SWE&C Estate, including all fees and expenses of the SWE&C Liquidating Trustee and its professionals;

(g) The SWE&C Disputed Claims Reserve in the amount of $2.9 million, to be used to pay (i) the holders of Allowed Class 4B: SWE&C Convenience Claims in full, (ii) holders of Allowed Class 5B: SWE&C General Unsecured Claims their Pro Rata share of the SWE&C Disputed Claims Reserve until all such Claims are paid in full; and

(h) The Reorganized SWINC Operating Reserve in the amount of $2.0 million, funded sixty percent (60%) by the Consolidated SWINC Estate and forty percent (40%) by the Consolidated SWE&C Estate, which amount shall be used to pay the administrative and other costs and expenses associated with Reorganized SWINC, including all fees and expenses of Reorganized SWINC and its processionals.

32. Payment of Fees. All fees payable by the Debtors under 28

U.S.C. § 1930 shall be paid on the Effective Date. On the Effective Date, each of the

SWINC Subsidiaries shall be deemed merged with and into SWINC and the Chapter 11 Cases of the SWINC Subsidiaries shall be closed. Further, on the Effective Date, each of the SWE&C Subsidiaries shall be deemed merged with and into SWE&C and the Chapter 11 Cases of the SWE&C Subsidiaries shall be closed. After the Effective Date, neither the Debtors, their Estates, the SWINC Plan Administrator nor the SWE&C Liquidating Trustee shall thereafter be liable for the payment of any additional fees, other than with respect to the Chapter 11 Cases of SWINC and SWE&C.

33. Non-Occurrence of the Effective Date. In the event that the Effective Date has not occurred as provided in Article XV.G of the Third Joint Plan, (a) this Confirmation Order shall be vacated; (b) the Third Joint Plan shall be null and void in all respects; (c) any settlement of Claims or Interests shall be null and void without further order of the Court; and (d) the time within which the Debtors may assume, assume and assign, or reject all executory contracts and unexpired leases shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated.

34. Reversal. If any or all of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the

41

Third Joint Plan prior to the Debtors' receipt of written notice of any such order. Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Third Joint Plan or any amendments or modifications thereto.

35. Retention of Jurisdiction. Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction as provided in the Third Joint Plan over all matters arising out of, and related to, the Chapter 11 Cases and the Third Joint Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XIV of the Third Joint Plan, as well as over the Agreement of Settlement, Release, and Sale by and between Stone & Webster and St. Paul Fire and Marine Insurance Company, St. Paul Surplus Lines Insurance Company and United States Fidelity and Guaranty Company (collectively, "St. Paul") and similar agreements with respect to the St. Paul policies and motions related thereto.

36. Plan Modifications.

a. Article I.1.13 of the Third Joint Plan is modified and approved as follows:

42

"Asbestos Insurance Carriers" means The Travelers Indemnity Company, Travelers Casualty and Surety Company (f/k/a/ The Aetna Casualty and Surety Company), Kemper National Insurance Company, Centennial Insurance Company, Argonaut Insurance Company, Royal Insurance Company and any other insurance companies that issued policies covering an Asbestos Claim.

      b. Article IX.I.2 of the Third Joint Plan is modified and approved as follows:

Unless otherwise authorized by a Final Order, any holder of a Claim must assert any setoff rights against a Claim by a Debtor against such entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor notwithstanding any statement to the contrary in a proof of claim or any other pleading or document filed with the Bankruptcy Court or delivered to the Debtors.

Notwithstanding anything in the Disclosure Statement or this Third Joint Plan to the contrary, all rights, claims and defenses, including but not limited to setoff and recoupment, arising pursuant to or in connection with the Asset Purchase Agreement between the Debtors and Shaw are hereby expressly preserved.

      c. Article VII.N of the Third Joint Plan is modified and approved as follows:

      3.    *Compensation of the Asbestos Trustee*

The Asbestos Trustee will be compensated at a rate of $325 per hour. Any professionals retained by the Asbestos Trust shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Asbestos Trust. The payment of the fees and expenses of the Asbestos Trustee and his retained professionals, if any, shall be made in the ordinary course of business and shall not be subject to the approval of the Court.

43

d.  Article VII.C of the Third Joint Plan is modified and approved as follows:

Reorganized SWINC shall emerge on the Effective Date out of the Consolidated SWINC Estate, in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws of SWINC in effect prior to the Effective Date, as amended under the Third Joint Plan.  Pursuant to the Amended Certificate of Incorporation and By-Laws of Reorganized SWINC, Reorganized SWINC will be authorized to engage in any lawful activity for which corporations may be organized under the Delaware General Corporation Law.  After emerging from bankruptcy, Reorganized SWINC's business operations will consist of the management of the Pension Plan, including any efforts in which Reorganized SWINC may terminate the Pension Plan or transfer its sponsorship in accordance with applicable law.  Although Reorganized SWINC will be fully authorized to engage in other business operations and management intends to evaluate opportunities as, when and if they arise, Reorganized SWINC has no present intention of engaging in business operations, will likely dissolve pursuant to the Delaware General Corporations Law within two years following confirmation of the Third Joint Plan.  Upon dissolution of the Consolidated SWINC Estate, the SWINC Plan Administrator shall be responsible for receiving valid service of process to the extent required by law and shall forward timely notice of Insured Claims to the relevant insurers.

e.  Article VII.D of the Third Joint Plan is modified and approved as follows:

On the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved.  If necessary or appropriate, the SWE&C Liquidating Trustee shall file a certificate of dissolution for SWE&C and/or the SWE&C Subsidiaries and shall take all other actions necessary or appropriate to effect the dissolution of SWE&C and the SWE&C Subsidiaries under applicable state law.  Upon dissolution of the Consolidated SWE&C Estate, the SWE&C Liquidating Trustee shall be responsible for receiving valid service of

44

process to the extent required by law and shall forward timely notice of Insured Claims to the relevant insurers.

f. The second paragraph of Article VII.R of the Third Joint Plan is replaced in its entirety with the following:

> The allowance of a Claim shall not bar the SWINC Plan Administrator or the SWE&C Liquidating Trustee from enforcing, suing on, settling or compromising any Litigation Claims against Claimholders by reason of res judicata, collateral estoppel, or similar doctrine unless the order allowing the Claim resolves such issue of fact or law or unless the Court decided such issue of law or fact in connection with the allowance of such Claim.

37.     Notwithstanding any provision in any order allowing a Claim (other than one allowing a Claim for voting purposes only) entered in these Chapter 11 Cases on or before August 27, 2003 allowing a Claim (other than one allowing a Claim for voting purposes only), reserving the rights by any Committee or by any other Plan Proponent with respect to the allocation of Cash or the allocation of Claims to an estate, such reservations of rights are hereby waived and released; *provided, however,* that the Creditors' Committee's reservation of rights with respect to the allocation of the Cash amounts paid by any entity that is part of the Consolidated SWE&C Estate in connection with the orders approving settlements (the "Cash Settlements") with the following parties are not so released or waived:  Buffalo Sheet Metals; CanFibre Lackawanna; Harbourview Electric, Ltd.; Higgins Erectors & Haulers, Inc.; Quackenbush Co., Inc., Allied Fire Protection Systems, Inc.; and Maschinenfabrik J. Dieffenbacher GMBH & Co. (collectively, the "Canfibre Subcon-

45

tractors") are not waived; *provided, further*, that the Consolidated SWE&C Consoli-

dated Estate's sole remedy with respect to the allocation of any such Cash Settlement

shall be to seek reimbursement from the Consolidated SWINC Estate in an amount

not to exceed $1,036,117.00; and *provided, further,*  that in the event that the

Consolidated SWINC Estate and the Consolidated SWE&C Estate are not able

consensually to resolve such allocation issue, disputes the Consolidated SWE&C

Estate's request for reimbursement of the Settlement Cash, such dispute shall be

submitted to the Interestate Oversight Board for resolution in accordance with the

terms of the Third Joint Plan.  With respect to any Claim or Interest that has not been

allowed by a final order (other than one allowing a Claim for voting purposes only)

entered by the Court on or before August 27, 2003, any disputes regarding allocation

of such Claims or Interest or Cash shall be submitted to the Interestate Oversight

Board for resolution in accordance with the Third Joint Plan if the Consolidated

SWINC Estate and the Consolidated SWE&C Estate are not able to resolve such

dispute consensually.

38. Notwithstanding any provision herein or in the Plan to the

contrary, except as provided in the immediately preceding paragraph and in the

provisos below, none of the Consolidated SWINC Estate, the Consolidated SWE&C

Estate, Reorganized SWINC, the Asbestos Trust, or the Plan Proponents shall seek to

allocate all or a part of a Disputed Claim based upon a claim that the Consolidated

46

SWINC Estate, the Consolidated SWE&C Estate or any Debtor should be substantively consolidated, that one was the alter ego of the other or that the corporate veil of one ought to be pierced in order to hold the other liable for any Disputed Claims, all of which claims have been settled in accordance with and pursuant to the terms of the Third Joint Plan; *provided, however*, that the foregoing shall not bar, limit, restrict or prohibit in any manner, any such party seeking to allocate, in whole or in part, from one Consolidated Estate to the other Consolidated Estate (x) a liability in respect of a Disputed Claim or seeking reimbursement, in whole or in part, in respect of such liability based upon a claim that such liability was incurred, in whole or in part, by or for the benefit of the Consolidated SWINC Estate or the Consolidated SWE&C Estate and that as a result of the Consolidated SWINC Estate and the Consolidated SWE&C Estate should share proportionately the liability for such Disputed Claim; or (y) an asset (or proceeds thereof) or seeking reimbursement, in whole or in part, for such asset based upon a claim that such asset (or proceeds thereof) was jointly owned or was created or acquired by or for the benefit of the Consolidated SWINC Estate or the Consolidated SWE&C Estate and that as a result the Consolidated SWINC Estate and the Consolidated SWE&C Estate should share proportionately in the assets (or proceeds thereof); and *provided, further, however*, that the foregoing shall not bar, limit, restrict or prohibit the Consolidated SWE&C Estate from seeking reimbursement from the Consolidated SWINC Estate for the Cash Settlement

47

referenced in paragraph 37 above based on a claim that a constructive trust did not

exist in respect of the amounts necessary to pay the Cash Settlements or that

SWE&C and the SWE&C Subsidiaries were not otherwise in compliance with the

New York lien law. Any disputes regarding any such Interestate Disputes or Cash

shall be submitted to the Interestate Oversight Board for resolution in accordance

with the Third Joint Plan if the Consolidated SWINC Estate and the Consolidated

SWE&C Estate are not able to resolve such dispute consensually.

39. The Plan Proponents, the Consolidated SWE&C Estate and the

Consolidated SWINC Estate further acknowledge and agree that pursuant to, and in

accordance with the Third Joint Plan, on the Effective Date, the Consolidated

SWE&C Estate shall deposit not more than $4,500,000 into the Asbestos Trust.

Neither the Consolidated SWE&C Estate nor any Plan Proponent shall seek reim-

bursement from the Consolidated SWINC Estate in respect of such deposit. Other

than the making of this $4,500,000 deposit, neither the Consolidated SWE&C Estate

nor the SWE&C Liquidating Trust shall have any liability with respect to any

Asbestos Claims or the Asbestos Trust.

40. Notwithstanding any other term or provision in the Third Joint

Plan or this Confirmation Order, this Confirmation Order (i) is without prejudice to

any of the rights, claims and/or defenses of the ACE USA Companies (and any other

48

ACE USA-related company)[3], St. Paul, and the Asbestos Insurance Carriers under any of their various insurance policies (collectively, the "Policies") including, without limitation, ACE USA's, St. Paul's and the Asbestos Insurance Carriers' rights and/or defenses in any subsequent litigation in which ACE USA, St. Paul, and/or the Asbestos Insurance Carriers may seek any declaration regarding the nature and/or extent of any insurance coverage under their respective Policies; (ii) confirms that all of the terms, provisions, conditions, limitations and/or exclusions contained in the Policies shall remain unmodified; (iii) confirms that, to the extent the Reorganized SWINC, the SWE&C Liquidating Trust and/or the Asbestos Trust seek coverage under the Policies, and to the extent that applicable law requires, they shall remain bound by all of the terms, provisions, conditions, limitations and/or exclusions contained in the Policies; (iv) confirms that ACE USA, St. Paul, and the Asbestos Insurance Carriers have reserved all rights to assert that their Policies may not be validly assigned without ACE USA's, St. Paul's and/or the Asbestos Insurance Carriers' express written consent; (v) confirms that nothing in the Plan shall be

---

[3]    The ACE USA Companies are Central Indemnity Company, as successor to CCl Insurance Company, successor to Insurance Company of North America and as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company, Central National Insurance Company of Omaha, with respect to policies issued through Cravens, Dargan Pacific Coast as Managing General Agent, International Insurance Company, Pacific Employers Insurance Company and Westchester Fire Insurance Company (collectively, "ACE USA")."

49

deemed to create any insurance coverage that does not otherwise exist, if at all, under

the terms of the Policies, or create any direct right of action against ACE USA, St.

Paul and/or the Asbestos Insurance Carriers that does not otherwise exist under

applicable state law; (vi) confirms that, to the extent the SWINC Plan Administrator,

the SWE&C Liquidating Trustee and/or Asbestos Trustee seek coverage under the

Policies, and to the extent that applicable law requires, they shall satisfy all continu-

ing duties and obligations of the insureds under the Policies; and (vii) confirms that

nothing in the Third Joint Plan shall be construed as an acknowledgment that the

Policies cover or otherwise apply to any Allowed Insured Claims or that any Allowed

Insured Claims are eligible for payment under any of the Policies.

41.  Resolution of Pension Benefit Guaranty Corporation Objection.

The Pension Benefit Guaranty Corporation ("PBGC") objected to confirmation of the

Third Joint Plan on the basis that the Pension Plan may not overfunded.  The Debtors

and the PBGC have resolved the PBGC's objection to the Third Joint Plan by

agreeing that the Debtors will set aside a portion of the Pension distributions for a

period of six months pending a final audit by the PBGC.  A copy of the settlement

agreement resolving the objection, in substantially final form, is attached hereto as

Exhibit B.

42.  Notice of Entry of Confirmation Order.  On or before the tenth

Business Day following the date of entry of this Confirmation Order, the Debtors

50

shall serve notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all creditors and interest holders, the United States Trustee and other parties in interest, by causing notice of entry of this Confirmation Order in substantially the form of the notice attached hereto as Exhibit C, which form hereby is approved (the "Notice of Confirmation"), to be delivered to such parties by first-class mail, postage prepaid. The Debtors hereby are authorized and directed to effect mailing of the Notice of confirmation in the manner set forth in the Solicitation Procedures Order. The Debtors may, but are not required to, publish the Notice of Confirmation within 10 business days after entry of this Confirmation Order in the national edition of The Wall Street Journal.

43. Notice of Effective Date. Within five Business Days following the occurrence of the Effective Date, Reorganized SWINC shall file notice of the occurrence of the Effective Date with the Bankruptcy Court and shall serve a copy of same on (a) counsel to the Creditors' Committee; (b) counsel to the Equity Committee; (c) the Professionals in these Chapter 11 Cases; and (d) the entities that have requested notice in these cases pursuant to Bankruptcy Rule 2002. Reorganized SWINC may, but is not required to, publish the Notice of the Effective Date within five business days after the occurrence of the Effective Date in the national edition of The Wall Street Journal.

51

44. <u>Reference to Plan Provisions</u>. The failure to specifically include or reference any particular provision of the Third Joint Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Third Joint Plan be confirmed in its entirety.

45. <u>Inconsistency</u>. In the event of an inconsistency between the Third Joint Plan and any other agreement, instrument, or document intended to implement the provisions of the Third Joint Plan, the provisions of the Third Joint Plan shall govern unless otherwise expressly provided for in such agreements, instruments, or documents. In the event of any inconsistency between the Third Joint Plan and any agreement, instrument or document intended to implement the Third Joint Plan and this Confirmation Order, the provisions of this Confirmation Order shall govern. Nothing in the Third Joint Plan, including, without limitation, this paragraph 45, shall alter, supercede, modify or invalidate any settlements or prior order of the Bankruptcy Court approving any settlements.

46. <u>Enforceability</u>. Pursuant to Bankruptcy Code sections 1123(a) and 1142(a) and the provisions of this Confirmation Order, the Third Joint Plan, the Plan Supplement and all plan-related documents shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

52

47. Separate Confirmation Orders. This Confirmation Order is and shall be a separate Confirmation Order with respect to each of the Debtors in each Debtor's separate Chapter 11 Case for all purposes.

Dated: Wilmington, Delaware
      January 16, 2004

Honorable Peter J. Walsh
United States Bankruptcy Judge

53

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| STONE & WEBSTER, INC., *et al.*, | Case No. 00-02142 (PJW) |
| Debtors.[1] | (Jointly Administered) |
| | |
| CONSOLIDATED SWINC ESTATE, and SWE&C LIQUIDATING TRUST, | Adv. Pro. No. _____ (PJW) |
| Plaintiffs, | |
| vs. | |
| ACE USA, INC., and CENTURY INDEMNITY COMPANY, | |
| Defendants. | |

## COMPLAINT

Plaintiffs, the Consolidated SWINC Estate (the "SWINC Estate") and the SWE&C Liquidating Trust (the "SWE&C Trust") (collectively, "Plaintiffs"), as and for their Complaint against Defendants ACE USA, Inc., and Century Indemnity Company allege as follows:

### NATURE OF ACTION

1.      This action seeks (a) a declaration that claims made by Plaintiffs against Defendants on account of certain losses incurred by Plaintiffs are covered by certain comprehensive general liability insurance policies held by Plaintiffs and issued by the Insurance Company of North America ("INA") and the Indemnity Insurance Company of North America ("IINA"); and (b) damages from Defendants for their breach of certain express and implied

---

[1] The Debtors are the Consolidated SWINC Estate and the Consolidated SWE&C Estate.  As more particularly set forth in Article VII(B) of the Joint Plan, certain debtor subsidiaries of Stone & Webster, Incorporated are merged into Stone & Webster, Incorporated, and their estates have been substantively consolidated to become the Consolidated SWINC Estate; and certain debtor subsidiaries of Stone & Webster Engineers and Constructors, Inc. are merged into Stone & Webster Engineers and Constructors, Inc., and their estates have been substantively consolidated to become the Consolidated SWE&C Estate.

DKT. NO. _1_

DT. FILED _1-26-07_

*Box H5*

contractual obligations under those comprehensive general liability insurance policies issued to Plaintiffs and violation of Rhode Island General Law § 9-1-33 and Massachusetts General Law chapter 93A, § 11, including, among other breaches and violations, Defendants' (i) failure to defend Plaintiffs or to compensate Plaintiffs for their reasonable costs of defense; (ii) improper handling of an insured claim by the Plaintiffs; (iii) failure to admit or deny coverage of an insured claim within a reasonable time; (iv) failure to acknowledge and act reasonably promptly upon communication with respect to a claim arising under insurance policies; (v) failure to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability had become reasonably clear; and (vi) failure to provide insurance coverage for Plaintiffs' payment of an insured allowed claim in the Bankruptcy Case, as defined herein.

## BACKGROUND – THE BANKRUPTCY CASE

2.     On June 2, 2000, Stone & Webster, Inc. and certain of its subsidiaries (collectively, "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). Thereafter, Debtors' chapter 11 cases were consolidated for procedural purposes and were jointly administered under Case No. 00-2142 (PJW) (the "Bankruptcy Case").

3.     On or about June 14, 2000, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors ("Creditors' Committee"). On or about June 26, 2000, the United States Trustee appointed an Official Committee of Equity Security Holders ("Equity Committee"). No trustee was appointed in the Bankruptcy Case.

4.     By order dated July 18, 2000, the Court established August 25, 2000 at 4:00 p.m. as the last date and time for the filing of proofs of claim in the Bankruptcy Case (the "Bar Date"). On information and belief, Debtors: (a) mailed a copy of the Notice of the Bar Date to all known

creditors of the Debtors; and (b) published the Notice in The Wall Street Journal (National Edition), The Boston Globe, The Los Angeles Times and seventeen other newspapers.

5.      Approximately 5,700 claims were filed against Debtors in the Bankruptcy Case. The proofs of claim are recorded on the Claims Registry in the Bankruptcy Case, which is maintained by Debtors' claims agent, The Trumbull Group.

6.      On January 16, 2004, the Court entered its Findings Of Fact, Conclusions Of Law, And Order (the "Plan Confirmation Order") [Docket #4879] confirming the Third Amended Joint Plan of the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders with Respect to (I) Stone & Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of its Subsidiaries (the "Joint Plan").[2]  A copy of the Joint Plan is attached hereto as Exhibit 1.

7.      On January 27, 2004 (the "Effective Date"), the Joint Plan became effective. Pursuant to the Joint Plan, the Creditors' Committee and the Equity Committee were dissolved on the Effective Date.

8.      The Joint Plan provides for the substantive consolidation of Stone & Webster, Incorporated ("SWINC") and its direct subsidiaries (except Stone & Webster Engineers and Constructors, Inc.) into the SWINC Estate.   Pursuant to the SWINC Plan Administrator Agreement, the SWINC Plan Administrator, on behalf of the SWINC Estate, has the right to:  (i) object to Claims or Interests filed against the SWINC Estate; (ii) exercise all powers and rights, and take all actions, contemplated by or provided for in the SWINC Plan Administrator Agreement; (iii) pursue any and all rights under the insurance policies of a Debtor providing

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Plan.

coverage with respect to Insured Claims; and (iv) object to Claims or Interests filed against SWINC or the SWINC Subsidiaries and, pursuant to Bankruptcy Rule 9019(b) and Bankruptcy Code Section 105, compromise and settle Claims and Disputed Interests.

9.    The Joint Plan provides for the substantive consolidation of Stone & Webster Engineers and Constructors, Inc. ("SWE&C") and its direct subsidiaries into the Consolidated SWE&C Estate.  On the Effective Date, the assets of the Consolidated SWE&C Estate were transferred to the SWE&C Trust.  Pursuant to the SWE&C Trust Agreement, the SWE&C Liquidating Trustee may, among other things: (i) liquidate the SWE&C Trust Assets and collect on, sell or otherwise dispose of the SWE&C Trust Assets; (ii) if authorized by the SWE&C Trust Advisory Board, pursue and settle any Disputed Claim filed against SWE&C or the SWE&C Subsidiaries; (iii) retain any and all rights involving an insurance policy of a Debtor with respect to Insured Claims; and (iv) commence actions involving SWE&C Trust Assets.

## PARTIES

10.    For purposes of this action, the Plaintiff SWINC Estate is the successor-in-interest to SWINC and its direct subsidiaries.

11.    For purposes of this action, the Plaintiff SWE&C Trust is the successor-in-interest to SWE&C and its subsidiaries, including but not limited to Stone & Webster Engineering Corporation ("SWEC") and Stone & Webster Management Consultants, Inc. ("SWMC").

12.    On information and belief, Defendant ACE USA, Inc., is a division of the ACE Group of insurance and reinsurance companies and provides a variety of insurance products throughout the U.S.  On information and belief, Defendant ACE USA, Inc., is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.

13.    On information and belief, Defendant ACE USA, Inc., is successor-in-interest to, or the alter ego of, INA.

402333/E/5                                  4

14.     On information and belief, Defendant Century Indemnity Company is a run-off company, which manages existing policies and related claims for, among others, INA and IINA. On information and belief, Defendant Century Indemnity Company is a company domesticated under the laws of the commonwealth of Pennsylvania, has its principal place of business in Philadelphia, Pennsylvania, and is licensed with an inactive status to do business in all fifty states and Washington, DC.

15.     On information and belief, Defendant Century Indemnity Company is successor-in-interest to, among others, INA.

16.     On information and belief, INA is an insurance company domesticated under the laws of the commonwealth of Pennsylvania and is licensed to do business as an insurance company in all fifty states and Washington, DC.

17.     On information and belief, INA is successor-in-interest to IINA.

18.     On information and belief, IINA is an insurance company domesticated under the laws of the commonwealth of Pennsylvania and is licensed to do business as an insurance company in all fifty states and Washington, DC.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 157 and 1334 in that this proceeding arises under the Bankruptcy Code, and arises in and is related to the Bankruptcy Case. By an order entered on January 9, 2004 (discussed more thoroughly below as the "Settlement Order"), this Court also retained jurisdiction "to determine the reasonableness of any proposed settlement between the Debtors [and their successors and assigns] and their primary insurers" with regard to the claims giving rise to this Complaint. A copy of the Settlement Order is attached hereto as Exhibit 2.

20.    Venue is proper in the District of Delaware under 28 U.S.C. § 1409 in that this proceeding arises in and relates to a bankruptcy case pending in this district and the Court approved the Settlement Agreement with Southern Union Company ("SU") and Narragansett Electric Company ("NEC") and entered the Settlement Order, which underlie this Complaint, in connection with the Bankruptcy Case.    Further, certain of Plaintiffs' predecessors were incorporated in the State of Delaware and the SWE&C Trust is a grantor trust created and generated by the laws of the State of Delaware.

21.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).    In addition, paragraph 35 of the Plan Confirmation Order provides that, pursuant to Bankruptcy Code Sections 105(a) and 1142, and notwithstanding the entry of the Plan Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction as provided in the Joint Plan over all matters arising out of, and related to, the Bankruptcy Case and the Joint Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XIV of the Joint Plan.    Pursuant to Article XIV, paragraphs (ii) and (v), of the Joint Plan, the Court retained jurisdiction to "[h]ear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located" and to "[h]ear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 cases . . . ."

## FACTS

### The Policies

22.    INA and/or IINA insured Plaintiffs' predecessors-in-interest under various comprehensive general liability policies between at least 1932 and 1961 (collectively, the "Policies"), including, without limitation, those identified by the following policies numbers:

a.)    OLT 164730;

b.)    P31382;

c.)    OLT 189465;

d.)    OLT 206013;

e.)    OLT 238518;

f.)    OLT 268677;

g.)    OLT 285965;

h.)    OLT 311279;

i.)    OLT 347734;

j.)    OLT 387776;

k.)    OLT 426818;

l.)    CGL 2681;

m.)    CGL 6756;

n.)    CGL 22620;

o.)    CGL 27952;

p.)    9CGL 60875;

q.)    9CGL 73616;

r.)    9CGL 94870;

s.)    XPL 5360;

t.)    9CGL 106198;

u.)    9CGL 115949;

v.)    9CGL 134350; and

w.)    CGL 188142.

23.    The Policies obligate INA and/or IINA to, among other things, "pay on behalf of [Plaintiffs' predecessors-in-interest] all sums which [Plaintiffs' predecessors-in-interest] shall become legally obligated to pay as damages" because of property damage, and to defend Plaintiffs' predecessors-in-interest in "any suit" alleging such property damage, "even if such suit is groundless, false, or fraudulent."

24.    The Policies afford coverage ranging from up to $2,000 per occurrence to up to $250,000 per occurrence for events occurring during the relevant policy periods.

## The Claim

25.    SU and NEC filed proofs of claim against Plaintiffs' predecessors in the Bankruptcy Case (collectively, the "SU/NEC Bankruptcy Claims"), on a joint and several liability theory, seeking to recover costs allegedly incurred in the cleanup of various manufactured gas plants or manufactured gas waste disposal sites (collectively, the "MGP Sites") allegedly owned by, operated by, or otherwise under the effective control of SWINC, SWEC, and/or SWMC, and/or certain predecessors-in-interest (collectively, the "SW Defendants"), including but not limited to the following sites:

a.)    Mendon Road (Attleboro, MA);

b.)    Lawn Street (Attleboro, MA);

c.)    Tidewater MGP (Pawtucket, RI);

d.)    Bay Street/Tokarz (Tiverton, RI);

e.)    Cory's Lane/Andrade (Tiverton, RI);

f.)    Cumberland (Pawtucket, RI);

g.)    Hamlet Ave. (Woonsocket, RI);

h.)    Pond Street (Woonsocket, RI);

i.)    Exchange Street (Pawtucket, RI);

j.)     Plympton, MA (onsite);

k.)     Plympton, MA (offsite);

l.)     Hartwell MGP (Fall River, MA);

m.)    Charles & Bay (Fall River, MA);

n.)    Pond & Anawan (Fall River, MA);

o.)    Robeson & Cherry (Fall River, MA);

p.)    Turner & Davol (Fall River, MA); and

q.)    High Street (Central Falls, RI)

The SU/NEC Bankruptcy Claims were identified as Claim Nos. 2267, 2457, 2548, 4221, 5424, 5425, 5426, 5427, 5428, and 5429.

26.    In the SU/NEC Bankruptcy Claims, SU and NEC alleged that one or more of the SW Defendants were responsible for creating, depositing, or transporting waste at the MGP Sites, which SU and/or NEC were later required to remove. The SU/NEC Bankruptcy Claims sought over $20 million and underdetermined future amounts from the SW Defendants in connection with the remediation of the MGP Sites.

27.    The SU/NEC Bankruptcy Claims further provide that prior to the filing of the Bankruptcy Case, SU and NEC filed lawsuits in two federal district courts against the SW Defendants seeking recovery in connection with the remediation of the MGP Sites. In connection with those lawsuits, INA and IINA refused to defend or indemnify the SW Defendants.

28.    SWINC, SWE&C, and SWMC gave timely and effective notice of the SU/NEC Bankruptcy Claims to Defendants and requested coverage for same.

29.     Despite having a duty to defend under the Policies, Defendants failed to respond to that request and thereby refused to pay Debtors', including the SW Defendants', costs of objecting to the SU/NEC Bankruptcy Claims.

30.     During the course of the Bankruptcy Case, Debtors, including the SW Defendants, objected to the SU/NEC Bankruptcy Claims and, in so doing, incurred attorneys' fees and other expenses.

31.     To avoid the risks and further expenses inherent in the continued litigation of the SU/NEC Bankruptcy Claims and in the best interests of their creditors, Debtors, including the SW Defendants, agreed to settle the SU/NEC Bankruptcy Claims in an amount that was fair and reasonable in relation to the SW Defendants' potential exposure and the costs of continuing to defend the SU/NEC Bankruptcy Claims.

32.     On November 11, 2003, Defendant Century Indemnity Company objected to the Motion to Approve the Settlement of Claims with SU and NEC as, *inter alia*, infringing on certain of its rights under the Policies. A copy of that objection is attached hereto as <u>Exhibit 3</u>.

33.     After a hearing, at which the Court heard evidence and argument, the Court overruled Defendant Century Indemnity Company's objection and subsequently entered an Order on January 9, 2004 granting the Motion to Approve the Settlement of Claims with SU and NEC (the "Settlement Order"). In the Settlement Order, the Court expressly found the settlement to be fair and reasonable. The Settlement Order incorporated and attached (as Exhibit A) the Settlement Agreement between Debtors, SU, and NEC (the "Settlement Agreement"), which was entered into in or around November 2003. <u>See</u> Exh. 2.

34.     The Settlement Agreement and Settlement Order granted SU and NEC an allowed claim against the SWINC Estate and the SWE&C Trust totaling $15 million for pollution remediation costs (the "Allowed Remediation Claim").

35.    Under the terms of the Settlement Agreement, Debtors became legally obligated to pay, and have in fact paid, $5 million to SU and NEC on account of the Allowed Remediation Claim.  In addition, Debtors, now Plaintiffs, became legally obligated to pay SU and NEC fifty percent (50%) of any recoveries Plaintiffs receive from any insurers, including Defendants, on account of the Allowed Remediation Claim.

36.    In correspondence dated December 29, 2003, Defendant Century Indemnity Company was provided with additional notice of the Court's approval of the Settlement Agreement and advised that "each primary carrier is jointly and severally liable to Debtors for the full amount of the Settlement Agreement."  The letter further noted that Debtors believed "that the primary carriers' failure to assist in the settlement with [SU and NEC] and the primary carriers' opposition to the settlement, ruled by the Bankruptcy Court as reasonable, constitute[d] bad faith entitling Debtors to both punitive damages, damages from each individual primary carrier which exceeds the policy limits of the policies at issue, and all fees and costs incurred by Debtors to obtain the Court's approval of the Settlement Agreement as well as all fees and costs incurred by Debtors to recover against its carriers."  A copy of that letter is attached hereto as Exhibit 4.

37.    Defendants have yet to take a position as to whether they will recognize or deny the claim at issue, and have not paid any portion of Plaintiffs' claim or Plaintiffs' defense costs, despite Defendants' contractual and legal obligation to do so.

38.    At all times, Plaintiffs and Plaintiffs' predecessors-in-interest complied with all of the terms and conditions precedent contained in the Policies under which they now seek coverage herein, including making timely payment of all premiums on such Policies, except as to that performance which has been excused, waived or prevented by the representations, acts or omissions of Defendants.

## COUNT I
### Breach of Contract

39.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 38 as if fully set forth herein.

40.     Plaintiffs have a claim under the Policies, as a named insured under the Policies, or as successor-in-interest to a named insured under the Policies, on account of the Settlement Agreement and for such other and further amounts that may be covered by the Policies, including defense fees, expenses, and costs.

41.     Defendants have breached their obligations under the Policies by, among other things, (i) failing to defend Plaintiffs in connection with the SU/NEC Bankruptcy Claims or to compensate Plaintiffs for the reasonable costs of defending the SU/NEC Bankruptcy Claims; (ii) improperly handling Plaintiffs' claim for coverage in connection with the Allowed Remediation Claim, which is covered by the Policies; (iii) failing to admit or deny coverage for the Allowed Remediation Claim within a reasonable time; (iv) failing to acknowledge and act reasonably promptly upon communication from Plaintiffs with respect to their claim for coverage in connection with the Allowed Remediation Claim, which is covered by the Policies; (v) failing to attempt in good faith to effectuate prompt, fair and equitable settlements of the SU/NEC Bankruptcy Claims in which liability had become reasonably clear; and (vi) failing to provide insurance coverage for Plaintiffs' payment of the Allowed Remediation Claim.

42.     As a proximate result of Defendants' breach of the Policies, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing

43.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 42 as if fully set forth herein

44.    The Policies contain an implied covenant of good faith and fair dealing, whereby INA and/or IINA promised to deal fairly and in good faith with Plaintiffs, as a named insured under the Policies or as successor-in-interest to a named insured under the Policies, and to do nothing that would have the effect of destroying or injuring the right of Plaintiffs to receive the fruits of the Policies.

45.    As set forth above, Defendants have breached and are continuing to breach their duty of good faith and fair dealing owned to Plaintiffs by, among other things, willfully, arbitrarily, unreasonably and in bad faith failing to admit or deny coverage for Plaintiffs' request for defense in connection with the SU/NEC Bankruptcy Claims and Plaintiffs' claim in connection with the Allowed Remediation Claim within a reasonable time, failing to acknowledge and act reasonably promptly upon communication from Plaintiffs with respect to their request for defense in connection with the SU/NEC Bankruptcy Claims and their claim in connection with the Allowed Remediation Claim, and breaching its obligations to Plaintiffs under the Policies, as set forth above.

46.    As a proximate result of Defendants' breach of the implied covenant of good faith and fair dealing in the Policies, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT III
## Violation of Rhode Island General Law § 9-1-33

47.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 46 as if fully set forth herein.

48.    As set forth above, Defendants have wrongfully, intentionally, unreasonably, and in bad faith refused to pay and/or settle Plaintiffs' claim under the Policies in connection with the Allowed Remediation Claim and to defend Plaintiffs in connection with the SU/NEC Bankruptcy

13

Claims, and have otherwise wrongfully, intentionally, unreasonably, and in bad faith refused to timely perform their obligations under the Policies.

49.    Such conduct constitutes a violation of R.I. Gen. Law § 9-1-33.

50.    As a proximate result of Defendants' violation of R.I. Gen. Law § 9-1-33, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT IV
### Violation of Massachusetts General Law chapter 93A, § 11

51.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 50 as if fully set forth herein.

52.    As set forth in Mass. Gen. L. ch. 93A, § 11(a), Plaintiffs and Defendants engage in the conduct of trade or commerce.

53.    As set forth above, Defendants have engaged in unfair and/or deceptive acts or practices in the conduct of their trade or commerce in connection with the Policies, and Plaintiffs' request for defense in connection with the SU/NEC Bankruptcy Claims and claim in connection with the Allowed Remediation Claim thereunder, which conduct constitutes a violation of Mass. Gen. Law ch. 93A, § 11.

54.    As a proximate result of Defendants' violation of Mass. Gen. Law. Ch. 93A, § 11, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT V
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a)

55.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 54 as if fully set forth herein.

56.    Plaintiffs and their predecessors-in-interest complied with all terms of the Policies, including payment of all premiums due thereunder.

57.    Plaintiffs have asserted a valid claim under the Policies in connection with the Allowed Remediation Claim and Defendants' contractual obligation to defend Plaintiffs in connection with the SU/NEC Bankruptcy Claims.

58.    There exists an actual controversy between the Plaintiffs and the Defendants regarding the interpretation of the Policies and specifically, whether the Plaintiffs may be reimbursed under the Policies for payment of the Allowed Remediation Claim and their costs of objecting to the SU/NEC Bankruptcy Claims and defending against Defendants' November 11, 2003 objection to the Motion to Approve the Settlement Agreement.

59.    Plaintiffs, as a named insured under the Policies or as successor-in-interest to a named insured under the Policies, desire and are entitled to a judicial declaration of their rights and the obligations of Defendants under the Policies. Such a declaration will terminate the controversy or some part of it and will serve a useful purpose in clarifying and establishing the Plaintiffs' right of recovery under the Policies.

WHEREFORE, the Plaintiffs request that this Court enter a judgment:

(a)    declaring that Plaintiffs have complied with all terms and conditions of the Policies;

(b)    declaring that Defendants had a duty to defend Plaintiffs in connection with the SU/NEC Bankruptcy Claims or to compensate Plaintiffs for their reasonable costs of defending such claims, and that Defendants breached that duty;

(c)    declaring Plaintiffs' claim in connection with the Allowed Remediation Claim is covered by the Policies;

(d)    awarding damages, including punitive damages, to Plaintiffs, plus fees, expenses, costs, and interest in an amount to be determined at trial; and

(e)    awarding such other and further relief as the Court deems just and proper.


[SIGNATURES ON FOLLOWING PAGE]


402333/E/S

Dated: January 26, 2007

THE CONSOLIDATED SWINC ESTATE

By: /s/ Gargan F. McDaniel
Ian Connor Bifferato (No. 3273)
Garvan F. McDaniel (No. 4167)
BIFFERATO, GENTILOTTI & BALICK L.L.C
1308 Delaware Avenue
Wilmington, DE 19899-2165
(302) 429-1900

Carmen H. Lonstein
Adam R. Schaeffer
Steven A. Domanowski
BELL, BOYD & LLOYD LLC
Three First National Plaza
70 West Madison Street, Suite 3300
Chicago, Illinois 60602
(312) 372-1121

-and-

THE SWE&C LIQUIDATING TRUST

By: /s/ Kerri K. Mumford
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
LANDIS RATH & COBB, LLP
919 Market Street, Suite 600
Wilmington, DE 19801
(302) 467-4400

Lorraine S. McGowen, *pro hac vice*
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103-0002
(212) 506-5000

James E. Houpt, *pro hac vice*
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814
(916) 447-9200

Kathleen A. Orr*
ORRICK, HERRINGTON & SUTCLIFFE LLP
3050 K Street, NW
Washington, DC 20007
(202) 339-8400
*not yet admitted *pro hac vice*

402333/E/5

**TRANSMITTAL SHEET FOR WITHDRAWAL OF REFERENCE TO THE
U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**Adversary Case #: 07-50390 (PJW)**
**Related Bankruptcy Case #: 00-2142 (PJW)**
**District Court Civil Action#:**

**Deputy Clerk Transferring Case:**          Sandra Jackson

**Case Type:**                              Adversary

**Nature of Suit:**                         Recover Money or Property/Declaratory Judgment

**Cause of Transmittal:**                   Motion to Withdraw the Reference

**Parties:**                                <u>**Consolidated SWINC Estate, et. al. v. Century**</u>
                                            <u>**Indemnity Company**</u>

**Plaintiff's Counsel:**                    **Kerri K Mumford**
                                            Landis Rath & Cobb LLP
                                            919 Market Street
                                            Suite 600
                                            Wilmington, DE 19801
                                            302-467-4400
                                            Fax : 302-467-4450
                                            Email: <u>mumford@lrclaw.com</u>

                                            **Linda Richenderfer**
                                            Bifferato Gentilotti LLC
                                            800 N. King Street, Plaza Level
                                            Wilmington, DE 19801
                                            302-429-1900
                                            Fax : 302-429-8600
                                            Email: <u>lrichenderfer@bgbde.com</u>

**Defendant's Counsel:**                    **Marc Stephen Casarino**
                                            White and Williams LLP
                                            824 Market Street
                                            Suite 902
                                            Wilmington, DE 19899
                                            usa
                                            302-467-4520
                                            Fax : 302-467-4550
                                            Email: casarinom@whiteandwilliams.com


***Note*** Motion of Defendant Century Indemnity Company for Determination that the Proceeding is Non-Core is still pending; Hearing was held on 4/10/07, but this matter is Under Advisement; decision is pending Judge Walsh's ruling. Motion to Withdraw the Reference being sent per Judge Walsh's request.