## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| STONE & WEBSTER, INCORPORATED, *et al.*, | Case No. 00-2142 (PJW) |
| Debtors. | Jointly Administered[1] |
| CONSOLIDATED SWINC ESTATE, and SWE&C LIQUIDATING TRUST | |
| Plaintiffs, | |
| vs. | Adversary No. 07-50390 |
| ACE USA, INC., and CENTURY INDEMNITY COMPANY, | |
| Defendants. | |

## THE SWINC PLAN ADMINISTRATOR'S AND THE SWE&C LIQUIDATING TRUST'S RESPONSE IN OPPOSITION TO THE MOTION OF DEFENDANT CENTURY INDEMNITY COMPANY FOR WITHDRAWAL OF REFERENCE PURSUANT TO 28 U.S.C. § 157(d)

---

[1] The Debtors are the Consolidated SWINC Estate and the Consolidated SWE&C Estate. As more specifically set forth in Article VII(B) of the Third Amended Joint Plan of Reorganization of the Debtors In Possession, Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders, With Respect to (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Third Joint Plan") (Bankr. Docket No. 4878), certain debtor subsidiaries of Stone & Webster, Incorporated are merged into Stone & Webster, Incorporated, and their estates have been substantively consolidated to become the Consolidated SWINC Estate; and certain debtor subsidiaries of Stone & Webster Engineers and Constructors, Inc. are merged into Stone & Webster Engineers and Constructors, Inc., and their estates have been substantively consolidated to become the Consolidated SWE&C Estate.

TABLE OF CONTENTS

Background ...............................................................................................1

    A.    The Bankruptcy Cases ......................................................1

    B.    The NEC/SU Claims and NEC/SU Settlement .......................2

    C.    The Adversary Proceeding..................................................5

Argument ................................................................................................6

    I.    Standard for Withdrawal of the Reference ..............................6

    II.    Defendant Century Has Failed to Show Cause to Withdraw
        the Reference ...............................................................7

        A.    The Adversary Proceeding is a Core Proceeding ............8

        B.    Even if the Adversary Proceeding is Non-Core, Withdrawal of the
            Reference is Not Mandated .....................................8

        C.    The Bankruptcy Court has "Related to" Jurisdiction Over the Adversary
            Proceeding and Expressly Retained Jurisdiction Over the Adversary
            Proceeding ........................................................9

        D.    Retaining the Reference in the Bankruptcy Court Will Promote
            Uniformity in Bankruptcy Administration ...................13

        E.    Retaining the Reference in the Bankruptcy Court Will Avoid
            Forum Shopping and Confusion ..............................15

        F.    Retaining the Reference in the Bankruptcy Court Fosters the
            Economical Use of the Debtors' and Creditors' Resources ...............16

        G.    Retaining the Reference in the Bankruptcy Court Will
            Expedite the Bankruptcy Process.............................17

        H.    The Timing of Defendant Century's Request Militates
            Against Withdrawal of the Reference ........................17

        I.    Even if Defendants Request a Jury Trial, Withdrawal of the
            Reference is Not Warranted....................................18

# TABLE OF AUTHORITIES

## CASES

In re 12th & N Joint Venture,
    63 B.R. 36 (Bankr. D. Col. 1986) .............................................................................13

In re Allegheny Health Education and Research Foundation,
    No. 06-1469, 2006 U.S. Dist. LEXIS 91548 (W.D. Pa. Dec. 16, 2006) ...................................8

In re American Capital Equipment, LLC,
    325 B.R. 372 (W.D. Pa. 2005).............................................................6, 8, 14, 15, 16, 18

In re Big v. Holding Corp v. CRS Wholesale Grocers, Inc.
    No. 01-233, 2002 U.S. Dist. LEXIS 12609 B.R. 372 (D.Del. July 11, 2002)...........................9

Corestates Bank, N.A. v. Huls America, Inc.,
    176 F.3d 187 (3d Cir. 1999).............................................................................10

In re Emerson Radio Corp.,
    173 B.R. 490 (D.N.J. 1994), aff'd 52 F.3d 50 (3d Cir. 1995)...................................13

In re GGC, LLC,
    No. 06-881, 2006 U.S. Dist. LEXIS 69163 (W.D. Pa. Sept. 26, 2006).........8, 9, 13, 14, 16, 17

In re G-I Holdings, Inc.,
    278 B.R. 376 (Bankr. D.N.J. 2002) ......................................................................10

In re G-I Holdings, Inc.,
    278 B.R. 725 (Bankr. D.N.J. 2002) ......................................................................10

Hatzel & Buehler, Inc.,
    106 B.R. 367 (D. Del. 1989)..........................................................................8, 9

Jamuna Real Estate, LLC v. Pratpal Bagga,
    No. 06-00050, 2007 U.S. Dist. Lexis 4559 (E.D. Pa. Jan. 22, 2007) .........................................8

Johns-Manville Corp. v. Colorado Ins. Guaranty Ass'n,
    91 B.R. 225 (S.D.N.Y. 1988).............................................................................13

In re Marcus Hook Development Park, Inc.,
    943 F.2d 261 (3d Cir. 1991)..........................................................................10

In re NDEP Corp.,
    203 B.R. 905 (D. Del. 1996)..........................................................................6, 7

Norkus Enters., Inc. v. Getty Oil Co.,
    No. 04-4437, 2005 U.S. Dist. LEXIS 29262 (D.N.J. 2005) ....................................................13

In re Northwestern Institute of Psychiatry, Inc.,
    268 B.R. 79 (Bankr. E.D. Pa. 2001) ..................................................................................7

Pacor, Inc. v. Higgins,
    743 F.2d 984 (3d Cir. 1984).............................................................................................10

In re Philadelphia Training Center Corporation,
    155 B.R. 109 (E.D. Pa. 1993) ...........................................................................................8

In re Pruitt,
    910 F.2d 1160 (3d Cir. 1990).............................................................................6, 7, 13, 15

RFE Industries, Inc. v. Anton Noll, Inc.,
    No. 99-334, 2002 U.S. Dist. LEXIS 26414 (D.N.J. April 23, 2002).........................................7

In re Resorts International, Inc.,
    372 F.3d 154 (3d Cir. 2004)...................................................................................9, 10, 13

Valley Forge Plaza Associates v. Fireman's Fund Insurance Companies,
    107 B.R. 514 (E.D. Pa. 1989) ............................................................................................8

In re Winstar Communications, Inc.,
No. 04-928, 2004 U.S. Dist. Lexis 25169 (D. Del. Nov. 16, 2004) ………………………………..9

## STATUTES & RULES

11 U.S.C. §§ 101-1330 ..............................................................................................................1

28 U.S.C. § 157.........................................................................................................................6

28 U.S.C. § 157(a) ....................................................................................................................6

28 U.S.C. § 157(c) ................................................................................................................9, 16

28 U.S.C. § 157(d) ....................................................................................................................6

28 U.S.C. § 1334(b) ..................................................................................................................6

Massachusetts General Law Chapter 93A, § 11 ..........................................................................5

Rhode Island General Law § 9-1-33……………………………………………………………….5

The SWINC Plan Administrator, on behalf of the Consolidated SWINC Estate, and the SWE&C Liquidating Trustee, on behalf of the SWE&C Liquidating Trust (collectively, the "Consolidated Estates" or "Plaintiffs") hereby file this Response in Opposition to Motion of Defendant Century Indemnity Company ("Defendant Century") for Withdrawal of Reference Pursuant to 28 U.S.C. § 157(d) (the "Motion to Withdraw Reference").

### BACKGROUND

#### A.    The Bankruptcy Cases

1.    On June 2, 2000, Stone & Webster, Incorporated and certain of its subsidiaries (collectively, "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Thereafter, Debtors' chapter 11 cases were consolidated for procedural purposes and were jointly administered under Case No. 00-2142 (PJW) (the "Bankruptcy Case").

2.    On January 16, 2004, the Bankruptcy Court entered its Findings Of Fact, Conclusions Of Law, And Order (Bankr. Docket No. 4879) (the "Confirmation Order") confirming the Third Amended Joint Plan of the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders with Respect to (I) Stone & Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of its Subsidiaries (the "Joint Plan").[2] Exhibit 2 and Exhibit 3, respectively, attached hereto.

3.    On January 27, 2004 (the "Effective Date"), the Joint Plan became effective.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Plan.

1

4.    The Joint Plan provides for the substantive consolidation of Stone & Webster, Incorporated ("SWINC") and its direct subsidiaries (except Stone & Webster Engineers and Constructors, Inc., and its subsidiaries) into the SWINC Estate. Pursuant to the SWINC Plan Administrator Agreement, the SWINC Plan Administrator, on behalf of the SWINC Estate, may, among other things, pursue any and all rights under the insurance policies of a SWINC Estate Debtor providing coverage with respect to Insured Claims.

5.    The Joint Plan also provides for the substantive consolidation of Stone & Webster Engineers and Constructors, Inc. ("SWE&C") and its direct subsidiaries (including SWEC and SWMC, defined herein) into the Consolidated SWE&C Estate. On the Effective Date, the assets of the Consolidated SWE&C Estate were transferred to the SWE&C Trust. Pursuant to the SWE&C Trust Agreement, the SWE&C Liquidating Trustee may, among other things retain any and all rights involving an insurance policy of a SWE&C Estate Debtor with respect to Insured Claims, and commence actions involving SWE&C Trust Assets.

**B.    The NEC/SU Claims and NEC/SU Settlement**

6.    Southern Union Company ("SU") and Narragansett Electric Company ("NEC") each filed proofs of claim against Plaintiffs' predecessors in the Bankruptcy Case (collectively, the "SU/NEC Claims"), on a joint and several liability theory, seeking to recover costs allegedly incurred in the cleanup of various manufactured gas plants or manufactured gas waste disposal sites (collectively, the "MGP Sites") allegedly owned by, operated by, or otherwise under the effective control of SWINC, Stone & Webster Engineering Corporation ("SWEC"), and/or Stone & Webster Management Consultants, Inc. ("SWMC"), and/or certain predecessors-in-interest (collectively, the "SW Defendants").

2

7.    In the SU/NEC Claims, SU and NEC alleged that one or more of the SW Defendants were responsible for creating, depositing, or transporting waste at the MGP Sites, which SU and/or NEC were later required to remove.  The SU/NEC Claims sought over $20 million for amounts actually incurred and underdetermined future amounts from the SW Defendants in connection with the remediation of the MGP Sites.

8.    To avoid the risks and further expenses inherent in the continued litigation of the SU/NEC Claims and in the best interests of their creditors, the Debtors, including the SW Defendants, agreed to settle the SU/NEC Claims in an amount that was fair and reasonable in relation to the SW Defendants' potential exposure and the costs of continuing to defend the SU/NEC Claims.  See Settlement Agreement between Stone and Webster Incorporated, et al., Southern Union Company, and The Narragansett Electric Company (the "SU/NEC Settlement"), attached as Exhibit A to Exhibit 4 hereto.

9.    On October 29, 2003, the Debtors filed a Motion for Order Under Fed. R. Bankr. P. 9019 and 3018 Approving Settlement of Claims with Southern Union Company and Narragansett Electric Company (the "Debtors' Motion") in the Bankruptcy Court.  (Bankr. Docket No. 4657).  Defendant Century, among others, objected to that motion.  (Bankr. Docket No. 4687).

10.    After an evidentiary hearing and consideration of all the evidence and objections raised (including Defendant Century's objection), the Bankruptcy Court granted the Debtors' Motion, concluding that the NEC/SU Settlement was fair and reasonable and in the best interests of the Debtors' estates.  See Order Under 11 U.S.C. §§ 105 and 502(e) and Fed. R. Bankr. P. 9019 and 3018 Granting Debtors Motion for Order Approving Settlement of Claims with

Southern Union Company and Narragansett Electric Company, dated January 9, 2004 (Bankr. Docket No. 4865) (the "NEC/SU Settlement Order"), attached hereto as Exhibit 4.

11.    Pursuant to the NEC/SU Settlement, the Debtors' estates were released from substantial claims asserted by NEC and SU for millions of dollars of losses incurred and projected to be incurred on account of alleged environmental damage at the MGP Sites. In exchange, NEC and SU were awarded an "Allowed Remediation Claim" in the amount of $15 million for "all past, present and/or future claims held or asserted." Exhibit A to Exhibit 4, ¶¶ 2, 5. That amount was to be paid in a cash distribution of $5 million to NEC and SU on the Effective Date of the Plan and from fifty percent of any recoveries the Debtors obtained through "reasonable efforts" from their primary insurers, including Defendants, up to $10 million. Id. ¶¶ 5-6.

12.    On or about August 31, 2004, the Consolidated SWINC Estate and the Consolidated SWE&C Estate, in keeping with the terms of the NEC/SU Settlement, paid NEC and SU $5 million. Prior to such payment and again in connection with making the payment, demand for insurance coverage was made on various insurers, including Defendants. Further, over the past year and half, the Consolidated Estates have attempted to engage Defendants in settlement discussions concerning the Allowed Remediation Claim and other related claims for unpaid defense costs.[3]    All of the Consolidated Estates' efforts to obtain coverage from Defendants have failed.

---

[3] In addition to the amounts due to the Consolidated Estates on account of the NEC/SU Settlement, the Consolidated Estates have substantial pre- and post-confirmation claims for unpaid defense costs related to the environmental claims asserted by NEC and SU and others filed against the Debtors' estates. For instance, Debtors SWINC and SWMC alone have asserted claims for unpaid defense costs in excess of $1.5 million.

C.    **The Adversary Proceeding**

13.    In keeping with their commitment under the NEC/SU Settlement to use reasonable efforts to obtain recovery from their primary insurers, the Consolidated Estates commenced an adversary proceeding against Defendants in the Bankruptcy Court (the "Adversary Proceeding"). As set forth in their Complaint, the Consolidated Estates seek (a) a declaration that the claims made by the Consolidated Estates against Defendants on account of certain losses incurred by Plaintiffs in connection with the NEC/SU Claims filed against the Debtors' estates are covered by comprehensive general liability insurance policies held by the Consolidated Estates and issued by the Insurance Company of North America ("INA") and the Indemnity Insurance Company of North America ("IINA"); and (b) damages from Defendants for their breach of certain express and implied contractual obligations under those policies and violation of Rhode Island General Law § 9-1-33 and Massachusetts General Law chapter 93A, § 11, including, among other breaches and violations, Defendants' failure to provide insurance coverage for the Consolidated Estates' payment of an insured allowed claim in the Bankruptcy Case.

14.    On March 2, 2007, Defendants requested the Bankruptcy Court find that the Adversary Proceeding is "non-core" (the "Motion for Determination"). (Adv. Docket No. 12). The Defendants also requested that this Court enter an order withdrawing the reference to the Adversary Proceeding (the "Motion to Withdraw Reference"). (Adv. Docket No. 13).

15.    Contemporaneously with filing this Response, the Consolidated Estates filed a response in the Bankruptcy Court to the Motion for Determination.

## ARGUMENT

### I.    STANDARD FOR WITHDRAWAL OF THE REFERENCE

16.    The district court has original, but not exclusive, jurisdiction over all bankruptcy proceedings. 28 U.S.C. § 1334(b). The bankruptcy court exercises such jurisdiction under a standing order of reference, as provided by 28 U.S.C. § 157(a). Once a title 11 proceeding has been referred to the bankruptcy court, the district court's authority to withdraw the reference is governed by 28 U.S.C. § 157, which provides for both mandatory and permissive withdrawal.

17.    Withdrawal of the reference from the bankruptcy court is mandatory where the district court determines that resolution of the proceeding requires consideration of both title 11 and other federal laws. 28 U.S.C. § 157(d) ("The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."). *Defendant Century concedes that the factors for mandatory withdrawal are not present* and, therefore, relies upon permissive withdrawal as its basis to withdraw the reference. Motion to Withdraw Reference, ¶ 9, p. 5.

18.    Withdrawal from the bankruptcy court is permissive under Section 157(d) "for cause shown." 28 U.S.C. § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."). As the movant in this case, Defendant Century bears the burden to show such cause. In re Pruitt, 910 F.2d 1160, 1168 (3d Cir. 1990); In re American Capital Equipment, LLC, 325 B.R. 372, 375 (W.D. Pa. 2005); In re NDEP Corp., 203 B.R. 905, 907 (D. Del. 1996).

19.    Although the phrase "for cause shown" is not defined in the statute, the Court of Appeals for the Third Circuit has set forth five factors that a district court should consider in determining whether "cause" exists for permissive withdrawal.    These factors include: (1) promoting uniformity of bankruptcy administration; (2) reducing forum shopping and confusion; (3) fostering economical use of debtor/creditor resources; (4) expediting the bankruptcy process; and (5) the timing of the request for withdrawal. In re Pruitt, 910 F.2d at 1168.

20.    In addition, district courts also consider whether the parties have requested a jury trial in determining whether "cause" exists for permissive withdrawal.  Assertion of a right to a jury trial, however, even when coupled with a refusal to consent to such trial before the bankruptcy court, is not of itself sufficient cause to justify discretionary withdrawal.    In re Northwestern Institute of Psychiatry, Inc., 268 B.R. 79, 84 (Bankr. E.D. Pa. 2001); see also RFE Industries, Inc. v. Anton Noll, Inc., No. 99-334, 2002 U.S. Dist. Lexis 26414, *10-12 (D.N.J. April 23, 2002).

21.    Finally, whether the action sought to be withdrawn is a core or non-core proceeding is relevant in determining whether "cause" exists for permissive withdrawal. See In re NDEP, 203 B.R. at 908.    The fact that a matter is non-core, however, does not require withdrawal of the reference. See infra pp. 9-10.

## II.    DEFENDANT CENTURY HAS FAILED TO SHOW CAUSE TO WITHDRAW THE REFERENCE

22.    When all the permissive withdrawal factors are considered, Defendant Century has failed to establish cause to withdraw the reference. In re Pruitt, 910 F.2d at 1168 (stating that 28 U.S.C. § 157(d) "requires in clear terms that cause be shown before the reference can be withdrawn") In fact, despite Defendant Century's assertions to the contrary, the permissive withdrawal factors outlined by the Third Circuit weigh strongly in favor of retaining the case

under the Bankruptcy Court's jurisdiction. See, e.g., In re Allegheny Health Education and Research Foundation, No. 06-1469, 2006 U.S. Dist. Lexis 91548 (W.D. Pa. Dec. 16, 2006) (permissive withdrawal denied where movant failed to show cause); In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, *4-5 (same); In re American Capital Equipment, 325 B.R. at 378-380 (same); In re Philadelphia Training Center Corporation, 155 B.R. 109, 112 (E.D. Pa. 1993) (same); Hatzel & Buehler, Inc., 106 B.R. 367, 370-71 (D. Del. 1989) (same); Valley Forge Plaza Associates v. Fireman's Fund Insurance Companies, 107 B.R. 514, 518 (E.D. Pa. 1989) (same).

**A.    The Adversary Proceeding is a Core Proceeding.**

23.    As stated in their opposition to the Motion for Determination, attached hereto as Exhibit 1, and incorporated herein by reference, the Consolidated Estates contend that the Adversary Proceeding, which would not exist and could not arise absent the bankruptcy case and whose underlying cause of action accrued post-petition, is a core proceeding.  That factor counsels in favor of retaining the reference in the Bankruptcy Court.

**B.    Even if the Adversary Proceeding is Non-Core, Withdrawal of the Reference is Not Mandated.**

24.    In its Motion to Withdraw Reference, Defendant Century suggests that cause exists to withdraw the reference simply because the Adversary Proceeding is purportedly non-core.  Even assuming, however, that the Adversary Proceeding is non-core, it is well established that "proceedings should not be withdrawn for the sole reason that they are non-core." Hatzel & Buehler, 106 B.R. at 371 (cause does not exist to withdraw the reference simply because the proceeding is non-core); see also Jamuna Real Estate, LLC v. Pratpal Bagga, No. 06-00050, 2007 U.S. Dist. Lexis 4559, *6-10 (E.D. Pa. Jan. 22, 2007) (denying motion to withdraw reference where bankruptcy court had related to jurisdiction and interests of judicial economy, uniformity and fairness would be best served by retention of jurisdiction by the bankruptcy

court); In re Big V Holding Corp. v. C&S Wholesale Grocers, Inc., No. 01-233, 2002 U.S. Dist. Lexis 12609, *12-15 (D. Del. July 11, 2002) (same); In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, *4-5 (same).

25.    Moreover, Defendant Century's suggestion that cause to withdraw the reference exists simply because a proceeding is non-core reads language into 28 U.S.C. § 157(d) that is not there.    See Hatzel & Buehler, 106 B.R. at 371.    Such a reading would make withdrawal nondiscretionary when the proceeding is non-core.    However, Congress authorized the district courts to refer both core and non-core proceedings to the bankruptcy courts. Id.

26.    In fact, this Court has held that the requirement that cause be shown for withdrawal of the reference "creates a presumption that Congress intended to have bankruptcy proceedings adjudicated in bankruptcy court, unless rebutted by a contravening policy." In re Winstar Communications, Inc., No. 04-928, 2004 U.S. Dist. Lexis 25169, *6 (D. Del. Nov. 16, 2004); see also Hatzel & Buehler, 106 B.R. at 371. Defendant Century has failed to rebut this presumption.

27.    In any event, even assuming *arguendo* that the Adversary Proceeding is non-core, the additional factors considered by courts in connection with permissive withdrawal do not support withdrawal of the reference.

**C.    The Bankruptcy Court has "Related To" Jurisdiction Over the Adversary Proceeding and Expressly Retained Jurisdiction Over the Adversary Proceeding.**

28.    Pursuant to 28 U.S.C. § 157(c), bankruptcy courts retain jurisdiction to hear non-core proceedings that are otherwise "related to" a bankruptcy case. See 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11."); In re Resorts International, Inc., 372 F.3d 154 (3d Cir. 2004);

Corestates Bank, N.A. v. Huls America, Inc., 176 F.3d 187 (3d Cir. 1999); Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984).

29.    In Pacor, the Third Circuit Court of Appeals set forth the seminal test for determining the boundaries of "related to" jurisdiction.  Under Pacor, bankruptcy courts have jurisdiction to hear a proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Pacor, 743 F.2d at 994; see also In re G-I Holdings, Inc., 278 B.R. 376, 384-85 (Bankr. D.N.J. 2002); In re G-I Holdings, Inc., 278 B.R. 725, 737 (Bankr. D.N.J. 2002).  The key word in such test is "conceivable"—"certainty, or even likelihood, is not a requirement." In re Marcus Hook Development Park, Inc., 943 F.2d 261 (3d Cir. 1991).  Further, the Third Circuit explained:

> The proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

Pacor, 743 F.2d at 994.  Bankruptcy court likewise retain post-confirmation jurisdiction where there is "a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter." In re Resorts International, 372 F.3d at 166-67.

30.    Here, the Adversary Proceeding will have, at the very least, a "conceivable effect" on the Bankruptcy Case and has a close nexus to the Joint Plan and approval of the NEC/SU Settlement.  See, e.g., In re G-I Holdings, 278 B.R. at 737.  Specifically, the Adversary Proceeding (a) will alter the Debtors' rights and liabilities (by a determination of the Debtors' coverage rights under the insurance policies at issue and the amounts to be paid to NEC/SU pursuant to the terms of the NEC/SU Settlement); (b) will impact the handling and administration of the Debtors' estates (by ensuring that sufficient assets are available to ensure

reasonable distributions to equity security holders or creditors while still ensuring sufficient assets to pursue legitimate claims against third parties, and by resolving disputes among third parties about their respective duties and obligations to the Consolidated Estates); (c) is inextricably tied to the NEC/SU Claims and the NEC/SU Settlement (insofar as the cause of action is based on the Defendants' failure to defend against the NEC/SU Claims and to indemnify under the NEC/SU Settlement approved by the Bankruptcy Court); and (d) will directly effect distributions to NEC/SU pursuant to the terms of the NEC/SU Settlement and to other creditors and equity holders under the Joint Plan (by augmenting amounts available for distribution to creditors of the SWE&C Liquidating Trust where even recoveries well below $10 million should result in significant percentage increases to creditor recoveries, and by helping the Consolidated SWINC Estate to pay its remaining creditors and provide a recovery to equity security holders).

31.    In addition, the Adversary Proceeding is inextricably linked to the Joint Plan. Specifically, the Joint Plan defines "Litigation Claims" as those that:

> [A] Debtor or its Estate may hold against any Person, or that is deemed property of a Debtor's Estate or a consolidated Estate under the Third Joint Plan or applicable bankruptcy law, which are retained by the SWINC Plan Administrator, or the SWE&C Liquidating Trustee, or the respective Consolidated Estates, as the case may be, pursuant to Article VII.R of this Third Joint Plan, including, but not limited to, the claims described in Third Joint Plan Exhibit B.

Exhibit 3, ¶ 1.110.    In Exhibit B of the Joint Plan, the claims at issue in the Adversary Proceeding are expressly deemed "Litigation Claims."    Id., Ex. B ("Any claims against any person, company or entity that provided or provides insurance to the Debtors for any failure to provide contractual coverage, including, but not limited to: ACE Insurance Company Ltd. . . . .").

11

32.    Therefore, even if a non-core proceeding, it cannot be disputed that the Bankruptcy Court has "related to" jurisdiction over the Adversary Proceeding.

33.    Moreover, in their attempt to withdraw the reference, Defendant Century also disregards the fact that the Bankruptcy Court retained jurisdiction over the claims giving rise to the Adversary Proceeding in the Confirmation Order, the Joint Plan, and the NEC/SU Settlement Order. Exhibits 2-4.

34.    Specifically, paragraph 35 of the Confirmation Order provides that, pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction as provided in the Joint Plan over all matters arising out of, and related to, the Bankruptcy Case and the Joint Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XIV of the Joint Plan. Exhibit 2, ¶ 35. As provided in Article XIV, paragraphs (ii), (v) and (xiii), of the Joint Plan, the Court retained jurisdiction to:

> a)    Hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located.
>
> b)    Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases.
>
> c)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases.

Exhibit 3, Art. XIV.

35.    Further, in the NEC/SU Settlement Order, the Bankruptcy Court also retained jurisdiction "to determine the reasonableness of any proposed settlement between the Debtors

[and their successors and assigns] and their primary insurers" with regard to the claims giving rise to the Adversary Proceeding. Exhibit 4, ¶ 8.

36.     Insofar as the Bankruptcy Court retains "related to" jurisdiction over the Adversary Proceeding, the retention of jurisdiction provisions in the Confirmation Order, Joint Plan, and the NEC/SU Settlement Order are fully enforceable and vest exclusive jurisdiction over the Adversary Proceeding with the Bankruptcy Court. See, e.g., In re Resorts International, 372 F.3d at 161 (finding that "if there is jurisdiction[, courts] will give effect to retention of jurisdiction provisions"); In re Emerson Radio Corp., 173 B.R. 490, 495 (D.N.J. 1994), aff'd 52 F.3d 50 (3d Cir. 1995) (transfer from state court to district court in which bankruptcy case was pending where plan of reorganization provided that bankruptcy court retained exclusive jurisdiction); Norkus Enters., Inc. v. Getty Oil Co., No. 04-4437, 2005 U.S. Dist. Lexis 29262 (D.N.J. 2005) (the bankruptcy court retained jurisdiction for all matters pertaining to the bankruptcy case and reorganized estate as set forth in the plan and confirmation order); Johns-Manville Corp. v. Colorado Ins. Guaranty Ass'n, 91 B.R. 225 (S.D.N.Y. 1988) (court granted injunction against state court action where plan provided that court retained jurisdiction over certain matters); In re 12th & N Joint Venture, 63 B.R. 36, 38 (Bankr. D. Col. 1986) (holding that the court has exclusive jurisdiction over matters retained in the plan).

### D.     Retaining the Reference in the Bankruptcy Court Will Promote Uniformity in Bankruptcy Administration.

37.     With regard to the factors articulated by the Third Circuit for determining whether "cause" exists for permissive withdrawal (In re Pruitt, 910 F.2d at 1168), retaining the reference in the Bankruptcy Court will promote uniformity in bankruptcy administration. See, e.g., In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, at *4-5 (withdrawal of reference denied where

uniformity of bankruptcy administration furthered by remaining in bankruptcy court, even though a non-core proceeding); In re American Capital Equipment, 325 B.R. at 378.

38.    The Bankruptcy Case has been before the Bankruptcy Court since June 2, 2000 and, as of March 27, 2007, there were no less than 6097 docket entries in the underlying bankruptcy. The Bankruptcy Court is also familiar with the NEC/SU Claims and the NEC/SU Settlement, the facts of which give rise to the claims asserted in the Adversary Proceeding. Specifically, the Bankruptcy Court oversaw discovery and held an evidentiary hearing in connection with the NEC/SU Settlement, which required it to address the complex issues underlying the NEC/SU Settlement and the NEC/SU Claims and to consider the objection of Defendant Century to the NEC/SU Settlement. Only after consideration of the evidence and objections raised, the Bankruptcy Court ultimately concluded that the NEC/SU Settlement was fair and reasonable and in the best interests of the Debtors' estates.

39.    Consequently, the Bankruptcy Court has an intimate knowledge of the Bankruptcy Case, the relevant parties to this Adversary Proceeding, the basis for the Consolidated Estates' claims against Defendants, and the insurance coverage at issue in the Adversary Proceeding. Therefore, allowing the Bankruptcy Court to steer the same parties through factual discovery related to the Adversary Proceeding and to determine Defendants' coverage obligations to the Consolidated Estates as a result of the NEC/SU Claims (which were filed in the Bankruptcy Court) and the NEC/SU Settlement (which was approved by the Bankruptcy Court) will promote administrative and substantive uniformity. See In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, at *4-5 (finding that retaining the reference in the Bankruptcy Court promoted the uniformity of bankruptcy administration where the underlying bankruptcy, which included 646 docket entries, had been with the Bankruptcy Court for 19 months); In re

American Capital Equipment, 325 B.R. at 378 (finding that retaining the reference in the Bankruptcy Court promoted the uniformity of bankruptcy administration where the Bankruptcy Court was "already familiar with [the debtor's] negotiation of the proposed plan, and the terms thereof, which facts [we]re the basis of [the] adversary complaint").

### E.    Retaining the Reference in the Bankruptcy Court will Avoid Forum Shopping and Confusion.

40.    In addition, retention of the reference by the Bankruptcy Court will avoid forum shopping and confusion. In re Pruitt, 910 F.2d at 1168. Although Defendant Century asserts that the forum shopping factor is inapplicable here, Defendants unsuccessfully objected to the NEC/SU Settlement and have since failed to engage Plaintiffs in good faith to effectuate a prompt, fair and equitable settlement of claims in which their liability was made clear under the NEC/SU Settlement. One may presume that Defendant Century hopes to evade the long history of these matters in the Bankruptcy Court by securing jurisdiction in the District Court. That, however, is not a valid reason for the Court to withdraw the reference of a proceeding properly pending before the Bankruptcy Court. See In re American Capital Equipment, 325 B.R. at 379.

41.    Further, as previously stated, the Bankruptcy Court is familiar with the parties to the Adversary Proceeding, the claims underlying the Consolidated Estates' coverage demand to the Defendants, and the NEC/SU Settlement itself, which forms the basis of the Consolidated Estates' coverage demand. The Bankruptcy Court also has resolved claims against other insurance carriers in the Bankruptcy Case. Thus, retaining the reference in the Bankruptcy Court eliminates any possibility of confusion with regard to the relevant issues in the Adversary Proceeding.

**F.    Retaining the Reference in the Bankruptcy Court Fosters the Economical Use of the Debtors' and Creditors' Resources.**

42.    Further, retention of the Adversary Proceeding by the Bankruptcy Court will foster economical use of the Debtors' and creditors' resources.  Specifically, it will keep the parties in one court, before one judge, and subject to one schedule.  See In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, at *4-5 (finding that allowing the Bankruptcy Court to retain the reference "is plainly in the interest of the debtor and . . . Defendants since it will be proceeding before the same judge that is handling the underlying bankruptcy case, up until trial").  It will also allow the same court that presided over the confirmation of the Joint Plan and approval of the NEC/SU Settlement to interpret and apply the terms of the Joint Plan and the NEC/SU Settlement in the context of the Adversary Proceeding.

43.    Contrary to Defendant Century's argument that judicial resources will be wasted absent withdrawal of the reference, the Bankruptcy Court is uniquely qualified, through its unmatched familiarity with the issues underlying the Adversary Proceeding, to manage the Adversary Proceeding in an expeditious and economical manner.  In addition, retaining the reference in the Bankruptcy Court will not require a duplication of effort by the District Court. If a core proceeding, the Bankruptcy Court will resolve the Adversary Proceeding and, if a non-core proceeding, the Bankruptcy Court, in exercising its "related to" jurisdiction, will submit proposed findings of fact and conclusions of law to the District Court, which it will consider in entering any final order or judgment.  28 U.S.C. § 157(c); In re American Capital Equipment, 325 B.R. at 379 n.1.

**G.    Retaining the Reference in the Bankruptcy Court Will Expedite the Bankruptcy Process.**

44.    In its motion to withdraw, Defendant Century argues that the Adversary Proceeding "is sufficiently different from the kind of cases that typically arise in the course of bankruptcy administration" and, therefore, that withdrawal of the reference will promote convenience and expedite the bankruptcy process.  Motion to Withdraw Reference ¶ 17, p. 8. That assertion, however, is inconsistent with the Bankruptcy Case.

45.    In fact, throughout the Bankruptcy Case, the Bankruptcy Court has addressed numerous insurance-related disputes, including the analysis of insurance policies, analysis of proofs of claim asserted by various insurance companies, and approval of settlement agreements resolving insurance claims and insurance-related disputes (including the NEC/SU Settlement).

46.    Thus, streamlining a determination of the Adversary Proceeding through the Bankruptcy Court, which is most familiar with the underlying parties and facts relevant to the Adversary Proceeding (including Debtors' chapter 11 cases, the parties, the Debtors' insurance coverage, and the coverage disputes at issue in the Adversary Proceeding), will allow them to be resolved most efficiently and expeditiously.  See In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, at *5-6 ("Since the bankruptcy judge is familiar with the parties and the issues, it stands to reason that permitting him to rule on the motion would expedite the case.").

**H.    The Timing of Defendant Century's Request Militates Against Withdrawal of the Reference.**

47.    The timing of Defendant Century's request for withdrawal militates against withdrawing the reference.  As noted by a District Court in this Circuit, the fact that an adversary proceeding is in an early stage "weighs in favor of not withdrawing the reference."  In re GGC, LLC, 2006 U.S. Dist. Lexis 69163, *6.  In fact, "[c]ourts have . . . recognized that it serves the

interests of judicial economy and efficiency to keep an action in Bankruptcy Court for the resolution of pre-trial managerial matters, even if the action will ultimately be transferred to a district court for trial." Id. (quoting In re Enron Corp., 295 B.R. 21, 28 (S.D.N.Y. 2003)).

48.    Here, there is a distinct possibility that many of the issues raised by the complaint will be amenable to resolution on summary judgment prior to a jury trial (if requested by Defendants) or settlement.  Given the Bankruptcy Court's intimate knowledge of the underlying parties and facts relevant to the Adversary Proceeding, the Bankruptcy Court is best suited to advance both possibilities.

**I.    Even if Defendants Request a Jury Trial, Withdrawal of the Reference is Not Warranted.**

49.    Finally, even if Defendants request a jury trial (a commitment they have studiously avoided so far), immediate withdrawal of the reference is not warranted.  As the Court explained in In re American Capital Equipment, LLC, 325 B.R. at 378, "the possibility that a jury trial might be held at some point in the future does not warrant immediate withdrawal of the reference during the pre-trial stages of the case."  Rather, "[i]t is appropriate, efficient, and logical that withdrawal of the reference in such circumstances can be deferred until the case is trial ready." Id.

WHEREFORE, the Consolidated Estates respectfully request that the Court enter an Order denying Defendant Century's Motion to Withdraw Reference and granting such other and further relief as is just and proper.

[SIGNATURES ON FOLLOWING PAGE]

Dated:  March 30, 2007
      Wilmington, Delaware

THE SWE&C LIQUIDATING TRUST

By: _____/s/ Kerri K. Mumford_____
    Adam G. Landis (No. 3407)
    Kerri K. Mumford (No. 4186)
    LANDIS RATH & COBB LLP
    919 Market Street, Suite 600
    Wilmington, DE  19801
    Tel:  (302) 467-4400
    Fax:  (302) 467-4450

    - and -

    Lorraine S. McGowen, *pro hac vice*
    ORRICK, HERRINGTON
     & SUTCLIFFE LLP
    666 Fifth Avenue
    New York, NY  10103-0002
    Tel:  (212) 506-5000
    Fax:  (212) 506-5151

    - and -

    James E. Houpt, *pro hac vice*
    Kathleen A. Orr, *pro hac vice*
    ORRICK, HERRINGTON
     & SUTCLIFFE LLP
    400 Capitol Mall, Suite 3000
    Sacramento, CA  95814
    Tel:  (916) 447-9200
    Fax: (916) 329-4900

Counsel to the SWE&C Liquidating Trust

THE CONSOLIDATED SWINC ESTATE

By: _____
    Ian Connor Bifferato (No. 3273)
    Garvan F. McDaniel (No. 4167)
    Linda Richenderfer (No. 4138)
    BIFFERATO GENTILOTTI LLC
    800 N. King Street, Plaza Level
    Wilmington, DE 19801
    Tel:  (302) 429-1900
    Fax:  (302) 429-8600

    - and -

    Carmen H. Lonstein, *pro hac vice*
    Steven A. Domanowski, *pro hac vice*
    BELL, BOYD & LLOYD LLC
    70 W. Madison St., Suite 3200
    Chicago, Illinois 60602-4207
    Tel:  (312) 372-1121
    Fax:  (312) 372-2098

Counsel to the Consolidated SWINC Estate

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| STONE & WEBSTER, INCORPORATED, | ) | Case No. 00-2142 (PJW) |
| *et al.,* | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered[1] |
| | ) | |
| CONSOLIDATED SWINC ESTATE, and | ) | |
| SWE&C LIQUIDATING TRUST | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Adversary No. 07-50390 |
| | ) | |
| ACE USA, INC., and | ) | |
| CENTURY INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**THE SWINC PLAN ADMINISTRATOR'S AND THE SWE&C LIQUIDATING
TRUST'S RESPONSE IN OPPOSITION TO THE MOTION OF DEFENDANT
CENTURY INDEMNITY COMPANY PURSUANT TO BANKR. L.R. 5011-1 FOR
DETERMINATION THAT THE PROCEEDING IS NON-CORE**

---

[1] The Debtors are the Consolidated SWINC Estate and the Consolidated SWE&C Estate. As more specifically set forth in Article VII(B) of the Third Amended Joint Plan of Reorganization of the Debtors In Possession, Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders, With Respect to (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Third Joint Plan")(Docket No. 4878), certain debtor subsidiaries of Stone & Webster, Incorporated are merged into Stone & Webster, Incorporated, and their estates have been substantively consolidated to become the Consolidated SWINC Estate; and certain debtor subsidiaries of Stone & Webster Engineers and Constructors, Inc. are merged into Stone & Webster Engineers and Constructors, Inc., and their estates have been substantively consolidated to become the Consolidated SWE&C Estate.

DKT. NO. 21
DT. FILED 3/30/07

## TABLE OF CONTENTS

BACKGROUND ............................................................................................3

    A.    The Bankruptcy Cases ...........................................................3

    B.    The NEC/SU Claims and NEC/SU Settlement................................5

    C.    The Adversary Proceeding ........................................................7

ARGUMENT ............................................................................................8

    A.    This Proceeding Could Only "Arise in the Context of a Bankruptcy
           Case" and, Therefore, is a Core Proceeding ....................................8

    B.    Insurance Coverage Disputes are Not *De Facto*
           Non-Core Proceedings ...........................................................11

# TABLE OF AUTHORITIES

## CASES

In re Allied Products Corp.,
    No. 02 C 8436, 2003 U.S. Dist. LEXIS 2596 (N.D. Ill. 2003)................................................9

In re American Capital Equipment, LLC,
    325 B.R. 372 (W.D. Pa. 2005) ........................................................................................11

In re Brass Corp.,
    110 F.3d 1261 (7th Cir. 1997) ........................................................................................9

Corestates Bank, N.A. v. Huls America, Inc.,
    176 F.3d 187 (3d Cir. 1999)............................................................................................8

Koken v. Reliance Group Holdings, Inc. (In re Reliance Group Holdings, Inc.),
    273 B.R. 374 (E.D. Pa. 2002) ........................................................................................12

In re Ramex Int'l, Inc.,
    91 B.R. 313 (E.D. Pa. 1988) ..........................................................................................9

Valley Forge Plaza Assocs. v. Fireman's Fund Ins. Cos.,
    107 B.R. 514 (E.D. Pa. 1989) ...................................................................................11, 12

In re West Electronics, Inc.,
    128 B.R. 900 (D.N.J. 1991) .......................................................................................10, 11

## STATUTES & RULES

11 U.S.C. §§ 101-1330 ...............................................................................................................3

11 U.S.C. §§ 105 .......................................................................................................................9

11 U.S.C. § 501 .........................................................................................................................9

11 U.S.C. § 502(a) .....................................................................................................................9

28 U.S.C. § 157(b)(2)(A)...........................................................................................................11

Fed. R. Bankr. P. 3018...............................................................................................................9

Fed. R. Bankr. P. 9019...............................................................................................................9

Massachusetts General Law Chap. 93A, § 11 ............................................................................8

Rhode Island General Law § 9-1-33 ................................................................................................7

The SWINC Plan Administrator, on behalf of the Consolidated SWINC Estate, and the SWE&C Liquidating Trustee, on behalf of the SWE&C Liquidating Trust (collectively, the "Consolidated Estates" or "Plaintiffs") hereby file this Response in Opposition to Motion of Defendant Century Indemnity Company ("Defendant Century") Pursuant to Del. Bankr. L.R. 5011-1 for Determination that the Proceeding is Non-Core (the "Motion for Determination").

As set forth herein, there is no hard and fast rule that all insurance coverage actions are non-core proceedings. In fact, there are numerous cases in this Circuit in which courts have found that such actions are core proceedings. Moreover, this proceeding, by its nature, could only arise in the context of a bankruptcy case. As such, it is a core proceeding and properly heard by this Court.

## BACKGROUND

### A.    The Bankruptcy Cases

1.    On June 2, 2000, Stone & Webster, Incorporated and certain of its subsidiaries (collectively, "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"). Thereafter, Debtors' chapter 11 cases were consolidated for procedural purposes and were jointly administered under Case No. 00-2142 (PJW) (the "Bankruptcy Case").

2.    On January 16, 2004, the Court entered its Findings Of Fact, Conclusions Of Law, And Order (Docket No. 4879) (the "Confirmation Order") confirming the Third

3

Amended Joint Plan of the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders with Respect to (I) Stone & Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of its Subsidiaries (the "Joint Plan").[2]

3.      On January 27, 2004 (the "Effective Date"), the Joint Plan became effective.

4.      The Joint Plan provides for the substantive consolidation of Stone & Webster, Incorporated ("SWINC") and its direct subsidiaries (except Stone & Webster Engineers and Constructors, Inc., and its subsidiaries) into the SWINC Estate.  Pursuant to the SWINC Plan Administrator Agreement, the SWINC Plan Administrator, on behalf of the SWINC Estate, may, among other things, pursue any and all rights under the insurance policies of a SWINC Estate Debtor providing coverage with respect to Insured Claims.

5.      The Joint Plan also provides for the substantive consolidation of Stone & Webster Engineers and Constructors, Inc. ("SWE&C") and its direct subsidiaries (including SWEC and SWMC, defined below) into the Consolidated SWE&C Estate.  On the Effective Date, the assets of the Consolidated SWE&C Estate were transferred to the SWE&C Trust.  Pursuant to the SWE&C Trust Agreement, the SWE&C Liquidating Trustee may, among other things, retain any and all rights involving an insurance policy of a SWE&C Estate Debtor with respect to Insured Claims, and commence actions involving SWE&C Trust Assets.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Plan.

**B.      The NEC/SU Claims and NEC/SU Settlement**

6.      Southern Union Company ("SU") and Narragansett Electric Company ("NEC") each filed proofs of claim against Plaintiffs' predecessors in the Bankruptcy Case (collectively, the "SU/NEC Claims"), on a joint and several liability theory, seeking to recover costs allegedly incurred in the cleanup of various manufactured gas plants or manufactured gas waste disposal sites (collectively, the "MGP Sites") allegedly owned by, operated by, or otherwise under the effective control of SWINC, Stone & Webster Engineering Corporation ("SWEC"), and/or Stone & Webster Management Consultants, Inc. ("SWMC"), and/or certain predecessors-in-interest (collectively, the "SW Defendants").

7.      In the SU/NEC Claims, SU and NEC alleged that one or more of the SW Defendants were responsible for creating, depositing, or transporting waste at the MGP Sites, which SU and/or NEC were later required to remove. The SU/NEC Claims sought over $20 million for amounts actually incurred and underdetermined future amounts from the SW Defendants in connection with the remediation of the MGP Sites.

8.      To avoid the risks and further expenses inherent in the continued litigation of the SU/NEC Claims and in the best interests of their creditors, the Debtors, including the SW Defendants, agreed to settle the SU/NEC Claims in an amount that was fair and reasonable in relation to the SW Defendants' potential exposure and the costs of continuing to defend the SU/NEC Claims. See Settlement Agreement between Stone and Webster Incorporated, et al., Southern Union Company, and The Narragansett Electric Company (the "SU/NEC Settlement"), attached as Exhibit A to Exhibit 1.

9.    On October 29, 2003, the Debtors filed a Motion for Order Under Fed. R. Bankr. P. 9019 and 3018 Approving Settlement of Claims with Southern Union Company and Narragansett Electric Company (Docket No. 4657) (the "NEC/SU Settlement Motion"). Defendant Century, among others, objected to the NEC/SU Settlement Motion (Docket No. 4687).

10.    After an evidentiary hearing and consideration of all the evidence and objections raised (including Defendant Century's objection), this Court granted the NEC/SU Settlement Motion, concluding that the NEC/SU Settlement was fair and reasonable and in the best interests of the Debtors' estates. Order Under 11 U.S.C. §§ 105 and 502(e) and Fed. R. Bankr. P. 9019 and 3018 Granting Debtors Motion for Order Approving Settlement of Claims with Southern Union Company and Narragansett Electric Company, dated January 9, 2004 (Docket No. 4865) (the "NEC/SU Settlement Order"), attached hereto as Exhibit 1.

11.    Pursuant to the NEC/SU Settlement, the Debtors' estates were released from substantial claims asserted by NEC and SU for millions of dollars of losses incurred and projected to be incurred on account of alleged environmental damage at the MGP Sites. In exchange, NEC and SU were awarded an "Allowed Remediation Claim" in the amount of $15 million for "all past, present and/or future claims held or asserted." Exhibit A to Exhibit 1, ¶¶ 2, 5. That amount was to be paid in a cash distribution of $5 million to NEC and SU on the Effective Date of the Plan and from fifty percent of any recoveries the Debtors obtained through "reasonable efforts" from their primary insurers, including Defendants, up to $10 million. Id. ¶¶ 5-6.

12.    On or about August 31, 2004, the Consolidated SWINC Estate and the Consolidated SWE&C Estate, in keeping with the terms of the NEC/SU Settlement, paid NEC and SU $5 million. Prior to such payment and again in connection with making the payment, demand for insurance coverage was made on various insurers, including Defendants. Further, over the past year and half, the Consolidated Estates have attempted to engage Defendants in settlement discussions concerning the Allowed Remediation Claim and other related claims for unpaid defense costs.[3] All of the Consolidated Estates' efforts to obtain coverage from Defendants have failed.

## C.    The Adversary Proceeding

13.    In keeping with their commitment under the NEC/SU Settlement to use reasonable efforts to obtain recovery from their primary insurers, the Consolidated Estates commenced this adversary proceeding against Defendants (the "Adversary Proceeding"). As set forth in their Complaint, the Consolidated Estates seek (a) a declaration that the claims made by Plaintiffs against Defendants on account of certain losses incurred by Plaintiffs in connection with the NEC/SU Claims filed against the Debtors' estates are covered by comprehensive general liability insurance policies held by Plaintiffs and issued by the Insurance Company of North America ("INA") and the Indemnity Insurance Company of North America ("IINA"); and (b) damages from Defendants for their breach of certain express and implied contractual obligations under those policies and violation of Rhode Island General Law § 9-1-33 and Massachusetts

---

[3] In addition to the amounts due to the Consolidated Estates on account of the NEC/SU Settlement, the Consolidated Estates have substantial pre- and post-confirmation claims for unpaid defense costs related to the environmental claims asserted by NEC and SU and others filed against the Debtors' estates. For instance, Debtors SWINC and SWMC alone have asserted claims for unpaid defense costs in excess of $1.5 million.

General Law chapter 93A, § 11, including, among other breaches and violations, Defendants' failure to provide insurance coverage for Plaintiffs' payment of an insured allowed claim in the Bankruptcy Case.

14.    On March 2, 2007, Defendant Century filed the Motion for Determination (Adv. Docket No. 12). On March 2, 2007, Defendant Century also filed a motion with the District Court requesting that the District Court enter an order withdrawing the reference to the Adversary Proceeding (the "Motion to Withdraw Reference") (Adv. Docket No. 13).

15.    Contemporaneously with filing this Response, Plaintiffs filed a response in opposition to the Motion to Withdraw Reference.

## ARGUMENT

### A.    This Proceeding Could Only "Arise in the Context of a Bankruptcy Case" and, Therefore, is a Core Proceeding.

16.    In the Third Circuit, an action is core when it (i) invokes a substantive right provided by title 11, or (ii) by its nature, could arise only in the context of a bankruptcy case. Corestates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 196 (3d Cir. 1999).

17.    According to Defendant Century, the insurance coverage issues underlying the NEC/SU Claims were being addressed by Stone & Webster prior to the Bankruptcy Case and, as such, do not invoke a substantive right provided by title 11 nor by their nature could arise only in the Bankruptcy Case. See Motion for Determination, at 6. That argument, however, oversimplifies and disregards the facts in this Adversary Proceeding, which establish that this proceeding, by its nature, could only arise in the context of a bankruptcy case.

18.    Specifically, the basis of the Adversary Proceeding is Defendants' failure to defend against the NEC/SU Claims and to indemnify the Consolidated Estates in connection with the NEC/SU Settlement. Neither the NEC/SU Claims, which proofs of claim are unique to bankruptcy cases (11 U.S.C. § 501), nor the NEC/SU Settlement, which was approved by the Court pursuant to the Bankruptcy Code and Rules (11 U.S.C. §§ 105 and 502(a); Bankr. R. P. 3018 and 9019), would exist absent the Bankruptcy Case. Thus, contrary to Defendant Century's allegations, this Adversary Proceeding would not exist and could not arise absent the Bankruptcy Case.

19.    In contrast, the cases cited by Defendant Century in which insurance coverage actions are found to be non-core could arise outside of bankruptcy. For instance, in In re Brass Corp., 110 F.3d 1261, 1268 (7th Cir. 1997), the Seventh Circuit found that the debtors' coverage claims were non-core where they could be "vindicated in an ordinary breach of contract suit" if the debtors were not bankrupt. Similarly, in In re Allied Products Corp., No. 02 C 8436, 2003 U.S. Dist. LEXIS 2596, *5 (N.D. Ill. 2003), the District Court for the Northern District of Illinois found that an insurance dispute was non-core where the insurance dispute did not arise under and was not in "any way related to" the Bankruptcy Code. Likewise, in In re Ramex Int'l, Inc., 91 B.R. 313, 315 (E.D. Pa. 1988), the District Court for the Eastern District of Pennsylvania found, inter alia, that a determination as to whether the insurance company's policies would provide coverage for any verdict ultimately entered against the debtor "could have been brought independent of the bankruptcy proceeding" and, as such, was non-core.

20.    In addition, the basis for the cause of action (i.e., Defendants' failure to defend the Consolidated Estates against the NEC/SU Claims and to indemnify under the

NEC/SU Settlement) occurred post-petition. As such, the cause of action accrued to the Debtors' estates. See In re West Electronics, Inc., 128 B.R. 900, 903-04 (D.N.J. 1991). Insofar as the Debtors' estates did not exist pre-petition, the estates could not have had a cause of action pre-petition and, therefore, this proceeding could not have arisen absent bankruptcy.

21.     In In re West Electronics, Inc., 128 B.R. 900, 904 (D.N.J. 1991), for example, the Court explained that the Third Circuit has "made it clear that a distinction must be drawn between a pre-petition and a post-petition cause of action." Id. Thus, the Court found that the debtor's insurance coverage action was core where, *inter alia*, "the events resulting in the loss and the cause of action for recovery under the insurance policy arose after the filing of the petition" and the debtor in possession "could not possibly have had a pre-petition cause of action because it did not come into existence until after the filing of the petition." Id. at 203-04.

22.     Again, Defendant Century maintains that the issues underlying the NEC/SU Claims were being addressed by Stone & Webster prior to the Bankruptcy Case. As an initial matter, the pre-petition efforts of Stone & Webster to which Defendant Century refers only concerned Defendants' duty to defend.   Moreover, Defendant Century disregards that NEC's and SU's claims were not fixed and determined prior to the Bankruptcy Case and were settled pursuant to a settlement approved by this Court and the Joint Plan. Thus, the Consolidated Estates' action to recover against Defendants accrued post-petition.

**B.    Insurance Coverage Disputes are Not *De Facto* Non-Core Proceedings.**

23.    Defendant Century further suggests that insurance coverage disputes are *de facto* non-core proceedings. There is, however, no hard and fast rule that all insurance coverage actions are non-core proceedings. See, e.g., In re American Capital Equipment, LLC, 325 B.R. 372, 377 (W.D. Pa. 2005) (finding that insurers' declaratory relief action is core where insurer tried to disclaim coverage based on debtor's negotiation and proposal of a bankruptcy plan; "Neither party has cited controlling case law as to whether a declaratory judgment action of the nature asserted by Travelers is a core proceeding. Courts in other jurisdictions have reached opposite conclusions when faced with the question of whether insurance coverage disputes are core or non-core proceedings.").

24.    In fact, there are numerous cases in this Circuit in which courts have found that such actions are <u>core</u> proceedings. For instance, in In re West Electronics, Inc., 128 B.R. at 903, this Court held that an action to recover from an insurance company was core where, *inter alia*, "the events resulting in the loss and the cause of action for recovery under the insurance policy arose after the filing of the petition" and, as a result, "that cause of action accrued to the estate and not to the debtor." According to the Court, the cause of action concerned the "administration of the estate" under 28 U.S.C. § 157(b)(2)(A) because the case "involve[d] damage to property which was already property of the estate and belonged to the debtor in possession whether by timing or by the operation of 11 U.S.C. §§ 541, 549 and 362(a)(4)." Id. at 904.

25.    Similarly, in Valley Forge Plaza Assocs. v. Fireman's Fund Ins. Cos., 107 B.R. 514, 517 (E.D. Pa. 1989), the District Court for the Eastern District of Pennsylvania found, in the context of an insurance coverage dispute, that there was "no constitutional

impediment that would prevent a bankruptcy court from deciding a post-petition cause of action based on a state law contract claim." Thus, because preservation of the insurance contract at issue was a matter concerning the "administration of the estate," the Court deemed the action to be core. Id. at 518. See also Koken v. Reliance Group Holdings, Inc. (In re Reliance Group Holdings, Inc.), 273 B.R. 374, 396 (E.D. Pa. 2002) ("Case law also supports the conclusion that an action for declaratory relief regarding the debtor's rights under insurance policies is a core proceeding.").

26.    The same rationales underlying those cases apply here. As already set forth above, the cause of action underlying this Adversary Proceeding – Defendants' failure to defend against the NEC/SU Claims and to indemnify in connection with the NEC/SU Settlement – occurred post-petition. Further, the Adversary Proceeding will augment amounts available for distribution to creditors of the SWE&C Liquidating Trust (where even recoveries below $10 million should result in significant percentage increases to creditor recoveries), help the Consolidated SWINC Estate pay its remaining creditors and provide a recovery to equity security holders, and resolve disputes among third parties about their respective duties and obligations to the Consolidated Estates. Thus, resolution of the Adversary Proceeding concerns the administration of the estate.

WHEREFORE, insofar as the Adversary Proceeding could only "arise in the context of a bankruptcy case," is based on a cause of action accruing post-petition, and concerns the administration of the estate, the Consolidated Estates respectfully request that the Court issue a determination that the Adversary Proceeding is a core proceeding.

[SIGNATURES ON FOLLOWING PAGE]

Dated:  March 30, 2007
       Wilmington, Delaware

THE SWE&C LIQUIDATING TRUST

THE CONSOLIDATED SWINC ESTATE

By:    /s/ Kerri K. Mumford
      Adam G. Landis (No. 3407)
      Kerri K. Mumford (No. 4186)
      LANDIS RATH & COBB LLP
      919 Market Street, Suite 600
      Wilmington, DE  19801
      Tel:  (302) 467-4400
      Fax:  (302) 467-4450

    - and -

      Lorraine S. McGowen, *pro hac vice*
      ORRICK, HERRINGTON
       & SUTCLIFFE LLP
      666 Fifth Avenue
      New York, NY  10103-0002
      Tel:  (212) 506-5000
      Fax:  (212) 506-5151

    - and -

      James E. Houpt, *pro hac vice*
      Kathleen A. Orr, *pro hac vice*
      ORRICK, HERRINGTON
       & SUTCLIFFE LLP
      400 Capitol Mall, Suite 3000
      Sacramento, CA  95814
      Tel:  (916) 447-9200
      Fax: (916) 329-4900


By:
      Ian Connor Bifferato (No. 3273)
      Garvan F. McDaniel (No. 4167)
      Linda Richenderfer (No. 4138)
      BIFFERATO GENTILOTTI LLC
      800 N. King Street, Plaza Level
      Wilmington, DE 19801
      Tel:  (302) 429-1900
      Fax:  (302) 429-8600

    - and -

      Carmen H. Lonstein, *pro hac vice*
      Steven A. Domanowski, *pro hac vice*
      BELL, BOYD & LLOYD LLC
      70 W. Madison St., Suite 3200
      Chicago, Illinois 60602-4207
      Tel:  (312) 372-1121
      Fax:  (312) 372-2098


Counsel to the Consolidated SWINC Estate

Counsel to the SWE&C Liquidating Trust

13

## CERTIFICATE OF SERVICE

I, Linda Richenderfer, hereby certify that on this 30th day of March, 2007, a copy of the

foregoing THE SWINC PLAN ADMINISTRATOR'S AND THE SWE&C LIQUIDATING

TRUST'S RESPONSE IN OPPOSITION TO THE MOTION OF DEFENDANT CENTURY

INDEMNITY COMPANY PURSUANT TO BANKR. L.R. 5011-1 FOR DETERMINATION

THAT THE PROCEEDING IS NON-CORE was caused to be served upon the following in the

manner indicated.

**VIA HAND DELIVERY**
Christian J. Singewald, Esquire
Marc S. Casarino, Esquire
White and Williams LLP
824 N. Market Street, Suite 902
Wilmington, DE 19801

**VIA U.S. MAIL**
The Corporation Trust Company
Registered Agent for ACE USA, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Linda Richenderfer (#4138)

**File an answer to a motion:**

07-50390-PJW Consolidated SWINC Estate and SWE&C Liquidating Tr v. ACE USA, Inc. et al

Type: ap                    Office: 1 (Delaware)           Lead Case: 00-02142-PJW
Judge: PJW                  Case Flag: ANSDue, NONPREF

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Richenderfer, Linda entered on 3/30/2007 at 11:54 AM EDT and filed on 3/30/2007

| | |
|---|---|
| **Case Name:** | Consolidated SWINC Estate and SWE&C Liquidating Tr v. ACE USA, Inc. et al |
| **Case Number:** | 07-50390-PJW |
| **Document Number:** | 21 |

**Docket Text:**
Response to *the Motion of Defendant Century Indemnity Company Pursuant to Bankr. L.R. 5011-1 for Determination that the Proceeding is Non-Core* (related document(s)[12] ) Filed by Consolidated SWINC Estate and SWE&C Liquidating Trust (Attachments: # (1) Exhibit 1# (2) Certificate of Service) (Richenderfer, Linda)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**H:\scans\Response.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=3/30/2007] [FileNumber=5550089-0]
[3340595f2a30fe262b0e2489b1ddf4478f3c3d07c759bc2ee1d6381dc4a6d34b51c3
a864a54b8caadf95e4456c6fe61da439e57e58507887cc088aa233dd8d65]]
**Document description:**Exhibit 1
**Original filename:**H:\scans\Exhibit 1 to Motion for Determination.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=3/30/2007] [FileNumber=5550089-1]
[476ec0e859b4d5cb5fea3dc92e9723dde7529577f57f15cc9bbaf7ba8f9b6d2940cb
56e5f9b663f7036532ac86b49e0d72d27eae820c51255dfd49241e84f61e]]
**Document description:**Certificate of Service
**Original filename:**H:\scans\COS.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=3/30/2007] [FileNumber=5550089-2]
[80857eb9ba6e6fef5d13e792790514e4d633e711c773470c2fb423c610ea77e28364
ee15be38a26051a4bfb0a1326cca3a3bffafeb34caaf9b3c0fc480ff44e5]]

**07-50390-PJW Notice will be electronically mailed to:**

Ian Connor Bifferato      icb@bgbde.com, jjh@bgbde.com;jmr@bgbde.com

Marc Stephen Casarino      casarinom@whiteandwilliams.com,

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
In re                                 :  Chapter 11
                                      :
STONE & WEBSTER, INCORPORATED, et al., :  Case No. 00-2142 (PJW)
                                      :
           Debtors.                   :  (Related Docket Nos. 4473, 4478, 4625
                                      :  and 4661)
- - - - - - - - - - - - - - - - - - - - - - - - - x
```

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
UNDER 11 U.S.C. § 1129(a) AND (b) CONFIRMING THIRD
AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY THE
DEBTORS IN POSSESSION, THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, FEDERAL INSURANCE COMPANY, MAINE
YANKEE ATOMIC POWER COMPANY, AND THE OFFICIAL COMMIT-
TEE OF EQUITY SECURITY HOLDERS FOR (I) STONE & WEBSTER,
INCORPORATED AND CERTAIN OF ITS SUBSIDIARIES AND AFFILI-
ATES AND (II) STONE & WEBSTER ENGINEERS AND CONSTRUCTORS,
INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES**

WHEREAS, on August 27, 2003, Stone & Webster, Incorporated, and

certain of its subsidiaries and affiliates ("SWINC") and Stone & Webster Engineers

and Constructors, Inc. and certain of its subsidiaries and affiliates ("SWE&C"),

debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors"),[1] filed the Third Amended Joint Plan of Reorganization Proposed by the

---

[1]    All capitalized terms not defined herein shall have the meanings ascribed to
them in the Third Joint Plan.

Debtors in Possession, the Official Committee of Unsecured Creditors, Federal

Insurance Company, Maine Yankee Atomic Power Company, and the Official

Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and

Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and

Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Third Joint

Plan"), together with a related disclosure statement (the "Disclosure Statement"); and

       WHEREAS, on September 4, 2003, the Court entered an order which,

among other things, (i) approved solicitation, voting and tabulation procedures,

notice of the hearing on confirmation of the Third Joint Plan (the "Confirmation

Hearing Notice"), and certain deadlines (the "Solicitation Procedures Order"); and

(ii) approved the adequacy of the Disclosure Statement in accordance with Bank-

ruptcy Code section 1125 (the "Disclosure Statement Order"); and

       WHEREAS, the Confirmation Hearing Notice, the Disclosure

Statement, the Third Joint Plan, certain notices of non-voting status (the "Non-

Voting Notices"), and/or the appropriate Ballots (collectively, the "Solicitation

Package") were transmitted to all holders of Claims and Interests and other parties in

interest in accordance with Bankruptcy Rule 3017(d) and the Solicitation Procedures

Order, as set forth in the Affidavit of David Hartie of Innisfree M&A, Incorporated,

the equity voting agent, dated September 23, 2003 and filed on October 7, 2003

(Docket No. 4578) and the Affidavit of Service of Jon Thomas of St Ives Burrups,

2

dated September 17, 2003 and filed on September 23, 2003 (Docket No. 4541) (the "Solicitation Declarations"); and

WHEREAS, the Confirmation Hearing Notice was published on September 15, 2003 in the national edition of the Wall Street Journal, the Boston Globe, and the Boston Herald, as set forth in the Affidavit of The Trumbull Group LLC f/k/a/ Trumbull Associates LLC regarding Newspaper Publishing of Notice of Confirmation Hearing and Objection Deadline filed on September 28, 2003 (Docket No. 4550) (the "Publication Affidavit"); and

WHEREAS, on October 20, 2003, the Plan Proponents filed the Plan Supplement to Third Amended Joint Plan Of Reorganization Proposed by the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (the "Plan Supplement") (Docket No. 4625); and

WHEREAS, on October 29, 2003, the Plan Proponents filed the Certification of Innisfree M&A Incorporated with Respect to Tabulation of Votes on the Debtors' Third Amended Joint Plan fo Reorganization (Docket No. 4652) (the

3

"Innisfree Voting Tabulation"), certifying the results of the ballot tabulation for Class 9A: SWINC Equity Interests voting to accept or reject the Third Joint Plan; and

WHEREAS, on October 29, 2003, the Plan Proponents filed the Declaration of William R. Gruber, Jr. Certifying Vote on Tabulation of Ballots Accepting and Rejecting the Third Amended Joint Plan Of Reorganization Proposed by the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (Docket No. 4656) (the "Trumbull Voting Tabulation"), attesting and certifying the results of the ballot tabulation for the classes of Claims voting to accept or reject the Third Joint Plan; and

WHEREAS on December 9, 2003, the Plan Proponents filed the Amended Declaration of William R. Gruber, Jr. Certifying Vote on Tabulation of Ballots Accepting and Rejecting the Third Amended Joint Plan Of Reorganization Proposed by the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engi-

4

neers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates (Docket No. 4768) (the "Amended Trumbull Voting Tabulation"), which amended the Trumbull Voting Tabulation to include the voting results for Class 4B as an accepting Class under the Third Joint Plan; and

WHEREAS, nine (9) objections or purported objections to confirmation of the Third Joint Plan were filed (the "Objections"); and

WHEREAS, on October 30, 2003, the Debtors filed a memorandum of law in support of confirmation of the Third Joint Plan ("Docket No. 4661) (the "Confirmation Memorandum"); and

WHEREAS, pursuant to Bankruptcy Code section 1128(a), the Court held a hearing commencing on October 31, 2003, at 10:00 a.m. (the "Confirmation Hearing"), which hearing was continued to November 18, 2003, at 9:30 a.m. and further continued to December 18, 2003, at 9:30 a.m., and January 13, 2004, at 10:00 a.m., to consider confirmation of the Third Joint Plan and the Objections.

NOW THEREFORE, based upon the Court's review and consideration of (i) the declarations and submissions previously filed with the Court, including the Solicitation Declarations, the Innisfree Voting Tabulation, the Trumbull Voting Tabulation, the Amended Trumbull Voting Tabulation, and the Publication Declaration; (ii) the record of the Confirmation Hearing (including all of the evidence proffered or adduced at the hearing, the pleadings, briefs, memoranda and

5

other submissions filed in connection therewith, and the arguments of counsel made at the hearing); (iii) the Objections; and (iv) the entire record of these Chapter 11 Cases; and after due deliberation thereon, and good cause appearing therefor:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THE COURT FINDS AND CONCLUDES THAT:[2]

1. Exclusive Jurisdiction; Venue; Core Proceeding – 28 U.S.C. §§ 157(b)(2) and 1334(a). This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. Confirmation of the Third Joint Plan is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has exclusive jurisdiction to determine whether the Third Joint Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

2. Judicial Notice. Judicial notice is hereby taken of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and transcripts of, and all evidence and arguments made, proffered, or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Cases.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

      3. Burden of Proof. The Plan Proponents have the burden of proving the elements of Bankruptcy Code sections 1129(a) and (b) by a preponderance of the evidence.

      4. Transmittal and Mailing of Materials; Notice. Due, adequate, and sufficient notice of the Disclosure Statement, the Third Joint Plan, and the Confirmation Hearing, along with all deadlines for voting on or filing objections to the Third Joint Plan, has been given to all known holders of Claims and/or Interests in accordance with the Bankruptcy Rules and the procedures set forth in the Solicitation Procedures Order and further orders of the Court.

      5. Solicitation. Votes for acceptance or rejection of the Third Joint Plan were solicited in good faith and in compliance with Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, all other applicable provisions of the Bankruptcy Code, and all other rules, laws and regulations.

      6. Distribution. All procedures used to distribute the Solicitation Packages to the applicable holders of Claims and to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and any other applicable rules, laws, and regulations.

7. Impaired Classes That Have Voted to Accept the Third Joint Plan. As evidenced by the Tabulation Declarations, which certified the results of the voting on the Third Joint Plan, Classes 5A, 9A, 3B, 4B and 5B have voted to accept or are deemed to have accepted the plan in accordance with the Solicitation Procedures Order and the requirements of sections 1124 and 1126 of the Bankruptcy code. Thus, at least one impaired class of Claims has voted to accept the Third Joint Plan, determined without including any acceptance of the Third Joint Plan by an insider.

8. Classes Deemed to Have Accepted the Third Joint Plan. Classes 1A, 2A, 1B and 2B are not impaired and are deemed to have accepted the Third Joint Plan under Bankruptcy Code section 1126(f).

9. Classes Deemed to Have Rejected the Third Joint Plan. Classes 6A, 10A, 6B, 7B, 8B, 9B and 10B will receive no distribution under the Third Joint Plan and are deemed to have rejected the Third Joint Plan under Bankruptcy Code section 1126(g). No votes were received in Classes 3A or 7A, and the votes cast in Class 8A were solely by insiders of the Debtors, thus Classes 3A, 7A, and 8A have been deemed to neither accept nor reject the Third Joint Plan.

10. Modifications to the Third Joint Plan. The modifications to the Third Joint Plan set forth on the record of the Confirmation Hearing and made by this Confirmation Order do not materially and adversely affect or change the treatment of any creditor who has not accepted such modifications. Accordingly, under Fed. R.

8

Bankr. P. 3019, these modifications neither require additional disclosure under

Bankruptcy Code section 1125 nor re-solicitation of acceptances or rejections under

Bankruptcy Code section 1126, nor do they require that holders of Claims be

afforded an opportunity to change previously cast acceptances or rejections of the

Third Joint Plan. Disclosure of the modifications on the record of the Confirmation

Hearing constitutes due and sufficient notice thereof under the circumstances of the

Chapter 11 Cases. Accordingly, pursuant to Bankruptcy Code section 1127 and

Bankruptcy Rule 3019, all holders of Claims that have accepted or are conclusively

deemed to have accepted the Third Joint Plan are deemed to have accepted such

modifications to the Third Joint Plan.

      11.  Plan Compliance with Bankruptcy Code – 11 U.S.C. §

1129(a)(1). The Third Joint Plan complies with the applicable provisions of the

Bankruptcy Code and the Bankruptcy Rules, thereby satisfying 11 U.S.C. §

1129(a)(1).

      a. Proper Classification  11 U.S.C. §§ 1122, 1123(a)(1). In
addition to Administrative Claims and Priority Tax Claims, which
need not be classified, the Third Joint Plan designates ten Classes of
Claims and Interests at each of the Consolidated SWINC Estate and
the Consolidated SWE&C Estate. The Claims and Interests placed in
each Class are substantially similar to other Claims or Interests, as the
case may be, in each such Class, and such classification is therefore
consistent with Bankruptcy Code section 1122. Valid business,
factual and legal reasons exist for separately classifying the various
Classes of Claims and Interests created under the Third Joint Plan,
and such Classes and the Third Joint Plan's treatment thereof do not
unfairly discriminate between holders of Claims or Interests. The

9

Third Joint Plan satisfies Bankruptcy Code sections 1122 and 1123(a)(1).

b. Specified Treatment of Unimpaired Classes 11 U.S.C. § 1123(a)(2). Article II.D. of the Third Joint Plan specifies that Classes 1A, 1B, 2A, and 2B are not impaired under the Third Joint Plan, thereby satisfying Bankruptcy Code section 1123(a)(2).

c. Specified Treatment of Impaired Classes – 11 U.S.C. §1123(a)(3). Article II.E. of the Third Joint Plan specifies the treatment of the impaired Classes of Claims (Classes 3A through 8A and Classes 3B through 8B) and Interests (Classes 9A, 10A, 9B and 10B), thereby satisfying Bankruptcy Code section 1123(a)(3).

d. No Discrimination – 11 U.S.C. § 1123(a)(4). The Third Joint Plan provides the same treatment for each Claim or Interest within each respective Class unless the holder of a particular Claim or Interest has agreed to other treatment of such Claim or Interest, thereby satisfying Bankruptcy Code section 1123(a)(4).

e. Implementation of the Third Joint Plan – 11 U.S.C. § 1123(a)(5). Article VII of the Third Joint Plan provides adequate and proper means for implementing the Third Joint Plan, thereby satisfying Bankruptcy Code section 1123(a)(5). Among other things, Article VII provides for (i) the substantive consolidation of the Debtors' Estates into the Consolidated SWINC Estate and the Consolidated SWE&C Estate; (ii) the cancellation of all Old Common Stock issued and outstanding or held in treasury; (iii) the amendment of the Debtors' organizational documents; and (iv) the issuance of new securities. Other articles of the Third Joint Plan provide means for implementation of the Third Joint Plan as well. For example, Article VIII describes the securities to be issued in connection with the Third Joint Plan; Article IX includes provisions regarding distributions under the Third Joint Plan; Article X provides for the treatment of executory contracts and unexpired leases; Article XI establishes procedures for resolving disputed, contingent, and unliquidated Claims; Article XII identifies conditions precedent to confirmation and consummation of the Third Joint Plan; and Article XIV provides for the continuing jurisdiction over matters arising out of or related to these Chapter 11 Cases and the Third Joint Plan.

10

f. Prohibition Against Issuance of NonVoting Equity Securities – 11 U.S.C. § 1123(a)(6). Article VII.E provides that the bylaws and certificate of incorporation of Reorganized SWINC shall, among other things, provide for the inclusion of provisions prohibiting the issuance of non-voting equity securities. Thus, the requirements of Bankruptcy Code section 1123(a)(6) are satisfied.

g. Selection of Officers and Directors – 11 U.S.C. § 1123(a)(7). The Plan Proponents properly and adequately disclosed the officers and directors of Reorganized SWINC, the members of the Consolidated SWINC Governing Board, and the members of the SWE&C Liquidating Trust Advisory Board or the manner of selection of such officers and directors, consistent with the interests of holders of Claims and Interests and with public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).

h. Additional Plan Provisions – 11 U.S.C. § 1123(b). The Third Joint Plan's provisions are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

12. Identification of Plan Proponents – Fed. R. Bankr. P. 3016(a).

The Third Joint Plan satisfies Bankruptcy Rule 3016(a) by identifying the date of the Third Joint Plan and the proponents of the Third Joint Plan.

13. Notice of the Confirmation Hearing – Fed. R. Bankr. P. 3017.

The Debtors have given notice of the Confirmation Hearing as required by Fed. R. Bankr. P. 3017(d) and the Solicitation Procedures Order. The Solicitation Packages prescribed by the Solicitation Procedures Order were transmitted to the creditors and interest holders entitled to vote on the Third Joint Plan in accordance with Fed. R. Bankr. P. 3017(d) and, with respect to beneficial holders in Class 9A, pursuant to Fed. R. Bankr. P. 3017(e).

11

14. Solicitation of Votes – Fed. R. Bankr. P. 3018. The solicitation of votes to accept or reject the Third Joint Plan satisfies Fed. R. Bankr. P. 3018. The Third Joint Plan was transmitted to all creditors and interest holders entitled to vote on the Third Joint Plan, sufficient time was prescribed for such creditors and interest holders to accept or reject the Third Joint Plan, and the solicitation materials used and solicitation procedures followed comply with Bankruptcy Code section 1126, thereby satisfying the requirements of Fed. R. Bankr. P. 3018.

15. The Debtors' Compliance with the Bankruptcy Code – 11 U.S.C. § 1129(a)(2). The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2). Specifically:

a. The Debtors are proper debtors under Bankruptcy Code section 109.

b. The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

c. The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Procedures Order in transmitting the Third Joint Plan, the Disclosure Statement, the Ballots and related documents and notices and in soliciting and tabulating votes on the Third Joint Plan.

16. Plan Proposed in Good Faith – 11 U.S.C. § 1129(a)(3). The Plan Proponents have proposed the Third Joint Plan in good faith and not by any means

12

forbidden by law, thereby satisfying Bankruptcy Code section 1129(a)(3). This Court has examined the totality of the circumstances surrounding the formulation of the Third Joint Plan. Based upon the evidence presented at the Confirmation Hearing, the Court finds and concludes that the Third Joint Plan has been proposed with the legitimate and honest purpose of restructuring the Debtors' debts and making distributions pursuant to the Third Joint Plan and in accordance with the priorities set forth in the Bankruptcy Code. The Third Joint Plan is the product of extensive arms'-length negotiations among the Debtors, the Creditors' Committee, Federal, Maine Yankee, and the Equity Committee, which itself provides independent evidence of the good faith of the Debtors in proposing the Third Joint Plan.

17. Payment for Services or Costs and Expenses – 11 U.S.C. § 1129(a)(4). Any payments made or to be made by the Debtors or Reorganized SWINC for services or for costs and expenses accruing before confirmation or in connection with the Chapter 11 Cases, or in connection with the Third Joint Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying Bankruptcy Code section 1129(a)(4). Specifically, all fees and expenses incurred by Professionals will be subject to the Court's final approval following the filing of final fee applications under Bankruptcy Code section 330.

13

18. <u>Identification of Directors, Officers, and Insiders – 11 U.S.C. §</u>

<u>1129(a)(5)</u>. The Debtors have complied with Bankruptcy Code section 1129(a)(5) by

disclosing at or before the Confirmation Hearing as required by the Third Joint Plan

(i) the identity and affiliations of any individual proposed to serve, after confirmation

of the Third Joint Plan, as a member of the initial board of directors of Reorganized

SWINC, (ii) the identity and affiliations of any individual proposed to serve, after

confirmation of the Third Joint Plan, as the SWINC Plan Administrator and as

members of the Consolidated SWINC Estate Governing Board, (iii) the identity and

affiliation of the individual proposed to serve, after confirmation of the Third Joint

Plan, as the Asbestos Trustee, and (iv) the identity and affiliations of any individual

proposed to serve, after confirmation of the Third Joint Plan, as the SWE&C

Liquidating Trustee and as members of the SWE&C Liquidating Trust Advisory

Board. The appointment to such position of such individual(s) is consistent with the

interests of the creditors and Interest holders and with public policy.

19. <u>No Rate Changes – 11 U.S.C. § 1129(a)(6)</u>. No governmental

regulatory commission has jurisdiction over rates of the Debtors after confirmation

of the Third Joint Plan. Thus, Bankruptcy Code section 1129(a)(6) is not applicable

in these Chapter 11 Cases.

20. <u>Best Interests of Creditors Test – 11 U.S.C. § 1129(a)(7)</u>. The

Third Joint Plan satisfies Bankruptcy Code section 1129(a)(7). Specifically:

14

a.  The Liquidation Analysis contained in the Disclosure Statement and other evidence regarding the subject thereof that has been proffered or adduced at or before the Confirmation Hearing have not been controverted by other evidence. The methodology used and assumptions made in connection with the Liquidation Analysis, as supplemented by other evidence at the Confirmation Hearing, are reasonable.

b.  Each holder of a Claim or Interest in each Impaired Class either has accepted the Third Joint Plan or will receive or retain on account of such Claim or Interest property of a value, as of the Effective Date of the Third Joint Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

21. Acceptance by Certain Classes – 11 U.S.C. § 1129(a)(8). Except for the Classes deemed to reject the Third Joint Plan, each Class of Claims or Interests has accepted the Third Joint Plan or is not impaired under the Third Joint Plan and therefore is conclusively presumed to have accepted the Third Joint Plan without the need for solicitation of acceptances or rejections with respect to such Class, with the exception of Classes 3A, 7A, and 8A, which are deemed to have neither accepted nor rejected the Third Joint Plan. Because not all Impaired Classes of Claims and Interests have accepted the Third Joint Plan or are deemed to have accepted the Third Joint Plan, the requirements of Bankruptcy Code section 1129(a)(8) have not been met, thus requiring application fo Bankruptcy Code section 1129(b).

15

22.  Treatment of Administrative, Other Priority Claims and Priority
Tax Claims – 11 U.S.C. § 1129(a)(9).  The treatment of Administrative Claims under
Articles III and IV of the Third Joint Plan satisfies the requirements of Bankruptcy
Code section 1129(a)(9)(A); the treatment of Other Priority Claims under Article IV
of the Third Joint Plan satisfies the requirements of Bankruptcy Code section
1129(a)(9)(B); and the treatment of Priority Tax Claims under Article IV of the Third
Joint Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9)(C).

23.  Acceptance by Impaired Classes – 11 U.S.C. § 1129(a)(10).  At
least one Class of Claims that is impaired under the Third Joint Plan has accepted the
Third Joint Plan, determined without including any acceptance of the Third Joint
Plan by an insider of the Debtors holding a Claim in such Class, thereby satisfying
Bankruptcy Code section 1129(a)(10).

24.  Feasibility – 11 U.S.C. § 1129(a)(11).  The projections set forth
in Liquidation Analysis and other evidence proffered or adduced by the Debtors at
the Confirmation hearing with respect to feasibility (i) are persuasive and credible,
(ii) have not been controverted by other evidence or challenged in any objection, (iii)
are based upon reasonable and sound assumptions, and (iv) establish that the Third
Joint Plan is feasible, thus, satisfying the requirements of Bankruptcy Code section
1129(a)(11).

25. <u>Payment of Fees – 11 U.S.C. § 1129(a)(12)</u>. All fees payable under 28 U.S.C. § 1930 on or before the Effective Date, as determined by the Court, have been paid or will be paid on the Effective Date pursuant to Article XV.B of the Third Joint Plan, thus satisfying the requirements of Bankruptcy Code section 1129(a)(12).

26. <u>Continuation of Retiree Benefits – 11 U.S.C. § 1129(a)(13)</u>. The Debtors do not have any retiree benefits to be continued under the Third Joint Plan, although they are assuming the Pension Plan. The Pension Plan is part of the Debtors' defined benefits plan, and is not a retiree benefit plan, thus Bankruptcy Code section 1129(a)(13) is not applicable to the Debtors.

27. <u>Fair and Equitable; No Unfair Discrimination – 11 U.S.C. § 1129(b)</u>. Classes 10A, 6B, 7B, 8B, 9B, and 10B will not receive or retain any property under the Third Joint Plan, and, therefore, are deemed to have rejected the Third Joint Plan under Bankruptcy Code section 1126(g). The Debtors presented uncontroverted evidence at the Confirmation Hearing that the Third Joint Plan does not discriminate unfairly and is fair and equitable with respect to Classes 10A, 6B, 7B, 8B, 9B, and 10B, as required by Bankruptcy Code section 1129(b)(1). Thus, the Third Joint Plan may be confirmed notwithstanding the Debtors' failure to satisfy Bankruptcy Code section 1129(a)(8). Upon confirmation and the occurrence of the

17

Effective Date, the Third Joint Plan shall be binding upon the members of Classes 10A, 6B, 7B, 8B, 9B, and 10B.

28. Principal Purpose of the Third Joint Plan – 11 U.S.C. § 1129(d). The principal purpose of the Third Joint Plan is neither the avoidance of taxes nor the avoidance of Section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Third Joint Plan on any such grounds. The Third Joint Plan therefore satisfies the requirements of Bankruptcy Code section 1129(d).

29. Good Faith Solicitation – 11 U.S.C. § 1125(e). Based on the record before the Court in these Chapter 11 Cases, the Debtors, the Creditors' Committee, the Equity Committee, Federal, and Maine Yankee and their respective directors, officers, employees, partners, shareholders, members, agents, advisors, accountants, investment bankers, consultants, attorneys, and other representatives have acted in good faith within the meaning of Bankruptcy Code section 1125(e) in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Third Joint Plan and their participation in the activities described in Bankruptcy Code section 1125, and are entitled to the protections afforded by Bankruptcy Code section 1125(e) and the exculpation and injunctive provisions set forth in Article XIII of the Third Joint Plan.

18

30. Impairment of Classes – 11 U.S.C. § 1123(b)(1). In accordance with Bankruptcy Code section 1123(b)(1), Article II of the Third Joint Plan impairs or leaves unimpaired, as the case may be, each class of Claims and Interests under the Third Joint Plan.

31. Treatment of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2). The Third Joint Plan constitutes a motion by the Debtors to reject all executory contracts and unexpired leases in effect on the Confirmation Date, subject to the occurrence of the Effective Date, except those contracts and leases (i) that have previously (a) assumed or rejected by the Debtors (including, but not limited to, those executory contracts and unexpired leases assumed and assigned to Shaw) or (b) expired to terminated by their own terms, or (ii) identified on the list of assumed contracts and leases attached as Exhibit H to the Third Joint Plan. The Debtors' decision regarding the assumption or rejection of the executory contracts is based on and is within the sound business judgment of the Debtors, and is in the best interests of the Debtors, their Estates, and their creditors and interest holders. In accordance with the Third Joint Plan, any Claim resulting from the rejection of an executory contract or unexpired lease, which is not already the subject of a timely filed proof of claim, must be filed with the Bankruptcy Court and served upon counsel for the Plan Proponents within 30 days after service of notice of entry of the Confirmation Order, or such other date as prescribed by the Court. Any Claim not

19

filed by the deadline will be unenforceable and forever barred. Accordingly, the Third Joint Plan complies with Bankruptcy Code section 1123(b)(2).

32. Releases and Discharges. The releases and discharges of claims and causes of action described in Article XIII of the Third Joint Plan constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interests of holders of Claims or Interests, are fair, equitable, and reasonable and are integral elements of the restructuring and resolution of the Chapter 11 Cases in accordance with the Third Joint Plan. Each of the discharge, release, injunction, indemnification and exculpation provisions set forth in the Third Joint Plan: (1) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d); (2) is an essential means of implementing the Third Joint Plan pursuant to Bankruptcy Code section 1123(a)(5); (3) is an integral element of the transactions incorporated into the Third Joint Plan; (4) confers material benefit on, and is in the best interest of, the Debtors, their estates and their creditors; (5) is important to the overall objectives of the Third Joint Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization; and (6) is consistent with Bankruptcy Code sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

20

33. Retention, Enforcement, and Settlement of Claims Held by the Debtors – 11 U.S.C. § 1123(b)(3). Article VII.R provides for the Debtors' preservation of certain rights of action. Accordingly, the Third Joint Plan complies with Bankruptcy Code section 1123(b)(3).

34. Rights of Holders of Claims – 11 U.S.C. § 1123(b)(5). The Third Joint Plan does not propose to modify the rights of holders of Claims. Accordingly, Bankruptcy Code section 1123(b)(5) is inapplicable.

35. Other Provisions Not Inconsistent with Title 11 – U.S.C. § 1123(b)(6). In accordance with Bankruptcy Code section 1123(b)(6), the Third Joint Plan includes appropriate provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code.

36. Satisfaction of Confirmation Requirements. The Third Joint Plan satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129. The Plan Proponents have represented to the court that the conditions precedent to confirmation set forth in Article XII.A of the Third Joint Plan have either been satisfied or waived.

37. Objections. All Objections to Confirmation of the Third Joint Plan have been withdrawn, settled, or overruled.

38. Plan Settlements. In accordance with Fed. R. Bankr. P. 9019, the Third Joint Plan is dependent upon and incorporates the terms of numerous compro-

21

mises and settlements among the Debtors, the Creditors' Committee, the Equity

Committee, Federal, and Maine Yankee, as to a myriad of significant and complex

issues in dispute in the Chapter 11 Cases, including the issues detailed in Article

XIII.G of the Third Joint Plan, including, but not limited to, (i) the Substantive

Consolidation Settlement, (ii) the Pension Plan Reversion Settlement, (iii) the

Federal Settlement, (iv) the Maine Yankee Settlement, and (v) the Isobord Settle-

ment. These compromises and settlements constitute good faith compromises and

settlements of the matters covered thereby. Such compromises and settlements are

made in exchange for consideration and are in the best interests of the Debtors, the

Estates and holders of Claims and Interests, are within the reasonable range of

possible litigation outcomes, are fair, equitable and reasonable and are essential

elements of the resolution of the Chapter 11 Cases in accordance with the Third Joint

Plan. Each of the compromises and settlements set forth in the Third Joint Plan:

> a. falls within the jurisdiction of this Court under 28 U.S.C.
> §§ 1334(a), (b) and (d);
>
> b. is an essential means of implementing the Third Joint Plan
> pursuant to Bankruptcy Code section 1123(a)(5);
>
> c. is an integral element of the transactions incorporated into
> the Third Joint Plan;
>
> d. confers material benefit on, and is in the best interest of the
> Debtors, their estates and their creditors;

e. is important to the overall objectives of the Third Joint Plan to finally resolve all claims among or against the parties in interest in the Chapter 11 Cases; and

f. is consistent with Bankruptcy Code sections 105, 510(a), 1123, 1129 and other applicable provisions of the Bankruptcy Code.

Each settlement and compromise has been negotiated at arms' length and has been entered into in good faith. The settlements and compromises avoid costly and time consuming litigation and pave the way toward achieving a successful reorganization.

39. Plan Modifications. The modifications to the Third Joint Plan set forth in the Modified Third Amended Joint Plan of Reorganization Proposed by the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone & Webster, Incorporated and Certain of Its Subsidiaries and Affiliates and (II) Stone & Webster Engineers and Constructors, Inc. and Certain of Its Subsidiaries and Affiliates Joint Plan (the "Modified Third Joint Plan"), as shown on Exhibit A hereto, do not materially or adversely affect or change the treatment of any holder of a Claim or Interest who has not accepted in writing the modifications. Accordingly, pursuant to Fed. R. Bankr. P. 3019, such modifications do not require additional disclosure under Bankruptcy Code section 1125 or resolicitation of acceptances or rejections under Bankruptcy

23

Code section 1126, nor do they require that holders of claims be afforded an opportunity to change previously cast acceptances or rejections of the Third Joint Plan. Disclosure of the modifications on the record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of these Chapter 11 Cases.

### DECREES

ACCORDINGLY, THE COURT HEREBY ORDERS THAT:

1. <u>Confirmation of the Third Joint Plan</u>. The Third Joint Plan, which consists of the Third Joint Plan, the Modified Third Joint Plan, and modifications set forth in this Confirmation Order or on the record at the Confirmation Hearing, is approved and confirmed under Bankruptcy Code section 1129 in its entirety. The terms of the Third Joint Plan are incorporated by reference into and are an integral part of this Confirmation Order.

2. <u>Objections</u>. All objections that have not been withdrawn, waived or settled, and all reservations of rights pertaining to confirmation of the Third Joint Plan included therein, are overruled on the merits.

3. <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>. The provisions of the Third Joint Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

4. Plan Classification Controlling. The classification of Claims and Interests for purposes of the distributions to be made under the Third Joint Plan shall be governed solely by the terms of the Third Joint Plan. The classifications set forth on any ballots tendered to or returned by the Claim or Interest holders in connection with voting on the Third Joint Plan (a) were set forth on such ballots solely for purposes of voting to accept or reject the Third Joint Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Third Joint Plan for distribution purposes, (c) may not be relied upon by any Claim or Interest holder as representing the actual classification of such Claims or Interest under the Third Joint Plan for distribution purposes, and (d) shall not be binding on Reorganized SWINC, the Estates, or the Debtors.

5. Approval of Plan Modifications. The modifications set forth in the Modified Third Joint Plan are approved. The Modified Third Joint Plan shall constitute the Third Joint Plan and all references herein to the Third Joint Plan shall mean the Third Joint Plan as so modified.

6. Effects of Confirmation; Immediate Effectiveness; Successors and Assigns. The Court directs that Fed. R. Civ. P. 62(a) and the stay provided by Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order, and the Court authorizes the Debtors to consummate the Third Joint Plan after entry of this

Confirmation Order.  Subject to the occurrence of the Effective Date as provided in

Article XII of the Third Joint Plan, and notwithstanding any otherwise applicable

law, immediately upon the entry of this Confirmation Order, the terms of the Third

Joint Plan (including the Plan Exhibits and all documents and agreements executed

pursuant to the Third Joint Plan) and this Confirmation Order shall be binding on (a)

the Debtors, (b) Reorganized SWINC, (c) all holders of Claims against and Interests

in the Debtors, whether or not impaired under the Third Joint Plan and whether or

not, if impaired, such holders accepted the Third Joint Plan, (d) each Person acquir-

ing property under the Third Joint Plan, (e) any other party in interest, (f) any Person

making an appearance in these Chapter 11 Cases, and (g) each of the foregoing's

respective heirs, successors, assigns, trustees, executors, administrators, affiliates,

officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

Upon the occurrence of the Effective Date with respect to each Debtor, the Third

Joint Plan shall be deemed substantially consummated as to each such Debtor.

    7.  Continued Corporate Existence of Reorganized SWINC; Dissolu-
tion of SWE&C and the SWE&C Subsidiaries.  On the Effective Date, Reorganized

SWINC shall emerge from the Consolidated SWINC Estate, in accordance with the

laws of the State of Delaware and pursuant to the certificate of incorporation and by-

laws of SWINC in effect before the Effective Date, as amended under the Third Joint

Plan. Reorganized SWINC may engage in any lawful activity for which corporations may be organized under the Delaware General Corporation Law.

8. On the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved.

9. No Revesting of Assets. On or following the Effective Date, the property of the Estates of SWINC and the SWINC Subsidiaries (except for any obligations and/or reversionary interest in the Pension Plan and the rights to Cash contributed to the Reorganized SWINC Operating Reserve in accordance with the Third Joint Plan) shall remain or become property of the Consolidated SWINC Estate and shall continue to be subject to the jurisdiction of the Court following confirmation of the Third Joint Plan until distributed to holders of Allowed Claims and Allowed Interests in accordance with the provisions of the Third Joint Plan, the SWINC Plan Administrator Agreement, and this Confirmation Order.

10. On or following the Effective Date, the property of the Estates of SWE&C and the SWE&C Subsidiaries (except for the right to Cash contributed to the Reorganized SWINC Operating Reserve in accordance with the Third Joint Plan) shall remain or become property of the SWE&C Liquidating Trust and shall continue to be subject to the jurisdiction of the Court following confirmation of the Third Joint Plan until distributed to holders of Allowed Claims and Allowed Interests in

27

accordance with the provisions of the Third Joint Plan, the SWE&C Liquidating

Trust Agreement, and this Confirmation Order.

11. Release of Liens. Except as otherwise provided in the Third Joint

Plan or this Confirmation Order, or in any contract, instrument, release or other

agreement or document created in connection with the Third Joint Plan, on the

Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests

against property of the Debtors' Estates are fully released and discharged.

12. Transfers of Property. To the extent the transfer of assets of the

Debtors to Reorganized SWINC pursuant to Article VII.Q of the Third Joint Plan or

the succession to assets of the Debtors by the Consolidated SWINC Estate or the

SWE&C Liquidating Trust, as the case may be, are deemed to constitute a "transfer"

of property, such transfers of property (a) are or shall be legal, valid, and effective

transfers of property, (b) vest or shall vest with good title to such property, free and

clear of all liens, charges, Claims, encumbrances, or interests, except as expressly

provided in the Third Joint Plan or this Confirmation Order, (c) do not and shall not

constitute avoidable transfers under the Bankruptcy Code or under applicable

nonbankruptcy law, and (d) do not and shall not subject Reorganized SWINC, the

Consolidated SWINC Estate, or the SWE&C Liquidating Trust to any liability by

reason of such transfer under the Bankruptcy Code or under applicable

28

nonbankruptcy law, including, without limitation, any laws affecting successor transferee liability.

13. Discharge of Reorganized SWINC.   Except as expressly provided in the Third Joint Plan or this Confirmation Order, Reorganized SWINC is discharged effective upon the Effective Date from any claim or cause of action, and Reorganized SWINC's liability in respect thereof is extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, manifested or not, contingent or noncontingent, asserted or unasserted, fixed or unfixed, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, or that arose from any agreement of any Debtor entered into or obligation of any Debtor incurred before the Effective Date, or from any conduct of any Debtor that occurred prior to the Effective Date, or that otherwise arose before the Effective Date, including, without limitation, successor liability for any conduct of any of the prepetition entities and all interest, if any, on any such debts, whether such interest accrued before or after the Petition Date, and any liability (including withdrawal liability) to the extent such liability relates to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Petition Date.

29

14. Pursuant to Article XIII.C of the Third Joint Plan and 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Third Joint Plan or in this Confirmation Order, the distributions and rights that are provided for in the Third Joint Plan shall be in exchange for and in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims and causes of action (whether known or unknown) against, liabilities of, liens on, obligations of and Interests in Reorganized SWINC or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Third Joint Plan on account of such Claims, including, but not limited to, demands and liabilities that arose on or before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Petition Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code or (c) the Claimholder of such a Claim accepted the Third Joint Plan.

30

15. Releases, Limitations of Liability, and Indemnification. The releases set forth in Articles XIII.B, and the exculpation and limitation of liability provisions set forth in Article XIII.D are incorporated in this Confirmation Order as if set forth in full herein and are hereby approved in their entirety.

16. Injunctions. Except as otherwise specifically provided in the Third Joint Plan and except as may be necessary to enforce or remedy a breach of the Third Joint Plan, from and after the Confirmation Date, all entities that have held, hold or may hold a Claim or other debt or liability against or an Interest in any of the Debtors shall be precluded and permanently enjoined from: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any Debtor; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Third Joint Plan; *provided, however,* that nothing contained in this Confirmation Order or the Third Joint Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Third Joint Plan, and *provided, further, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that

31

any person may have against the fiduciaries of the Pension Plan, the Employee Stock

Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries; the

Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the

Employee Investment Plan of Stone & Webster Incorporated and Participating

Subsidiaries solely in their capacity as fiduciaries or the Pension Plan or such other

Plan. In addition, nothing in this provision will affect or impair the rights, if any, that

a non-debtor entity has to take direct actions to recover under policies of insurance

where such non-debtor entity is a "co-insured" or "additional insured" with a Debtor.

17. Continuance of Injunctions and Automatic Stay. Pursuant to

Article XV.J of the Third Joint Plan, unless otherwise provided in the Third Joint

Plan or this Confirmation Order, all injunctions or stays provided for in the Chapter

11 Cases under Bankruptcy Code sections 105, 362 or 524 or otherwise, and in

existence on the Confirmation Date, shall remain in full force and effect until all

property of the Estate(s) of SWINC and the SWINC Subsidiaries and SWE&C and

the SWE&C Subsidiaries has been distributed.

18. Plan Implementation Authorization. Pursuant to the Third Joint

Plan, as to Reorganized SWINC, the chairman of the Reorganized SWINC Board,

president, chief financial officer, or any other appropriate officer of Reorganized

SWINC shall be authorized to execute, deliver, file or record such contracts, instru-

ments, releases, and other agreements or documents and to take such actions as may

32

be necessary or appropriate to effectuate, implement and further evidence the terms

and conditions of the Third Joint Plan. As to the Consolidated SWE&C Estate, the

SWE&C Liquidating Trustee shall be authorized to execute, deliver, file or record

such contracts, instruments, release, and any other agreements or documents, and to

take such actions as may be necessary or appropriate to effectuate and further

evidence the Third Joint Plan. Any of all such documents shall be accepted by each

of the respective state filing offices and recorded in accordance with applicable state

law and shall become effective in accordance with their terms and the provisions of

state law.

19. Binding Effect. On the Effective Date, except as expressly

provided in this Confirmation Order, the Third Joint Plan and its provisions shall be

binding upon (a) the Debtors, (b) Reorganized SWINC, (c) the SWINC Plan Admin-

istrator and the Consolidated SWINC Estate Governing Board, (d) the SWE&C

Liquidating Trustee and the SWE&C Liquidating Trust Advisory Board, (e) the

Asbestos Trustee, (f) any entity acquiring or receiving property or a distribution

under the Third Joint Plan, (g) any present or future holder of a Claim against or

Interest in the Debtors, including all governmental entities, whether or not the Claim

or Interest of such holder is impaired under the Third Joint Plan and whether or not

such holder or entity has accepted the Third Joint Plan, (h) any other party in interest,

(i) any person making an appearance in the Chapter 11 Cases, and (j) any of the

33

foregoing's heirs, successors, assigns, trustees, executors, administrators, affiliates, directors, agents, representatives, attorneys, beneficiaries, or guardians.

20. Approval of Substantive Consolidation. The substantive consolidation of the Debtors' estates for the purposes and with the effects described in Article XIII.G.2 of the Third Joint Plan is approved.

21. Approval of Compromises and Settlements Embodied in the Third Joint Plan. The compromises and settlements of the issues described in Article XII.G of the Third Joint Plan, and the terms and provisions of the Third Joint Plan reflecting such compromises and settlements, including without limitation Article XIII.G of the Third Joint Plan are approved, including the Substantive Consolidation Settlement, the Pension Plan Reversion Settlement, the Federal Settlement, the Maine Yankee Settlement, and the Isobord Settlement.

22. Rejection of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2). Pursuant to Article X of the Third Joint Plan, all executory contracts and unexpired leases to which any of the Debtors are a party shall be automatically rejected as of the Effective Date, unless such executory contract or unexpired lease (a) shall have been previously assumed by the Debtors, (b) is the subject of a motion to assume filed on or before the Confirmation Date, or (c) is listed on the schedule of assumed contracts and leases annexed as Exhibit H to the Third Joint Plan.

34

23. Bar Date for Rejection Damage Claims. Pursuant to Article X.B of the Third Joint Plan, if the rejection of an executory contract or unexpired lease pursuant to Article X.B of the Third Joint Plan or otherwise gives rise to a Claim, such Claim shall be forever barred and shall not be enforceable against the Debtors, the SWINC Plan Administrator, the SWE&C Liquidating Trustee, or their respective successors or properties, unless a proof of claim is filed and served no later than thirty (30) calendar days after the service of a notice of entry of the Confirmation Order. Article X.B shall not extend any prior deadline to file a proof of claim for damages arising from the rejection of an executory contract or unexpired lease.

24. Governmental Approvals Not Required. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any State or any other governmental authority with respect to implementation or consummation of the Third Joint Plan and any documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Third Joint Plan, the Disclosure Statement and any documents, instruments or agreements, and any amendments or modifications thereto.

25. Exemption from Certain Taxes. Pursuant to 11 U.S.C. § 1146(c), neither (a) the issuance, transfer or exchange of notes or equity securities under the Third Joint Plan, (b) the creation of any mortgage, deed of trust, lien, pledge or other

35

security interest, (c) the making or assignment of any contract, lease or sublease, nor

(d) the making or delivery of any deed or other instrument of transfer under, in

furtherance of, or in connection with, the Third Joint Plan, including, without

limitation, any merger agreements, any agreements of consolidation, restructuring,

disposition, liquidation, or dissolution, any deed, any bills of sale, or any transfers of

tangible or intangible property, shall be subject to any ~~document recording tax~~, stamp

tax, ~~conveyance fee, intangibles~~ or similar tax, ~~mortgage tax, stamp act, real estate~~

~~transfer tax, sales or use tax, mortgage recording tax, or other~~ similar tax or govern~~-~~

~~mental assessment.~~ State and local governmental officials or agents are hereby

directed to forego the collection of any such tax or governmental assessment and to

accept for filing and recordation any of the foregoing instruments or other documents

without the payment of any such tax or governmental assessment.

     26. <u>Exemption from Securities Laws</u>. The exemption from the

requirements of Section 5 of the Securities Act of 1933, and any state or local law

requiring registration for the offer, sale, issuance, exchange or transfer of a security

provided for in the Third Joint Plan in exchange for Claims against or Interests in the

Debtors, or registration or licensing of an issuer of, underwriter of, or broker dealer

in, such security is authorized by 11 U.S.C. § 1145. The issuance of the Reorganized

SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock,

and Reorganized SWINC New Series B Preferred Stock is exempt from registration under 11 U.S.C. § 1145.

27. <u>Plan Supplement</u>. There being no objections to any of the documents contained in the Plan Supplement and any amendments, modifications and supplements thereto and all documents and agreements introduced therein (including all exhibits and attachments thereto and documents referred to therein), the execution, delivery and performance thereof is authorized and approved. Without need for further order or authorization of the Court, the Reorganized SWINC Board, the Consolidated SWINC Governing Board, the SWINC Plan Administrator, the SWE&C Liquidating Trust Advisory Board, SWE&C Liquidating Trustee, and the Asbestos Trustee, as appropriate, are authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement that may be agreed to by the parties thereto and are consistent with the Third Joint Plan.

28. <u>Final Fee Applications</u>. Pursuant to Article XV.A.2 of the Third Joint Plan (but subject to the provisos set forth therein), Professionals or other entities asserting Professional Fee Claims must file and serve on Reorganized SWINC, the SWINC Plan Administrator and the SWE&C Liquidating Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, an application for final allowance of such Profes-

37

sional Fee Claim no later than 90 days after the Confirmation Date (the "Professional

Fee Bar Date"); *provided, however,* that any Professional who may receive compen-

sation or reimbursement of expenses pursuant to the Ordinary Course Professionals

Order may continue to receive such compensation and reimbursement of expenses

for service rendered before the Confirmation Date, without further Court review or

approval. Holders of Professional Fee claims that are required to file and serve

applications for final allowance of their Professional Fee claims and that do not file

and serve such applications within the time period set forth herein shall be forever

barred from doing so. Objections to any Professional Fee Claim must be filed and

served on the SWINC Plan Administrator and the SWE&C Liquidating Trustee and

the requesting Professional or other entity no later than 60 days after the Professional

Fee Bar Date.

29. Resolution of Claims and Interests. Except as otherwise ordered

by the Court, any Claim that is not an Allowed Claim shall be determined, resolved,

or adjudicated in accordance with the terms of the Third Joint Plan. The SWINC

Plan Administrator, the SWE&C Liquidating Trustee, and/or the Interestate Over-

sight Board, as provided in the Third Joint Plan, may (a) until 240 days after the

Confirmation Date (unless extended by order of the Court) file objections in the

Court to the allowance of any Claim or Interest (whether or not a proof of Claim or

Interest has been filed) and (b) prosecute objections to Claims or Interests that have

been filed before the Confirmation Date but not finally resolved by the Court before

the Confirmation Date. Any request for an extension of the 240-day post-confirma-

tion period to object to Claims or Interests shall be served upon all parties requesting

notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

30. Cancellation of Existing Securities. All Old Securities are

canceled and terminated upon the occurrence of the Effective Date as provided in

Article VII.H of the Third Joint Plan.

31. Reserves. The following Reserves shall be established as

provided in the Third Joint Plan:

(a) General Administrative Claims Reserve in the amount of
$13.9 million, to be used to pay Allowed General Administra-
tive Claims, including General Professional Fee Claims;

(b) SWINC Professional Fee Reserve in the amount of $2
million, to be used to pay Allowed Professional Fee Claims
hereby (i) counsel and any advisers to the Equity Committee
and (ii) any professionals working exclusively on behalf of
SWINC or any SWINC Subsidiary;

(c) SWINC Operating Reserve in the amount of $1.8 million,
to be used to pay the administrative and other costs and ex-
penses associated with the Consolidated SWINC Estate, in-
cluding all fees and expenses of the SWINC Plan Administra-
tor and its professionals;

(d) SWINC Disputed Claims Reserve in the amount of $42.9
million, to be used to pay (i) the holders of Allowed Class 4A:
SWINC Convenience Class Claims in full, (ii) the holders of
Allowed Class 5A: SWINC General Unsecured Claims their
Pro Rata share of the Disputed Claims Reserve until all such

39

Claims are paid in full, (iii) the holders of Allowed Class 7A: SWINC Subordinated Claims their Pro Rata share of the Disputed Claims Reserve remaining after Class 4A and Class 5A have been paid in full, and (iv) the holders of Allowed Class 8A: SWINC Securities Claims and Allowed Class 9A: SWINC Equity Interests their Pro Rata share of the Disputed Claims Reserve remaining after holders in Allowed Class 7A: SWINC Subordinated Claims have been paid in full;

(e) The SWE&C Professional Fee Reserve in the amount of $1.5 million, to be used to pay Allowed SWE&C Professional Fee Claims held by (i) counsel and any advisers to the Creditors' Committee and (ii) any professionals working exclusively on behalf of SWE&C or any SWE&C Subsidiary;

(f) The SWE&C Operating Reserve in the amount of $2.2 million, to be used to pay the administrative and other costs and expenses associated with the Consolidated SWE&C Estate, including all fees and expenses of the SWE&C Liquidating Trustee and its professionals;

(g) The SWE&C Disputed Claims Reserve in the amount of $2.9 million, to be used to pay (i) the holders of Allowed Class 4B: SWE&C Convenience Claims in full, (ii) holders of Allowed Class 5B: SWE&C General Unsecured Claims their Pro Rata share of the SWE&C Disputed Claims Reserve until all such Claims are paid in full; and

(h) The Reorganized SWINC Operating Reserve in the amount of $2.0 million, funded sixty percent (60%) by the Consolidated SWINC Estate and forty percent (40%) by the Consolidated SWE&C Estate, which amount shall be used to pay the administrative and other costs and expenses associated with Reorganized SWINC, including all fees and expenses of Reorganized SWINC and its processionals.

32. <u>Payment of Fees</u>. All fees payable by the Debtors under 28

U.S.C. § 1930 shall be paid on the Effective Date. On the Effective Date, each of the

SWINC Subsidiaries shall be deemed merged with and into SWINC and the Chapter 11 Cases of the SWINC Subsidiaries shall be closed. Further, on the Effective Date, each of the SWE&C Subsidiaries shall be deemed merged with and into SWE&C and the Chapter 11 Cases of the SWE&C Subsidiaries shall be closed. After the Effective Date, neither the Debtors, their Estates, the SWINC Plan Administrator nor the SWE&C Liquidating Trustee shall thereafter be liable for the payment of any additional fees, other than with respect to the Chapter 11 Cases of SWINC and SWE&C.

33. Non-Occurrence of the Effective Date. In the event that the Effective Date has not occurred as provided in Article XV.G of the Third Joint Plan, (a) this Confirmation Order shall be vacated; (b) the Third Joint Plan shall be null and void in all respects; (c) any settlement of Claims or Interests shall be null and void without further order of the Court; and (d) the time within which the Debtors may assume, assume and assign, or reject all executory contracts and unexpired leases shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated.

34. Reversal. If any or all of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the

41

Third Joint Plan prior to the Debtors' receipt of written notice of any such order. Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Third Joint Plan or any amendments or modifications thereto.

35. <u>Retention of Jurisdiction</u>.  Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction as provided in the Third Joint Plan over all matters arising out of, and related to, the Chapter 11 Cases and the Third Joint Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XIV of the Third Joint Plan, as well as over the Agreement of Settlement, Release, and Sale by and between Stone & Webster and St. Paul Fire and Marine Insurance Company, St. Paul Surplus Lines Insurance Company and United States Fidelity and Guaranty Company (collectively, "St. Paul") and similar agreements with respect to the St. Paul policies and motions related thereto.

36. <u>Plan Modifications</u>.

a. Article I.1.13 of the Third Joint Plan is modified and approved as follows:

42

"Asbestos Insurance Carriers" means The Travelers Indemnity Company, Travelers Casualty and Surety Company (f/k/a/ The Aetna Casualty and Surety Company), Kemper National Insurance Company, Centennial Insurance Company, Argonaut Insurance Company, Royal Insurance Company and any other insurance companies that issued policies covering an Asbestos Claim.

b. Article IX.I.2 of the Third Joint Plan is modified and

approved as follows:

Unless otherwise authorized by a Final Order, any holder of a Claim must assert any setoff rights against a Claim by a Debtor against such entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor notwithstanding any statement to the contrary in a proof of claim or any other pleading or document filed with the Bankruptcy Court or delivered to the Debtors.

Notwithstanding anything in the Disclosure Statement or this Third Joint Plan to the contrary, all rights, claims and defenses, including but not limited to setoff and recoupment, arising pursuant to or in connection with the Asset Purchase Agreement between the Debtors and Shaw are hereby expressly preserved.

c. Article VII.N of the Third Joint Plan is modified and

approved as follows:

3.    *Compensation of the Asbestos Trustee*

The Asbestos Trustee will be compensated at a rate of $325 per hour. Any professionals retained by the Asbestos Trust shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Asbestos Trust. The payment of the fees and expenses of the Asbestos Trustee and his retained professionals, if any, shall be made in the ordinary course of business and shall not be subject to the approval of the Court.

43

d. Article VII.C of the Third Joint Plan is modified and approved as follows:

Reorganized SWINC shall emerge on the Effective Date out of the Consolidated SWINC Estate, in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws of SWINC in effect prior to the Effective Date, as amended under the Third Joint Plan. Pursuant to the Amended Certificate of Incorporation and By-Laws of Reorganized SWINC, Reorganized SWINC will be authorized to engage in any lawful activity for which corporations may be organized under the Delaware General Corporation Law. After emerging from bankruptcy, Reorganized SWINC's business operations will consist of the management of the Pension Plan, including any efforts in which Reorganized SWINC may terminate the Pension Plan or transfer its sponsorship in accordance with applicable law. Although Reorganized SWINC will be fully authorized to engage in other business operations and management intends to evaluate opportunities as, when and if they arise, Reorganized SWINC has no present intention of engaging in business operations, will likely dissolve pursuant to the Delaware General Corporations Law within two years following confirmation of the Third Joint Plan. Upon dissolution of the Consolidated SWINC Estate, the SWINC Plan Administrator shall be responsible for receiving valid service of process to the extent required by law and shall forward timely notice of Insured Claims to the relevant insurers.

e. Article VII.D of the Third Joint Plan is modified and approved as follows:

On the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved. If necessary or appropriate, the SWE&C Liquidating Trustee shall file a certificate of dissolution for SWE&C and/or the SWE&C Subsidiaries and shall take all other actions necessary or appropriate to effect the dissolution of SWE&C and the SWE&C Subsidiaries under applicable state law. Upon dissolution of the Consolidated SWE&C Estate, the SWE&C Liquidating Trustee shall be responsible for receiving valid service of

44

process to the extent required by law and shall forward timely notice of Insured Claims to the relevant insurers.

f. The second paragraph of Article VII.R of the Third Joint Plan is replaced in its entirety with the following:

The allowance of a Claim shall not bar the SWINC Plan Administrator or the SWE&C Liquidating Trustee from enforcing, suing on, settling or compromising any Litigation Claims against Claimholders by reason of res judicata, collateral estoppel, or similar doctrine unless the order allowing the Claim resolves such issue of fact or law or unless the Court decided such issue of law or fact in connection with the allowance of such Claim.

37.    Notwithstanding any provision in any order allowing a Claim (other than one allowing a Claim for voting purposes only) entered in these Chapter 11 Cases on or before August 27, 2003 allowing a Claim (other than one allowing a Claim for voting purposes only), reserving the rights by any Committee or by any other Plan Proponent with respect to the allocation of Cash or the allocation of Claims to an estate, such reservations of rights are hereby waived and released; *provided, however,* that the Creditors' Committee's reservation of rights with respect to the allocation of the Cash amounts paid by any entity that is part of the Consolidated SWE&C Estate in connection with the orders approving settlements (the "Cash Settlements") with the following parties are not so released or waived: Buffalo Sheet Metals; CanFibre Lackawanna; Harbourview Electric, Ltd.; Higgins Erectors & Haulers, Inc.; Quackenbush Co., Inc., Allied Fire Protection Systems, Inc.; and Maschinenfabrik J. Dieffenbacher GMBH & Co. (collectively, the "Canfibre Subcon-

45

tractors") are not waived; *provided, further*, that the Consolidated SWE&C Consolidated Estate's sole remedy with respect to the allocation of any such Cash Settlement shall be to seek reimbursement from the Consolidated SWINC Estate in an amount not to exceed $1,036,117.00; and *provided, further*, that in the event that the Consolidated SWINC Estate and the Consolidated SWE&C Estate are not able consensually to resolve such allocation issue, disputes the Consolidated SWE&C Estate's request for reimbursement of the Settlement Cash, such dispute shall be submitted to the Interestate Oversight Board for resolution in accordance with the terms of the Third Joint Plan. With respect to any Claim or Interest that has not been allowed by a final order (other than one allowing a Claim for voting purposes only) entered by the Court on or before August 27, 2003, any disputes regarding allocation of such Claims or Interest or Cash shall be submitted to the Interestate Oversight Board for resolution in accordance with the Third Joint Plan if the Consolidated SWINC Estate and the Consolidated SWE&C Estate are not able to resolve such dispute consensually.

38. Notwithstanding any provision herein or in the Plan to the contrary, except as provided in the immediately preceding paragraph and in the provisos below, none of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, Reorganized SWINC, the Asbestos Trust, or the Plan Proponents shall seek to allocate all or a part of a Disputed Claim based upon a claim that the Consolidated

46

SWINC Estate, the Consolidated SWE&C Estate or any Debtor should be substan-

tively consolidated, that one was the alter ego of the other or that the corporate veil of

one ought to be pierced in order to hold the other liable for any Disputed Claims, all

of which claims have been settled in accordance with and pursuant to the terms of the

Third Joint Plan; *provided, however*, that the foregoing shall not bar, limit, restrict or

prohibit in any manner, any such party seeking to allocate, in whole or in part, from

one Consolidated Estate to the other Consolidated Estate (x) a liability in respect of a

Disputed Claim or seeking reimbursement, in whole or in part, in respect of such

liability based upon a claim that such liability was incurred, in whole or in part, by or

for the benefit of the Consolidated SWINC Estate or the Consolidated SWE&C

Estate and that as a result of the Consolidated SWINC Estate and the Consolidated

SWE&C Estate should share proportionately the liability for such Disputed Claim;

or (y) an asset (or proceeds thereof) or seeking reimbursement, in whole or in part,

for such asset based upon a claim that such asset (or proceeds thereof) was jointly

owned or was created or acquired by or for the benefit of the Consolidated SWINC

Estate or the Consolidated SWE&C Estate and that as a result the Consolidated

SWINC Estate and the Consolidated SWE&C Estate should share proportionately in

the assets (or proceeds thereof); and *provided, further, however,* that the foregoing

shall not bar, limit, restrict or prohibit the Consolidated SWE&C Estate from seeking

reimbursement from the Consolidated SWINC Estate for the Cash Settlement

47

referenced in paragraph 37 above based on a claim that a constructive trust did not exist in respect of the amounts necessary to pay the Cash Settlements or that SWE&C and the SWE&C Subsidiaries were not otherwise in compliance with the New York lien law. Any disputes regarding any such Interestate Disputes or Cash shall be submitted to the Interestate Oversight Board for resolution in accordance with the Third Joint Plan if the Consolidated SWINC Estate and the Consolidated SWE&C Estate are not able to resolve such dispute consensually.

39. The Plan Proponents, the Consolidated SWE&C Estate and the Consolidated SWINC Estate further acknowledge and agree that pursuant to, and in accordance with the Third Joint Plan, on the Effective Date, the Consolidated SWE&C Estate shall deposit not more than $4,500,000 into the Asbestos Trust. Neither the Consolidated SWE&C Estate nor any Plan Proponent shall seek reimbursement from the Consolidated SWINC Estate in respect of such deposit. Other than the making of this $4,500,000 deposit, neither the Consolidated SWE&C Estate nor the SWE&C Liquidating Trust shall have any liability with respect to any Asbestos Claims or the Asbestos Trust.

40. Notwithstanding any other term or provision in the Third Joint Plan or this Confirmation Order, this Confirmation Order (i) is without prejudice to any of the rights, claims and/or defenses of the ACE USA Companies (and any other

48

ACE USA-related company)[3], St. Paul, and the Asbestos Insurance Carriers under any of their various insurance policies (collectively, the "Policies") including, without limitation, ACE USA's, St. Paul's and the Asbestos Insurance Carriers' rights and/or defenses in any subsequent litigation in which ACE USA, St. Paul, and/or the Asbestos Insurance Carriers may seek any declaration regarding the nature and/or extent of any insurance coverage under their respective Policies; (ii) confirms that all of the terms, provisions, conditions, limitations and/or exclusions contained in the Policies shall remain unmodified; (iii) confirms that, to the extent the Reorganized SWINC, the SWE&C Liquidating Trust and/or the Asbestos Trust seek coverage under the Policies, and to the extent that applicable law requires, they shall remain bound by all of the terms, provisions, conditions, limitations and/or exclusions contained in the Policies; (iv) confirms that ACE USA, St. Paul, and the Asbestos Insurance Carriers have reserved all rights to assert that their Policies may not be validly assigned without ACE USA's, St. Paul's and/or the Asbestos Insurance Carriers' express written consent; (v) confirms that nothing in the Plan shall be

---

[3]      The ACE USA Companies are Central Indemnity Company, as successor to CCI Insurance Company, successor to Insurance Company of North America and as successor to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company, Central National Insurance Company of Omaha, with respect to policies issued through Cravens, Dargan Pacific Coast as Managing General Agent, International Insurance Company, Pacific Employers Insurance Company and Westchester Fire Insurance Company (collectively, "ACE USA")."

49

deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Policies, or create any direct right of action against ACE USA, St. Paul and/or the Asbestos Insurance Carriers that does not otherwise exist under applicable state law; (vi) confirms that, to the extent the SWINC Plan Administrator, the SWE&C Liquidating Trustee and/or Asbestos Trustee seek coverage under the Policies, and to the extent that applicable law requires, they shall satisfy all continuing duties and obligations of the insureds under the Policies; and (vii) confirms that nothing in the Third Joint Plan shall be construed as an acknowledgment that the Policies cover or otherwise apply to any Allowed Insured Claims or that any Allowed Insured Claims are eligible for payment under any of the Policies.

41.  Resolution of Pension Benefit Guaranty Corporation Objection. The Pension Benefit Guaranty Corporation ("PBGC") objected to confirmation of the Third Joint Plan on the basis that the Pension Plan may not overfunded.  The Debtors and the PBGC have resolved the PBGC's objection to the Third Joint Plan by agreeing that the Debtors will set aside a portion of the Pension distributions for a period of six months pending a final audit by the PBGC.  A copy of the settlement agreement resolving the objection, in substantially final form, is attached hereto as Exhibit B.

42.  Notice of Entry of Confirmation Order.  On or before the tenth Business Day following the date of entry of this Confirmation Order, the Debtors

shall serve notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all creditors and interest holders, the United States Trustee and other parties in interest, by causing notice of entry of this Confirmation Order in substantially the form of the notice attached hereto as Exhibit C, which form hereby is approved (the "Notice of Confirmation"), to be delivered to such parties by first-class mail, postage prepaid. The Debtors hereby are authorized and directed to effect mailing of the Notice of confirmation in the manner set forth in the Solicitation Procedures Order. The Debtors may, but are not required to, publish the Notice of Confirmation within 10 business days after entry of this Confirmation Order in the national edition of The Wall Street Journal.

43. Notice of Effective Date. Within five Business Days following the occurrence of the Effective Date, Reorganized SWINC shall file notice of the occurrence of the Effective Date with the Bankruptcy Court and shall serve a copy of same on (a) counsel to the Creditors' Committee; (b) counsel to the Equity Committee; (c) the Professionals in these Chapter 11 Cases; and (d) the entities that have requested notice in these cases pursuant to Bankruptcy Rule 2002. Reorganized SWINC may, but is not required to, publish the Notice of the Effective Date within five business days after the occurrence of the Effective Date in the national edition of The Wall Street Journal.

51

44. Reference to Plan Provisions. The failure to specifically include or reference any particular provision of the Third Joint Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Third Joint Plan be confirmed in its entirety.

45. Inconsistency. In the event of an inconsistency between the Third Joint Plan and any other agreement, instrument, or document intended to implement the provisions of the Third Joint Plan, the provisions of the Third Joint Plan shall govern unless otherwise expressly provided for in such agreements, instruments, or documents. In the event of any inconsistency between the Third Joint Plan and any agreement, instrument or document intended to implement the Third Joint Plan and this Confirmation Order, the provisions of this Confirmation Order shall govern. Nothing in the Third Joint Plan, including, without limitation, this paragraph 45, shall alter, supercede, modify or invalidate any settlements or prior order of the Bankruptcy Court approving any settlements.

46. Enforceability. Pursuant to Bankruptcy Code sections 1123(a) and 1142(a) and the provisions of this Confirmation Order, the Third Joint Plan, the Plan Supplement and all plan-related documents shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

52

47. Separate Confirmation Orders. This Confirmation Order is and

shall be a separate Confirmation Order with respect to each of the Debtors in each

Debtor's separate Chapter 11 Case for all purposes.

Dated: Wilmington, Delaware
   January 16 2004

          _____
          Honorable Peter J. Walsh
          United States Bankruptcy Judge

# EXHIBIT 3
# PART 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

In re:                :     Chapter 11

STONE & WEBSTER, INCORPORATED :     Case No. 00-2142 (PJW)
et al.               :
          Debtors.    :     Jointly Administered
                :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

**THIRD AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTORS IN
POSSESSION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FEDERAL
INSURANCE COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, AND THE
OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS WITH RESPECT TO
(I) STONE & WEBSTER, INCORPORATED AND CERTAIN OF ITS SUBSIDIARIES
AND AFFILIATES AND (II) STONE & WEBSTER ENGINEERS AND CONSTRUCTORS,
INC. AND CERTAIN OF ITS SUBSIDIARIES AND AFFILIATES**

Dated:  Wilmington, Delaware
       January 13, 2004

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Gregg M. Galardi (I.D. No. 2991)
Eric M. Davis (I.D. No. 3621)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

-and-

Edward J. Meehan
1440 New York Avenue, N.W.
Washington, D.C. 20005-2111

Attorneys for Debtors and
Debtors-in-Possession

ORRICK, HERRINGTON &
  SUTCLIFFE LLP
Anthony Princi, Esq.
Lorraine S. McGowen, Esq.
666 Fifth Avenue
New York, New York 10103

- and -

LANDIS RATH & COBB LLP
Adam G. Landis (I.D. No. 3407)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware  19801
(302) 467-4400

Attorneys for the Official Committee
  of Unsecured Creditors

-and-

MANIER & HEROD
J. Michael Franks
Sam H. Poteet, Jr.
Thomas T. Pennington
150 4th Avenue North, Suite 2200
Nashville, Tennessee  37219
(615) 244-0030

-and-

DUANE MORRIS LLP
Michael R. Lastowski (I.D. No. 3892)
1100 North Market Street
Suite 1200
Wilmington, Delaware 19801-1246
(302) 657-4900

Attorneys for Federal Insurance Company

-and-

PIERCE ATWOOD
William J. Kayatta, Jr., Esq.
One Monument Square
Portland, Maine  04101
(207) 791-1100

2

-and-

MARCUS, CLEGG & MISTRETTA, P.A.
George J. Marcus, Esq.
100 Middle Street, East Tower
Portland, Maine 04101-4102
(207) 828-8000

-and-

FERRY, JOSEPH & PEARCE, P.A.
Michael B. Joseph, Esq.
Theodore J. Tacconelli, Esq.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899-1351
(302) 575-1555

Attorneys for Maine Yankee Atomic
  Power Company

-and-

BELL, BOYD & LLOYD LLC
David F. Heroy, Esq.
Carmen H. Lonstein, Esq.
70 West Madison Street, Suite 3300
Chicago, Illinois 60602
(312) 372-1121

- and -

BIFFERATO, BIFFERATO & GENTILOTTI
Ian Connor Bifferato, Esq.
1308 Delaware Avenue
Wilmington, Delaware 19806
(302) 429-1900

Attorneys for Official Committee of Equity
  Security Holders of Stone & Webster, Incorporated

3

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ............................................................... 1

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION,
COMPUTATION OF TIME AND GOVERNING LAW ........................... 1

A. Scope of Definitions; Rules of Construction .......................................... 1

B. Definitions ............................................................. 1

C. Rules of Interpretation ................................................. 25

D. Computation of Time .................................................. 26

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ........................ 26

A. Introduction ........................................................... 26

B. Summary of Unclassified Claims (not entitled to vote on the Third Joint Plan) ........... 26
   1. General Administrative Claims ..................................... 26
   2. SWINC Administrative Claims ...................................... 26
   3. SWINC Priority Tax Claims ........................................ 26
   4. SWE&C Administrative Claims ...................................... 26
   5. SWE&C Priority Tax Claims ........................................ 27

C. Summary of Classified Claims and Interests ............................... 27
   1. Consolidated SWINC Estate Classifications .......................... 27
   2. Consolidated SWE&C Estate Classifications .......................... 27

D. Classification of Unimpaired Classes of Claims and Interests (deemed to have
   accepted the Third Joint Plan and therefore not entitled to vote) .................... 28
   1. Consolidated SWINC Estate Classifications .......................... 28
   2. SWE&C Classifications ............................................ 28

E. Classification of Impaired Classes of Claims and Interests .......................... 29
   1. SWINC Classifications ............................................. 29
   2. SWE&C Classifications ............................................. 30

ARTICLE III TREATMENT OF UNCLASSIFIED GENERAL CLAIMS .................... 31

A. Unclassified General Claims ............................................. 31
   1. General Administrative Claims ..................................... 31
   2. General Professional Fee Claims ................................... 31

ARTICLE IV TREATMENT OF CLAIMS AGAINST AND INTERESTS
IN SWINC AND THE SWINC SUBSIDIARIES ..................................... 31

A. Unclassified SWINC Claims ............................................. 31

1.  *SWINC Administrative Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
2.  *SWINC Priority Tax Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.  Unimpaired Classes of SWINC Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    1.  *Class 1A:  SWINC Secured Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    2.  *Class 2A:    SWINC Other Priority Claims* . . . . . . . . . . . . . . . . . . . . . . . . 32

C.  Impaired Classes of SWINC Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    1.  Class 3A:  SWINC Asbestos Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    2.  *Class 4A:  SWINC Convenience Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    3.  *Class 5A:  SWINC General Unsecured Claims* . . . . . . . . . . . . . . . . . . . . . 33
    4.  *Class 6A:  SWINC Intraestate Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    5.  *Class 7A:  SWINC Subordinated Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    6.  *Class 8A:  SWINC Securities Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    7.  *Class 9A:  SWINC Equity Interests* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    8.  *Class 10A: SWINC Subsidiary Interests* . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D.  Special Provision Regarding Unimpaired Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARTICLE V  TREATMENT OF CLAIMS AGAINST AND INTERESTS
IN SWE&C AND THE SWE&C SUBSIDIARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

A.  Unclassified SWE&C Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    1.  *SWE&C Administrative Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    2.  *SWE&C Priority Tax Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.  Unimpaired Classes of SWE&C Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    1.  *Class 1B:  SWE&C Miscellaneous Secured Claims* . . . . . . . . . . . . . . . . . . 36
    2.  *Class 2B:  SWE&C Other Priority Claims* . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.  Impaired Classes of SWE&C Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    1.  *Class 3B: SWE&C Asbestos Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    2.  *Class 4B:  SWE&C Convenience Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    3.  *Class 5B:  SWE&C General Unsecured Claims* . . . . . . . . . . . . . . . . . . . . . 37
    4.  *Class 6B:  SWE&C Intraestate Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    5.  *Class 7B:  SWINC Intercompany Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    6.  *Class 8B:  SWE&C Subordinated Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    7.  *Class 9B:  SWE&C Subsidiary Interests* . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    8.  *Class 10B: SWE&C Interests* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

D.  Special Provision Regarding Unimpaired Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE VI  ACCEPTANCE OR REJECTION OF THE THIRD JOINT PLAN . . . . . . . . . . . . 38

A.  Impaired Classes of Claims and Interests Entitled to Vote . . . . . . . . . . . . . . . . . . . . . . . 38

B.  Acceptance by an Impaired Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.  Unimpaired Classes Conclusively Presumed to Accept Third Joint Plan . . . . . . . . . . . . . 39
    1.  *SWINC Classes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    2.  *SWE&C Classes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ii

D. Classes Deemed to Reject Third Joint Plan .................................... 39
    1. *SWINC Classes* ........................................................ 39
    2. *SWE&C Classes* ....................................................... 39

E. Summary of Classes Voting on the Third Joint Plan .......................... 39
    1. *SWINC Classes* ........................................................ 39
    2. *SWE&C Classes* ....................................................... 39

F. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .................... 39

ARTICLE VII MEANS FOR IMPLEMENTATION OF THE THIRD JOINT PLAN .......... 40

A. Substantive Consolidation ................................................. 40
    1. *Consolidation of SWINC and the SWINC Subsidiaries* ................... 40
    2. *Consolidation of SWE&C and the SWE&C Subsidiaries* .................. 40

B. Merger of Entities ....................................................... 41

C. Continued Corporate Existence of Reorganized SWINC .......................... 41

D. Dissolution of SWE&C and the SWE&C Subsidiaries ............................ 41

E. Certificate of Incorporation and By-laws of Reorganized SWINC .................... 41

F. Directors and Officers of Reorganized SWINC ................................ 42

G. Corporate Action ........................................................ 42

H. Cancellation of Securities, Instruments and Agreements Evidencing Claims
    and Interests .......................................................... 42

I. Issuance of Reorganized SWINC New Common and Preferred Stock .................. 42

J. Effectuating Documents; Further Transactions ................................ 43

K. Consolidated SWINC Estate Governing Board ................................ 43

L. The SWINC Plan Administrator ............................................ 43
    1. *Appointment* ......................................................... 43
    2. *Rights, Powers and Duties of the Consolidated SWINC Estate and the SWINC Plan
       Administrator* ....................................................... 44
    3. *Compensation of the SWINC Plan Administrator* ....................... 45
    4. *Indemnification* ...................................................... 45
    5. *Insurance* ........................................................... 45
    6. *Authority to Object to Claims and Interests and to Settle Disputed Claims* ........... 45

M. The Asbestos Trust ...................................................... 46

N. The Asbestos Trustee ..................................................... 46
    1. *Appointment* ......................................................... 46

iii

2.  *Rights, Powers and Duties of the Asbestos Trustee* .......................... 46
3.  *Compensation of the Asbestos Trustee* ............................... 47
4.  *Indemnification* ...................................................... 47
5.  *Insurance* ........................................................... 48
6.  *Asbestos Insurance Policies* .......................................... 48

O.  The SWE&C Liquidating Trust ............................................ 48
    1.  *Appointment of Trustee* ............................................ 48
    2.  *Transfer of SWE&C Liquidating Trust Assets to the SWE&C Liquidating Trust* ....... 49
    3.  *The SWE&C Liquidating Trust* ....................................... 49
    4.  *Compensation of the SWE&C Liquidating Trustee* ..................... 50
    5.  *The SWE&C Liquidating Trust Advisory Board* ........................ 50

P.  Interestate Oversight Board ............................................. 51

Q.  No Revesting of Assets ................................................. 51

R.  Preservation of Rights of Action ....................................... 52

S.  Creditors' Committee and Equity Committee .............................. 53
    1.  *Dissolution of Creditors' Committee* ............................... 53
    2.  *Dissolution of Equity Committee* .................................. 53

T.  Sources of Cash for Third Joint Plan Distributions ..................... 53

U.  Exemption from Certain Transfer Taxes .................................. 54

V.  Release of Liens ....................................................... 54

W.  Special Provisions Regarding Insured Claims ............................ 54

ARTICLE VIII  DESCRIPTION OF SECURITIES AND INSTRUMENTS
      TO BE ISSUED IN CONNECTION WITH THE THIRD JOINT PLAN ................. 55

A.  Reorganized SWINC New Common Stock ..................................... 55

B.  Reorganized SWINC New Series A Preferred Stock ......................... 56

C.  Reorganized SWINC New Series B Preferred Stock ......................... 57

ARTICLE IX  PROVISIONS GOVERNING DISTRIBUTIONS ............................. 58

A.  Distributions for Claims or Interests Allowed as of the Effective Date ...... 58

B.  Interest on Claims or Interests ........................................ 58

C.  Distributions by Disbursing Agents ..................................... 59

D.  Delivery of Distributions and Undeliverable or Unclaimed Distributions ..... 59
    1.  *Delivery of Distributions in General* .............................. 59
    2.  *Undeliverable and Unclaimed Distributions* ........................ 59

iv

E.   Notification Date for Distributions to Holders of Equity Securities ..................... 60

F.   Surrender of Securities or Instruments ............................................ 60

G.   Means of Cash Payment ......................................................... 61

H.   Withholding and Reporting Requirements ........................................... 61

I.   Setoffs ....................................................................... 61
     1.   By a Debtor ............................................................. 61
     2.   By Non-Debtors .......................................................... 61

J.   Fractional Dollars; De Minimus Distributions ...................................... 61

K.   Allocation of Third Joint Plan Distributions Between Principal and Interest .............. 62

ARTICLE X  TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES ................................................................ 62

A.   Rejected Contracts and Leases ................................................... 62

B.   Rejection Damages Bar Date ..................................................... 62

C.   Assumed Contracts and Leases ................................................... 62

D.   Pension Plan ................................................................. 63

E.   Indemnification Obligations ..................................................... 63

ARTICLE XI  PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT
AND UNLIQUIDATED CLAIMS AND DISPUTED INTERESTS ...................................... 63

A.   Claims Objection Deadlines; Prosecution of Objections ............................... 63
     1.   SWINC Claims Objection Deadline .......................................... 63
     2.   SWE&C Claims Objection Deadline .......................................... 64
     3.   Claims Against Both Consolidated Estates .................................... 64

B.   No Distributions Pending Allowance ............................................... 64

C.   Reserves ..................................................................... 64
     1.   General Administrative Claims Reserve ....................................... 64
     2.   The SWINC Professional Fee Reserve ......................................... 65
     3.   SWINC Operating Reserve .................................................. 65
     4.   The SWINC Disputed Claims Reserve ......................................... 65
     5.   The SWE&C Professional Fee Reserve ......................................... 65
     6.   SWE&C Operating Reserve .................................................. 66
     7.   The SWE&C Disputed Claims Reserve ......................................... 66
     8.   The Reorganized SWINC Operating Reserve .................................... 66

D.   Distributions After Allowance .................................................... 66

ARTICLE XII CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE THIRD JOINT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

A. Conditions to Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

B. Conditions to Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

C. Waiver of Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

ARTICLE XIII EFFECT OF THIRD JOINT PLAN CONFIRMATION . . . . . . . . . . . . . . . . . . . . 68

A. Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

B. Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
   1. Releases by the Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
   2. Releases by Holders of Claims and Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
   3. Injunction Related to Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

C. Discharge of Claims and Termination of Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

D. Exculpation and Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

E. Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

F. Satisfaction of Subordination Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

G. Compromises and Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
   1. Settlement Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
   2. Substantive Consolidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
   3. The Federal Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
   4. The Maine Yankee Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
   5. The Equity Settlement Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
   6. The Asbestos Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

ARTICLE XIV RETENTION OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

ARTICLE XV MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

A. Bar Dates for Certain Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
   1. Administrative Claims Bar Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
   2. Professional Fee Claims; Substantial Contribution Claims . . . . . . . . . . . . . . . . . . 80

B. Payment of Statutory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

C. Amendment or Modification of the Third Joint Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

D. Severability of Third Joint Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

E. Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

vi

F.   Plan Supplement ......................................................... 81

G.   Revocation, Withdrawal or Non-Consummation ............................... 81

H.   Notice ................................................................. 81

I.   Governing Law .......................................................... 83

J.   Term of Injunctions or Stays ........................................... 84

## INTRODUCTION

Stone and Webster, Incorporated ("SWINC") and Stone & Webster Engineers and Constructors, Inc. ("SWE&C") and their respective subsidiaries and affiliates that are debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (together with SWINC and SWE&C, the "Debtors"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), Federal Insurance Company, an Indiana corporation ("Federal"), Maine Yankee Atomic Power Company ("Maine Yankee"), and the Official Committee of Equity Security Holders of Stone and Webster, Incorporated (the "Equity Committee") hereby collectively propose the following plan of reorganization (the "Third Joint Plan") for the resolution of outstanding creditor claims against and equity interests in the Debtors. All capitalized terms not defined in this Introduction have the meanings ascribed in Article I of the Third Joint Plan. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of the Debtors' history, business, properties and operations, a summary and analysis of the Third Joint Plan, and certain related matters. The Debtors, the Creditors' Committee, Federal, Maine Yankee, and the Equity Committee are the proponents of the Third Joint Plan within the meaning of section 1129 of the Bankruptcy Code. These Chapter 11 Cases were consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Court.

Under section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Third Joint Plan cannot be solicited from holders of Claims or Interests until such time as the Disclosure Statement has been approved by the Court and distributed to such holders. ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF INTERESTS ARE ENCOURAGED TO READ THIS THIRD JOINT PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS THIRD JOINT PLAN. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Third Joint Plan prior to its substantial consummation.

## ARTICLE I
### DEFINITIONS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME AND GOVERNING LAW

#### A.    Scope of Definitions; Rules of Construction

For purposes of this Third Joint Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article I of this Third Joint Plan. Any term used in this Third Joint Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include the masculine.

#### B.    Definitions

1.1    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, (a) the actual, necessary, costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries or commissions for services rendered after the commencement of

1

the Chapter 11 Cases, (b) Professional Fee Claims, (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930 and (d) all Allowed Claims pursuant to a Final Order of the Court under section 546(c)(2)(A) of the Bankruptcy Code.

1.2    "Administrative Claims Bar Date" means the last day for filing Administrative Claims, which day shall be sixty (60) days after the Confirmation Date.

1.3    "AEC International" means AEC International Projects, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2145 (PJW) pending in the United States District Court for the District of Delaware.

1.4    "Allowed" means, when used in reference to a Claim or Interest a Claim or Interest as to which no objection has been filed by the respective Claim Objection Deadline set forth in this Third Joint Plan or an Order of the Court.

1.5    "Allowed Class ... Claim" or "Allowed Class ... Interest" means an Allowed Claim or Allowed Interest in the particular Class described.

1.6    "Allowed Federal Claim" means Federal's Allowed Claim as more particularly described in Article XIII.G.3 of the Third Joint Plan.

1.7    "Allowed Maine Yankee Claim" means Maine Yankee's Allowed Claim as more particularly described in Article XIII.G.4 of the Third Joint Plan.

1.8    "Allowed SWE&C Claim" or "Allowed SWE&C Interest" means a Claim or any portion thereof, or an Interest or any portion thereof, against SWE&C or a SWE&C Subsidiary (a) as to which no objection to allowance or request for estimation has been filed on or before the SWE&C Claims Objection Deadline, (b) that has been expressly allowed by a Final Order, (c) that either (x) has been Scheduled as a liquidated, non-contingent, undisputed claim or interest in an amount greater than zero in the Debtors' Schedules, as such schedules may from time to time be amended or modified in accordance with the Bankruptcy Code, Bankruptcy Rules, or orders of the Court before the SWE&C Claims Objection Deadline or (y) is the subject of a timely proof of claim or interest as to which either (i) no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code, the SWE&C Claims Objection Deadline or by any order of the Court or (ii) any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Third Joint Plan; *provided, however*, that, with respect to a SWE&C Administrative Claim, "Allowed SWE&C Administrative Claim" means a SWE&C Administrative Claim as to which a timely request for payment has been made in accordance with Article XV.A hereof (if such written request is required) or other SWE&C Administrative Claim, in each case as to which the Debtors (1) have not interposed a timely objection or (2) have interposed a timely objection and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order.

1.9    "Allowed SWINC Claim" or "Allowed SWINC Interest" means a Claim or any portion thereof, or an Interest or any portion thereof, against SWINC or a SWINC Subsidiary (a) as to which no objection to allowance or request for estimation has been filed on or before the SWINC Claims Objection Deadline, (b) that has been expressly allowed by a Final Order, (c) that either (x) has been Scheduled as a liquidated, non-contingent, undisputed claim or interest in an amount greater than zero in the Debtors'

2

Schedules, as such schedules may from time to time be amended or modified in accordance with the Bankruptcy Code, Bankruptcy Rules, on orders of the Court before the SWINC Objection Deadline or (y) is the subject of a timely proof of claim or interest as to which either (i) no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code, the SWINC Claims Objection Deadline or by any order of the Court or (ii) any objection to its allowance has been settled, waived through payment, or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Third Joint Plan; *provided, however,* that, with respect to a SWINC Administrative Claim, "Allowed SWINC Administrative Claim" means an Administrative Claim as to which a timely request for payment has been made in accordance with Article XV.A hereof (if such written request is required) or other SWINC Administrative Claim, in each case as to which the Debtors (1) have not interposed a timely objection or (2) have interposed a timely objection and such objection has been settled, waived through payment, or withdrawn, or has been denied by a Final Order.

1.10    "Allowed SWINC Subrogation Claim" means the Class 5B Allowed Claim held by the Consolidated SWINC Estate, in the amount of $16.8 million, on account of the SWINC MY Contribution Claim against the Consolidated SWE&C Estate, as provided in Article XIII.G.4 of the Third Joint Plan.

1.11    "Amended Certificate of Incorporation and By-laws of SWINC" means Reorganized SWINC's certificate of incorporation and by-laws in effect under the laws of the State of Delaware, as amended and restated pursuant to the Third Joint Plan.

1.12    "Asbestos Claim" means any Claim whenever or wherever arising or asserted against the Debtors, their predecessors, successors or their present or former officers, directors or employees (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured or unsecured) sounding in tort, contract, warranty, or any other theory of law, equity or admiralty for, relating to, or arising by reason of physical, emotional, bodily or other personal injury or damages, diagnosable or manifested before the Effective Date of the Third Joint Plan, (x) caused or allegedly caused, in whole or in part (i) by asbestos or asbestos-containing products sold, installed, or removed by the Debtors, (ii) by services, actions or operations provided, completed or taken by the Debtors in connection with asbestos or asbestos-containing products, or (y) caused or allegedly caused by asbestos for which Debtors are otherwise liable under any applicable law, whether or not arising or allegedly arising from acts or omissions of the Debtors, their predecessors, successors or their present or former officers, directors or employees. Notwithstanding the foregoing, "Asbestos Claim" shall not include any Claim or demand (i) for loss of or damage to property or (ii) based on exposure to asbestos or asbestos-containing products solely during the course of the claimant's employment with the Debtors, their predecessors or successors.

1.13    "Asbestos Insurance Carriers" means The Travelers Indemnity Company, Travelers Casualty and Surety Company (f/k/a/ The Aetna Casualty and Surety Company), Kemper National Insurance Company, Centennial Insurance Company, Argonaut Insurance Company, Royal Insurance company and any other insurance companies that issued policies covering an Asbestos Claim.

1.14    "Asbestos Trust" means the segregated trust fund established pursuant to the Asbestos Trust Agreement.

3

1.15    "Asbestos Trust Agreement" means that certain agreement, effective as of the Effective Date, substantially in the form annexed hereto as Third Joint Plan Exhibit A, as it may be modified from time to time.

1.16    "Asbestos Trust Assets" means the Asbestos Trust Payment and an Allowed Class 5B Claim in the amount of $1.0 million, as well as the Debtors' rights with respect to, among other things, indemnification, contribution or reimbursement under the insurance policies issued by the Asbestos Insurance Carriers (but not the policies themselves) and all of their rights under any other policies that provide coverage for Asbestos Claims (but not those policies themselves), but only to the extent of such coverage under those policies, which rights shall be transferred to the Asbestos Trustee.

1.17    "Asbestos Trust Payment" means the Cash payment in the amount of $4.5 million made by the Debtors to the Asbestos Trust pursuant to the Asbestos Trust Agreement.

1.18    "Asbestos Trustee" means the Person appointed to administer the Asbestos Trust in accordance with the terms of the Third Joint Plan and the Asbestos Trust Agreement, and any successor thereto.

1.19    "Asset Purchase Agreement" means the asset purchase agreement, dated as of July 14, 2000, as subsequently amended, between the Debtors as sellers and Shaw as purchaser.

1.20    "Associated Engineers" means Associated Engineers & Consultants, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2146 (PJW) pending in the United States District Court for the District of Delaware.

1.21    "Auburn GC" means Auburn VPS General Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2147 (PJW) pending in the United States District Court for the District of Delaware.

1.22    "Auburn LC" means Auburn VPS Limited Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2148 (PJW) pending in the United States District Court for the District of Delaware.

1.23    "Available Asbestos Trust Cash" means any Cash remaining in the Asbestos Trust after deducting the amount determined by the Asbestos Trustee to be necessary and appropriate to reserve for future costs of administration of the Asbestos Trust (including, without limitation, the compensation, fees and costs of the Asbestos Trustee and the compensation, fees and costs of all professionals, consultants, agents and employees retained or to be retained by the Asbestos Trustee).

1.24    "Available Cash" means the SWINC Available Cash or the SWB&C Liquidating Trust Available Cash.

1.25    "Ballot" means each of the ballot forms distributed with the Disclosure Statement to holders of Impaired Claims and/or Interests entitled to vote under Article V hereof in connection with the solicitation of acceptances of the Third Joint Plan.

1.26    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as now in effect or hereafter amended.

4

1.27    "Bankruptcy Rules" means collectively the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

1.28    "Bar Date(s)" means the date(s), if any, designated by the Court as the last date(s) for filing Proofs of Claim or Interest against the Debtors.

1.29    "Bar Date Order" means the Order Establishing Bar Date For Filing Proofs Of Claim, signed by the Court on July 18, 2000, as the same may have been or hereafter may be amended, modified or supplemented.

1.30    "Belmont" means Belmont Constructors Company, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2149 (PJW) pending in the United States District Court for the District of Delaware.

1.31    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

1.32    "Canadian Cash" means all Cash held by SWCL not to exceed $5 million less the shared cost of the Isobord Claim Objection Litigation.

1.33    "Cash" means legal tender of the United States of America and equivalents thereof.

1.34    "CCS" means Commercial Cold Storage, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2150 (PJW) pending in the United States District Court for the District of Delaware.

1.35    "Chapter 11 Cases" means the chapter 11 cases of the Debtors jointly administered under Case No. 00-2142 (PJW).

1.36    "Chubb Canada" means Chubb Insurance Company of Canada.

1.37    "Claim" means a claim, as such term is defined by section 101(5) of the Bankruptcy Code, against a Debtor, whether or not asserted.

1.38    "Claims Agent" means Trumbull Services LLC.

1.39    "Claimholder" means a holder of a Claim.

1.40    "Claims Objection Deadline" means either the SWINC Claims Objection Deadline or the SWE&C Claims Objection Deadline.

1.41    "Claims Registry" means the official list of Claims and Interests in these Chapter 11 Cases maintained by the Claims Agent.

5

1.42    "Class" means a category of holders of Claims or Interests, as described in Article II hereof.

1.43    "Collateral" means any property or interest in property of a Debtor's Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state laws.

1.44    "Confirmation" means entry by the Court of the Confirmation Order.

1.45    "Confirmation Date" means the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order.

1.46    "Confirmation Hearing" means the hearing to consider confirmation of the Third Joint Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.47    "Confirmation Order" means the order entered by the Court confirming the Third Joint Plan.

1.48    "Consolidated SWE&C Estate" means the substantively consolidated Estates of SWE&C and the SWE&C Subsidiaries.

1.49    "Consolidated SWINC Estate" means the substantively consolidated Estates of SWINC and the SWINC Subsidiaries.

1.50    "Consolidated SWINC Estate Governing Board" means the three (3) member board established pursuant to Article VII.K of this Third Joint Plan to advise, assist and supervise the SWINC Plan Administrator pursuant to the SWINC Plan Administrator Agreement.

1.51    "Convenience Claim" means an Allowed Class 4A: SWINC General Unsecured Claim or an Allowed Class 4B: SWE&C General Unsecured Claim.

1.52    "Court" means the United States Bankruptcy Court for the District of Delaware, currently presiding over these Chapter 11 Cases or such other court as may have jurisdiction over the Chapter 11 Cases, including the United States District Court for the District of Delaware which previously presided over the Chapter 11 Cases.

1.53    "Creditor" means any Entity who holds a Claim against a Debtor.

1.54    "Creditors' Committee" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.55    "Cure" means the distribution of Cash, or such other property as may be agreed upon by the parties or ordered by the Court, with respect to the assumption of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law.

1.56    "Debtor" means, individually, SWINC, SWE&C, any of the SWINC Subsidiaries or any of the SWE&C Subsidiaries.

1.57    "Debtors" means collectively, SWINC, SWE&C, the SWINC Subsidiaries, and the SWE&C Subsidiaries.

1.58    "Delaware General Corporation Law" means title 8 of the Delaware Code, in effect as of the date hereof.

1.59    "Disallowed SWE&C Claim" or "Disallowed SWE&C Interest" means a Claim or any portion thereof, or an Interest or any portion thereof, against SWE&C or a SWE&C Subsidiary that (a) has been disallowed or reallocated to a debtor not included in the Consolidated SWE&C Estate by a Final Order (b) is Scheduled at zero or Scheduled as contingent, disputed or unliquidated and as to which a proof of claim or interest bar date has been established but no proof of claim or interest has been filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law, or (c) is not Scheduled and as to which a proof of claim or interest bar date has been established but no proof of claim or interest has been filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law.

1.60    "Disallowed SWINC Claim" or "Disallowed SWINC Interest" means a Claim or any portion thereof, or an Interest or any portion thereof, against SWINC or any SWINC Subsidiary that (a) has been disallowed or reallocated to a debtor not included in the Consolidated SWINC Estate by a Final Order (b) is Scheduled at zero Scheduled or as contingent, disputed or unliquidated and as to which a proof of claim or interest bar date has been established but no proof of claim or interest has been filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law, or (c) is not Scheduled and as to which a proof of claim or interest bar date has been established but no proof of claim or interest has been filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law.

1.61    "Disclosure Statement" means the written disclosure statement (including all schedules thereto or referenced therein) that relates to this Third Joint Plan, as approved by the Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

1.62    "Disputed Claims Reserves" means the SWINC Disputed Claims Reserve and the SWE&C Disputed Claims Reserve established under Article XI.C of the Third Joint Plan.

1.63    "Disputed SWE&C Claim" or "Disputed SWE&C Interest" means a Claim or any portion thereof, or an Interest or any portion thereof, against SWE&C or any SWE&C Subsidiary a Debtor that is neither an Allowed SWE&C Claim nor a Disallowed SWE&C Claim, or an Allowed SWE&C Interest or a Disallowed SWE&C Interest, as the case may be, including, but not limited to, Claims (a) that (i) have not been Scheduled by SWE&C or any SWE&C Subsidiary or (ii) have been Scheduled by SWE&C or any SWE&C Subsidiary at zero or as contingent, unliquidated or disputed, (b) that is the subject of a proof of claim or interest against SWE&C or any SWE&C Subsidiary that either (i) differs in nature, amount or priority from SWE&C or any SWE&C Subsidiary Schedules or (ii) asserts a Claim

7

against SWE&C or any SWE&C Subsidiary that Claim would be properly asserted against SWINC or any SWINC Subsidiary or (c) the allowance or disallowance of which is not yet the subject of a Final Order.

1.64    "Disputed SWINC Claim" or "Disputed SWINC Interest" means a Claim or any portion thereof, or an Interest or any portion thereof, against SWINC or any SWINC Subsidiary that is neither an Allowed SWINC Claim nor a Disallowed SWINC Claim, or an Allowed Interest or a Disallowed SWINC Interest, as the case may be, including, but not limited to, Claims (a) that (i) have not been Scheduled by a Debtor but should have been included on the Debtors Schedules as a Claim against or Interests in SWINC or a SWINC Subsidiary or (ii) have been Scheduled at zero or as contingent, unliquidated or disputed, (b) that are the subject of a proof of claim or interest that either (i) differs in nature, amount or priority from any of the Debtors' Schedules or (ii) asserts a Claim against SWINC or any SWINC Subsidiary that would be properly asserted against SWE&C or any SWE&C Subsidiary, or (c) the allowance or disallowance of which is not yet the subject of a Final Order.

1.65    "Distribution Date" means the Effective Date and any subsequent date in which distributions are made under the Third Joint Plan.

1.66    "DSS" means DSS Engineers, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2151 (PJW) pending in the United States District Court for the District of Delaware.

1.67    "Effective Date" means the Business Day on which all conditions to the consummation of the Third Joint Plan as set forth in Article XII.B hereof have been satisfied or waived as provided in Article XII hereof and is the effective date of the Third Joint Plan.

1.68    "Enclave Parkway" means 1430 Enclave Parkway Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2143 (PJW) pending in the United States District Court for the District of Delaware.

1.69    "Enclave Parkway Realty" means Enclave Parkway Realty, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2152 (PJW) pending in the United States District Court for the District of Delaware.

1.70    "Entity" means an Entity as defined in section 101(15) of the Bankruptcy Code.

1.71    "Equity Committee" means the statutory committee of equity security holders appointed in the chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.72    "Equity Settlement Fund" means the fund to be established pursuant to Article XIII.G.5 of the Third Joint Plan, which shall be funded with the Cash from the Minimum Federal Distribution and the Initial Maine Yankee Distribution to be paid to holders of Allowed Class 9A:: SWINC Equity Interests that vote to accept the Third Joint Plan in the event that (i) Class 9A: SWINC Equity Interests vote to accept the Third Joint Plan, (ii) the Federal Settlement is approved, and (iii) the Maine Yankee Settlement is approved.

1.73    "Equity Voting Record Date" means August 27, 2003, which shall be the date for determining holders of Old Securities entitled to vote on the Third Joint Plan.

8

1.74    "Estate" means (a) individually, the estate of SWINC, SWE&C, any of the SWINC Subsidiaries, or any of the SWE&C Subsidiaries and (b) collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

1.75    "Face Amount" means (a) when used in reference to a Disputed or Disallowed Claim, either (i) the full stated liquidated amount claimed by the holder of such Claim in any proof of Claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Court or other applicable bankruptcy law or (ii) if such Claim is unliquidated, zero (0), and (b) when used in reference to an Allowed Claim, the allowed amount of such Claim.

1.76    "Fast Supply" means Fast Supply Corporation, debtor and debtor-in-possession in Chapter 11 Case No. 00-2153 (PJW) pending in the United States District Court for the District of Delaware.

1.77    "Federal" means Federal Insurance Company, an Indiana corporation.

1.78    "Federal Settlement Agreement" means the agreement among the Debtors and Federal, effective as of the Effective Date, as described in Article XIII of the Third Joint Plan.

1.79    "File, Filed or Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

1.80    "Final Order" means an order or judgment of the Court, as entered on the docket in the Chapter 11 Cases, or the order or judgment of any other court of competent jurisdiction, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed, or, if filed, remains pending.

1.81    "General Administrative Claim" means an Administrative Claim that is not a SWINC Administrative Claim nor a SWE&C Administrative Claim.

1.82    "General Professional Fee Claim" means any Professional Fee Claim that is neither a SWINC professional Fee Claim nor a SWE&C Professional Fee Claim.

1.83    "General Professional Fee Reserve" means the reserve account to be established and maintained under the Third Joint Plan into which will be deposited an amount equal to $10.6 million to fund and pay any Allowed General Professional Fee Claim.

1.84    "General Unsecured Claim" means a Claim that is either a Class 5A: SWINC General Unsecured Claim or a Class 5D: SWE&C General Unsecured Claim.

1.85    "GSES" means GSES Holding, LLC, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2154 (PJW) pending in the United States District Court for the District of Delaware.

1.86    "IE&C" means International Engineers & Constructors, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2155 (PJW) pending in the United States District Court for the District of Delaware.

9

1.87    "Impaired" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.88    "Indemnification Claim" means a Claim for, relating to, or arising by reason of, directly or indirectly, an Indemnification Obligation.

1.89    "Indemnification Obligations" means the obligation of any of the Debtors to indemnify, reimburse or provide contribution to any present or former officer, director or employee, or any present or former professionals or advisors of the Debtors, pursuant to certificates of incorporation, by-laws, comparable organizational documents, contract, statute or otherwise as may be in existence immediately prior to the Petition Date, including, without limitation, accountants, auditors, financial consultants, underwriters or attorneys, whether pursuant to articles of incorporation, by-laws, comparable organizational documents, contract, statute or otherwise, regardless of whether the indemnification is owed in connection with a pre-petition or post-petition occurrence.

1.90    "Initial Class 5A Distribution Amount" means the amount of SWINC Available Cash to be distributed to all holders of Allowed Class 5A: SWINC General Unsecured Claims on the Effective Date.

1.91    "Initial Class 5B Distribution Amount" means the amount of SWE&C Available Cash to be distributed to the holders of Allowed Class 5B: SWE&C General Unsecured Claims on the Effective Date.

1.92    "Initial Class 7A Distribution Amount" means the amount of SWINC Available Cash to be distributed to all holders of Allowed Class 7A: SWINC Subordinated Claims on the Effective Date.

1.93    "Initial Class 8A Distribution Amount" means the amount of SWE&C Available Cash to be distributed to all holders of Allowed Class 8A: SWINC Securities Claims on the Effective Date.

1.94    "Initial Maine Yankee Distribution" means an initial distribution in an amount no less than $1.8 million in Cash to Maine Yankee on account of the Allowed Maine Yankee Claim against the Consolidated SWINC Estate.

1.95    "Insured Claim" means any Claim against a Debtor for which the Debtor is entitled to indemnification, reimbursement, contribution or other payment under a policy of insurance wherein a Debtor is an insured or beneficiary of the coverage of any of the Debtors.

1.96    "Insurance Proceeds" means any recovery by the Debtors or other beneficiary of an insurance policy on account of or with respect to an Insured Claim.

1.97    "Intraestate Claim" means either the SWINC Intraestate Claims or the SWE&C Intraestate Claims.

1.98    "Intercompany Claim" means (a) any claim reflected in the books and records of account by one Debtor with respect to any other Debtor or (b) any Claim that is not reflected in such books and records entries but is held pursuant to the terms of this Third Joint Plan by a Debtor against any other Debtor.  Intercompany Claims do not include claims by one Debtor against another Debtor for

10

contribution, reimbursement, or subrogation based on distributions by either the Consolidated SWINC Estate or the Consolidated SWE&C Estate under the terms of the Third Joint Plan.

1.99    "Interestate Disputes" means any disputes between the Consolidated SWINC Estate and the Consolidated SWE&C Estate regarding the allocation of assets and/or claims between the Consolidated SWINC Estate and the Consolidated SWE&C Estate, pending or proposed litigation, objections to Claims or settlements related to Claims filed or asserted against or that affect both Consolidated Estates, including any disagreements as to the manner and procedure for objecting to or settling such claims and the counsel to be selected for the prosecution of such objections or settlements.

1.100    "Interestate Oversight Board" means the three (3) member board established pursuant to Article VII.P of this Third Joint Plan to resolve all interestate disputes regarding the classification of claims as SWINC or SWE&C claims or the allocation of assets between the Consolidated SWINC Estate and the Consolidated SWE&C Estate.

1.101    "Interest" means (a) the legal, equitable, contractual and other rights of any Person with respect to the Old Common Stock, Old Common Stock Options or any other equity or membership interest in any of the Debtors and (b) the legal, equitable, contractual or other rights of any Person to acquire or receive any of the foregoing.

1.102    "Interestholder" means a holder of an Interest.

1.103    "IRC" means the Internal Revenue Code of 1986, as amended and in effect.

1.104    "IRS" means Internal Revenue Service of the United States of America.

1.105    "Isobord" means Isobord Enterprises Inc.

1.106    "Isobord Claim Objection Litigation" means that litigation with respect to SWE&C's objection to the proof of claim filed by Isobord in the Chapter 11 Cases.

1.107    "Isobord Facility" means the facility to manufacture straw-based particle board using a process technology developed and patented by Isobord and Kvaerner Panel Systems GmbH.

1.108    "Isobord Litigation" means that litigation initiated by Isobord against SWCI and SWEC in the Superior Court of Justice in Ontario, Canada, for CN$150,000,000 in June 2000.

1.109    "Lien" means a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.110    "Litigation Claims" means the Claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that a Debtor or its Estate may hold against any Person, or that is deemed property of a Debtor's Estate or a Consolidated Estate under the Third Joint Plan or applicable bankruptcy law, which are retained by the SWINC Plan Administrator, or the SWE&C Liquidating Trustee, or the respective Consolidated Estates, as the case may be, pursuant to Article VII.R of this Third Joint Plan, including, but not limited to, the claims described in Third Joint Plan Exhibit B.

11

1.111    "Lumbermens" means Lumbermens Mutual Casualty Company, together with its business affiliate AXA Pacific Insurance Company.

1.112    "Lumbermens Claim" means proof of claim no. 5179 filed by Lumbermens relating to losses suffered by Lumbermens solely in connection with surety bonds and which amended and superseded proofs of claim nos. 3300 and 4491. The Lumbermens Claim does not include any other proof of claim filed by Lumbermens.

1.113    "Maine Yankee" means Maine Yankee Atomic Power Company.

1.114    "Maine Yankee Settlement Agreement" means the agreement among the Debtors and Maine Yankee, effective as of the Effective Date, as described in Article XIII of the Third Joint Plan.

1.115    "Minimum Federal Distribution" means the distribution or distributions to Federal in an aggregate amount of no less than $25 million on account of the Allowed Federal Claim against the Consolidated SWINC Estate.

1.116    "Nordic Holdings" means Nordic Holdings, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2156 (PJW) pending in the United States District Court for the District of Delaware.

1.117    "Nordic Investors" means Nordic Investors, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2157 (PJW) pending in the United States District Court for the District of Delaware.

1.118    "Nordic Rail" means Nordic Rail Services, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2158 (PJW) pending in the United States District Court for the District of Delaware.

1.119    "NRSI" means Nordic Refrigerated Services, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2159 (PJW) pending in the United States District Court for the District of Delaware.

1.120    "NRSLP" means Nordic Refrigerated Services, Limited Partnership, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2160 (PJW) pending in the United States District Court for the District of Delaware.

1.121    "NTS" means Nordic Transportation Services, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2161 (PJW) pending in the United States District Court for the District of Delaware.

1.122    "Old Common Stock" means shares of common stock, par value $1.00 per share, of SWINC issued and outstanding as of the Petition Date, together with any options, warrants, or rights, contractual or otherwise, to acquire or receive any such stock, including, but not limited to the Old Common Stock Options and any contracts or agreements pursuant to which a non-Debtor party was or could have been entitled to receive SWINC common stock.

12

1.123    "Old Common Stock Options" means the outstanding options to purchase Old Common Stock, as of the Petition Date.

1.124    "Old Securities" means, collectively, the Old Common Stock and Old Common Stock Options.

1.125    "Operating Reserve" means the reserve accounts to be established and maintained by the SWINC Plan Administrator and the SWE&C Liquidating Trustee into which the SWINC Plan Administrator and the SWE&C Liquidating Trustee shall from time to time deposit Cash to fund, among other things, the expenses of the SWINC Plan Administrator, as set forth more fully in the SWINC Plan Administrator Agreement and the expenses of SWE&C Liquidating Trustee, as set more fully in the SWE&C Liquidity Trust Agreement.

1.126    "Other Priority Claim" means a Claim, other than an Administrative Claim or Priority Tax Claim, that is entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

1.127    "Pension Plan" means the Employee Retirement Plan of Stone & Webster, Incorporated and Participating Subsidiaries, as the same may have been or may be amended, modified, revised or restated.

1.128    "Person" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

1.129    "Petition Date" means June 2, 2000, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.130    "Plan Exhibit" means any exhibit attached to the Third Joint Plan.

1.131    "Plan Supplement" means the compilation of documents and forms of documents specified in the Third Joint Plan which will be filed with the Court not later than the deadline for objection to confirmation of the Third Joint Plan, October 20, 2003.

1.132    "Polar Transport" means Polar Transport, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2162 (PJW) pending in the United States District Court for the District of Delaware.

1.133    "Postpetition Interest" means interest accruing after the Petition Date until payment of an Allowed Claim.

1.134    "Power Technologies" means Power Estate, Inc., f/k/a Power Technologies, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2163 (PJW) pending in the United States District Court for the District of Delaware.

1.135    "Prescient" means Prescient Technologies, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2164 (PJW) pending in the United States District Court for the District of Delaware.

13

1.136    "Priority Tax Claim" means a Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

1.137    "Professional" means any professional employed in the Chapter 11 Cases pursuant to section 327, 328 or 1103 of the Bankruptcy Code or otherwise and any professional seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.138    "Professional Fee Claim" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date and prior to or on the Effective Date.

1.139    "Professional Fee Order" means the order under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated July 28, 2000.

1.140    "Projects Engineers" means Projects Engineers, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2165 (PJW) pending in the United States District Court for the District of Delaware.

1.141    "Pro Rata" means, from time to time, unless the Third Joint Plan specifically provides otherwise, (a) with respect to Claims, the proportion that the Face Amount of a Claim in a particular Class of Claims bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such class and (b) with respect to Interests, the number of shares or units held by such Interestholder in relation to the total number of such shares or units outstanding included in such class.

1.142    "Reorganized SWINC" means, the successor to SWINC and the SWINC Subsidiaries after giving effect to the substantive consolidation and merger of SWINC and the SWINC Subsidiaries into SWINC on the Effective Date pursuant to the Third Joint Plan.

1.143    "Reorganized SWINC Board" means the Board of Directors of Reorganized SWINC, as reconstituted on the Effective Date.

1.144    "Reorganized SWINC New Common Stock" means the shares of common stock, par value $.01 per share, of Reorganized SWINC authorized under Article VII.I hereof and under the Amended Certificate of Incorporation and By-laws of Reorganized SWINC.

1.145    "Reorganized SWINC New Series A Preferred Stock" means the shares of Series A participating Preferred Stock, par value $.01 per share, of Reorganized SWINC authorized under Article VII.I hereof and under the Amended Certificate of Incorporation and By-laws of Reorganized SWINC.

1.146    "Reorganized SWINC New Series B Preferred Stock" means the shares of series B participating Preferred Stock, par value $.01 per share, of Reorganized SWINC authorized under Article VI.I hereof and under the Amended Certificate of Incorporation and By-laws of Reorganized SWINC.

14

1.147     "Reserves" means, one or more of: (i) the Disputed Claims Reserves, (ii) the Unclaimed Distribution Reserves and (iii) the Operating Reserves (iv) the Professional Fee Claims Reserves and (v) any other reserves established under the Third Joint Plan.

1.148     "Restricted Cash" means the Cash segregated by the SWINC Plan Administrator from time to time to fund the Reserves.

1.149     "Reversion" means the remaining assets within the Pension Plan after all Pension Plan liabilities have been satisfied.

1.150     "Rockton Associates" means Rockton Associates, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2166 (PJW) pending in the United States District Court for the District of Delaware.

1.151     "Rockton Technical" means Rockton Technical Services Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2167 (PJW) pending in the United States District Court for the District of Delaware.

1.152     "Sabal" means Sabal Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2168 (PJW) pending in the United States District Court for the District of Delaware.

1.153     "Sabal Real Estate" means Sabal Real Estate Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2169 (PJW) pending in the United States District Court for the District of Delaware.

1.154     "Sale Order" means the Revised Order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c), and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014, (A) Approving Asset Purchase Agreement; (B) Authorizing (i) Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (ii) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (iii) Assumption of Certain Liabilities, entered by the Court on July 14, 2000, authorizing the Debtors' sale of substantially all of their assets to Shaw pursuant to the Asset Purchase Agreement.

1.155     "Sale Proceeds" means the proceeds received by the Debtors from Shaw pursuant to the Asset Purchase Agreement.

1.156     "SAW" means SAW Consulting Services, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2170 (PJW) pending in the United States District Court for the District of Delaware.

1.157     "Scheduled" means, with respect to any Claim or Interest, the status and amount, if any, of such Claim or Interest as set further in the Schedules.

1.158     "Schedules" means the schedules of assets and liabilities, the list of holders of Interests and the statements of financial affairs filed by the Debtors on July 14, 2000, as such schedules or statements have been or may be further modified, amended or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Court, including, but not limited to, the amended schedules filed by the Debtors on April 2, 2003.

15

1.159    "SC Wood" means SC Wood, LLC, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2171 (PJW) pending in the United States District Court for the District of Delaware.

1.160    "Secured Claim" means a Claim (a) secured by a Lien on property in which an Estate has an interest or (b) that is subject to setoff under section 553 of the Bankruptcy Code and such right of setoff has been asserted by the holder of such right prior to the Confirmation Date in a property filed motion for relief from the automatic stay, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.161    "Securities Claim" means (a) any claim or demand whenever and wherever arising or asserted against the Debtors, their predecessors, successors, or their present or former officers, directors or employees and (b) any debt, obligation or liability (whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured, or unsecured), whenever and wherever arising or asserted, of the Debtors, their predecessors, successors, or their present or former officers, directors or employees (including, but not limited to, all thereof in the nature of or sounding in tort, contract, warranty, or any other theory of law, equity or admiralty); in either case (a) and (b) for, relating to, or arising by reason of, directly or indirectly, the ownership of Old Securities, including, but not limited to, any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

1.162    "Selective Technologies" means Selective Technologies Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2172 (PJW) pending in the United States District Court for the District of Delaware.

1.163    "Semi-annual Class 5A Distribution Amount" means, with respect to each Semi-annual Distribution Date, the amount of SWINC Available Cash distributed to all holders of Allowed Class 5A: SWINC General Unsecured Claims.

1.164    "Semi-annual Class 5B Distribution Amount" means, with respect to each Semi-annual Distribution Date, the amount of SWE&C Available Cash to be distributed to holders of Allowed Class 5B SWE&C General Unsecured Claims.

1.165    "Semi-annual Distribution Date" means (a) initially, the first Business Day occurring six (6) months after the Effective Date, and (b) subsequently, the first Business Day occurring six (6) full months after the immediately preceding Semiannual Distribution Date.

1.166    "Shaw" means The Shaw Group Inc., a Louisiana corporation, and its affiliates and subsidiaries, including, but not limited to, SWINC Acquisition Three, Inc., a Louisiana corporation.

1.167    "Shaw Sale" means the Debtors' sale of substantially all of their assets to Shaw pursuant to the Sale Order.

1.168    "Sleeper Street" means Sleeper Street Realty Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2173 (PJW) pending in the United States District Court for the District of Delaware.

16

1.169    "Solicitation Order" means the order entered by the Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject this Third Joint Plan.

1.170    "Substantive Consolidation Order" means the order, or provision of the Confirmation Order, substantively consolidating the Chapter 11 Cases, as provided in Article VII.A of the Third Joint Plan.

1.171    "Substantive Consolidation Settlement" means the compromise and settlement proposed in the Third Joint Plan in Article VII.A and described in the Disclosure Statement.

1.172    "Summer Street" means 245 Summer Street Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2144 (PJW) pending in the United States District Court for the District of Delaware.

1.173    "S&W Abu Dhabi" means Stone & Webster Abu Dhabi (United Arab Emirates), Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2174 (PJW) pending in the United States District Court for the District of Delaware.

1.174    "S&W Argentina" means Stone & Webster of Argentina Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2196 (PJW) pending in the United States District Court for the District of Delaware.

1.175    "S&W Asia" means Stone & Webster Asia Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2175 (PJW) pending in the United States District Court for the District of Delaware.

1.176    "S&W Auburn" means Stone & Webster Auburn Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2176 (PJW) pending in the United States District Court for the District of Delaware.

1.177    "S&W Bharat" means Stone & Webster Bharat, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2177 (PJW) pending in the United States District Court for the District of Delaware.

1.178    "S&W Binghamton" means Stone & Webster Binghamton Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2178 (PJW) pending in the United States District Court for the District of Delaware.

1.179    "S&W Civil" means Stone & Webster Civil and Transportation Services, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2179 (PJW) pending in the United States District Court for the District of Delaware.

1.180    "S&W Construction" means SWCC, Inc., f/k/a Stone & Webster Construction Company, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2180 (PJW) pending in the United States District Court for the District of Delaware.

1.181    "S&W Development" means Stone & Webster Development Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2181 (PJW) pending in the United States District Court for the District of Delaware.

1.182    "S&W Dominican Republic" means Stone & Webster Dominican Republic, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2182 (PJW) pending in the United States District Court for the District of Delaware.

1.183    "S&W Far East" means Stone & Webster Far East Technical Services Corp., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2184 (PJW) pending in the United States District Court for the District of Delaware.

1.184    "S&W Indonesia" means Stone & Webster Indonesia Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2185 (PJW) pending in the United States District Court for the District of Delaware.

1.185    "S&W Industrial" means Stone & Webster Industrial Technology Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2186 (PJW) pending in the United States District Court for the District of Delaware.

1.186    "S&W Inter-American" means Stone & Webster Inter-American Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2187 (PJW) pending in the United States District Court for the District of Delaware.

1.187    "S&W International" means Stone & Webster International Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2188 (PJW) pending in the United States District Court for the District of Delaware.

1.188    "S&W International Projects" means Stone & Webster International Projects Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2189 (PJW) pending in the United States District Court for the District of Delaware.

1.189    "S&W Italia" means Stone & Webster Italia, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2190 (PJW) pending in the United States District Court for the District of Delaware.

1.190    "S&W Korea" means Stone & Webster Korea Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2191 (PJW) pending in the United States District Court for the District of Delaware.

1.191    "S&W Kuwait" means Stone & Webster Kuwait, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2192 (PJW) pending in the United States District Court for the District of Delaware.

1.192    "S&W Management" means S&WMC, Inc., f/k/a Stone & Webster Management Consultants, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2194 (PJW) pending in the United States District Court for the District of Delaware.

18

1.193    "S&W Mexico" means Stone & Webster of Mexico Engineering Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2197 (PJW) pending in the United States District Court for the District of Delaware.

1.194    "S&W Michigan" means SWM Co., Inc., f/k/a Stone & Webster Michigan, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2214 (PJW) pending in the United States District Court for the District of Delaware.

1.195    "S&W Middle East" means Stone & Webster Middle East Engineering Services Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2195 (PJW) pending in the United States District Court for the District of Delaware.

1.196    "S&W Oil" means Stone & Webster Oil Company, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2198 (PJW) pending in the United States District Court for the District of Delaware.

1.197    "S&W Operating" means Stone & Webster Operating Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2199 (PJW) pending in the United States District Court for the District of Delaware.

1.198    "S&W Overseas Consultants" means Stone & Webster Overseas Consultants, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2200 (PJW) pending in the United States District Court for the District of Delaware.

1.199    "S&W Overseas Development" means Stone & Webster Overseas Development Corporation f/k/a Stone & Webster Lithuania Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2193 (PJW) pending in the United States District Court for the District of Delaware.

1.200    "S&W Overseas Group" means Stone & Webster Overseas Group, Inc., a debtor and debtor-in-possession in Chapter 11 Case No. 00-2201 (PJW) pending in the United States District Court for the District of Delaware.

1.201    "S&W Pacific" means Stone & Webster Pacific Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2202 (PJW) pending in the United States District Court for the District of Delaware.

1.202    "S&W Power Engineering" means Stone & Webster Power Engineering Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2203 (PJW) pending in the United States District Court for the District of Delaware.

1.203    "S&W Power Projects" means Stone & Webster Power Projects Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2204 (PJW) pending in the United States District Court for the District of Delaware.

1.204    "S&W Procurement" means Stone & Webster Procurement Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2205 (PJW) pending in the United States District Court for the District of Delaware.

1.205   "S&W Puerto Rico" means Stone & Webster Puerto Rico, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2206 (PJW) pending in the United States District Court for the District of Delaware.

1.206   "S&W Saudi Arabia" means Stone & Webster Saudi Arabia, Incorporated, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2207 (PJW) pending in the United States District Court for the District of Delaware.

1.207   "S&W Taiwan" means Stone & Webster Taiwan Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2208 (PJW) pending in the United States District Court for the District of Delaware.

1.208   "S&W Technology" means Stone & Webster Technology Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2209 (PJW) pending in the United States District Court for the District of Delaware.

1.209   "S&W Wallingford" means Stone & Webster Wallingford Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2210 (PJW) pending in the United States District Court for the District of Delaware.

1.210   "S&W Worldwide" means Stone & Webster Worldwide Engineering Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2211 (PJW) pending in the United States District Court for the District of Delaware.

1.211   "SWCL" means Stone & Webster Canada Ltd.

1.212   "SWE&C" means Stone & Webster Engineers and Constructors, Inc., a Delaware corporation and a debtor and debtor-in-possession in Chapter 11 Case No. 00-2183 (PJW) pending in the United States District Court for the District of Delaware.

1.213   "SWE&C Administrative Claim" means an Administrative Claim against SWE&C or a SWE&C Subsidiary.

1.214   "SWE&C Available Cash" means all SWE&C Liquidating Trust Assets consisting of Cash as of the date ten (10) Business Days prior to the date of any distribution, other than, (a) the Cash or property contained in any Disputed Claims Reserve, Unclaimed Distribution Reserve and any other similar reserve or escrow account established or maintained by the SWE&C Liquidating Trustee pursuant to the provisions of the Third Joint Plan and the SWE&C Liquidating Trust Agreement and (b) the amount determined by the SWE&C Liquidating Trustee, after consultation with the SWE&C Liquidating Trust Advisory Board pursuant to the SWE&C Liquidating Trust Agreement, to be necessary and appropriate to reserve for future costs of administration of the SWE&C Liquidating Trust (including, without limitation, the compensation, fees and costs of the SWE&C Liquidating Trustee and the compensation, fees and costs of all professionals, consultants, agents and employees retained or to be retained by the SWE&C Liquidating Trustee and the SWE&C Liquidating Trustee Advisory Board).

1.215   "SWE&C Claims Objection Deadline" means the last day for Filing objections to Disputed Claims or Disputed Interests (other than Disputed Claims and Disputed Interests set forth in

20

Article VIII hereof, for which no objection or request for estimation shall be required), which day shall be (i) the 240th day following the Confirmation Date or (ii) such other date as the Court may order.

1.216    "SWE&C Convenience Claim" means a SWE&C General Unsecured Claim whose holder elects to be treated as a holder of a Class 4B: SWE&C Convenience Claim and receive in full satisfaction, release and discharge of and in exchange for such SWE&C General Unsecured Claim, the lesser of $1,000 or 50% of their Allowed SWE&C General Unsecured Claim.

1.217    "SWE&C Equity Interests" means any and all Interests in SWE&C.

1.218    "SWE&C General Unsecured Claim" means a claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Miscellaneous Secured Claim, Intraestate Claim, Intercompany Claim, Securities Claim, Convenience Claim or Subordinated Claim, but does include the Allowed SWINC Subrogation Claim.

1.219    "SWE&C Intraestate Claim" means an Intercompany Claim between SWE&C or any SWE&C Subsidiary and SWE&C Subsidiary or SWE&C.

1.220    "SWE&C Liquidating Trust" means the trust created pursuant to the SWE&C Liquidating Trust Agreement on the Effective Date in accordance with this Third Joint Plan, the Confirmation Order and the SWE&C Liquidating Trust Agreement.

1.221    "SWE&C Liquidating Trust Agreement" means that certain SWE&C Liquidating Trust Agreement, effective as of the Effective Date, substantially in the form annexed hereto as Third Joint Plan Exhibit C, as it may be modified from time to time.

1.222    "SWE&C Liquidating Trust Assets" means those assets transferred to and owned by the SWE&C Liquidating Trust pursuant to Article VII.O.2 of the Third Joint Plan, which are comprised of (a) any and all assets and property of the Estates of SWE&C and the SWE&C Subsidiaries as of the Effective Date including, without limitation, (i) Cash, (ii) Cash from the market value allocation of the Sale Proceeds, (ii) Litigation Claims held by SWE&C or the SWE&C Subsidiaries, and (iii) all of the rights and standing of SWE&C and the SWE&C Subsidiaries to object to, litigate, settle and otherwise resolve all Disputed Claims filed solely against the Consolidated SWE&C Estate in accordance with and subject to the provisions of the Third Joint Plan; (b) the Reorganized SWINC New Common Stock held by the SWE&C Liquidating Trustee for the benefit of the beneficiaries of the SWE&C Trust; (c) the Reorganized SWINC Note; and (d) any and all proceeds of the foregoing and interest actually earned with respect thereto.

1.223    "SWE&C Liquidating Trust Advisory Board" means the three (3) member board established pursuant to Article VII.O.5 of this Third Joint Plan to advise, assist and supervise the SWE&C Liquidating Trustee in the administration of the SWE&C Liquidating Trust pursuant to the SWE&C Liquidating Trust Agreement.

1.224    "SWE&C Liquidating Trust Disbursing Agent" means the SWE&C Liquidating Trustee or any party designated by the SWE&C Liquidating Trust Board to serve as the disbursing agent under the Third Joint Plan.

1.225   "SWE&C Liquidating Trustee" means the Person designated by the SWE&C Liquidating Trust Advisory Board at least 5 days prior to the Confirmation Hearing and any successor thereof, in his capacity as trustee under the SWE&C Liquidating Trust Agreement.

1.226   "SWE&C Miscellaneous Secured Claim" means all Secured Claims against SWE&C or any SWE&C Subsidiary.

1.227   "SWE&C Operating Reserve" means the reserve accounts to be established and maintained by the SWE&C Liquidating Trustee into which the SWE&C Liquidating Trustee shall from time to time deposit Cash to fund, among other things, the expenses of the SWINC Plan Administrator, as set forth more fully in the SWE&C Liquidity Trust Agreement.

1.228   "SWE&C Other Priority Claim" means a Claim against SWE&C or any SWE&C Subsidiary entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a SWE&C Administrative Claim or SWE&C Priority Tax Claim.

1.229   "SWE&C Priority Tax Claims" means a Priority Tax Claim against SWE&C or a SWE&C Subsidiary.

1.230   "SWE&C Professional Fee Claims" means a claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred on or after the Petition Date and prior to or on the Effective Date on behalf of SWE&C, a SWE&C Subsidiary or either respective Estates.

1.231   "SWE&C Professional Fee Reserve" means the reserve account to be established and maintained under the Third Joint Plan into which will be deposited an amount equal to $1.5 million to Fund and pay any Allowed SWE&C Professional Fee Claims.

1.232   "SWE&C Setoff Claim" means the aggregate of all Intercompany Claims held by SWE&C or any SWE&C Subsidiary against SWINC or any SWINC Subsidiary.

1.233   "SWE&C Subordinated Claim" means a Subordinated Claim against SWE&C or any SWE&C Subsidiary subordinated pursuant to a Final Order under section 510(c) of the Bankruptcy Code.

1.234   "SWE&C Subsidiaries" means any or all of the following direct and indirect subsidiaries of SWE&C: Belmont, S&W Civil, S&W Construction, DSS, Fast Supply, Rockton Associates, S&W Management, S&W Operating, S&W Procurement, SAW, S&W Industrial, S&W Michigan, Power Technologies, S&W Argentina, S&W Overseas Consultants, S&W Power Projects, GSES, Summer Street, SC Wood, S&W Overseas Group, Rockton Technical, S&W Abu Dhabi, S&W Asia, S&W Bharat, S&W Dominican Republic, S&W Far East, S&W Indonesia, S&W Inter-American, S&W International Projects, S&W Italia, S&W Korea, S&W Kuwait, Associated Engineers, S&W Middle East, S&W Pacific, S&W Puerto Rico, S&W Power Engineering, AEC International, Selective Technologies, IR&C, Projects Engineers, S&W Overseas Development, S&W Saudi Arabia, S&W Taiwan, S&W Technology, S&W International, S&W Mexico, SWEC, Enclave Parkway, and S&W Worldwide.

1.235   "SWE&C Subsidiary Interest" means any and all Interests in a SWE&C Subsidiary.

22

1.236   "SW&C" means Stone & Webster, Engineering Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2142 (PJW) pending in the United States District Court for the District of Delaware.

1.237   "SWINC" means Stone & Webster, Incorporated, a Delaware corporation and a debtor and debtor-in-possession in Chapter 11 Case No. 00-2142 (PJW) pending in the United States District Court for the District of Delaware.

1.238   "SWINC Administrative Claim" means an Administrative Claim Against SWINC or a SWINC Subsidiary.

1.239   "SWINC Available Cash" means all Cash of the Estates of SWINC and the SWINC Subsidiaries held by the SWINC Plan Administrator as of the date ten (10) Business Days prior to the date of any distribution, other than, (i) with respect to distributions to be made on the Effective Date, (a) Cash to be distributed on the Effective Date to holders of Allowed Claims against SWINC, and (b) Restricted Cash and (ii) with respect to distributions to be made on any Semi-Annual Distribution Date, Restricted Cash.

1.240   "SWINC Claims Objection Deadline" means the last day for Filing objections to Disputed Claims or Disputed Interests (other than Disputed Claims and Disputed Interests set forth in Article X hereof, for which no objection or request for estimation shall be required), which day shall be (i) the 240th day following the Confirmation Date or (ii) such other date as the Court may order.

1.241   "SWINC Convenience Claim" means a SWINC General Unsecured Claim whose holder elects to be treated as a holder of a Class 4A: SWINC Convenience Claim and receive in full satisfaction, release and discharge of and in exchange for such SWINC General Unsecured Claim, the lesser of $1,000 or 50% of their Allowed SWINC General Unsecured Claim.

1.242   "SWINC Disbursing Agent" means any party designated by the SWINC Plan Administrator to serve as a disbursing agent for SWINC under the Third Joint Plan.

1.243   "SWINC Equity Interests" means, collectively, the issued and outstanding Old Common Stock and the Old Common Stock Options. To be entitled to vote on and receive a distribution under the Third Joint Plan, Old Common Stock Options must have been exercised before the Equity Voting Record Date.

1.244   "SWINC General Unsecured Claim" means a claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Secured Claims, Intercompany Claim, Securities Claim, Convenience Claim or Subordinated Claim.

1.245   "SWINC Intercompany Claim" means the aggregate Intercompany Claims by SWINC of any SWINC Subsidiary against SW&C or any SW&C Subsidiary.

1.246   "SWINC Intraestate Claim" means an Intercompany Claim between SWINC or any SWINC Subsidiary against SWINC Subsidiary or SWINC.

1.247   "SWINC Miscellaneous Secured Claim" means all Secured Claims against SWINC or any SWINC Subsidiary other than the SW&C Setoff Claim.

23

1.248    "SWINC MY Contribution Claim" means the Consolidated SWINC Estate's claim for contribution/reimbursement/subrogation against the Consolidated SWE&C Estate in the fixed amount of $16.8 million, regardless of actual payments made by SWINC to Maine Yankee on account of its claim, as provided in Article XIII.G.4 of the Third Joint Plan. The SWINC MY Contribution Claim shall be treated as a Class 5B: SWE&C General Unsecured Claim under the Third Joint Plan.

1.249    "SWINC Operating Reserve" means the reserve accounts to be established and maintained by the SWINC Plan Administrator into which the SWINC Plan Administrator shall from time to time deposit Cash to fund, among other things, the expenses of the SWINC Plan Administrator, as set forth more fully in the SWINC Plan Administrator Agreement.

1.250    "SWINC Other Priority Claim" means a Claim against SWINC or any SWINC Subsidiary entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a SWINC Administrative Claim or SWINC Priority Tax Claim.

1.251    "SWINC Plan Administrator" means the Person appointed by the Consolidated SWINC Estate Governing Board to administer the Third Joint Plan in accordance with the terms of the Third Joint Plan and the SWINC Plan Administrator Agreement and to take such other actions as may be authorized under the SWINC Plan Administrator Agreement, and any successor thereto.

1.252    "SWINC Plan Administrator Agreement" means the agreement between and among SWINC, the SWINC Subsidiaries and the SWINC Plan Administrator specifying the rights, duties and responsibilities of and to be performed by the SWINC Plan Administrator under the Third Joint Plan, substantially in the form annexed hereto as Plan Exhibit D, as it may be modified from time to time.

1.253    "SWINC Priority Tax Claim" means a Priority Tax claim against SWINC or a SWINC Subsidiary.

1.254    "SWINC Professional Fee Claim" means a claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred on or after the Petition Date and prior to or on the Effective Date on behalf of SWINC, a SWINC Subsidiary or either respective Estates.

1.255    "SWINC Professional Fee Reserve" means the reserve account to be established and maintained under the Third Joint Plan into which will be deposited an amount equal to $2 million to Fund and pay any Allowed SWINC Professional Fee Claims.

1.256    "SWINC Secured Claim" means either a SWE&C Setoff Claim or a SWINC Miscellaneous Secured Claim.

1.257    "SWINC Securities Claim" means a Securities Claim against SWINC or any SWINC Subsidiary.

1.258    "SWINC Subordinated Claim" means a Subordinated Claim against SWINC or any SWINC Subsidiary subordinated pursuant to a Final Order under section 510(c) of the Bankruptcy Code.

24

1.259    "SWINC Subsidiaries" means any or all of the following direct and indirect subsidiaries of SWINC:  S&W Auburn, S&W Development, S&W Binghamton, SWL, S&W Wallingford, Auburn GC, Auburn LC, Nordic Holdings, Nordic Investors, Nordic Rail, NRSI, NRSLP, NTS, CCS, Polar Transport, Prescient, Sleeper Street, Sabal, Enclave Parkway Realty, Sabal Real Estate, and S&W Oil.

1.260    "Subordinated Claim" means any claim subordinated pursuant to a Final Order under section 510(c) of the Bankruptcy Code.

1.261    "SWL" means SWL Corporation, a debtor and debtor-in-possession in Chapter 11 Case No. 00-2212 (PJW) pending in the United States District Court for the District of Delaware.

1.262    "Third Joint Plan" means this chapter 11 plan and all exhibits annexed hereto, including the Plan Supplement, either in its present form or as the same may be altered, amended or modified from time to time.

1.263    "Treasury Regulations" means the regulations under title 26 of the United States Code.

1.264    "Unimpaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.265    "Unimpaired Claim" means a Claim that is not an Impaired Claim.

1.266    "Unimpaired Interest" means an Interest that is not an Impaired Interest.

1.267    "Voting Deadline" means the last day for submitting Ballots to accept or reject this Third Joint Plan in accordance with section 1126 of the Bankruptcy Code, as specified in the Solicitation Order.

1.268    "Weitz & Luxenberg Agreements" means the:  (i) the New York Asbestos Litigation: Stone & Webster Present Cases Settlement Agreement entered into between SWEC and Weitz & Luxenberg on behalf of pending asbestos-related personal injury cases, effective as of January 11, 1995, which agreement was entered into to resolve pending asbestos-related personal injury cases that Weitz & Luxenberg has filed on behalf of its clients against SWEC in the State of New York State, and (ii) the New York Asbestos Litigation:  Stone & Webster Future Cases Settlement Agreement entered into between SWEC and Weitz & Luxenberg on behalf of future asbestos-related personal injury cases, effective as of January 11, 1995, which agreement was entered into to resolve the future asbestos-related personal injury cases that have been or will be filed by Weitz & Luxenberg on behalf of its clients against SWEC in the State of New York State after January 11, 1995.

**C.    Rules of Interpretation**

For purposes of this Third Joint Plan (a) any reference in the Third Joint Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference in the Third Joint Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Third Joint Plan to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Third Joint

25

Plan; (d) the words "herein" and "hereto" refer to the Third Joint Plan in its entirety rather than to a particular portion of the Third Joint Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Third Joint Plan; (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

### D.  Computation of Time

In computing any period of time prescribed or allowed by the Third Joint Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### ARTICLE II
### CLASSIFICATION OF CLAIMS AND INTERESTS

### A.  Introduction

This Third Joint Plan proposes as a compromise and settlement of various disputes and issues raised by, among others, the Equity Committee and the Creditors' Committee, the substantive consolidation of (i) SWINC and the SWINC Subsidiaries into the Consolidated SWINC Estate and (ii) SWE&C and the SWE&C Subsidiaries into the Consolidated SWE&C Estate, which substantive consolidation is set forth more fully in Article VII.A of the Third Joint Plan. The classifications listed below include (i) Claims against and Interests in SWINC and the SWINC Subsidiaries, as substantively consolidated, and (ii) Claims against SWE&C and the SWE&C Subsidiaries, as substantively consolidated. All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Third Joint Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Confirmation Date.

### B.  Summary of Unclassified Claims (not entitled to vote on the Third Joint Plan)

1.  *General Administrative Claims*

2.  *SWINC Administrative Claims*

3.  *SWINC Priority Tax Claims*

4.  *SWE&C Administrative Claims*

26

5.    *SWE&C Priority Tax Claims*

C.    **Summary of Classified Claims and Interests**

1.    *Consolidated SWINC Estate Classifications*

| Class | Status |
|---|---|
| Class 1A: SWINC Secured Claims | Unimpaired - deemed to accept |
| Class 2A: SWINC Other Priority Claims | Unimpaired - deemed to accept |
| Class 3A: SWINC Asbestos Claims | Impaired - entitled to vote |
| Class 4A: SWINC Convenience Claims | Impaired - entitled to vote |
| Class 5A: SWINC General Unsecured Claims | Impaired - entitled to vote |
| Class 6A: SWINC Intraestate Claims | Impaired - deemed to reject Third Joint Plan |
| Class 7A: SWINC Subordinated Claims | Impaired - entitled to vote |
| Class 8A: SWINC Securities Claims | Impaired - entitled to vote |
| Class 9A: SWINC Equity Interests | Impaired - entitled to vote |
| Class 10A: SWINC Subsidiary Interests | Impaired - deemed to reject Third Joint Plan |

2.    *Consolidated SWE&C Estate Classifications*

| Class | Status |
|---|---|
| Class 1B: SWE&C Miscellaneous Secured Claims | Unimpaired – deemed to accept Third Joint Plan |
| Class 2B: SWE&C Other Priority Claims | Unimpaired - deemed to accept Third Joint Plan |
| Class 3B: SWE&C Asbestos Claims | Impaired - entitled to vote |
| Class 4B: SWE&C Convenience Claims | Impaired - entitled to vote |
| Class 5B: SWE&C General Unsecured Claims | Impaired - entitled to vote |
| Class 6B: SWE&C Intraestate Claims | Impaired - deemed to reject Third Joint Plan |

27

| | |
|---|---|
| Class 7B:  Intercompany Claims of SWINC or any SWINC Subsidiaries | Impaired – deemed to reject Third Joint Plan |
| Class 8B:  SWE&C Subordinated Claims | Impaired – deemed to reject Third Joint Plan |
| Class 9B:  SWE&C Subsidiary Interests | Impaired – deemed to reject Third Joint Plan |
| Class 10B:  SWE&C Equity Interests | Impaired – deemed to reject Third Joint Plan |

D.      **Classification of Unimpaired Classes of Claims and Interests (deemed to have accepted the Third Joint Plan and therefore not entitled to vote)**

1.      *Consolidated SWINC Estate Classifications*

(A)      Class 1A:  SWINC Secured Claims

Class 1A.1 consists of the SWE&C Setoff Claim.

Class 1A.2 consists of all SWINC Miscellaneous Secured Claims, excluding the SWE&C Setoff Claim, each such claim, if any, being deemed to be a separate class under the Third Joint Plan.

(B)      Class 2A:  SWINC Other Priority Claims

Class 2A consists of all Other Priority Claims against SWINC or a SWINC Subsidiary.

2.      *SWE&C Classifications*

(A)      Class 1B:  SWE&C Miscellaneous Secured Claims

Class 1B consists of all Secured Claims against SWE&C or a SWE&C Subsidiary, each such claims, if any, being deemed to be a separate class under the Third Joint Plan.

(B)      Class 2B:  SWE&C Other Priority Claims

Class 2B consists of all Other Priority Claims against SWE&C or a SWE&C Subsidiary.

28

E.    **Classification of Impaired Classes of Claims and Interests**

1.    *SWINC Classifications*

Classes 3A, 4A, 5A, 7A, 8A and 9A are entitled to vote on the Third Joint Plan; Classes 6A and 10A are deemed to have rejected the Third Joint Plan and, therefore, are not entitled to vote on the Third Joint Plan.

(A)    Class 3A:  SWINC Asbestos Claims

Class 3A consists of all Asbestos Claims against SWINC.

(B)    Class 4A:  SWINC Convenience Claims

Class 4A consists of all Convenience Claims against SWINC or a SWINC Subsidiary.

(C)    Class 5A:  SWINC General Unsecured Claims

Class 5A consists of all General Unsecured Claims against SWINC or a SWINC Subsidiary.

(D)    Class 6A:  SWINC Intraestate Claims

Class 6A consists of all Intercompany Claims against SWINC or a SWINC Subsidiary by SWINC or a SWINC Subsidiary.

(E)    Class 7A:  SWINC Subordinated Claims

Class 7A consists of all Subordinated Claims against SWINC or a SWINC Subsidiary.

(F)    Class 8A:  SWINC Securities Claims

Class 8A consists of all Securities Claims against SWINC or a SWINC Subsidiary.

(G)    Class 9A: SWINC Equity Interests

Class 9A consists of all SWINC Equity Interests.

(H)    Class 10A: SWINC Subsidiary Interests

Class 10A consists of all Interests in the SWINC Subsidiaries.

29

2.     *SWE&C Classifications*

Classes 3B, 4B and 5B are entitled to vote on the Third Joint Plan; Classes 6B, 7B, 8B, 9B and 10B are deemed to have rejected the Third Joint Plan and, therefore, are not entitled to vote on the Third Joint Plan.

(A)     Class 3B:  SWE&C Asbestos Claims

Class 3B consists of all Asbestos Claims against SWE&C.

(B)     Class 4B:  SWE&C Convenience Claims

Class 4B consists of all Convenience Claims against SWE&C or a SWE&C Subsidiary.

(C)     Class 5B:  SWE&C General Unsecured Claims

Class 5B consists of all General Unsecured Claims against SWE&C or a SWE&C Subsidiary.

(D)     Class 6B:          SWE&C Intraestate Claims

Class 6B consists of all Intercompany Claims by SWE&C or a SWE&C Subsidiary against SWE&C or a SWE&C Subsidiary.

(E)     Class 7B:  SWINC Intercompany Claims

Class 7B consists of the Intercompany Claims by SWINC or any SWINC Subsidiary after giving effect to the SWE&C Setoff Claim against the Consolidated SWINC Estate.

(F)     Class 8B:  SWE&C Subordinated Claims

Class 8B consists of all Subordinated Claims against SWE&C or a SWE&C Subsidiary.

(G)     Class 9B:  SWE&C Subsidiary Interests

Class 9B consists of all Interests in a SWE&C Subsidiary.

(H)     Class 10B: SWE&C Equity Interests

Class 10B consists of all Interests in SWE&C.

**ARTICLE III**
**TREATMENT OF UNCLASSIFIED GENERAL CLAIMS**

A.    Unclassified General Claims

1.    *General Administrative Claims*

General Administrative Claims shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto out of available funds prior to distribution being made to the Consolidated SWINC Estate and the Consolidated SWE&C Estate.

2.    *General Professional Fee Claims*

General Professional Fee Claims shall be paid in accordance with the procedures established in the Bankruptcy Code, the Bankruptcy Rules, the United States Trustee Guidelines and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Bankruptcy Court will review and determine all applications for compensation for services rendered and reimbursement of costs.

**ARTICLE IV**
**TREATMENT OF CLAIMS AGAINST AND INTERESTS**
**IN SWINC AND THE SWINC SUBSIDIARIES**

A.    Unclassified SWINC Claims

1.    *SWINC Administrative Claims*

Each holder of an Allowed SWINC Administrative Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed SWINC Administrative Claim (a) Cash equal to the unpaid portion of such Allowed SWINC Administrative Claim or (b) such other treatment as to which the SWINC Plan Administrator and such holder shall have agreed upon in writing.

2.    *SWINC Priority Tax Claims*

Each holder of an Allowed SWINC Priority Tax Claim shall be entitled to receive on account of such Allowed SWINC Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed SWINC Priority Tax Claim, (i) equal Cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) a single Cash payment to be made on the Effective Date or as soon as practicable thereafter in an amount equivalent to the amount of such Allowed Priority Tax Claim, or (iii) such other treatment as to which the SWINC Plan Administrator and such holder shall have agreed upon in writing.

31

**B.    Unimpaired Classes of SWINC Claims**

    1.    *Class 1A:  SWINC Secured Claims*

    (A)    Class 1A.1:  SWE&C Setoff Claim

        On the Effective Date the Class 1A.1:  SWE&C Setoff Claim held by the Consolidated SWE&C Estate shall be deemed offset against the Class 7B:  SWINC Intercompany Claim by the Consolidated SWINC Estate resulting in a net Allowed Class 7B:  SWINC Intercompany Claim held by the Consolidated SWINC Estate against the Consolidated SWE&C Estate in the approximate amount of $20 million.  As a result, the Allowed Class 1A:  SWE&C Setoff Claim shall be deemed satisfied in full.

    (B)    Class 1A.2:  SWINC Miscellaneous Secured Claims

        On the Effective Date, each holder of an Allowed Class 1A.2:  Miscellaneous Secured Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 1A.2:  SWINC Miscellaneous Secured Claim (a) Cash equal to the unpaid portion of the Allowed Class 1A.2:  SWINC Miscellaneous Secured Claim or (b) such treatment as the SWINC Plan Administrator and such holder shall have agreed upon in writing.

    2.    *Class 2A:   SWINC Other Priority Claims*

        Each holder of an Allowed Class 2A SWINC Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 2A SWINC Other Priority Claim (a) Cash equal to the unpaid portion of such Allowed Class 2A SWINC Other Priority Claim or (b) such other treatment as to which the SWINC Plan Administrator and such holder shall have agreed upon in writing.

**C.    Impaired Classes of SWINC Claims and Interests**

    1.    Class 3A:  SWINC Asbestos Claims

        As of the Effective Date, liability, if any, for all Asbestos Claims against SWINC or the SWINC Subsidiaries shall be automatically and without further act or deed be deemed assumed by and shall be the sole responsibility of the Asbestos Trust.  Each holder of an Allowed Class 3A:  SWINC Asbestos Claim shall receive in full satisfaction, settlement, release and discharge of an In exchange for such Allowed Class 3A:  SWINC Asbestos Claim (a) its Pro Rata share of the Asbestos Trust Assets set forth in Article VII.M., subject to the terms and conditions of the Asbestos Trust Agreement or (b) such other treatment as to which the Asbestos Trustee and the holder of such Allowed Class 3A:  SWINC Asbestos Claim shall have agreed upon in writing.

        Under the Third Joint Plan, Allowed Class 3A:  SWINC Asbestos Claims are characterized as impaired because the Proponents are unable to determine whether the Available Asbestos Trust Cash plus any Insurance Proceeds with respect to a specific Allowed Class 3A:  SWINC Asbestos Claim will be adequate to pay all Allowed Class 3A:  SWINC Asbestos Claims in full.  In over 15 years of liquidating Asbestos Claims, the Asbestos Insurance Coverage available to the Debtors has been more than adequate to satisfy such claims.  Under a pre-petition arrangement with the Asbestos Insurance Carriers, the Debtors also agreed to contribute a certain percentage towards the liquidation and

indemnification of Asbestos Claims. In addition, SWEC entered into the Weitz & Luxenberg Agreements. The Debtors will assume the Weitz & Luxenberg Agreements in connection with the Third Joint Plan. To date, the amount of cash funds paid out by the Debtors in connection with Asbestos Claims is less than the amount to be contributed by the Debtors to the Asbestos Trust. The Proponents also believe that Asbestos Claims, if any, are Claims properly asserted only against the Debtors in the Consolidated SWE&C Estate and that there will be no Allowed Asbestos Claims at the Consolidated SWINC Estate. The Proponents believe, therefore, based on the Debtors' historical liability for Asbestos Claims and an understanding of the Asbestos Insurance Coverage, that the holder of Class 3A: Allowed Asbestos claims will receive from the Available Asbestos Trust Cash and the Insurance Proceeds at least the same percentage recovery as they would receive if they held Allowed Claims in Class 5A: SWINC General Unsecured Claims and as much s the holder would be entitled to under the Weitz & Luxenberg Agreements. Accordingly, the Proponents of the Third Joint Plan have characterized the Class 3A: SWINC Asbestos Claims as impaired and seek a vote of the Class 3A to bind all members of Class 3A: SWINC Asbestos Claims to the treatment of such Claims proposed in the Third Joint Plan. In the event that the Proponents are unable to confirm the Third Joint Plan with the Class 3A: SWINC Asbestos Claims, the Proponents reserve their right to modify the Third Joint Plan to seek confirmation of a Third Joint Plan wherein the Class 3A: SWINC Asbestos Claims are combined with and treated the same as Class 5A: SWINC General Unsecured Claims.

2.    *Class 4A:  SWINC Convenience Claims*

On the Effective Date, each holder of a Class 5A: SWINC General Unsecured Claim that elects to be treated as a holder of a Class 4A: SWINC Convenience Claim shall receive in full satisfaction, release and discharge of and in exchange for such Class 5A: SWINC General Unsecured Claim, the lesser of $1,000 or 50% of such holder's Allowed Class 5A: SWINC General Unsecured Claim. Only holders of Class 5A: SWINC General Unsecured Claims who vote in favor of the Third Joint Plan may elect to have their claim treated as a Class 4A: SWINC Convenience Claim.

3.    *Class 5A:  SWINC General Unsecured Claims*

On the Effective Date, each holder of an Allowed Class 5A: SWINC General Unsecured Claim shall receive its Pro Rata share of the Initial Class 5A Distribution Amount. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 5A: SWINC General Unsecured Claim shall receive its Pro Rata share of the Semi-Annual Class 5A Distribution Amount.

4.    *Class 6A:  SWINC Intraestate Claims*

In connection with, and as a result of, the substantive consolidation of SWINC and the SWINC Subsidiaries into the Consolidated SWINC Estate, all Class 6A: SWINC Intraestate Claims shall be deemed waiver, released and cancelled and the holders of Class 6A Consolidated SWINC Intraestate Claims shall not be entitled to and shall not receive or retain any property or interest on account of such Claims.

5.    *Class 7A:  SWINC Subordinated Claims*

Upon the payment in full of the Allowed Class 4A: SWINC Convenience Claims and the Allowed Class 5A: SWINC General Unsecured Claims or as son thereafter as is practicable, each holder of an Allowed Class 7A: SWINC Subordinated Claim shall receive its Pro Rata share of the Initial Class 7A Distribution Amount, if any. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 7A: SWINC Subordinated Claim shall receive its Pro Rata share of the Semi-Annual Class 7A Distribution Amount.

33

6.    *Class 8A: SWINC Securities Claims*

Upon the payment in full of Allowed Class 4A: SWINC Convenience Class Claims, Allowed Class 5A: SWINC General Unsecured Claims, and Allowed Class 7A: SWINC Subordinated Claims, each holder of an Allowed Class 8A: SWINC Securities Claim (less any insurance proceeds actually received and retained by such holder in respect of such holder in respect of such Class 8A: SWINC Securities Claim) shall receive its Pro Rata share (as diluted by Allowed Class 9A: SWINC Equity Interests) of (i) the remaining Available Cash in the SWINC Disputed Claims Reserve and (ii) any amounts remaining that were paid to the Consolidated SWINC Estate as a liquidation preference with respect to the SWINC New Series A Preferred Stock after all Allowed Class 4A: SWINC Convenience Class Claims, Allowed Class 5A: SWINC General Unsecured Claims and Allowed Class 7A: SWINC Subordinated Claims have been satisfied. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 8A: SWINC Securities Claim shall receive its Pro Rata share (as diluted by Allowed Class 9A: SWINC Equity Interests) of the remaining Available Cash in the SWINC Disputed Claims Reserve and remaining Available Cash paid to the SWINC Plan Administrator as the liquidation preference with respect to the SWINC New Series A Preferred Stock. Upon receipt by the holder of an Allowed Class 8A: SWINC Securities Claim of any amounts distributed under the Third Joint Plan in respect of such claim, such holder shall be deemed to have assigned to the SWINC Plan Administrator all rights of the holder to recover such amounts from the applicable insurer.

7.    *Class 9A: SWINC Equity Interests*

In the event that Class 9A: SWINC Equity Interests vote to accept the Third Joint Plan, then on the Effective Date, or as soon thereafter as practicable, each holder of an Allowed SWINC Equity Interest (i.e., Old Common Stock as of the Equity Voting Record Date) that votes to accept the Third Joint Plan shall receive $.12 per share of Old Common Stock held by such holder from the Equity Settlement Fund on account of Maine Yankee's contribution to the Equity Settlement Fund from the Initial Maine Yankee Distribution as provided in Article XIII.G of the Third Joint Plan. In addition, once Federal has received the Minimum Federal Distribution, Federal shall pay its contribution to the Equity Settlement Fund, and as soon thereafter as is practicable, each holder of an Allowed SWINC Equity Interest that votes to accept the Third Joint Plan shall receive $.50 per share of Old Common Stock held by such holder from the Equity Settlement Fund on account of Federal's contribution to the Equity Settlement Fund from the Minimum Federal Distribution. The Equity Settlement Fund shall be administered by the Consolidated SWINC Estate Governing Board. In addition, upon the payment in full of the Allowed Class 5A: SWINC General Unsecured Claims, the Allowed Class 4A: SWINC Convenience Class Claims, and the Allowed Class 7A: SWINC Subordinated Claims, each holder of an Allowed Class 9A: SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A: SWINC Securities Claims) of (i) the remaining Available Cash in the SWINC Disputed Claims Reserve and (ii) any amounts remaining that were paid to the SWINC Plan Administrator as a liquidation preference with respect to the SWINC New Series A Preferred Stock after all Allowed Class 4A: SWINC Convenience Class Claims, Allowed Class 5A: SWINC General Unsecured Claims and Allowed Class 7A: SWINC Subordinated Claims have been satisfied. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 9A: SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A: SWINC Securities Claims) of the remaining Available Cash paid to the Consolidated SWINC Estate as the remaining liquidation preference with respect to the SWINC New Series A Preferred Stock.

In the event that Class 9A: SWINC Equity Interests vote to reject the Third Joint Plan, then, upon the payment in full of the Allowed Class 5A: SWINC General Unsecured Claims, the Allowed Class 4A: SWINC Convenience Class Claims, and the Allowed Class 7A: SWINC Subordinated Claims, each holder of an Allowed Class 9A: SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A: SWINC Securities Claims) of (i) the remaining Available Cash in

34

the SWINC Disputed Claims Reserve and (ii) any amounts remaining that were paid to the Consolidated SWINC Estate as a liquidation preference with respect to the SWINC New Series A Preferred Stock after all Allowed Class 4A: SWINC Convenience Class Claims, Allowed Class 5A: SWINC General Unsecured Claims and Allowed Class 7A: SWINC Subordinated Claims have been satisfied. On each ensuing Semi-Annual Distribution Date, each holder of an Allowed Class 9A: SWINC Equity Interest shall receive its Pro Rata share (as may be diluted by Allowed Class 8A: SWINC Securities Claims) of the remaining Available Cash paid to the Consolidated SWINC Estate as the remaining liquidation preference with respect to the SWINC New Series A Preferred Stock.

On the Effective Date, all Old Common Stock and Old Common Stock Options in SWINC will be canceled. Holders of Allowed Class 9A Equity Interests as of the Effective Date shall be deemed to hold a pro rata beneficial interest in the assets of the Consolidated SWINC Estate after payment in full of the Allowed Class 5A: SWINC General Unsecured Claims, the Allowed Class 4A: SWINC Convenience Class Claims, and the Allowed Class 7A: SWINC Subordinated Claims, as provided in the Third Joint Plan. Only Holders of Old Common Stock as of the Equity Voting Record Date that voted to accept the Third Joint Plan shall be deemed to hold a pro rata beneficial interest in the Equity Settlement Fund.

This Third Joint Plan shall not preclude insiders of the Debtors, who vote to accept the Third Joint Plan as holders of Class 9A: SWINC Equity Interests, from receiving a distribution from the Equity Settlement Fund.

        8.     *Class 10A: SWINC Subsidiary Interests*

In connection with, and as a result of, the substantive consolidation of SWINC and the SWINC Subsidiaries into the Consolidated SWINC Estate, all Interests in the SWINC Subsidiaries shall be deemed cancelled as of the Effective Date and the holders of Class 10A: SWINC Subsidiary Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

**D.     Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in the Third Joint Plan, nothing shall affect the rights, claims or defenses, whether legal or equitable, of SWINC, any SWINC Subsidiary or the SWINC Plan Administrator with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**ARTICLE V**
**TREATMENT OF CLAIMS AGAINST AND INTERESTS**
**IN SWE&C AND THE SWE&C SUBSIDIARIES**

**A.     Unclassified SWE&C Claims**

        1.     *SWE&C Administrative Claims*

On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the First Semi-Annual Distribution Date after an Administrative Claim becomes an Allowed SWE&C Administration Claim, each holder of an Allowed SWE&C Administrative Claim shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed SWE&C Administrative Claim (a) Cash equal

35

to the unpaid portion of such Allowed SWE&C Administrative Claim or (b) such other treatment as to which SWE&C and/or the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

### 2.  SWE&C Priority Tax Claims

Each holder of an Allowed SWE&C Priority Tax Claim, at the sole option of the SWE&C Liquidating Trustee, shall be entitled to receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed Priority Tax Claim, (i) equal Cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax on which such Claim is based, totaling the principal amount of such Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) a single Cash payment to be made on the Effective Date or as soon as practicable thereafter in an amount equivalent to the amount of such Allowed SWE&C Priority Tax Claim, or (iii) such other treatment as to which the SWE&C Liquidating Trustee and such holder shall have agreed upon in writing.

### B.  Unimpaired Classes of SWE&C Claims

#### 1.  Class 1B:  SWE&C Miscellaneous Secured Claims

On the Effective Date, each holder of an Allowed Class 1B: SWE&C Miscellaneous Secured Claim shall receive either (a) Cash equal to the unpaid portion of such Allowed SWE&C Miscellaneous Secured Claim or (b) such other treatment as to which the SWE&C Liquidating Trustee and the holder of such Allowed Class 1B: SWE&C Miscellaneous Secured Claim agree to in writing.

#### 2.  Class 2B:  SWE&C Other Priority Claims

Each holder of an Allowed Class 2B: SWE&C Other Priority Claim shall receive in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Class 2B: SWE&C Other Priority Claim either (a) Cash equal to the unpaid portion of such Allowed Class 2B: SWE&C Other Priority Claim or (b) such other treatment as to which the SWE&C Liquidating Trustee and the holder of such Allowed SWE&C Other Priority Claim shall have agreed upon in writing.

### C.  Impaired Classes of SWE&C Claims and Interests

#### 1.  Class 3B:  SWE&C Asbestos Claims

As of the Effective Date, liability, if any, for all Asbestos Claims against SWE&C or the SWE&C Subsidiaries shall be automatically and without further act or deed assumed by and shall be the sole responsibility of the Asbestos Trust. Each holder of an Allowed Class 3B: SWE&C Asbestos Claim shall receive in full satisfaction, settlement, release and discharge of an in exchange for its Allowed Class 3B: SWE&C Asbestos Claim (a) its Pro Rata share of the Asbestos Trust Assets set forth in Article VII.M., subject to the terms and conditions of the Asbestos Trust Agreement or (b) such other treatment as to which the Asbestos Trustee and such holder shall have agreed upon in writing.

Under the Third Joint Plan, Allowed Class 3B: SWE&C Asbestos Claims are characterized as impaired because the Proponents are unable to determine whether the Available Asbestos Trust Cash plus any Insurance Proceeds with respect to a specific Allowed Class 3B: SWE&C Asbestos Claim will be adequate to pay all Allowed Class 3B: SWE&C Asbestos Claims in full. In over 15 years

36

of liquidating Asbestos Claims, the Asbestos Insurance Coverage available to the Debtors has been more than adequate to satisfy such claims. Under a pre-petition arrangement with the Asbestos Insurance Carriers, the Debtors also agreed to contribute a certain percentage towards the liquidation and indemnification of Asbestos Claims. In addition, SWEC entered into the Weitz & Luxenberg Agreements. The Debtors will assume the Weitz & Luxenberg Agreements in connection with the Third Joint Plan. To date, the amount of cash funds paid out by the Debtors in connection with Asbestos Claims is less than the amount to be contributed by the Debtors to the Asbestos Trust. The Proponents believe, therefore, based on the Debtors' historical liability and an understanding of the Asbestos Insurance Coverage, that the holder of Class 3B Allowed Asbestos claims will receive from the Available Asbestos Trust Cash and the Insurance Proceeds at least the same percentage recovery as they would receive if they held Allowed Claims in Class 5B General Unsecured Claims and as much as the holder would be entitled to under the Weitz & Luxenberg Agreements. Accordingly, the Proponents of the Third Joint Plan have characterized the Class 3B Asbestos Claims as impaired and seek a vote of the Class 3B to bind all members of Class 3B: SWE&C Asbestos claims to the treatment of such Claims proposed in the Third Joint Plan. In the event that the Proponents are unable to confirm the Third Joint Plan with the Class 3B: SWE&C Asbestos Claims, the Proponents reserve their right to modify the Third Joint Plan to seek confirmation of a Third Joint Plan wherein the Class 3B: SWE&C Asbestos Claims are combined with and treated the same as Class 5B: SWE&C General Unsecured Claims.

2.    *Class 4B: SWE&C Convenience Claims*

On the Effective Date, each holder of a Class 5B: SWE&C General Unsecured Claim that elects to be treated in Class 4B shall receive in full satisfaction, release and discharge of and in exchange for such Class 5B: SWE&C General Unsecured Claim, the lesser of $1,000 or 50% of such holder's Allowed Class 5B: SWE&C General Unsecured Claim. Only holders of Class 5B: SWE&C General Unsecured Claims who vote in favor of the Third Joint Plan may elect to have their claim treated as a Class 4B: SWE&C Convenience Claim.

3.    *Class 5B: SWE&C General Unsecured Claims*

On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the first Semi-Annual Distribution Date after such Class 5B: SWE&C General Unsecured Claim becomes an Allowed Class 5B: SWE&C General Unsecured Claim, each holder of an Allowed Class 5B: SWE&C General Unsecured Claim shall receive a beneficial interest in the SWE&C Liquidating Trust entitling such holder to receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 5B: SWE&C General Unsecured Claim its Pro Rata share of the Semi-Annual Class 5B Distribution Amount.

4.    *Class 6B: SWE&C Intraestate Claims*

In connection with, and as a result of, the substantive consolidation of SWE&C and the SWE&C Subsidiaries into the Consolidated SWE&C Estate, all Class 6B: SWE&C Intraestate Claims shall be deemed eliminated and the holders of Class 6B: SWE&C Intraestate Claims shall not be entitled to and shall not receive or retain any property or interest on account of such Claims.

5.    *Class 7B: SWINC Intercompany Claims*

Holders of Class 7B: SWINC Intercompany Claims shall not receive or retain any property or interest on account of such Claims.

37

6.    *Class 8B:  SWE&C Subordinated Claims*

Holders of Allowed Class 8B: SWE&C Subordinated Claims shall not receive or retain any distribution on account of such Class 8B: SWE&C Subordinated Claim.

7.    *Class 9B:  SWE&C Subsidiary Interests*

In connection with, and as a result of, the substantive consolidation of SWE&C and the SWE&C Subsidiaries, on the Effective Date or such other date set by an order of the Court, all Interests in the SWE&C Subsidiaries shall be eliminated and the holders of Class 9B: SWE&C Subsidiary Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

8.    *Class 10B:  SWE&C Interests*

In connection with, and as a result of, the substantive consolidation of SWE&C and the SWE&C Subsidiaries, on the Effective Date or such other date set by an order of the Court, all Interests in SWE&C shall be eliminated and the holders of Class 10B: SWE&C Interests shall not be entitled to and shall not receive or retain any property or interest on account of such Interests.

**D.    Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in the Third Joint Plan, nothing shall affect the rights, claims or defenses, whether legal and equitable, of SWE&C, any SWE&C Subsidiary or the SWE&C Liquidating Trustee, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**ARTICLE VI**
**ACCEPTANCE OR REJECTION OF THE THIRD JOINT PLAN**

**A.    Impaired Classes of Claims and Interests Entitled to Vote**

Subject to Articles VI.C and VI.D below, Claimholders and Interestholders in each Impaired Class of Claims or Interests are entitled to vote as a class to accept or reject the Third Joint Plan.

**B.    Acceptance by an Impaired Class**

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Third Joint Plan if the Third Joint Plan is accepted by the holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims of such Class that have timely and properly voted to accept the Third Joint Plan.

In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests has accepted the Third Joint Plan if the holders of at least two-thirds (⅔) in amount of the Allowed Interests of such Class have timely and properly voted to accept the Third Joint Plan.

38

C.    **Unimpaired Classes Conclusively Presumed to Accept Third Joint Plan**

1.    *SWINC Classes*

Classes 1A and 2A are Unimpaired by the Third Joint Plan.  Under section 1126(f) of the Bankruptcy Code, such Claimholders are conclusively presumed to accept the Third Joint Plan, and the votes of such Claimholders will not be solicited.

2.    *SWE&C Classes*

Classes 1B and 2B are Unimpaired by the Third Joint Plan.  Under section 1126(f) of the Bankruptcy Code, such Claimholders are conclusively presumed to accept the Third Joint Plan, and the votes of such Claimholders will not be solicited.

D.    **Classes Deemed to Reject Third Joint Plan**

1.    *SWINC Classes*

Claimholders in Class 6A and Interestholders in Class 10A are not entitled to receive or retain any property under the Third Joint Plan.  Under section 1126(g) of the Bankruptcy Code, Class 6A Claimholders and Class 10A Interestholders are deemed to reject the Third Joint Plan, and the votes of such Interestholders or Claimholders will not be solicited.

2.    *SWE&C Classes*

Claimholders in Classes 6B, 7B and 8B and Interestholders in Class 9B and 10B are not entitled to receive or retain any property under the Third Joint Plan.  Under section 1126(g) of the Bankruptcy Code, Classes 6B, 7B and 8B Claimholders and Class 9B and 10B Interestholders are deemed to reject the Third Joint Plan, and the votes of such Interestholders or Claimholders will not be solicited.

E.    **Summary of Classes Voting on the Third Joint Plan**

1.    *SWINC Classes*

As a result of the provision of Article IV.C of this Third Joint Plan, the votes of holders of Claims in Classes 3A, 4A, 5A, 7A, and 8A and Interests in Class 9A will be solicited with respect to this Third Joint Plan.

2.    *SWE&C Classes*

As a result of the provision of Article V.C of this Third Joint Plan, the votes of holders of Claims in Classes 3B, 4B and 5B will be solicited with respect to this Third Joint Plan.

F.    **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

To the extent that any Impaired Class rejects the Third Joint Plan or is deemed to have rejected the Third Joint Plan, the Debtors request confirmation of the Third Joint Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Third Joint Plan or any Plan Exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

# EXHIBIT 3
# PART 2

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE THIRD JOINT PLAN

### A.    Substantive Consolidation

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Third Joint Plan, the provisions of the Third Joint Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the issue of substantive consolidation and the Substantive Consolidation Litigation. Accordingly, this Third Joint Plan shall serve as, and shall be deemed to be, a motion for entry of an order pursuant to Bankruptcy Rule 9019 (i) substantively consolidating the Estates of SWINC and the SWINC Subsidiaries and (ii) substantively consolidating the Estates of SWE&C and the SWE&C Subsidiaries. As set forth more fully in the Disclosure Statement, the Proponents believe that such a settlement and compromise is justified by administrative, substantive and equitable reasons.

### 1.    Consolidation of SWINC and the SWINC Subsidiaries

On the Effective Date, the Estates of SWINC and the SWINC Subsidiaries shall be substantively consolidated as follows:  (i) the SWINC Subsidiaries shall be merged with and into SWINC, with the surviving corporation being Reorganized SWINC, (ii) all Intercompany Claims by, between and among SWINC and the SWINC Subsidiaries shall be forgiven and eliminated, (iii) all assets and liabilities of the SWINC Subsidiaries shall be merged or treated as if they were merged with the assets and liabilities of SWINC, (iv) any obligation of SWINC or one of the SWINC Subsidiaries and all guarantees thereof by SWINC or one of the SWINC Subsidiaries shall be deemed to be one obligation of SWINC, and (v) each Claim filed or to be filed against SWINC or a SWINC Subsidiary shall be deemed filed only against SWINC and shall be deemed a single Claim against and a single obligation of SWINC. On the Effective Date, and in accordance with the terms of the Third Joint Plan and the consolidation of the assets and liabilities of SWINC and the SWINC Subsidiaries, all Claims based upon guarantees of collection, payment or performance made by SWINC or the SWINC Subsidiaries as to the obligations of SWINC or one of the SWINC Subsidiaries shall be released and of no further force and effect.

### 2.    Consolidation of SWE&C and the SWE&C Subsidiaries

The Third Joint Plan contemplates and is also predicated upon the substantive consolidation of the Estates of SWE&C and the SWE&C Subsidiaries for the purposes of all actions associated with confirmation and consummation of the Third Joint Plan. On the Effective Date, the Estates of SWE&C and the SWE&C Subsidiaries shall be substantively consolidated as follows: (i) all assets and liabilities of the SWE&C Subsidiaries shall be merged or treated as if they were merged with the assets and liabilities of SWE&C, (ii) all Intercompany Claims by, between and among SWE&C and the SWE&C Subsidiaries shall be forgiven and eliminated, (iii) any obligation of SWE&C or one of the SWE&C Subsidiaries and all guarantees thereof by SWE&C or one of the SWE&C Subsidiaries shall be deemed to be one obligation of SWE&C, and (iv) each Claim filed or to be filed against SWE&C and/or a SWE&C Subsidiary shall be deemed filed only against SWE&C and shall be deemed a single Claim against and a single obligation of SWE&C. On the Effective Date, and in accordance with the terms of the Third Joint Plan and the consolidation of the assets and liabilities of SWE&C and the SWE&C Subsidiaries, all Claims based upon guarantees of collection, payment or performance made by SWE&C or one of the SWE&C Subsidiaries as to the obligations of SWE&C or one of the SWE&C Subsidiaries shall be released and of no further force and effect.

**B.    Merger of Entities**

On the Effective Date or as soon thereafter as practicable, (a) each of the SWINC Subsidiaries shall be merged or deemed merged with and into SWINC and (b) the Chapter 11 Cases of the SWINC Subsidiaries shall be closed, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWINC Subsidiaries shall be brought or otherwise commenced in SWINC's Chapter 11 Case.

On the Effective Date or as soon thereafter as practicable, (a) each of the SWE&C Subsidiaries shall be merged or deemed merged with and into SWE&C and (b) the Chapter 11 Cases of the SWE&C Subsidiaries shall be closed, following which any and all proceedings that could have been brought or otherwise commenced in the Chapter 11 Case of any of the SWE&C Subsidiaries shall be brought or otherwise commenced in SWE&C's Chapter 11 Case.

The foregoing merger of entities shall be exempt from any tax under applicable state or federal law as set forth in Article VII.U of the Third Joint Plan.

**C.    Continued Corporate Existence of Reorganized SWINC**

Reorganized SWINC shall emerge on the Effective Date out of the Consolidated SWINC Estate, in accordance with the laws of the State of Delaware and pursuant to the certificate of incorporation and by-laws of SWINC in effect prior to the Effective Date, as amended under the Third Joint Plan. Pursuant to the Amended Certificate of Incorporation and By-Laws of Reorganized SWINC, Reorganized SWINC will be authorized to engage in any lawful activity for which corporations may be organized under the Delaware General Corporation Law. After emerging from bankruptcy, Reorganized SWINC's business operations will consist of the management of the Pension Plan, including any efforts in which Reorganized SWINC may terminate the Pension Plan or transfer its sponsorship in accordance with applicable law. Although Reorganized SWINC will be fully authorized to engage in other business operations and management intends to evaluate opportunities as, when and if they arise, Reorganized SWINC has no present intention of engaging in business operations, will likely dissolve pursuant to the Delaware General Corporations Law within two years following confirmation of the Third Joint Plan. Upon dissolution of the Consolidated SWINC Estate, the SWINC Plan Administrator shall be responsible for receiving valid service of process to the extent required by law and shall forward timely notice of Insured Claims to the relevant insurers.

**D.    Dissolution of SWE&C and the SWE&C Subsidiaries**

On the Effective Date or as soon thereafter as the SWE&C Liquidating Trustee determines is appropriate, SWE&C and the SWE&C Subsidiaries shall be dissolved. If necessary or appropriate, the SWE&C Liquidating Trustee shall file a certificate of dissolution for SWE&C and/or the SWE&C Subsidiaries and shall take all other actions necessary or appropriate to effect the dissolution of SWE&C and the SWE&C Subsidiaries under applicable state law. Upon dissolution of the Consolidated SWE&C Estate, the SWE&C Liquidating Trustee shall be responsible for receiving valid service of process to the extent required by law and shall forward timely notice of Insured Claims to the relevant insurers.

**E.    Certificate of Incorporation and By-laws of Reorganized SWINC**

The certificate of incorporation and by-laws of SWINC shall be amended as necessary to satisfy the provisions of the Third Joint Plan and the Bankruptcy Code. The certificate of incorporation of Reorganized SWINC shall be amended to, among other things: (a) authorize 1,000 shares of Reorganized SWINC New Common Stock, $0.01 par value per share, (b) authorize 100 shares of

Reorganized SWINC New Series A Preferred Stock, $0.01 par value per share, (c) authorize 100 shares of Reorganized SWINC New Series B Preferred Stock, $0.01 par value per share, and (d) pursuant to Bankruptcy Code section 1123(a)(6), add (i) a provision prohibiting the issuance of non-voting equity securities, and, if applicable, (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. The forms of the documents relating to the Amended Certificate of Incorporation and By-laws of Reorganized SWINC shall be in substantially the form annexed to the Third Joint Plan as Plan Exhibits E and F, respectively.

F.    **Directors and Officers of Reorganized SWINC**

On the Effective Date, the members of the board of directors and executive officers of SWINC and each of the SWINC Subsidiaries shall be deemed to have resigned. From and after the Effective Date, the board of directors of Reorganized SWINC shall consist of three (3) directors: (1) Mr. James Carroll, who will serve as Chairman and President of Reorganized SWINC; (2) a director designated by the Equity Committee; and (3) a director designated by the SWE&C Liquidating Trust Advisory Board. The Directors of Reorganized SWINC shall not receive compensation for their service on the Reorganized SWINC Board but shall be entitled to reimbursement of the reasonable and necessary expenses incurred by them in carrying out the purpose of Reorganized SWINC.

G.    **Corporate Action**

Each of the matters provided for under the Third Joint Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further action by stockholders, creditors, or directors of the Debtors.

H.    **Cancellation of Securities, Instruments and Agreements Evidencing Claims and Interests**

Except as otherwise provided in the Third Joint Plan and in any contract, instrument or other agreement or document created in connection with the Third Joint Plan, on the Effective Date (a) the Old Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of a Debtor shall be deemed cancelled, and, in the case of the Old Securities, shall be retired and shall cease to exist and (b) the obligations of the Debtors under any agreement, indenture or certificate of designations governing the Old Securities and any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of a Debtor shall be deemed released.

I.    **Issuance of Reorganized SWINC New Common and Preferred Stock**

On the Effective Date or as soon thereafter as practicable, Reorganized SWINC shall issue for distribution in accordance with the terms of the Third Joint Plan, (i)(A) the Reorganized SWINC New Series A Preferred Stock to the Consolidated SWINC Estate to be held for the benefit of Holders of Allowed Claims and Interests in accordance with the terms of the Third Joint Plan and the SWINC Plan Administrator Agreement and (B) the Reorganized SWINC New Series B Preferred Stock to the SWE&C Liquidating Trustee to be held for the benefit of Holders of Allowed Claims and Interests in accordance with the terms of the Third Joint Plan and the SWE&C Liquidating Trust Agreement and (ii) the

42

Reorganized SWINC New Common Stock to the SWE&C Liquidating Trustee. The issuance of Reorganized SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock shall be exempt from registration under applicable securities laws pursuant to Section 4(2) of the Securities Act. All such shares of Reorganized SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock shall be, when issued pursuant to and in accordance with the terms of the Third Joint Plan, duly authorized, validly issued, fully paid and nonassessable.

Pursuant to the terms of the SWE&C Liquidating Trust Agreement, the SWINC Plan Administrator Agreement and the securities themselves, the SWE&C Liquidating Trustee and the SWINC Plan Administrator have agreed not to transfer or otherwise dispose of the Reorganized SWINC New Common Stock, the Reorganized SWINC New Series A Preferred Stock and the Reorganized SWINC New Series B Preferred Stock, respectively. In no event will the Reorganized SWINC New Common Stock be distributed to the beneficial owners of the SWE&C Liquidating Trust and the shares of Reorganized SWINC New Common Stock will not be deemed to be assets of the SWE&C Liquidating Trust. Accordingly, none of the securities to be issued by Reorganized SWINC under the Third Joint Plan will be transferrable.

**J.**    **Effectuating Documents; Further Transactions**

The chairman of the Reorganized SWINC board of directors, president, chief financial officer, or any other appropriate officer of Reorganized SWINC shall be authorized to execute, deliver, file, or record such contracts, instruments, release, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Third Joint Plan. The secretary or assistant secretary of Reorganized SWINC shall be authorized to certify or attest to any of the foregoing actions.

The SWE&C Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, release, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Third Joint Plan. The secretary or assistant secretary appointed by the SWE&C Liquidating Trustee shall be authorized to certify or attest to any of the foregoing actions.

**K.**    **Consolidated SWINC Estate Governing Board**

From and after the Effective Date, the Consolidated SWINC Estate shall be governed by the Consolidated SWINC Estate Governing Board. The Consolidated SWINC Estate Governing Board shall consist of three (3) directors: (1) a director designated by Federal; (2) a director designated by Maine Yankee; and (3) a director designated by the Equity Committee. The Consolidated SWINC Estate Governing Board will, among other things, choose the SWINC Plan Administrator, approve counsel for the resolution of claims that are solely against the Consolidated SWINC Estate, and determine reasonable compensation, if any, for directors to serve on the Consolidated SWINC Estate Governing Board.

**L.**    **The SWINC Plan Administrator**

1.    *Appointment*

From and after the Effective Date, a Person appointed by the Consolidated SWINC Estate Governing Board shall serve as the SWINC Plan Administrator pursuant to the SWINC Plan Administrator Agreement and the Third Joint Plan, until death, resignation, discharge or the

43

appointment of a successor SWINC Plan Administrator in accordance with the SWINC Plan Administrator Agreement.

2. *Rights, Powers and Duties of the Consolidated SWINC Estate and the SWINC Plan Administrator*

The Consolidated SWINC Estate shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under the Third Joint Plan. Except as otherwise provided in the Third Joint Plan, the Confirmation Order, or in any document, instrument, release or other agreement entered into in connection with the Third Joint Plan, such rights, powers and duties, which shall be exercisable by the SWINC Plan Administrator on behalf of the Consolidated SWINC Estate pursuant to the Third Joint Plan and the SWINC Plan Administrator Agreement, shall include, among others:

(A)    investing the Cash of the Consolidated SWINC Estate, including, but not limited to, the Cash held in the Reserves in (i) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America; (ii) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (iii) any other investments that may be permissible under (a) section 345 of the Bankruptcy Code or (b) any order of the Court entered in the Debtors' Chapter 11 cases;

(B)    calculating and paying all distributions to be made under the Third Joint Plan, the SWINC Plan Administrator Agreement and other orders of the Court to holders of Allowed Claims against and Interests in the Consolidated SWINC Estate;

(C)    employing, supervising and compensating professionals retained to represent the interests of and serve on behalf of the Consolidated SWINC Estate;

(D)    objecting to Claims or Interests filed against the Consolidated SWINC Estate;

(E)    seeking estimation under section 502(c) of the Bankruptcy Code of contingent or unliquidated claims filed against the Consolidated SWINC Estate;

(F)    seeking determination of tax liability of the Consolidated SWINC Estate under section 505 of the Bankruptcy Code;

(G)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the SWINC Plan Administrator Agreement;

(H)    voting the shares of Reorganized SWINC New Series A Preferred Stock in connection with any matter submitted to a vote of such stockholders of Reorganized SWINC, as directed by the Consolidated SWINC Estate Governing Board;

(I)    pursuing any and all rights under the insurance policies of a Debtor providing coverage with respect to Insured Claims;

(J)    taking any and all other actions necessary or appropriate to implement or consummate this Third Joint Plan and the provisions of the SWINC Plan Administrator Agreement.

44

3.    *Compensation of the SWINC Plan Administrator*

The SWINC Plan Administrator shall be compensated from the SWINC Operating Reserve pursuant to the terms of the SWINC Plan Administrator Agreement, as it may be modified from time to time by the Consolidated SWINC Estate Governing Board. Any professionals retained by the SWINC Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the SWINC Operating Reserve. The payment of the fees and expenses of the SWINC Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Court.

4.    *Indemnification*

SWINC, the SWINC Subsidiaries, the Consolidated SWINC Estates and Reorganized SWINC shall, to the fullest extent permitted by the applicable laws of the jurisdiction in which each such entity is incorporated or otherwise organized, indemnify and hold harmless the SWINC Plan Administrator (in his capacity as such) and the agents, representatives, professionals and employees of the SWINC Plan Administrator (collectively the "Indemnified Parties"), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to SWINC, the SWINC Subsidiaries and their Estate(s) or the implementation or administration of the Third Joint Plan and the Reorganized SWINC Plan Administrator Agreement if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of SWINC, the SWINC Subsidiaries and their Estate(s), as the case may be, and, with respect to any criminal action or proceeding, had no reasonable cause to believe its conduct was unlawful. To the extent SWINC, the SWINC Subsidiaries, their Estate(s) or Reorganized SWINC indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the SWINC Plan Administrator in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid out of the SWINC Operating Reserve. The indemnification provisions of the SWINC Plan Administrator Agreement shall remain available to and be binding upon any future SWINC Plan Administrator or the estate of any decedent SWINC Plan Administrator and shall survive the termination of the SWINC Plan Administrator Agreement.

5.    *Insurance*

The SWINC Plan Administrator shall be authorized to obtain all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, SWINC, the SWINC Subsidiaries, and the Consolidated SWINC Estate including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Consolidated SWINC Estate and (ii) the liabilities, duties and obligations of the SWINC Plan Administrator and its agents, representatives, employees or independent contractors under the SWINC Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the SWINC Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the SWINC Plan Administrator Agreement.

6.    *Authority to Object to Claims and Interests and to Settle Disputed Claims*

From and after the Effective Date, the SWINC Plan Administrator shall be authorized (i) to object to Claims or Interests filed solely against SWINC and the SWINC Subsidiaries and

45

(ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims and Disputed Interests.

**M.      The Asbestos Trust**

      The Asbestos Trust is the result of a settlement and compromise of disputes between the Proponents and the Asbestos Insurance Carriers. On the Effective Date, and pursuant to the terms of the Asbestos Trust Agreement, the Debtors shall transfer to the Asbestos Trust Cash in the amount of $4.5 million and an Allowed Class 5B Claim in the amount of $1.0 million for distribution to holders of Allowed Asbestos Claims and to pay the reasonable and necessary costs and expenses associated with administering the Asbestos Trust, any litigation related to the liquidation, resolution, settlement or compromise of the Asbestos Claims or any litigation related to the resolution, settlement or compromise regarding Asbestos Insurance Issues. On the Effective Date, and pursuant to the terms of the Asbestos Trust Agreement, the Debtors shall transfer to the Asbestos Trustee all of their rights with respect to, among other things, indemnification, contribution or reimbursement under the insurance policies issued by the Asbestos Insurance Carriers (but not the policies themselves) and all of their rights under any other policies that provide coverage for Asbestos Claims (but not those policies themselves), but only to the extent of such coverage under those policies. Notwithstanding anything to the contrary herein, the Debtors or their respective successors and assigns under this Third Joint Plan shall retain any and all rights under policies issued by the Asbestos Insurance Carriers or the policies providing coverage for Asbestos Claims with respect to coverage for any Claims other than Asbestos Claims. The Asbestos Trust shall remain in existence until dissolved by the Asbestos Trustee, and upon termination, any remaining assets of the Asbestos Trust shall revert and be paid over to the SWE&C Liquidating Trust.

**N.      The Asbestos Trustee**

      1.      *Appointment*

      From and after the Effective Date, Mr. James Carroll shall serve as the Asbestos Trustee pursuant to the Third Joint Plan, until death, resignation, discharge or the appointment of a successor Asbestos Trustee. The Asbestos Trustee shall have and perform all duties, responsibilities, rights and obligations set forth in the Asbestos Trust Agreement.

      2.      *Rights, Powers and Duties of the Asbestos Trustee*

      The Asbestos Trustee shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Third Joint Plan and the Asbestos Trust Agreement. Such rights, powers and duties, which shall be exercisable by the Asbestos Trustee on behalf of the Debtors pursuant to the Third Joint Plan and the Asbestos Trust Agreement, shall include, among others:

      (a)      maintaining any Unclaimed Distribution Reserve for the benefit of the holders of Allowed Asbestos Claims;

      (b)      investing Cash in the Asbestos Trust in (i) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America; (ii) money market deposit accounts, checking accounts, savings accounts, certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (iii) any other investments that may be permissible under (x) section 345 of the Bankruptcy Code or (y) any order of the Court entered in the Debtors' Chapter 11 Cases;

46

(c)    calculating and paying of all distributions to be made under the Third Joint Plan, the Asbestos Trust Agreement, and other orders of the Court, to holders of Allowed Asbestos Claims that have become undisputed, non-contingent, and liquidated claims;

(d)    employing, supervising and compensating professionals, if any, necessary to represent the interests of and serve on behalf of the Asbestos Trust;

(e)    objecting to, defending against and settling Asbestos Claims, and seeking estimation of contingent or unliquidated Asbestos Claims under section 502(c) of the Bankruptcy Code;

(f)    dissolving the Asbestos Trust;

(g)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the Asbestos Trust Agreement;

(h)    taking any and all other actions necessary or appropriate to implement the provisions of the Asbestos Trust Agreement;

(i)    making and filing any tax returns for the Asbestos Trust;

(j)    taking any actions necessary to ensure that the Asbestos Insurance Carriers will receive timely notice of any Asbestos Claim or demand including, without limitation, taking action to maintain the corporate existence of one or more of the Debtors;

(k)    entering into one or more coverage in place agreements with the Asbestos Insurance Carriers on terms satisfactory to the Trustee or taking other appropriate action with respect to insurance provided by the Asbestos Insurance Carriers; and

(l)    taking any actions necessary to ensure the preservation of the Debtors' documents to the extent such documents may be necessary to the defense of Asbestos Claims, including, without limitation, the entry into long-term storage agreements with respect to such documents.

3.    *Compensation of the Asbestos Trustee*

The Asbestos Trustee will be compensated at a rate of $325 per hour. Any professionals retained by the Asbestos Trust shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Asbestos Trust. The payment of the fees and expenses of the Asbestos Trustee and his retained professionals, if any, shall be made in the ordinary course of business and shall not be subject to the approval of the Court.

4.    *Indemnification*

The Asbestos Trust shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Asbestos Trustee (in his capacity as such) and the Asbestos Trustee's and the Asbestos Trust's agents, representatives, professionals, and employees (collectively, the "Indemnified Parties"), from and against and in respect to any and all liabilities, losses, damages, claims, costs, and expenses, including but not limited to attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Asbestos Trust or the implementation or administration of the Third Joint Plan and the Asbestos Trust Agreement, if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Asbestos Trust, and, with respect to any criminal action or proceeding, had no

47

reasonable cause to believe its conduct was unlawful. To the extent that the Asbestos Trust must indemnify and hold harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Asbestos Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid out of the Asbestos Trust. The indemnification provisions of the Asbestos Trust Agreement shall remain available to and be binding upon any future Asbestos Trustee or the estate of any decedent Asbestos Trustee and shall survive the termination of the Asbestos Trust Agreement.

### 5. *Insurance*

The Asbestos Trustee shall be authorized to obtain all reasonably necessary insurance coverage for himself, his agents, representatives, employees, independent contractors, and the Asbestos Trust, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Asbestos Trust and (ii) the liabilities, duties, and obligations of the Asbestos Trustee and his agents, representatives, employees, independent contractors under the Asbestos Trust Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Asbestos Trustee, remain in effect for a reasonable period (not to exceed five years) after the termination of the Asbestos Trust Agreement.

The Debtors intend that the Asbestos Trust will be treated as a "liquidating trust" within the meaning of Section 307.7701-4(d) of the Tax Regulation. Accordingly, it is intended that the transfer of the Asbestos Trust Assets to the Asbestos Trust shall be treated, for all income tax purposes, as a deemed transfer of the Asbestos Trust Assets to the beneficiaries of the Asbestos Trust for all income tax purposes, followed by a deemed transfer of such assets by such beneficiaries to the Asbestos Trust. The Asbestos Trust shall be considered a "grantor" trust, and the beneficiaries of the Asbestos Trust shall be treated as the grantors and the deemed owners of the Asbestos Trust.

### 6. *Asbestos Insurance Policies*

The Third Joint Plan shall not expand the scope of, the amount of, or alter in any other way the Asbestos Insurance Carriers' obligations under their policies. The Third Joint Plan shall not operate as a waiver of certain proofs of claim filed by the Asbestos Insurance Carriers in the Chapter 11 Cases, *provided, however*, that to the extent such Claims relate to Asbestos Claims, the Asbestos Insurance Carriers' Claims are deemed satisfied in full, except for claims by Travelers Insurance Company and its affiliates for premiums under retrospectively rated insurance policies issued to the Debtors.

### O. The SWE&C Liquidating Trust

### 1. *Appointment of Trustee*

From and after the Effective Date, a Person appointed by the SWE&C Liquidating Trust Advisory Board shall serve as the SWE&C Liquidating Trustee pursuant to the SWE&C Liquidating Trust Agreement and the Third Joint Plan, until death, resignation, discharge or the appointment of a successor SWE&C Liquidating Trustee in accordance with the SWE&C Liquidating Trust Agreement. The SWE&C Liquidating Trustee shall have and perform all duties, responsibilities, rights and obligations set forth in the SWE&C Liquidating Trust Agreement, including resolving claims solely against the Consolidated SWE&C Estate.

48

2. *Transfer of SWE&C Liquidating Trust Assets to the SWE&C Liquidating Trust*

On the Effective Date, SWE&C, the SWE&C Subsidiaries and their Estates shall transfer and shall be deemed to have irrevocably transferred to the SWE&C Liquidating Trust, for and on behalf of the beneficiaries of the SWE&C Liquidating Trust, the SWE&C Liquidating Trust Assets.

3. *The SWE&C Liquidating Trust*

(A)     Without any further action of the directors of SWE&C or the SWE&C Subsidiaries, on the Effective Date, the SWE&C Liquidating Trust Agreement, substantially in the form annexed hereto as Plan Exhibit C, shall become effective. The SWE&C Liquidating Trustee shall accept the SWE&C Liquidating Trust and sign the SWE&C Liquidating Trust Agreement on the Effective Date and the SWE&C Liquidating Trust will then be deemed created and effective.

(B)     The SWE&C Liquidating Trustee shall have full authority to take any steps necessary to administer the SWE&C Liquidating Trust Agreement, including, without limitation, the duty and obligation (i) to liquidate SWE&C Liquidating Trust Assets, (ii) to make distributions therefrom to holders of Allowed Claims against SWE&C and the SWE&C Subsidiaries, (iii) to maintain any Reserves on behalf of and for the benefit of the beneficiaries of the SWE&C Liquidating Trust, (iv) to vote the shares of Reorganized SWINC New Common Stock in connection with any matter submitted to a vote of the stockholders of Reorganized SWINC as directed by the SWE&C Liquidating Trust Advisory Board, and (v) if authorized by the SWE&C Liquidating Trust Advisory Board, to pursue and settle any Disputed Claims filed solely against or Disputed Interests solely in the Consolidated SWE&C Estate in accordance with and subject to the provisions of the Third Joint Plan. The SWE&C Liquidating Trustee shall not at any time, whether on behalf of the SWE&C Liquidating Trust, SWE&C, the SWE&C Subsidiaries, or their Estates, continue or engage in the conduct of trade or business, and no part of the SWE&C Liquidating Trust or the proceeds, revenue or income therefrom shall be used or disposed of by the SWE&C Liquidating Trustee in the furtherance of any business.

(C)     All costs and expenses associated with the administration of the SWE&C Liquidating Trust, including those rights, obligations and duties described in this Article VII.O of this Third Joint Plan, shall be the responsibility of and paid by the SWE&C Liquidating Trust from the SWE&C Liquidating Trust Assets.

(D)     The SWE&C Liquidating Trustee may retain such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "SWE&C Liquidating Trustee Professionals"), in its sole discretion, to aid in the performance of its responsibilities pursuant to the terms of this Third Joint Plan including, without limitation, the liquidation and distribution of SWE&C Liquidating Trust Assets.

(E)     The Debtors intend that the SWE&C Liquidating Trust will be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations. Accordingly, it is intended that the transfer of the SWE&C Liquidating Trust Assets to the SWE&C Liquidating Trust shall be treated, for all income tax purposes, as a deemed transfer of the SWE&C Liquidating Trust Assets to the beneficiaries of the SWE&C Liquidating Trust for all income tax purposes, followed by a deemed transfer of such assets by such beneficiaries to the SWE&C Liquidating Trust. The SWE&C Liquidating Trust shall be considered a "grantor" trust, and the beneficiaries of the SWE&C Liquidating Trust shall be treated as the grantors and the deemed owners of the SWE&C Liquidating Trust.

(F)     The SWE&C Liquidating Trustee shall be responsible for filing all federal, state and local tax returns for the SWE&C Liquidating Trust.

(G)     The SWE&C Liquidating Trust shall retain any and all rights under any insurance policies of a Debtor providing coverage with respect to Insured Claims.

(H)     The SWE&C Liquidating Trust shall terminate on the later of (i) the tenth (10) anniversary of the Confirmation Date or (ii) the distribution of all property in accordance with the terms of the SWE&C Liquidating Trust Agreement.

4.     *Compensation of the SWE&C Liquidating Trustee*

The SWE&C Liquidating Trustee shall be compensated from the SWE&C Operating Reserve pursuant to the terms of the SWE&C Liquidating Trust Agreement. Any professionals retained by the SWE&C Liquidating Trustee shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the SWE&C Operating Reserve, subject to the prior approval of the SWE&C Liquidating Trust Advisory Board. The payment of the fees and expenses of the SWE&C Liquidating Trustee and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Court.

5.     *The SWE&C Liquidating Trust Advisory Board*

The SWE&C Liquidating Trust Advisory Board shall be comprised of three (3) members selected by the Creditors' Committee prior to the Confirmation Hearing. The SWE&C Liquidating Trustee shall consult regularly with the SWE&C Liquidating Trust Advisory Board when carrying out the purpose and intent of the SWE&C Liquidating Trust. The members of the SWE&C Liquidating Trust Advisory Board shall receive compensation as determined by the SWE&C Liquidating Trust Advisory Board, in its discretion from time to time for their services on the SWE&C Liquidating Trust Advisory Board, in carrying out the purpose of the SWE&C Liquidating Trust Advisory Board. Reimbursement of the reasonable and necessary expenses of the members of the SWE&C Liquidating Trust Advisory Board shall be payable by the SWE&C Liquidating Trust.

(A)     In the case of an inability or unwillingness of any member of the SWE&C Trust Advisory Board to serve, such member shall be replaced by designation of the remaining members of the SWE&C Trust Advisory Board. If any position on the SWE&C Trust Advisory Board remains vacant for more than thirty (30) days, such vacancy shall be filled within fifteen (15) days thereafter by the designation of the SWE&C Liquidating Trustee without the requirement of a vote by the other members of the SWE&C Trust Advisory Board.

(B)     Upon the certification by the SWE&C Liquidating Trustee that all SWE&C Liquidating Trust Assets have been distributed, abandoned or otherwise disposed of, the members of the SWE&C Liquidating Trust Advisory Board shall resign their positions, whereupon they shall be discharged from further duties and responsibilities.

(C)     The SWE&C Liquidating Trust Advisory Board may, by majority vote, authorize the SWE&C Liquidating Trustee to invest the corpus of the SWE&C Liquidating Trust in prudent investments other than those described in section 345 of the Bankruptcy Code.

(D)     The SWE&C Liquidating Trust Advisory Board may remove the SWE&C Liquidating Trustee in its discretion. In the event the requisite approval is not obtained, the SWE&C Liquidating Trustee may be removed by the Court for cause shown. In the event of the resignation or

removal of the SWE&C Liquidating Trustee, the SWE&C Liquidating Trust Advisory Board shall, by majority vote, designate a person to serve as successor SWE&C Liquidating Trustee.

(E)    Notwithstanding anything to the contrary in this Third Joint Plan, neither the SWE&C Liquidating Trust Advisory Board nor any of its members, designees, counsel, financial advisors or any duly designated agent or representative of any such party shall be liable for the act, default or misconduct of any other member of the SWE&C Liquidating Trust Advisory Board, nor shall any member be liable for anything other than such members' own gross negligence or willful misconduct. The SWE&C Liquidating Trust Advisory Board may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with its counsel, accountants or other professionals, and shall not be liable for anything done or omitted or suffered to be done in accordance with such advice or opinions. If the SWE&C Liquidating Trust Advisory Board determines not to consult with its counsel, accountants or other professional, it shall not be deemed to impose any liability on the SWE&C Liquidating Trust Advisory Board, or its members and/or designees.

(F)    The SWE&C Liquidating Trust Advisory Board shall govern its proceedings through the adoption of by-laws, which the SWE&C Liquidating Trust Advisory Board may adopt by majority vote. No provision of such by-laws shall supersede any express provision of the Third Joint Plan.

**P.    Interstate Oversight Board**

From and after the Effective Date, a three (3) member board shall be appointed to resolve Interstate Disputes. The Interstate Oversight Board shall consist of: (1) a director designated by the Consolidated SWINC Estate Governing Board, who shall not be the SWINC Plan Administrator (the "SWINC Designee"); (2) a director designated by the SWE&C Liquidating Trust Advisory Board, who shall not be the SWE&C Liquidating Trustee (the "SWE&C Designee); and (3) a director agreed to by the SWINC Designee and the SWE&C Designee (the "Joint Designee"). In the event that the SWINC Designee and the SWE&C Designee cannot agree as to the appointment of the Joint Designee, each will recommend two (2) independent nominees (i.e., individuals who hold no interest in or claims against any of the Debtors or their affiliates) and the Court shall appoint the Joint Designee.

The SWINC and SWE&C Designees on the Interstate Oversight Board shall not receive compensation for their service on the Interstate Oversight Board, although they shall be entitled to reimbursement of reasonable and necessary expenses incurred by them in carrying out the purpose of the Interstate Oversight Board. The Joint Designee shall be entitled to compensation at such amounts agreed to by the Joint Designee and the other Interstate Oversight Board members. Reimbursement of the reasonable and necessary expenses of the members of the Interstate Oversight Board shall be payable one-half from the Consolidated SWINC Estate and one-half from the Consolidated SWE&C Estate. The Interstate Oversight Board shall have the authority to resolve all Interstate Disputes. In the event that there is no unanimity as to the resolution of any interstate dispute after 30 days, the Joint Designee shall issue a final and binding resolution based on the facts, equities and legal authorities. The Interstate Oversight Board shall have the authority to choose counsel to defend against or pursue claims that affect both estates, including, among other things, environmental litigation and insurance matters, as set out more fully in the charter for the Interstate Oversight Board attached hereto as Exhibit G.

**Q.    No Revesting of Assets**

On or following the Effective Date, the property of the Estates of SWINC and the SWINC Subsidiaries (except for any obligations and/or reversionary interest in the Pension Plan, the rights to Cash contributed to the Reorganized SWINC Operating Reserve in accordance with this Third Joint Plan) shall remain or become the property of the Consolidated SWINC Estate and shall continue to be

subject to the jurisdiction of the Court following confirmation of the Third Joint Plan until distributed to holders of Allowed Claims and Allowed Interests in accordance with the provisions of the Third Joint Plan, the SWINC Plan Administrator Agreement, and the Confirmation Order. Reorganized SWINC shall succeed SWINC as the "contributing sponsor" of the Pension Plan for all purposes, including under ERISA section 4001(a)(13), and shall succeed SWINC as the "employer" maintaining the Pension Plan for all purposes, including under ERISA section 4044(d).

On or following the Effective Date, the property of the Estates of SWE&C and the SWE&C Subsidiaries (except for the rights to Cash contributed to the Reorganized SWINC Operating Reserve in accordance with this Third Joint Plan) shall remain or become the property of the SWE&C Liquidating Trust and shall continue to be subject to the jurisdiction of the Court following confirmation of the Third Joint Plan until distributed to holders of Allowed Claims and Allowed Interests in accordance with the provisions of the Third Joint Plan, the SWE&C Liquidating Trust Agreement, and the Confirmation Order.

**R.    Preservation of Rights of Action**

Except as otherwise provided in the Third Joint Plan or the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with the Third Joint Plan, in accordance with Bankruptcy Code section 1123(b), the Consolidated SWINC Estate and the SWE&C Liquidating Trust shall retain the Litigation Claims, including but not limited to: (1) any claims against any person, company or entity that provided or provides insurance to the Debtors for any failure to provide contractual coverage, including, but not limited to: ACE Insurance Company Ltd.; AIG; Genesis Insurance Company; Greenwich Insurance Company; Indian Harbor Insurance Company; Kemper Insurance Company; Lloyd's of London; National Union; Reliance Insurance; Royal; St. Paul Fire and Marine Insurance Company; The Travelers Indemnity Company & Affiliates; XL Insurance Company Ltd.; (2) any and all claims under the Arizona Missions insurance policies; (3) any and all claims under the Debtors' excess coverage insurance policies, including those relating to Isobord and Maine Yankee; (4) any and all claims, including claims for contribution, reimbursement or indemnification under any of the Debtors' directors and officers liability policies; (5) any and all claims, including claims for contribution, reimbursement or indemnification under any other policy of insurance, including the Debtors' general liability insurance policies; (6) any claims for acts or omissions of the Debtors' present and former officers and directors; and (7) any claims against the U.S. Department of Energy and/or NAC International or other subcontractors for indemnification or contribution concerning claims by Maine Yankee, as well as those Litigation Claims listed on Exhibit B annexed hereto and those Litigation Claims against any Person or Entity hereinafter arising or discovered and regardless of when the facts giving rise to such Litigation Claims arose or existed. The Debtors further reserve any and all claims against any and all insurance companies that have in the past provided or continue to provide insurance coverage to the Debtors with respect to all policies of insurance and all coverage, including, but not limited to, those policies of insurance listed on the attached Exhibit I.

The allowance of a Claim shall not bar the SWINC Plan Administrator or the SWE&C Liquidating Trustee from enforcing, suing on, settling or compromising any Litigation Claims against Claimholders by reason of res judicata, collateral estoppel, or similar doctrine unless the order allowing the Claim resolves such issue of fact or law or unless the Court decided such issue of law or fact in connection with the allowance of such Claim.

The Proponents have attached a preliminary list of the Litigation Claims to be retained as part of the Third Joint Plan and reserve the right to amend that list up to and prior to the deadline for objections to the Third Joint Plan, October 20, 2003. The SWINC Plan Administrator, on behalf of SWINC, the SWINC Subsidiaries and the Consolidated SWINC Estate, shall retain and may enforce, sue

on, settle or compromise (or decline to do any of the foregoing) any and all of the Litigation Claims that SWINC, the SWINC Subsidiaries, their Estates or the Consolidated SWINC Estate may hold against any Person or Entity. The SWE&C Liquidating Trustee, on behalf of SWE&C, the SWE&C Subsidiaries, and the SWE&C Liquidating Trust shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any and all of the Litigation Claims that SWE&C, the SWE&C Subsidiaries, their Estates or the SWE&C Liquidating Trust may hold against any Person or Entity. The failure of the Debtors to list a claim, right of action, suit or proceeding on Plan Exhibit B shall not constitute a waiver or release by the Debtors or their Estates of such claim, right of action, suit or proceeding all such claims, rights of action, suits or proceedings are being expressly reserved.

    S.    **Creditors' Committee and Equity Committee**

        1.    *Dissolution of Creditors' Committee*

        The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code, and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Third Joint Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order. All expenses of Creditors' Committee members and the fees and expenses of their professionals through the Effective Date shall be paid in accordance with the terms and conditions of the Fee Order and the Confirmation Order and this Third Joint Plan.

        2.    *Dissolution of Equity Committee*

        The Equity Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Equity Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Third Joint Plan and its implementation, and the retention or employment of the Equity Committee's attorneys, accountants and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order. All expenses of Equity Committee members and the fees and expenses of their professionals through the Effective Date shall be paid in accordance with the terms and conditions of the Fee Order the Confirmation Order and this Third Joint Plan.

    T.    **Sources of Cash for Third Joint Plan Distributions**

        Except as otherwise provided in the Third Joint Plan or the Confirmation Order, all Cash necessary for the SWINC Plan Administrator and the SWINC Disbursing Agent, as the case may be, to make payments pursuant to the Third Joint Plan to holders of the Claims against and Interests in SWINC, the SWINC Subsidiaries or the Consolidated SWINC Estates shall be obtained from (i) the Cash balances of SWINC and the SWINC Subsidiaries, including Cash from the market value allocation of the Sale Proceeds, and (ii) the liquidation of the remaining non-Cash assets, if any, of SWINC, the SWINC Subsidiaries and the Consolidated SWINC Estates and (iii) the liquidation of the remaining non-Cash assets, if any, of SWINC and the SWINC Subsidiaries.

        Except as otherwise provided in the Third Joint Plan or the Confirmation Order, all Cash necessary for the SWE&C Liquidating Trustee and the SWE&C Liquidating Trust Disbursing Agent, as

the case may be, to make payments pursuant to the Third Joint Plan to holders of Claims against SWE&C, the SWE&C Subsidiaries or the SWE&C Liquidating Trust shall be obtained from (i) the Cash balances of SWE&C and the SWE&C Subsidiaries, including Cash from the market value allocation of the Sale Proceeds, (ii) proceeds derived from the repayment of the Reorganized SWINC Note, and (iii) the liquidation of the remaining non-Cash assets, if any, of SWE&C and the SWE&C Subsidiaries.

### U.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to Reorganized SWINC or any other Person or Entity pursuant to the Third Joint Plan in the United States shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### V.    Release of Liens

Except as otherwise provided in the Third Joint Plan, the Confirmation Order or in any contract, instrument, release or other agreement or document created in connection with the Third Joint Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against the property of the Debtors' Estates shall be fully released and discharged.

### W.    Special Provisions Regarding Insured Claims

Distributions under the Third Joint Plan to each holder of an Allowed Insured Claim against SWINC, a SWINC Subsidiary, SWE&C or a SWE&C Subsidiary, shall be in accordance with the treatment provided under the Third Joint Plan for the Class in which such Allowed Insured Claim is classified; *provided, however,* that the maximum amount of any distribution under the Third Joint Plan on account of an Allowed Insured Claim (except for Allowed Asbestos Claims) shall be limited to an amount equal to the amount of the Allowed Insured Claim minus any insurance proceeds actually received and retained by such holder in respect of such Allowed Insured Claim. Nothing in this Article VII shall (x) constitute a waiver of any claim, right, or cause of action the Debtors may hold against any Person, including the Debtors' insurance carriers or (y) is intended to, shall, or shall be deemed to preclude any holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to any distribution such holder may receive pursuant to the Third Joint Plan; provided, however, that the Debtors do not waive, and expressly reserve their rights to assert that any insurance coverage is property of the estate to which they are entitled, with the exception of the provisions contained in the stipulated agreement between SWINC and the Secretary of Labor, United States Department of Labor, filed by the Debtors on or about February 26, 2002. Upon receipt by the holder of an Allowed Insured Claim of any amounts distributed under the Third Joint Plan in respect of such claim, such holder shall be deemed to have assigned to the SWINC Plan Administrator all rights of the holder to recover such amounts from the applicable insurer.

This Third Joint Plan shall not expand the scope of or alter in any other way the insurers' obligations under their policies, and the insurers shall retain any and all defenses to coverage that they may have. The Third Joint Plan shall not operate as a waiver of any other claims the insurers have asserted or may assert in proofs of claim filed in the Debtors' bankruptcy cases or the Debtors' rights as to those claims.

This Third Joint Plan does not prejudice or impair any rights of a holder of a contingent claim, if any, under the Bankruptcy Code or any other applicable law, including, but not limited to, Bankruptcy Code section 502, to seek recovery under any policy of insurance under which a Debtor is an insured or beneficiary, and/or the right to be an Insured Claim, after such contingent claim becomes liquidated.

Each of the insurers retains any and all of its rights, at its own expense, to commence and participate in any contested matters and other related proceedings concerning asbestos claims, including objections to and requests for relief from the automatic stay with respect to any such claims, until the Debtors' bankruptcy cases are closed.

Any insurance proceeds received on account of an Insured Claim or as a result of a buy-out of an insurance policy under which a Debtor is an insured or beneficiary will be used first to satisfy Allowed Insured Claims.

## ARTICLE VIII
## DESCRIPTION OF SECURITIES AND INSTRUMENTS
## TO BE ISSUED IN CONNECTION WITH THE THIRD JOINT PLAN

### A.    Reorganized SWINC New Common Stock

The principal terms of the Reorganized SWINC New Common Stock to be issued by Reorganized SWINC under the Third Joint Plan are as follows:

| | |
|---|---|
| Authorization . . . . . . . . . . . . . . . . . | 1,000 shares. |
| Initial Issuance . . . . . . . . . . . . . . . . . . . . | 100 shares. |
| Par Value . . . . . . . . . . . . . . . . . . . | $.01 per share. |
| Listing . . . . . . . . . . . . . . . . . . . . . | None. |
| Voting Rights . . . . . . . . . . . . . . . | One vote per share on all matters submitted to a vote of the stockholders of Reorganized SWINC; votes together as a single class with the Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock. The SWE&C Liquidating Trustee has granted an irrevocable proxy to the Board of Directors of Reorganized SWINC for the limited purpose of permitting the Board to vote the shares of Reorganized SWINC New Common Stock, at its discretion, in favor of the dissolution of Reorganized SWINC. |
| Transfer Restrictions . . . . . . . . . . . . . . . . . | Not transferable. |
| Preemptive Rights . . . . . . . . . . . . . . . . . . . . | None. |

55

**B.    Reorganized SWINC New Series A Preferred Stock**

The principal terms of the Reorganized SWINC New Series A Preferred Stock to be issued by Reorganized SWINC under the Third Joint Plan are as follows:

| | |
|---|---|
| Authorization | 100 shares. |
| Initial Issuance | 1 share. |
| Par Value | $.01 per share. |
| Listing | None. |
| Ranking | Senior to the Reorganized SWINC New Common Stock and all other series of Preferred Stock that subsequently may be issued by Reorganized SWINC. Except as to the liquidation preference, the Reorganized SWINC New Series B Preferred Stock and Reorganized SWINC New Series A Preferred Stock rank equally. |
| Liquidation Preference | Upon termination of the Pension Plan and the liquidation, dissolution and winding up of Reorganized SWINC, and in accordance with the terms of the Third Joint Plan, holders of Series A Preferred Stock shall be entitled to receive a liquidating distribution calculated as follows: (i) from the Reversion either (x) two-thirds of the first $30 million of funds generated from the Reversion of the Pension Plan plus, if the Reversion exceeds $30 million, 50% of any funds generated from the Reversion in excess of $30 million or (y) in the event Class 9A votes to reject the Third Joint Plan, two-thirds of the first $30 million of funds generated from the Reversion of the Pension Plan plus, if the Reversion exceeds $30 million, twenty-five percent (25%) of any funds generated from the Reversion in excess of $30 million; and (ii) 100% of the funds generated from the liquidation of any additional assets, other than the Reversion, of Reorganized SWINC (the "Series A Liquidation Preference"). The SWINC Plan Administrator will distribute the Series A Liquidation Preference to the Holders of Allowed SWINC Claims and Interests in accordance with the terms of the Third Joint Plan and the SWINC Plan Administrator Agreement. |
| Dividends | Holders of Series A Preferred Stock are entitled to participate ratably in any dividends declared on the Reorganized SWINC New Common Stock, when, as and if declared by the Board of Directors of Reorganized SWINC. |
| Redemption | Non-Redeemable. |

| Board Designations ................. | None. |
| Voting Rights ................ | One vote per share on all matters submitted to a vote of the stockholders of Reorganized SWINC; votes together as a single class with the Reorganized SWINC New Common Stock and Reorganized SWINC New Series B Preferred Stock. |
| Transfer Restrictions .................. | Not transferable. |
| Preemptive Rights ....................... | None. |

### C.    Reorganized SWINC New Series B Preferred Stock

The principal terms of the Reorganized SWINC New Series B Preferred Stock to be issued by Reorganized SWINC under the Third Joint Plan are as follows:

| Authorization ................ | 1,000 shares. |
| Initial Issuance ................... | 1 share. |
| Par Value ................... | $.01 per share. |
| Listing ................... | None. |
| Ranking ................... | Senior to the Reorganized SWINC New Common Stock and all other series of Preferred Stock that subsequently may be issued by Reorganized SWINC. Except as to the liquidation preference, the Reorganized SWINC New Series B Preferred Stock and the Reorganized SWINC New Series A Preferred Stock rank equally. |
| Liquidation Preference .................. | Upon termination of the Pension Plan and the liquidation, dissolution and winding up of Reorganized SWINC, and in accordance with the terms of the Third Joint Plan, following payment of the Series A Liquidation Preference, holders of Series B Preferred Stock shall be entitled to receive a liquidating distribution calculated from the Reversion as follows: either (i) one-third of the first $30 million of funds generated from the Reversion plus, if the Reversion exceeds $30 million, 50% of any funds generated from the Reversion in excess of $30 million or (ii) in the event Class 9A votes to reject the Third Joint Plan, one-third of the first $30 million of funds generated from the Reversion of the Pension Plan plus, if the Reversion exceeds $30 million, seventy-five percent (75%) of any funds generated from the Reversion in excess of $30 million (the "Series B Liquidation Preference"). The |

|  | SWE&C Liquidating Trustee will distribute the Series B Liquidation Preference to the Holders of Allowed SWE&C Claims in accordance with the terms of the Third Joint Plan and the SWE&C Liquidating Trust Agreement. |
|---|---|
| Dividends . . . . . . . . . . . . . . . . . | Holders of Reorganized SWINC New Series B Preferred Stock are entitled to participate ratably in any dividends declared on the Reorganized SWINC New Common Stock, when, as and if declared by the Board of Directors of Reorganized SWINC. |
| Redemption . . . . . . . . . . . . . . . . | Non-Redeemable. |
| Board Designations . . . . . . . . . . . . . . . . | None. |
| Voting Rights . . . . . . . . . . . . . . | One vote per share on all matters submitted to a vote of the stockholders of Reorganized SWINC; votes together as a single class with the Reorganized SWINC New Common Stock and Reorganized SWINC New Series A Preferred Stock. |
| Transfer Restrictions . . . . . . . . . . . . . . . . | Not transferable. |
| Preemptive Rights . . . . . . . . . . . . . . . . . . . . . | None. |

## ARTICLE IX
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions for Claims or Interests Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Court, distributions to be made on account of Claims or Interests that are Allowed Claims or Allowed Interests as of the Effective Date shall be made on the Effective Date. Any distribution to be made on the Effective Date pursuant to this Third Joint Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Third Joint Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Claims or Interests that first become Allowed Claims or Allowed Interests after the Effective Date shall be made on the first Semi-annual Distribution Date following the date on which the Claim or Interest was Allowed, unless otherwise provided in the terms and conditions of the SWINC Plan Administrator Agreement, the SWE&C Liquidating Trust Agreement, the Asbestos Trust Agreement and Articles IV, VII and IX of this Third Joint Plan, except as otherwise provided in the Third Joint Plan or any contract, instrument or other agreement created in connection with the Third Joint Plan.

### B.    Interest on Claims or Interests

Postpetition Interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest.

Interest shall not accrue or be paid upon any Disputed Claim or Disputed Interest in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest.

### C.    Distributions by Disbursing Agents

The SWINC Disbursing Agent shall make all distributions required under this Third Joint Plan on account of Claims against and Interests in the Consolidated SWINC Estate. If the SWINC Disbursing Agent is an independent third party designated by the SWINC Plan Administrator to serve in such capacity, then the SWINC Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to the Third Joint Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from SWINC on terms acceptable to the SWINC Plan Administrator. The SWINC Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.

The SWE&C Liquidating Trust Disbursing Agent shall make all distributions required under this Third Joint Plan on account of Claims against the Consolidated SWE&C Estate. If the SWE&C Disbursing Agent is an independent third party designated by the SWE&C Liquidating Trust to serve in such capacity, then the SWE&C Liquidating Trust Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to the Third Joint Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the SWE&C Liquidating Trust on terms acceptable to the SWE&C Liquidating Trust. The SWE&C Liquidating Trust Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.

### D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1.    *Delivery of Distributions in General*

Distributions to holders of Allowed Claims or Allowed Interests shall be made at the addresses set forth in the Amended Schedules unless such addresses are superseded by proofs of claim or interest or transfers of claim filed pursuant to Bankruptcy Rule 3001 (or at the last known addresses of such holders if the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent, as the case may be, has been notified in writing of a change of address).

#### 2.    *Undeliverable and Unclaimed Distributions*

##### (A)    Holding and Investment of Undeliverable and Unclaimed Distributions.

If the distribution to any holder of an Allowed Claim or Allowed Interest is returned to the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent, as the case may be, as undeliverable or is otherwise unclaimed, no further distributions shall be made to such holder unless and until the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent, as the case may be, is notified in writing of such holder's then-current address. Undeliverable and unclaimed distributions shall be set aside or, in the case of a Cash distribution, deposited in a segregated, interest-bearing account, designated as an "unclaimed distribution reserve" (the "Unclaimed Distribution Reserve"), for the benefit of all such similarly situated Persons until such time as a distribution becomes deliverable or is claimed.

##### (B)    After Distributions Become Deliverable

On each semiannual Distribution Date, the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent, as the case may be, shall make distributions that have become deliverable or have been claimed since the Distribution Date or the immediately preceding Semiannual Distribution Date, as the case may be, together with any interest actually earned thereon.

(C)    Failure to Claim Undeliverable Distributions

Except as otherwise provided in the Third Joint Plan or any contract, instrument or other agreement created in connection with the Third Joint Plan, the holder of an Allowed Claim or Allowed Interest that does not assert a Claim or Interest pursuant to the Third Joint Plan for an undeliverable or unclaimed distribution within three (3) years after the Effective Date shall be deemed to have forfeited its Claim or Interest for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim or Interest for an undeliverable or unclaimed distribution against the Debtors, their Estates, the SWINC Plan Administrator or the SWE&C Liquidating Trust, or their property. In such cases, any Cash or other property held in an Unclaimed Distribution Reserve for distribution on account of such Claims or Interests for undeliverable or unclaimed distributions shall become the property of the Debtors, their Estates, the SWE&C Liquidating Trust, as the case may be, free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary, and shall be distributed in accordance with the terms of the Third Joint Plan, the SWE&C Liquidating Trust Agreement or the SWINC Plan Administrator Agreement. Nothing contained in the Third Joint Plan, the SWINC Plan Administrator Agreement or the SWE&C Liquidating Trust Agreement shall require any Disbursing Agent, including, but not limited to, the SWINC Disbursing Agent or the SWE&C Liquidating Trust Disbursing Agent to attempt to locate any holder of an Allowed Claim or Allowed Interest.

E.    Notification Date for Distributions to Holders of Equity Securities

At the close of business on the Confirmation Date, the transfer ledgers for the Old Securities shall be closed, and there shall be no further changes in the record holders of the Old Securities. Neither the SWINC Plan Administrator nor the SWINC Disbursing Agent shall have any obligation to recognize any transfer of such Old Securities occurring after the Confirmation Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders as of the close of business on the Confirmation Date.

F.    Surrender of Securities or Instruments

On or before the Effective Date, or as soon as practicable thereafter, each holder of an instrument evidencing an Interest on account of Old Securities (as to each, a "Certificate") shall surrender such Certificate to the SWINC Disbursing Agent and such Certificate shall be cancelled; *provided, however,* that the surrender and cancellation of such Certificates pursuant to or under this Third Joint Plan shall in no way impair or affect the right of any holder to pursue any claims against non-Debtors in any of the Securities Actions. No distribution of property hereunder shall be made to or on behalf of any such holder unless and until such Certificate is received by the SWINC Disbursing Agent or the unavailability of such Certificate is reasonably established to the satisfaction of the SWINC Disbursing Agent. Any such holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the SWINC Disbursing Agent prior to the second (2nd) anniversary of the Effective Date, shall be deemed to have forfeited all rights and Interests in respect of such Certificate and shall not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including interest accrued thereon, shall revert to the SWINC Plan Administrator for the benefit of the Claimholders and Interestholders of SWINC notwithstanding any federal or state escheat laws to the contrary.

60

G.    Means of Cash Payment

Cash payments made pursuant to this Third Joint Plan shall be in U.S. funds, by the means agreed to by the payor and the payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor shall determine in its sole discretion.

H.    Withholding and Reporting Requirements

In connection with the Third Joint Plan and all distributions thereunder, the SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

I.    Setoffs

1.    By a Debtor

The SWINC Plan Administrator and the SWE&C Liquidating Trustee may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Third Joint Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the SWINC Plan Administrator or the SWE&C Liquidating Trustee, as the case may be, of any such claim that the Debtors may have against such holder.

2.    By Non-Debtors

Unless otherwise authorized by a Final Order, any holder of a Claim must assert any setoff rights against a Claim by a Debtor against such entity by filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor notwithstanding any statement to the contrary in a proof of claim or any other pleading or document filed with the Bankruptcy Court or delivered to the Debtors.

Notwithstanding anything in the Disclosure Statement or this Third Joint Plan to the contrary, all rights, claims and defenses, including but not limited to setoff and recoupment, arising pursuant to or in connection with the Asset Purchase Agreement between the Debtors and Shaw are hereby expressly preserved.

J.    Fractional Dollars; De Minimus Distributions

Notwithstanding any other provision of the Third Joint Plan, the SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall (i) not be required to make distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Third Joint Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down; and (ii) have no obligation to make a distribution on account of an Allowed Claim from any Reserve or account (a) to any holder of an Allowed Claim if the aggregate amount of all distributions authorized to be made from all such Reserves or accounts on the particular Distribution Date in question is less than $1,000,000 or (b) to a specific holder of an

61

Allowed Claim if the amount to be distributed to that holder on the particular Distribution Date (1) does not constitute a final distribution to such holder and (2) is less than $100.00.

### K.    Allocation of Third Joint Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Third Joint Plan comprises indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that, for income tax purposes, such distribution shall be allocated (to the extent permitted) first to the principal amount of the Claim and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

## ARTICLE X
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

### A.    Rejected Contracts and Leases

Except as otherwise provided in the Third Joint Plan, the Confirmation Order, or in any contract, instrument, release or other agreement or document entered into in connection with the Third Joint Plan, each of the prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, shall be deemed rejected by the applicable Debtor effective on the Confirmation Date and subject to the occurrence of the Effective Date, unless such contract or lease (i) previously (a) shall have been assumed or rejected by the Debtors (including, but not limited to, those executory contracts and unexpired leases assumed and assigned to Shaw) or (b) shall have expired or terminated pursuant to its own terms, or (ii) is listed on the schedule of assumed contracts and leases attached hereto as Plan Exhibit H; *provided, however*, that neither the inclusion by the Debtors of a contract or lease in Plan Exhibit H nor anything contained in this Article X shall constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.    The Confirmation Order shall constitute an order of the Court approving the rejections described in this Article X, pursuant to section 365 of the Bankruptcy Code, as of the Confirmation Date.

### B.    Rejection Damages Bar Date

If the rejection of an executory contract or unexpired lease pursuant to Article X.A above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the SWINC Plan Administrator, the SWE&C Liquidating Trust or their respective successors or properties unless a proof of Claim is filed and served on the Debtors and counsel for the Debtors within thirty (30) days after service of a notice of entry of the Confirmation Order or such other date as prescribed by the Court.

### C.    Assumed Contracts and Leases

Except as otherwise provided in the Third Joint Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Third Joint Plan, the Debtors shall assume (and assign, as the case may be) each of the executory contracts and unexpired leases listed on Plan Exhibit H. Any monetary amounts by which each executory contract and unexpired lease to be assumed under the Third Joint Plan may be in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure on the Effective Date or as soon thereafter as practicable.  In the event of a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtors or any assignee of the Debtors to provide

62

"adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption or assignment, Cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption and, as the case may be, assignment. The Confirmation Order shall constitute an order of the Court approving the assumptions (as assignments, as the case may be) described in this Article X.C, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

**D.      Pension Plan**

The Pension Plan shall be assumed pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2), to the extent it is executory. The Third Joint Plan does not purport to release or affect any causes of action pursuant to ERISA concerning the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster and the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries, or limit any potential claim of the Secretary of Labor, United States Department of Labor, pursuant to the stipulated agreement between SWINC and the Secretary of Labor, United States Department of Labor, filed by the Debtors on or about February 26, 2002.

**E.      Indemnification Obligations**

Except as otherwise provided in the Third Joint Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Third Joint Plan; any and all indemnification obligations that the Debtors have pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document or applicable law shall be rejected as of the Effective Date of the Third Joint Plan, to the extent executory.

### ARTICLE XI
### PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND DISPUTED INTERESTS

**A.      Claims Objection Deadlines; Prosecution of Objections**

**1.      *SWINC Claims Objection Deadline***

Except as otherwise provided in the Third Joint Plan or any contract, instrument or other agreement created in connection with the Third Joint Plan, from the Effective Date through the SWINC Claims Objection Deadline (which may be extended by an order of the Court), the SWINC Plan Administrator shall have the exclusive authority to file objections to Claims against or Interests in the Consolidated SWINC Estate with the Court and serve such objections upon the holders of each of the Claims or Interests to which objections are made. Nothing contained herein, however, shall limit the right of the SWINC Plan Administrator to object to Claims against or Interests in the Consolidated SWINC Estate, if any, filed, amended or reclassified after the SWINC Claims Objection Deadline. Subject to the limitations set forth in the SWINC Plan Administrator Agreement and Article VII.L.6 of this Third Joint Plan, the SWINC Plan Administrator shall be authorized to, and shall, resolve all Disputed Claims solely against or Disputed Interests in SWINC by withdrawing or settling such objections thereto, or by litigating to judgment in the Court or such other court having jurisdiction the validity, nature and/or amount thereof.

2.      *SWE&C Claims Objection Deadline*

Except as otherwise provided in the Third Joint Plan or any contract, instrument or other agreement created in connection with the Third Joint Plan, from the Effective Date through the SWE&C Claims Objection Deadline (which may be extended by an order of the Court), the SWE&C Liquidating Trustee shall have the exclusive authority to file objections to Claims against or Interests in the Consolidated SWE&C Estate with the Court and serve such objections upon the holders of each of the Claims against or Interests in the Consolidated SWE&C Estate to which objections are made. Nothing contained herein, however, shall limit the right of the SWE&C Liquidating Trustee to object to Claims against or Interests in SWE&C, if any, filed or amended after the SWE&C Claims Objection Deadline. Subject to the limitations set forth in the SWE&C Liquidating Trust Agreement and Article VII.O of this Third Joint Plan, the SWE&C Liquidating Trustee shall be authorized to, and shall, resolve all Disputed Claims solely against or Disputed Interests in SWE&C by withdrawing or settling such objections thereto, or by litigating to judgment in the Court or such other court having jurisdiction the validity, nature and/or amount thereof.

3.      *Claims Against Both Consolidated Estates*

Except as otherwise provided in the Third Joint Plan or any contract, instrument or other agreement created in connection with the Third Joint Plan, from the Effective Date through the later of (i) the SWE&C Claims Objection Deadline or (ii) the SWINC Claims Objection Deadline (which may be extended by an order of the Court), the Interestate Oversight Board shall have the exclusive authority to file objections to Claims with respect to Claims or Interests asserted against both the Consolidated SWE&C Estate and the Consolidated SWINC Estate and serve such objections upon the holders of each of the Claims or Interests to which objections are made. Subject to the limitations set forth in this Third Joint Plan, the Interestate Oversight Board shall be authorized to, and shall, resolve all Disputed Claims against or Disputed Interests in both the Consolidated SWE&C Estate and the Consolidated SWINC Estate by withdrawing or settling such objections thereto, or by litigating to judgment in the Court or such other court having jurisdiction the validity, nature and/or amount thereof.

B.      No Distributions Pending Allowance

Notwithstanding any other provision of the Third Joint Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or the Disputed Interest, or some portion thereof, has become an Allowed Claim or Allowed Interest.

C.      Reserves

On the Effective Date or as soon thereafter as practicable, the following Reserves will be established and funded:

1.      *General Administrative Claims Reserve*

On the Effective Date, there shall be created and funded with Cash, a General Administrative Claims Reserve in the amount of $13.9 million, to be used to pay under the Third Joint Plan Allowed General Administrative Claims, including General Professional Fee Claims. In the event that any Cash remains in the General Administrative Claims Reserve after the payment in full of General Administrative Claims, such amount shall be distributed 50% to the SWINC Disputed Claims Reserve and 50% to the SWE&C Disputed Claims Reserve.

64

2.      *The SWINC Professional Fee Reserve*

On the Effective Date, there shall be created and funded with Cash, the SWINC Professional Fee Reserve in the amount of $2 million to be used to pay Allowed Professional Fee Claims held by (i) counsel and any advisers to the Equity Committee and (ii) any professionals working exclusively on behalf of SWINC or any SWINC Subsidiary. In the event that any Cash remains in the SWINC Professional Fee Reserve after payment of the Allowed SWINC Professional Fee Claims, such Cash shall be distributed to the SWINC Disputed Claims Reserve.

3.      *SWINC Operating Reserve*

On the Effective Date, there shall be created and funded with Cash, a SWINC Operating Reserve in the amount of $1.8 million, which amount shall be used to pay the administrative and other costs and expenses associated with the Consolidated SWINC Estate, including all fees and expenses of the SWINC Plan Administrator and its professionals.[1] In the event that Cash in the SWINC Operating Reserve is exhausted, the SWINC Plan Administrator, in his or her sole discretion, has the right to obtain such additional Cash from the SWINC Disputed Claims Reserve so as to replenish the SWINC Operating Reserve. In the event that any Cash remains in the SWINC Operating Reserve after the final resolution of all Claims Against or Interests in the Consolidated SWINC Estate, such Cash shall be distributed to the SWINC Disputed Claims Reserve for distributions under the Third Joint Plan.

4.      *The SWINC Disputed Claims Reserve*

On the Effective Date, there shall be created and funded with Cash, a SWINC Disputed Claims Reserve from Cash in the amount of $42.9 million, which amount will be used to pay (i) the holders of Allowed Class 4A: SWINC Convenience Claims in full, (ii) the holders of Allowed Class 5A: SWINC General Unsecured Claims their Pro Rata share of the Disputed Claims Reserve until all such Claims are paid in full, (iii) the holders of Allowed Class 7A: SWINC Subordinated Claims their Pro Rata Share of the Disputed Claims Reserve remaining after holders in Class 4A and Class 5A have been paid in full, and (iv) the holders of Allowed Class 8A: SWINC Securities Claims and Allowed Class 9A: SWINC Equity Interests their Pro Rata share of the Disputed Claims Reserve remaining after holders in Allowed Class 7A: SWINC Subordinated Claims have been paid in full. The SWINC Disputed Claims Reserve shall be supplemented from time to time with Cash or other property received by the SWINC Plan Administrator from recoveries on claims or causes of action, dispositions of property or receipt of unused funds in Reserves distributable to the SWINC Disputed Claim Reserve.

5.      *The SWE&C Professional Fee Reserve*

On the Effective Date, there shall be created and funded with Cash, the SWE&C Professional Fee Reserve in the amount of $1.5 million to be used to pay Allowed SWE&C Professional Fee Claims held by (i) counsel and any advisers to the Creditors' Committee and (ii) any professionals working exclusively on behalf of SWE&C or any SWE&C Subsidiary. In the event that any Cash remains in the SWE&C Professional Fee Reserve after payment of all Allowed SWE&C Professional Fee Claims, such Cash shall be distributed to the SWE&C Disputed Claims Reserve.

---

[1]      Included in the SWINC Operating Reserve is $150,000, which represents one-half of the severance package for James Carroll. The full severance package of $300,000 shall be deemed to have been earned by Mr. Carroll upon confirmation of the Third Joint Plan, but such payment will be deferred until Mr. Carroll's employment is terminated, whether voluntary or not.

65

6.    *SWE&C Operating Reserve*

On the Effective Date, there shall be created and funded with Cash, a SWE&C Operating Reserve in the amount of $2.2 million, which amount shall be used to pay the administrative and other costs and expenses associated with the Consolidated SWE&C Estate, including all fees and expenses of the SWE&C Liquidating Trustee and its professionals[2]. In the event that Cash in the SWE&C Operating Reserve is exhausted, the SWE&C Liquidating Trustee, in his or her sole discretion, has the right to obtain such additional Cash from the SWE&C Disputed Claims Reserve so as to replenish the SWE&C Operating Reserve. In the event that any Cash remains in the SWE&C Operating Reserve after the final resolution of all Claims Against or Interests in the Consolidated SWE&C Estate, such Cash shall be distributed to the SWE&C Disputed Claims Reserve for distributions under the Third Joint Plan.

7.    *The SWE&C Disputed Claims Reserve*

On the Effective Date, there shall be created and funded with Cash, a SWE&C Disputed Claims Reserve in the amount of $2.9 million, which amount will be used as follows: (i) first, to pay the holders of Allowed Class 4B: SWE&C Convenience Claims in full, and (ii) second, to pay the holders of Allowed Class 5B: SWE&C General Unsecured Claims their Pro Rata share of the SWE&C Disputed Claims Reserve until all such Claims are paid in full. The SWE&C Disputed Claims Reserve shall be supplemented from time to time with Cash and other property received by the SWE&C Liquidating Trustee from recoveries on claims or causes of action, dispositions of property, the receipt of unused funds from Reserves established under the Third Joint Plan and distributable to the SWE&C Disputed Claims Reserve.

8.    *The Reorganized SWINC Operating Reserve*

On the Effective Date, there shall be created and funded with Cash, a Reorganized SWINC Operating Reserve in the amount of $2.0 million, funded sixty percent (60%) by the Consolidated SWINC Estate and forty percent (40%) by the Consolidated SWE&C Estate, which amount shall be used to pay the administrative and other costs and expenses associated with Reorganized SWINC, including all fees and expenses of Reorganized SWINC and its professionals. In the event that any Cash remains in the Reorganized SWINC Operating Reserve upon completion of all of its obligations under the Third Joint Plan, such Cash shall be reimbursed in the same proportion to the SWINC Disputed Claims Reserve (60%) and the SWE&C Disputed Claims Reserve (40%) for further distribution under the Third Joint Plan. In the event that the Reorganized SWINC Board determines that the Reorganized SWINC Operating Reserve needs to be replenished, the Consolidated SWINC Estate and the Consolidated SWE&C Estate shall replenish said reserve in the same proportional amounts.

D.    **Distributions After Allowance**

The SWINC Disbursing Agent and the SWE&C Liquidating Trust Disbursing Agent shall make payments and distributions from the appropriate Reserves to the holder of any Disputed Claim that has become an Allowed Claim or Allowed Interest, on the first Semi-Annual Distribution Date following the date that such Disputed Claim becomes an Allowed Claim. Such distributions shall be made in accordance

---

[2]    Included in the SWE&C Operating Reserve is $150,000, which represents one-half of the severance package for James Carroll. The full severance package of $300,00 shall be deemed to have been earned by Mr. Carroll upon confirmation of the Third Joint Plan, but such payment will be deferred until Mr. Carroll's employment is terminated, whether voluntary or not.

with the Third Joint Plan, the SWINC Plan Administrator Agreement and the SWE&C Liquidating Trust Agreement, as the case may be.

## ARTICLE XII
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE THIRD JOINT PLAN

### A.    Conditions to Confirmation

The following are conditions precedent to the occurrence of the Confirmation Date: (a) the entry of an order finding that the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and (b) the proposed Confirmation Order shall be in a form and substance reasonably acceptable to the Plan Proponents.

### B.    Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article XII.C of this Third Joint Plan:

1.    The Confirmation Order shall have been entered and become enforceable pursuant to Bankruptcy Rule 7052 and not the subject of a stay under Bankruptcy Rule 7062 and shall:

(A)    authorize and direct the Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the instruments, releases, and other agreements or documents created in connection with the Third Joint Plan;

(B)    authorize the issuance of Reorganized SWINC New Common Stock, Reorganized SWINC New Series A Preferred Stock and Reorganized SWINC New Series B Preferred Stock; and

(C)    provide that the Reorganized SWINC New Common Stock, the Reorganized SWINC New Series A Preferred Stock and the Reorganized SWINC New Series B Preferred Stock issued under the Third Joint Plan are exempt from registration under the Securities Act 1933, as amended, pursuant to Section 4(2) of the Securities Act.

2.    All Plan Exhibits shall be in form and substance reasonably acceptable to the Plan Proponents and shall have been executed and delivered.

3.    All actions, documents and agreements necessary to implement the Third Joint Plan shall have been effectuated or executed.

### C.    Waiver of Conditions

Each of the conditions set forth in Articles XII.A and XII.B of the Third Joint Plan, may be waived in whole or in part by the Debtors, without any other notice to parties in interest or the Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation or the Effective Date may be asserted by the Debtors or Reorganized SWINC regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or Reorganized SWINC). The failure of the Debtors or Reorganized SWINC to exercise any of the foregoing rights shall

67

not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE XIII
## EFFECT OF THIRD JOINT PLAN CONFIRMATION

### A.    Binding Effect

The Third Joint Plan shall be binding upon and inure to the benefit of the Debtors, all present and former holders of Claims and Interests, and their respective successors and assigns.

### B.    Releases

#### 1.    *Releases by the Debtors*

A.    On the Effective Date, each of the Debtors shall release unconditionally (i) the SWE&C Liquidating Trustee, (ii) the SWE&C Liquidating Trust Disbursing Agent, (iii) the SWINC Disbursing Agent, (iv) the SWINC Plan Administrator, (v) their respective directors and officers, advisors, accountants, investment bankers, consultants, and attorneys, (vi) the Interstate Oversight Board, and (vii) the respective advisors, accountants, investment bankers, and attorneys of any of the foregoing, solely in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors or Reorganized SWINC under the Third Joint Plan and the contracts, instruments, releases and other agreements delivered under the Third Joint Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or after the Petition Date and prior to or on the Effective Date and in any way relating to the Debtors, the Chapter 11 Cases, the Third Joint Plan or the Disclosure Statement.

B.    On the Effective Date, each of the Debtors and their Estates shall release unconditionally those present directors, which directors served only as directors and not as officers of any of the Debtors, in their respective capacities as such, from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (other than the right to enforce the performance of their respective obligations, if any, to the Debtors or Reorganized SWINC under the Third Joint Plan and the contracts, instruments, releases and other agreements delivered under the Third Joint Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place prior to or on the Effective Date that could have been asserted by or on behalf of any of the Debtors or their Estates against such current and former directors.

#### 2.    *Releases by Holders of Claims and Interests*

On the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, in consideration for the obligations of the Debtors and Reorganized SWINC under the Third Joint Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Third Joint Plan, each entity (other than a Debtor) that has held, holds or may hold a Claim or Interest (except for holders of Asbestos Claims), as applicable, will be deemed to forever release, waive and discharge all

68

claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the Debtors' or Reorganized SWINC's obligations under the Third Joint Plan and the contracts, instruments, releases, agreements and documents delivered under the Third Joint Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place at any time on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Third Joint Plan or the Disclosure Statement that such entity has, had or may have against (i) the Debtors, and, solely in their respective capacities as such: (ii) the SWE&C Liquidating Trustee, (iii) the SWE&C Liquidating Trust Disbursing Agent, (iv) the SWINC Disbursing Agent, (v) the SWINC Plan Administrator, and (vi) the Interestate Oversight Board; *provided, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries solely in their capacity as fiduciaries of the Pension Plan or such other plan, *and provided, further, however,* that the Third Joint Plan does not release, enjoin, or otherwise affect in any way the Claims held by purchasers of the Stone & Webster, Incorporated securities before the Petition Date against any and all present and former directors and officers of the Debtors and any other non-Debtor third party.

3.    *Injunction Related to Releases*

The Confirmation Order will permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Third Joint Plan, including, but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in this Article XIII.B, *provided, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries solely in their capacity as fiduciaries of the Pension Plan or such other plan, *and provided, further, however,* that the Third Joint Plan does not release, enjoin, or otherwise affect in any way the Claims held by purchasers of the Stone & Webster, Incorporated securities before the Petition Date against any and all present and former directors and officers of the Debtors and any other non-Debtor third party.

C.    **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d)(1) of the Bankruptcy Code, Confirmation will discharge Claims against and Interests in SWINC and the SWINC Subsidiaries and no holder of a Claim against or Interest in SWINC or the SWINC Subsidiaries may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against Reorganized SWINC, SWINC, the SWINC Subsidiaries, their respective successors or their respective property, except as expressly provided herein.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against SWE&C and the SWE&C Subsidiaries; *provided, however,* that no holder of a Claim against or Interest in SWE&C or the SWE&C Subsidiaries may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against, SWE&C, the SWE&C Subsidiaries, the Consolidated SWE&C Estate, their respective successors or their respective property, except as expressly provided herein.

69

**D.    Exculpation and Limitation of Liability**

None of the Debtors, Federal, Maine Yankee, the Creditors' Committee, past and present members of the Creditors' Committee in their capacities as such, the Equity Committee, past and present members of the Equity Committee in their capacities as such, nor any of their respective present or former officers and directors (who were officers and directors on the Petition Date), advisors or attorneys, shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, shareholders, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission occurring on or after the Petition Date in connection with, relating to, or arising out of, the Debtors' Chapter 11 Cases, the pursuit of confirmation of the Third Joint Plan, the consummation of the Third Joint Plan or the administration of the Third Joint Plan or the property to be distributed under the Third Joint Plan, except for their willful misconduct or gross negligence and except with respect to any claim against a fiduciary of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries with respect to the Pension Plan or such other plan, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Third Joint Plan, *provided, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries solely in their capacity as fiduciaries of the Pension Plan or such other plan.

**E.    Injunction**

Except as otherwise provided in the Third Joint Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, hold or may hold a Claim or other debt or liability against SWINC, a SWINC Subsidiary or the Consolidated SWINC Estate or an Interest in SWINC or a SWINC Subsidiary or the Consolidated SWINC Estate are (a) permanently enjoined from taking any of the following actions against the Estate of SWINC, the Estates of the SWINC Subsidiaries, the SWINC Plan Administrator (solely in his/her capacity as such), the Consolidated SWINC Estates, Reorganized SWINC, or any of their property on account of any such Claims or Interests and (b) preliminarily enjoined from taking any of the following actions against SWINC, a SWINC Subsidiary, the Consolidated SWINC Estate, Reorganized SWINC, or their property on account of such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the SWINC or the SWINC Subsidiaries; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Third Joint Plan; *provided, however,* that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Third Joint Plan, *and provided, further, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries solely in their capacity as fiduciaries of the Pension Plan or such other plan. In addition, nothing in this provision will affect or impair the rights, if any, that a non-debtor entity has to take direct actions to recover under policies of insurance where such non-debtor entity is a "co-insured" or "additional insured" with a Debtor.

70

Except as otherwise provided in the Third Joint Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, hold or may hold a Claim or other debt or liability against SWE&C or the SWE&C Subsidiaries or an Interest in SWE&C or the SWE&C Subsidiaries are (a) permanently enjoined from taking any of the following actions against the Estate of SWE&C, the Estates of the SWE&C Subsidiaries, the SWE&C Liquidating Trustee, or any of their property on account of any such Claims or Interests and (b) preliminarily enjoined from taking any of the following actions against SWE&C, the SWE&C Subsidiaries or their property on account of such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the SWE&C or the SWE&C Subsidiaries; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Third Joint Plan; *provided, however,* that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Third Joint Plan, *and provided, further, however,* that the Third Joint Plan does not release or otherwise affect any pre or post Effective Date Claim, except as to the Debtors, that any person may have against the fiduciaries of the Pension Plan, the Employee Stock Ownership Plan of Stone & Webster, Incorporated and Participating Subsidiaries, the Group Life Insurance and Spouses Insurance Plan of Stone & Webster or the Employee Investment Plan of Stone & Webster Incorporated and Participating Subsidiaries solely in their capacity as fiduciaries of the Pension Plan or such other plan.   In addition, nothing in this provision will affect or impair the rights, if any, that a non-debtor entity has to take direct actions to recover under policies of insurance where such non-debtor entity is a "co-insured" or "additional insured" with a Debtor.

By accepting distributions pursuant to the Third Joint Plan, each holder of an Allowed Claim or Allowed Interest receiving distributions pursuant to the Third Joint Plan will be deemed to have specifically consented to the injunctions set forth in this Article XIII.E.

**F.    Satisfaction of Subordination Rights**

Nothing in this Third Joint Plan shall affect any rights and claims between or among Claimholders relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any subordination rights, whether asserted or unasserted, legal or equitable.  Distributions to the various Classes of Claims and Interests hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Claimholder or Interestholder by reason of any subordination rights or otherwise, so that each Claimholder and Interest holder shall have and receive, the benefit of the distributions in the manner set forth in the Third Joint Plan, any beneficiary of such subordination rights shall have no claim or cause of action against the Debtors, the SWINC Plan Administrator, the SWE&C Liquidating Trustee or any Cash or property to be distributed under the Plan and must assert such subordination rights directly against Claimholders or Interestholders subject to such subordination rights.

**G.    Compromises and Settlements**

**1.    *Settlement Authority***

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various Claims against them and/or claims that they may have against other Persons.  The Debtors expressly reserve the right (with Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims against them and claims that they may have against other Persons up to and including the Effective Date.  After the Effective Date, such right shall pass to (i) the SWINC Plan Administrator pursuant to Articles VII.L of the Third Joint Plan, or (ii) the SWE&C Liquidating Trustee pursuant to Articles VII.O of the Third Joint Plan.

71

2. *Substantive Consolidation*

To avoid continued litigation with respect to Substantive Consolidation and related issues regarding the Pension Plan Reversion, the Proponents propose the Third Joint Plan, which provides, among other things, that upon the Effective Date, two separate consolidated estates will be created.

    (a)   The Substantive Consolidation of SWINC and the SWINC Subsidiaries

On the Effective Date, the Estates of SWINC and the SWINC Subsidiaries shall be substantively consolidated as follows: (i) the SWINC Subsidiaries shall be merged with and into SWINC, with the surviving corporation being Reorganized SWINC, (ii) all Intercompany Claims by, between and among SWINC and the SWINC Subsidiaries shall be forgiven and eliminated, (iii) all assets and liabilities of the SWINC Subsidiaries shall be merged or treated as if they were merged with the assets and liabilities of SWINC, (iv) any obligation of SWINC or one of the SWINC Subsidiaries and all guarantees thereof by SWINC or one of the SWINC Subsidiaries shall be deemed to be one obligation of SWINC, and (v) each Claim filed, or to be filed or allocated against SWINC or a SWINC Subsidiary shall be deemed filed only against SWINC and shall be deemed a single Claim against and a single obligation of SWINC. On the Effective Date, and in accordance with the terms of the Third Joint Plan and the consolidation of the assets and liabilities of SWINC and the SWINC Subsidiaries, all Claims based upon guarantees of collection, payment or performance made by SWINC or the SWINC Subsidiaries as to the obligations of SWINC or one of the SWINC Subsidiaries shall be released and, of no further force and effect.

    (b)   The Substantive Consolidation of SWE&C and the SWE&C Subsidiaries

The Third Joint Plan contemplates and is also predicated upon the substantive consolidation of the Estates of SWE&C and the SWE&C Subsidiaries for the purposes of all actions associated with confirmation and consummation of the Third Joint Plan. On the Effective Date, the Estates of SWE&C and the SWE&C Subsidiaries shall be substantively consolidated as follows: (i) all assets and liabilities of the SWE&C Subsidiaries shall be merged or treated as if they were merged with the assets and liabilities of SWE&C, (ii) all Intercompany Claims by, between and among SWE&C and the SWE&C Subsidiaries shall be forgiven and eliminated, (iii) any obligation of SWE&C or one of the SWE&C Subsidiaries and all guarantees thereof by SWE&C or one of the SWE&C Subsidiaries shall be deemed to be one obligation of SWE&C, (iv) each Claim filed, or to be filed or allocated against SWE&C and/or a SWE&C Subsidiary shall be deemed filed only against SWE&C and shall be deemed a single Claim against and a single obligation of SWE&C, and (v) all Interests in SWE&C or any SWE&C Subsidiary shall be cancelled and the holders thereof shall not be entitled to any distribution. On the Effective Date, and in accordance with the terms of the Third Joint Plan and the consolidation of the assets and liabilities of SWE&C and the SWE&C Subsidiaries, all Claims based upon guarantees of collection, payment or performance made by SWE&C or one of the SWE&C Subsidiaries as to the obligations of SWE&C or one of the SWE&C Subsidiaries shall be released and of no further force and effect.

    (c)   The Pension Plan Reversion

Pursuant to Bankruptcy Rule 9019 under the Third Joint Plan and as part of the Substantive Consolidation Settlement, the Proponents also propose to settle certain disputes regarding the potential reversionary interest associated with the overfunded Pension Plan. Specifically, the Plan Proponents believe that the Pension Plan is presently overfunded and that upon termination of the Pension Plan in a state law dissolution of Reorganized SWINC, funds in excess of $30 million net of taxes, after all liabilities of the Pension Plan to Pension Plan participants have been satisfied, will revert to the Debtors'

estates and become available for distribution to holders of Claims and Interests. As part of the Substantive Consolidation Litigation, the Equity Committee has asserted that holders of Claims against and Interests in SWINC are entitled to the entire amount of the Reversion because SWINC is the sole legal owner of the Reversion under the Pension Plan documents. In response, the Creditors' Committee has asserted that the Reversion should be available to pay the holders of Claims against SWE&C and the SWE&C Subsidiaries and only after that would a distribution be made to holders of Equity Interests in SWINC because, among other things, the contributions to such Pension Plan were made primarily by employees of SWE&C on behalf of its employee. To avoid further litigation as to the Reversion, and as part of the Substantive Consolidation and Federal Settlement, the Proponents propose to settle all disputes regarding the Pension Plan and the Reversion as follows:

1.    In the event Class 9A: SWINC Equity Interests vote to accept the Third Joint Plan, the Reversion from the Pension Plan will be distributed as follows: (i) two-thirds (2/3) of the Reversion's first $30 million to the Consolidated SWINC Estate; (ii) one-third (1/3) of the Reversion's first $30 million to the Consolidated SWE&C Estate; and (iii) if the Reversion exceeds $30 million, an equal distribution between the Consolidated SWE&C Estate and the Consolidated SWINC Estate of any Reversion in excess of $30 million.

2.    In the event Class 9A: SWINC Equity Interests vote to reject the Third Joint Plan, the Reversion from the Pension Plan will be distributed as follows: (i) two-thirds of the Reversion's first $30 million to the Consolidated SWINC Estate; (ii) one-third of the Reversion's first $30 million to the Consolidated SWE&C Estate; and (iii) if the Reversion exceeds $30 million, a distribution of seventy-five percent (75%) of any Reversion in excess of $30 million to the Consolidated SWE&C Estate and twenty-five percent (25%) of any Reversion in excess of $30 million to the Consolidated SWINC Estate.

The Proponents believe that such a settlement is fair and equitable because, among other things, (i) prior to SWINC becoming the sole legal sponsor of the Pension Plan, each then individual Debtor was a sponsor and (ii) even after SWINC became the legal sponsor, the overfunded Pension Plan was carried on the books and records of SWEC and (iii) Mercer Human Resources Consulting reported on a nonconsolidated basis by operating unit of the Debtors with respect to Pension Plan expenses and assets in addition to reporting on a consolidated basis at the SWINC level in accordance with general accepted accounting principles.

3.    *The Federal Settlement*

As part of the Third Joint Plan, the Plan Proponents also propose a settlement of various claims filed by Federal. Specifically, Federal initially filed numerous unliquidated and contingent proofs of claim in the Bankruptcy Cases in the amount of $371,505,215.90, of which at least $55,208,965.23 has been subsequently liquidated (the "Federal Liquidated Claim"). The balance of $316,296,205.69 represents unliquidated claims asserted by Federal against, among others, SWINC and SWEC. In addition to asserting claims against each of the primary obligors, Federal also asserted a Claim directly against SWINC pursuant to certain General Indemnity Agreements executed between Federal and SWINC. A significant portion of the Federal Liquidated Claim, in the amount of $44 million, arises in connection with Federal's payment under certain Payment and Performance Bonds between SWE&C and Federal related to Maine Yankee.

Originally, Federal opposed the Substantive Consolidation proposed by the Creditors' Committee and was in negotiations with the Equity Committee regarding support for its plan. Subsequent

73

to the Initial Disclosure Statement Hearing, the Debtors reached an agreement with Federal regarding Substantive Consolidation and the Federal Claims. As ultimately agreed to by the Creditors' Committee and incorporated into the plan, that settlement provided, among other things, an opportunity for Class 9A: SWINC Equity Interests that voted to accept an immediate Cash payment of $0.50 per share. As a result of subsequent events, including, among other things, the Equity Committee's continued prosecution of a separate plan, part of the settlement was withdrawn. Under current Third Joint Plan, however, a similar opportunity exists.

Specifically, the terms of the Federal Settlement are as follows:

- Federal will hold an Allowed Federal Claim in the amount of $52,113,000 against both the Consolidated SWINC Estate and the Consolidated SWE&C Estate and will be permitted to vote such Allowed Federal Claim as an Allowed Class 5A Claim and an Allowed Class 5B Claim. On the Effective Date, however, Federal will be deemed to have elected under sections 502 and 509 of the Bankruptcy Code to receive distributions on the Allowed Federal Claim filed against the Consolidated SWINC Estate only, and any distribution on such Allowed Federal Claim shall satisfy and discharge any obligation by the Debtors on Proof of Claim No. 5179 filed by Lumbermens in an amount in excess of $6 million relating to potential losses by Lumbermens in connection with its issuance of surety bonds, which claim amended and superseded Proofs of Claim Nos. 3300 and 4419.

- In addition, Chubb Canada will receive a distribution of the Canadian Cash, which Cash shall be held in trust by Chubb Canada for its use in defending, settling or otherwise resolving the Isobord Litigation, as well as a transfer, conveyance, distribution, or assignment from Debtor or non-debtor affiliate insured/obligee of all insurance proceeds in excess of the Canadian Cash relating to Isobord, including, without limitation, errors and omission, efficacy, directors and officers and any other policy or bond that may provide coverage or indemnification for Isobord claims. Any Canadian Cash remaining at the conclusion of the Isobord Litigation shall be paid over to the SWE&C Liquidating Trustee to be distributed in accordance with the Third Joint Plan. The Debtors, non-debtor affiliates, the Consolidated SWINC Estate and/or Reorganized SWINC will not be permitted to settle any potentially insured Isobord claim without obtaining Federal's consent.

- Upon the allowance of the Federal Claims, Federal will also release any and all Claims for subrogation or other Claims it has or might have against the Consolidated SWINC Estate or the Consolidated SWE&C Estate, including but not limited to, Claims for indemnification, contribution, reimbursement or subrogation arising out of the Isobord Litigation in Canada. Federal shall have complete control of the Isobord Litigation, with complete authority to settle or otherwise resolve the Isobord Litigation without the consent or participation of any of the Debtors. While Federal will waive any Claim against the Consolidated SWINC and SWE&C Estates in connection with the Isobord Litigation, Federal is not agreeing to indemnify SWINC or any other of the Debtors from liability in connection with the Isobord Facility. Furthermore, Federal is also not waiving any of its rights or defenses as surety, either in law, in equity or under the bonds that it might have against Isobord with respect to the Isobord Facility or any

related contract, but in no event will the Allowed Federal Claim exceed $52,113,000 because of the Isobord Litigation.

- Federal will also receive the lesser of (i) ten percent (10%) or (ii) $1,250,000 from the gross proceeds received from any insurance recovery on the claims asserted by Maine Yankee by way of a transfer, conveyance, distribution or assignment from the Debtors.

- Finally, if Class 9A: SWINC Equity Interests vote to accept the Third Joint Plan, then upon the Consolidated SWINC Estate having made distributions in the aggregate amount of $25,000,000 to Federal, on account of the Allowed Federal Claim in Class 5A, Federal will pay to the Equity Settlement Fund, which shall be administered by the Consolidated SWINC Estate Governing Board, an amount equal to $0.50 per share to Holders of Old Common Stock as of the Equity Voting Record Date that voted to accept the Third Joint Plan (the aggregate amount of such distribution not to exceed $7,113,000). On the Effective Date, the Cash in the Equity Settlement Fund shall be distributed to holders of Allowed Class 9A: SWINC Equity Interests (i.e., holders of Old Common Stock as of the Equity Voting Record Date) that voted to accept the Third Joint Plan. Federal will have no right to recoup from the Consolidated SWINC Estate any portion of the payment made to the Equity Settlement Fund from either the Consolidated SWINC Estate or the Consolidated SWE&C Estate, and the Initial Federal Distribution shall count towards the payment of the Allowed Federal Claim in Class 5A.

- In the event Class 9A does not vote to accept the Third Joint Plan, Federal will retain all rights against the Consolidated SWINC Estate on the Allowed Federal Claim in Class 5A in the amount of $52,113,000 for distribution purposes.

The Federal Settlement is contingent upon confirmation of the Third Joint Plan, and will be binding on all interested parties upon approval of the Third Joint Plan, and absent the Federal Settlement, certain individual Debtors, including SWINC and SWEC could be liable to Federal in an amount that exceeds $80 million.

United States Fidelity and Guaranty Company, St. Paul Fire and Marine Insurance Company and St. Paul Surplus Lines Insurance Company (collectively, the Non-Settling Insurers) do not consent to and oppose the assignment, conveyance, distribution or transfer of any rights under their policies, including the rights to proceeds, if any. The rights of the Non-Settling Insurers to challenge the validity, effectiveness or enforceability of any proposed assignments or transfers under their policies or applicable law are hereby expressly preserved.

4.    *The Maine Yankee Settlement*

As part of the settlements embodied in the Third Joint Plan, the Plan Proponents propose a settlement of various disputes between the Debtors and Maine Yankee. Specifically, Maine Yankee initially filed numerous proofs of claim in the Bankruptcy Cases in the amount of $78.2 million stemming from alleged performance defaults under a decommissioning agreement related to Maine Yankee's nuclear power plant in Wiscasset, Maine. Maine Yankee's claim was ultimately capped at $64.8 million after an eight-day proceeding to address the Maine Yankee claims, of which a total of $20.8 million was estimated to be Maine Yankee's allowable claim in the SWE&C, SWINC and SWEC bankruptcy cases ($64.8 million less $44 million previously paid by Federal).

75

Subsequent to the mediation conducted in July 2003, the Debtors, Federal and the Creditors' Committee reached an agreement with Maine Yankee regarding the Maine Yankee Claims. Thereafter, and as part of resolving numerous other disputes, the Equity Committee agreed to settle the Maine Yankee Claims, approval of which settlement is sought pursuant to this Third Joint Plan.

The principal terms of the Maine Yankee Settlement are as follows:

- Maine Yankee will hold an Allowed Maine Yankee Claim in the amount of $20,300,000 against both the Consolidated SWINC Estate and the Consolidated SWE&C Estate and will be permitted to vote such Allowed Maine Yankee Claim as an Allowed Class 5A Claim and an allowed Class 5B Claim. On the Effective Date, however, Maine Yankee will be deemed to have elected under sections 502 and 509 of the Bankruptcy Code to receive distributions on the Allowed Maine Yankee Claim filed against the Consolidated SWINC Estate only.

- If Class 9A: SWINC Equity Interests vote to accept the Third Joint Plan, SWINC shall make the Initial Maine Yankee Distribution to Maine Yankee on account of the Allowed Maine Yankee Claim in Class 5A out of which Maine Yankee will pay to the Equity Settlement Fund, which shall be administered by the Consolidated SWINC Estate Governing Board, an amount equal to $0.12 per share to Holders of Old Common Stock as of the Equity Voting Record Date that voted to accept the Third Joint Plan (the aggregate amount of any such payment cannot exceed $1,800,000). On the Effective Date, the Cash in the Equity Settlement Fund shall be distributed to holders of Allowed Class 9A: SWINC Equity Interests (i.e., holders of Old Common Stock as of the Equity Voting Record Date) that voted to accept the Third Joint Plan. Maine Yankee will not have the right to recoup from either the Consolidated SWINC Estate or the Consolidated SWE&C Estate any portion of the payment made to the Equity Settlement Fund, and the Initial Maine Yankee Distribution shall count towards the payment of the Allowed Maine Yankee Claim in Class 5A.

- In the event Class 9A does not vote to accept the Third Joint Plan, Maine Yankee will retain all rights against the Consolidated SWINC Estate on the Allowed Maine Yankee Claim in Class 5A in the amount of $20,300,000 for distribution purposes.

- The Consolidated SWINC Estate will have the SWINC MY Contribution Claim against the Consolidated SWE&C Estate in the fixed allowed amount of $16.8 million, regardless of actual cash distributions made by SWINC on the Allowed Maine Yankee Claim, which claim shall be treated as an Allowed Class 5B: SWE&C General Unsecured Claim; provided, however, that in no event shall Maine Yankee be entitled to distributions in excess of $20,300,000 (including, without limitation, amounts received on account of the SWINC MY Contribution Claim).

- Maine Yankee will have a first lien on any distributions from the Consolidated SWE&C Estate on account of the SWINC MY Contribution Claim for any amount necessary to "top up" the cash recovery by Maine Yankee against SWINC to $18.5 million, net of any payment made by Maine Yankee to the Equity Settlement Fund.

- Upon Maine Yankee's receipt of $18.5 million in cash (after giving effect to any payments made to the Equity Settlement Fund on account of accepting Class 9A: SWINC Equity Interests), all proceeds payable by the Consolidated SWE&C Estate on account of the SWINC MY Contribution Claim will be made to the Consolidated SWINC Estate for distribution under the Third Joint Plan.

- Notwithstanding any contrary provision of Article VII, Section R of the Third Joint Plan, the Debtors shall release all claims and causes of action that they or any one of them have or may have had against Maine Yankee, as of the Effective Date. Without limiting the generality of the following, Adversary Proceeding No. 02-02031 (PJW) now pending in the Court, shall be dismissed, with prejudice and without costs to any party.

The Maine Yankee Settlement is contingent upon confirmation of the Third Joint Plan and will be binding.

### 5.    The Equity Settlement Fund

The Equity Settlement Fund shall be Administered by the Consolidated SWINC Estate for the benefit of all Holders of Old Common Stock, as of the Equity Voting Record Date, who voted to accept the Third Joint Plan. The cost of administering the Equity Settlement Fund shall be paid by the Consolidated SWINC Estate. Holders of Old Common Stock as of the Equity Voting Record Date that voted to accept the Third Joint Plan shall be deemed to hold a pro rata beneficial interest in the Equity Settlement Fund, determined by the number of shares held by each Holder in relation to the total number of shares that voted to accept the Third Joint Plan.

### 6.    The Asbestos Trust

As part of the Third Joint Plan, the Plan Proponents propose a settlement of disputes between the Debtors and the Asbestos Insurance Carriers. The Asbestos Insurance Carriers have contended that they hold certain claims against the Debtors arising from the Debtors' obligations under certain insurance policies and claims handling agreements. Specifically, the Asbestos Insurance Carriers note that the Asbestos Insurance Carriers issued, before the Petition Date, liability insurance policies to one or more of the Debtors that relate to, among other things, potential liability for exposure of third parties to asbestos. The Asbestos Insurance Carriers also contend that SWEC is party to a number of pre-petition claims handling agreements, including, but not limited to the Weitz & Luxenberg Agreements, under which SWEC undertook certain obligations with respect to lawsuits brought against SWEC for personal injury based upon exposure to asbestos. The Asbestos Insurance Carriers argue that they hold claims against the Debtors because, under the insurance policies and the claims handling agreements, the Debtors promised to (i) pay certain amounts relating to defense costs, (ii) cooperate with the Asbestos Insurance Carriers in the defense of claims, and (iii) to pay certain amounts with respect to any settlements or judgements. The Asbestos Carriers finally contend that unless the Debtors provide adequate means for performance of the Debtors' ongoing obligations under the insurance policies and the claims handling agreements, such as cooperating on the defense of claims, receipt of service of process and maintaining corporate records, the Asbestos Insurance Carriers would no longer have a duty to defend or indemnify. The Debtors dispute these contentions of the Asbestos Insurance Carriers.

In order to resolve the dispute, the Proponents and the Asbestos Insurance Carriers reached an agreement regarding ongoing obligations to defend and indemnify. The substance of the agreement is set forth in the Asbestos Trust and is more specifically set forth in Article VII.M. and Exhibit A of the Third Joint Plan.

77

If and to the extent the Non-Settling Insurers – United States Fidelity and Guaranty Company, St. Paul Fire and Marine Insurance Company and St. Paul Surplus Lines Insurance Company – are Asbestos Insurance Carriers, they have not entered into a compromise agreement relating to Asbestos Claims. Accordingly, the terms of the Third Joint Plan and Asbestos Trust that implement compromises with certain insurers, including without limitation, this Article VII.N.6 of the Third Joint Plan, do not apply to or affect the claims or rights of the Non-Settling Insurers.

## ARTICLE XIV
## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Third Joint Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(i) Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(ii) Hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(iii) Hear and determine all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor may be liable, including, if necessary, the nature or amount of any required Cure of the liquidation or allowance of any Claims arising therefrom;

(iv) Ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Third Joint Plan;

(v) Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

(vi) Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Third Joint Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Third Joint Plan, the Disclosure Statement or the Confirmation Order;

(vii) Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Third Joint Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Third Joint Plan, or any entity's rights arising from or obligations incurred in connection with the Third Joint Plan or such documents;

(viii) Consider any modifications of the Third Joint Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Court including, without limitation, the Confirmation Order;

78

(ix)    Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Third Joint Plan or under sections 330, 331 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code, *provided, however,* that from and after the Effective Date the payment of fees and expenses of the Professionals of Reorganized SWINC shall be made in the ordinary course of business and shall not be subject to the approval of the Court;

(x)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Third Joint Plan or the Confirmation Order;

(xi)    Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xii)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Third Joint Plan are enjoined or stayed;

(xiii)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(xiv)    Hear and determine all disputes or other matters arising in connection with the interpretation, implementation or enforcement of the Asset Purchase Agreement and the Sale Order;

(xv)    Hear and determine disputes with respect to compensation of the SWE&C Liquidating Trustee and his professional advisors;

(xvi)    Hear and determine disputes with respect to compensation of the SWINC Plan Administrator and his professional advisors;

(xvii)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(xviii)    Enter a final decree closing the Chapter 11 Cases.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

A.    **Bar Dates for Certain Claims**

1.    *Administrative Claims Bar Date*

The Confirmation Order will establish an Administrative Claims Bar Date for filing Administrative Claims, which date shall be sixty (60) days after the Confirmation Date (the

"Administrative Claims Bar Date"). Holders of asserted Administrative Claims, except for Professional Fee Claims, not paid prior to the Effective Date shall submit requests for payment of Administrative Claim on or before such Administrative Claims Bar Date or forever be barred from doing so. The notice of the Effective Date to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth such date and constitute notice of this Administrative Claims Bar Date. The Debtors, the SWINC Plan Administrator and the SWE&C Liquidating Trustee, as the case may be, shall have ninety (90) days (or such longer period as may be allowed by order of the Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims.

### 2.    *Professional Fee Claims; Substantial Contribution Claims*

All Persons requesting compensation or reimbursement of Professional Fee Claims pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to the Debtors prior to the Effective Date (including requests under section 503(b)(4) of the Bankruptcy Code by any Professional or other entity for making a substantial contribution in the Chapter 11 Cases) shall file and serve on the SWINC Plan Administrator and the SWE&C Liquidating Trustee an application for final allowance of compensation and reimbursement of expenses no later than ninety (90) days after the Confirmation Date, unless otherwise ordered by the Court (the "Professional Fee Bar Date"). Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the SWINC Plan Administrator, and the SWE&C Liquidating Trustee and the requesting Professional or other entity no later than sixty (60) days after the Professional Fee Bar Date (or such longer period as may be allowed by order of the Court).

### B.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Court at the Confirmation Hearing, shall be paid on the Effective Date, and neither the Debtors, their Estates, the SWINC Plan Administrator nor the SWE&C Liquidating Trustee shall thereafter be liable for the payment of any additional fees under 28 U.S.C. § 1930, other than with respect to the Chapter 11 Cases of SWINC and SWE&C.

### C.    Amendment or Modification of the Third Joint Plan

The Plan Proponents may alter, amend, or modify the Third Joint Plan or any Plan Exhibits under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing, provided all Plan Proponents have agreed to such alteration, amendment or modification. After the Confirmation Date and prior to substantial consummation of the Third Joint Plan as defined in section 1101(2) of the Bankruptcy Code, the Plan Proponents may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Third Joint Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Third Joint Plan.

### D.    Severability of Third Joint Plan Provisions

If, prior to the Confirmation Date, any term or provision of the Third Joint Plan is determined by the Court to be invalid, void or unenforceable, the Court, at the request of any Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Third Joint Plan will remain in full force and effect and will in no way be affected, impaired or

80

invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Third Joint Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Third Joint Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity.

### F.    Plan Supplement

Any and all exhibits, lists or schedules not filed with the Third Joint Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than the deadline for objecting to the Third Joint Plan, October 20, 2003. Upon its filing, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court or its designee during normal business hours. Claimholders and Interestholders may obtain a copy of the Plan Supplement upon written request to Debtor in accordance with Article XV.H of the Third Joint Plan. The Plan Proponents explicitly reserve the right to modify or make additions to or subtractions from any schedule to the Third Joint Plan and to modify any exhibit to the Third Joint Plan prior to the Confirmation Hearing.

### G.    Revocation, Withdrawal or Non-Consummation

The Plan Proponents reserve the right, to revoke or withdraw the Third Joint Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Plan Proponents revoke or withdraw the Third Joint Plan or if Confirmation or Consummation does not occur, then, (i) the Third Joint Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Third Joint Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases affected by the Third Joint Plan, and any document or agreement executed pursuant to the Third Joint Plan, shall be deemed null and void, and (iii) nothing contained in the Third Joint Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (b) prejudice in any manner the rights of such Debtors or any other Person, or (c) constitute an admission of any sort by the Debtors or any other Person.

### H.    Notice

Any notice required or permitted to be provided to the Debtors, the Creditors' Committee or the Equity Committee, under the Third Joint Plan shall be in writing and served by (a) certified mail, return receipt requested, (b) hand delivery, or (c) overnight delivery service, to be addressed as follows:

*If to the Debtors:*

STONE & WEBSTER, INCORPORATED
45 Milk Street
Boston, Massachusetts 02109
Attn:  James P. Carroll

*with copies to:*

81

SKADDEN ARPS SLATE MEAGHER
   & FLOM LLP
One Rodney Square
Wilmington, Delaware 19899-0636
Attn:  Gregg M. Galardi, Esq.
       Eric M. Davis, Esq.

*If to Federal:*

DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Attn:  Michael R. Lastowski, Esq.

- and -

MANIER & HEROD
150 4th Avenue North, Suite 2200
Nashville, Tennessee 37219
Attn:  J. Michael Franks, Esq.
      Sam H. Poteet, Jr., Esq.
      Thomas T. Pennington, Esq.

*If to the Creditors' Committee:*

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Attn:  Anthony Princi, Esq.
      Lorraine S. McGowen, Esq.

- and -

LANDIS RATH & COBB LLP
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware 19801
Attn:  Adam G. Landis, Esq.

*If to the Equity Committee:*

BELL, BOYD & LLOYD LLC
70 West Madison Street, Suite 3300
Chicago, IL 60602
Attn:  David F. Heroy, Esq.
      Carmen H. Lonstein, Esq.

- and -

82

BIFFERATO, BIFFERATO & GENTILOTTI
1308 Delaware Avenue
Wilmington, Delaware 19806
Attn: Ian Connor Bifferato, Esq.

*If to Maine Yankee*

PIERCE ATWOOD
One Monument Square
Portland, Maine 04101
Attn: William J. Kayatta, Jr., Esq.

-and-

MARCUS, CLEGG & MISTRETTA, P.A.
100 Middle Street, East Tower
Portland, Maine 04101-4102
Attn: George J. Marcus, Esq.

-and-

FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware 19899-1351
Attn: Michael B. Joseph, Esq.
     Theodore J. Tacconelli, Esq.

## I.     Governing Law

Except to the extent the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent a Plan Exhibit provides otherwise, the rights and obligations arising under this Third Joint Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**J.    Term of Injunctions or Stays**

With respect to SWINC, the SWINC Subsidiaries, SWE&C and the SWE&C Subsidiaries all injunctions or stays provided for in the Chapter 11 Cases under section 105, 362 or 524 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all property of the Estate(s) of SWINC and the SWINC Subsidiaries, SWE&C and the SWE&C Subsidiaries has been distributed.

Dated:   Wilmington, Delaware
       January 13, 2004

           STONE & WEBSTER, INC., et al.
           Debtors and Debtors-in-Possession


           By:   /s/ James P. Carroll
           Name:  James P. Carroll
           Title:  President and Chief Restructuring Officer


           FEDERAL INSURANCE COMPANY


           By:   /s/ Wayne Walton
           Name:  Wayne Walton
           Title:


           MAINE YANKEE ATOMIC POWER COMPANY


           By:   /s/ Joseph D. Fay
           Name:  Joseph D. Fay
           Title:  General Counsel, Clerk, and Assistant Secretary


           OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF STONE
           & WEBSTER, INC., et al., Debtors and Debtors-in-Possession


           By:   /s/ Bayard Graf
           Name:  Bayard Graf
           Title:  Chairperson, Official Committee of Unsecured Creditors

84

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF
STONE & WEBSTER, INCORPORATED

By:  /s/ Brian D. Brookover
Name:  Brian D. Brookover
Title:  Portfolio Manager


 /s/ Gregg M. Galardi
Gregg M. Galardi (I.D. No. 2991)
Eric M. Davis (I.D. No. 3621)
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
(302) 651-3000

Attorneys for Debtors and
 Debtors-in-Possession


Anthony Princi, Esq.
Lorraine S. McGowen, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103

    - and -


 /s/ Adam G. Landis
Adam G. Landis (I.D. No. 3407)
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, Delaware  19801
(302) 467-4400

Attorneys for the Official Committee
 of Unsecured Creditors

85

J. Michael Franks
Sam H. Poteet, Jr.
Thomas T. Pennington
MANIER & HEROD
150 4th Avenue North, Suite 2200
Nashville, Tennessee  37219

     -and-

  /s/ Michael R. Lastowski
Michael R. Lastowski (I.D. No. 3892)
DUANE MORRIS LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
(302) 657-4900

Attorneys for Federal Insurance
  Company


William J. Kayatta, Jr., Esq.
PIERCE ATWOOD
One Monument Square
Portland, Maine  04101

     -and-


George J. Marcus, Esq.
MARCUS, CLEGG & MISTRETTA, P.A.
100 Middle Street, East Tower
Portland, Maine  04101-4102

     -and-

  /s/ George J. Marcus
Michael B. Joseph, Esq. (I.D. No. 392)
Theodore J. Tacconelli, Esq. (I.D. No. 2678)
FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, Delaware  19899-1351
(302) 575-1555

Attorneys for Maine Yankee Atomic
  Power Company

David F. Heroy, Esq.
Carmen H. Lonstein, Esq.
BELL, BOYD & LLOYD LLC
70 West Madison Street, Suite 3300
Chicago, Illinois 60602

- and -

  /s/ Ian Connor Bifferato
BIFFERATO, BIFFERATO &
  GENTILOTTI
Ian Connor Bifferato, Esq.
1308 Delaware Avenue
Wilmington, Delaware 19806
(302) 429-1900

Attorneys for Official Committee of Equity
  Security Holders of Stone & Webster,
  Incorporated

87

**Exhibit B**

Litigation Claims:

1. Any claims, rights and causes of action already initiated by or against the Debtors prior to the Effective Date through which the Debtors seek affirmative relief.

2. Any claims against any person, company or entity that provided or provides insurance to the Debtors for any failure to provide contractual coverage, including, but not limited to: ACE Insurance Company Ltd.; AIG; Genesis Insurance Company; Greenwich Insurance Company; Indian Harbor Insurance Company; Kemper Insurance Company; Lloyd's of London; National Union; Reliance Insurance; Royal; St. Paul Fire and Marine Insurance Company; The Travelers Indemnity Company & Affiliates; XL Insurance Company Ltd.

3. Any and all claims under the Arizona Missions insurance policies

4. Any and all claims under the Debtors' excess coverage insurance policies, including those relating to Isobord and Maine Yankee

5. Any and all claims, including claims for contribution, reimbursement or indemnification under any of the Debtors' directors and officers liability policies

6. Any and all claims, including claims for contribution, reimbursement or indemnification under any other policy of insurance, including the Debtors' general liability insurance policies

7. Any claims for acts or omissions of the Debtors' present and former officers and directors.

8. Any claims against the U.S. Department of Energy and/or NAC International or other subcontractors for indemnification or contribution concerning claims by Maine Yankee.

9. Any claims under 11 U.S.C. § 510, 542–45, 547-551 and 553, whether such actions related to claims are already initiated, to be initiated or initiated subsequent to the Confirmation Date.

THE DEBTORS RESERVE THE RIGHT TO AMEND THIS EXHIBIT TO INCLUDE ADDITIONAL CLAIMS AND CAUSES OF ACTION. THIS EXHIBIT IS NOT INTENDED TO BE AN EXHAUSTIVE LIST OF THE CLAIMS, RIGHTS OF ACTION, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, WHETHER KNOW OR UNKNOWN, THAT A DEBTOR OR ITS ESTATE MAY HOLD AGAINST ANY PERSON, WHICH ARE RETAINED BY THE SWINC PLAN ADMINISTRATOR, OR THE SWE&C LIQUIDATING TRUSTEE, AS THE CASE MAY BE, PURSUANT TO ARTICLE VII.R OF THE PLAN.

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - x
                              :
In re:                        :   Chapter 11
                              :
STONE & WEBSTER, INCORPORATED, :  Case No. 00-02142 (PJW)
     et al.,                  :
                              :   Jointly Administered
          Debtors.           :
                              :
- - - - - - - - - - - - - - x   Related to: 4657

**ORDER UNDER 11 U.S.C. §§ 105 AND 502(e) AND FED. R.
BANKR. P. 9019 AND 3018 GRANTING DEBTORS' MOTION FOR
ORDER APPROVING SETTLEMENT OF CLAIMS WITH SOUTHERN
UNION COMPANY AND NARRAGANSETT ELECTRIC COMPANY**

Upon consideration of the Debtors'[1] motion for

an order approving settlement of claims with Southern

Union Company and Narragansett Electric Company (the

"Motion"); and the Court having reviewed the Motion and

having determined that granting the relief requested is

in the best interests of the Debtors, their estates,

creditors, and interest holders, and is a proper exercise

of the Debtors' business judgment; and it appearing that

proper and adequate notice of the Motion has been given

---

[1]    Unless otherwise defined herein, capitalized terms
       shall have the meaning ascribed to them in the
       Motion.



and that no other or further notice is necessary; and the
Court having considered the Motion and all objections
thereto; and upon the record herein; and after due delib-
eration thereon; and good and sufficient cause appearing
therefor,

IT IS HEREBY FOUND THAT:

A.   Adequate notice of the Motion and Settle-
ment was served upon all parties with an interest in this
contested matter, as well as upon all parties requesting
such notice under Fed. R. Bankr. P. 2002.

B.   The Settlement is in the best interests of
the Debtors, their estates, creditors, and interest
holders, and is also in the best interests of
Narragansett Electric Company and Southern Union Company
(together, the "Claimants"), and their ratepayers.

C.   The Settlement is the result of good-
faith, arms'-length negotiations and is a proper exercise
of the Debtors' business judgment, representing a fair
and reasonable compromise of the parties' claims and
defenses.

2

D.    All objections to the Motion not otherwise resolved should be overruled, and the Motion should be granted.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED.

2.    Pursuant to 11 U.S.C. §§ 105 and 502(e), Fed. R. Bankr. P. 9019 and 3018, and the provisions of the Third Amended Joint Plan, the Settlement annexed as Exhibit A to this Order is approved.

3.    The Debtors, or their successors, are authorized to execute any documents necessary or desirable to consummate the Settlement.

4.    All objections to the Motion not resolved or withdrawn are hereby overruled in their entirety.

5.    The Claimants are deemed to hold an allowed claim against the Consolidated SWINC Estate and the Consolidated SWE&C Estate, in the amount of $15,000,000.00 for actual response costs incurred to date at all of the sixteen (16) sites which are the subject of the Claimants' claims in this Court (the "Allowed Remediation Claim"), which Allowed Remediation Claim is

3

hereby deemed to be a vote to accept the Third Amended Joint Plan in Class 5A and Class 5B.

6.   In order to effectuate the foregoing provision, Valley Gas Claim numbers 2422 and 2438 are reinstated and Fall River Claim numbers 5424 through 5429 are deemed timely filed.  The Allowed Remediation Claim is an amendment to and a consolidation of claims numbered 2548, 2457, 4221, 2267, 2422, 2438, and 5424 through 5429.

7.   On the effective date of the Third Amended Joint Plan, and in accordance therewith, the Claimants will receive a cash distribution of $5,000,000.00 (the "Cash Payment") in payment of the Allowed Remediation Claim.  Notwithstanding any provision of the Settlement, the Cash Payment is the maximum amount and sole portion of the Allowed Remediation Claim that will be paid from the Debtors' estates or their successor entities.

8.   The Debtors shall use reasonable efforts to obtain recovery from their primary insurers.  To the extent the Debtors, through settlement or otherwise, recover any payments from their primary insurers with regard to the Allowed Remediation Claim, the insurance

4

proceeds will be divided and disbursed 50% to the Claim-
ants, and 25% to each of the Consolidated SWINC Estate
and the Consolidated SWE&C Estate until such time as the
Claimants are paid an additional $5,000,000.00 (the
"Additional Cash Payment"). Until the Additional Cash
Payment is received by the Claimants, any settlement
between the Debtors and their primary insurers with
regard to the Allowed Remediation Claim will be subject
to approval by the Claimants, whose approval will not be
unreasonably withheld. This Court shall retain jurisdic-
tion to determine the reasonableness of any proposed
settlement between the Debtors and their primary insurers
with regard to the Allowed Remediation Claim to the
extent that the Claimants disapprove of any such settle-
ment.

9. Notwithstanding any provision of the
Settlement, the Settlement shall not constitute an admis-
sion of liability by the Debtors for any purpose other
than consummation of the Settlement, and shall not con-
stitute an admission of liability by the Debtors with
respect to any sites other than the sixteen (16) sites
that are the subject of the Allowed Remediation Claim.

5

No third-party beneficiaries are intended in the Settlement, and no party other than the Claimants is a beneficiary thereof. Other than the Claimants, no party may rely on any admission of liability by the Debtors in the Settlement for any purpose whatsoever. The approval of the Settlement by this Order does not constitute a finding of any liability by the Debtors for any purpose whatsoever.

10. It is not this Court's intention to cause the findings in paragraphs B and C of this Order to be given collateral estoppel, res judicata, or other claim or issue preclusion effects in any court presiding over any insurance coverage litigation. However, this Court makes no ruling as to the rights of any party in any insurance coverage litigation to contend that the findings in paragraphs B and C of this Order have collateral estoppel, res judicata, or other claim or issue preclusion effects, as well as the rights of any party in any insurance coverage litigation to contend that there are no such collateral estoppel, res judicata, or other claim or issue preclusion effects.

6

11. The rights of the Debtors' insurers to contest coverage for the Allowed Remediation Claim or any remediation claims related to the sites set forth in recitals D and E of the Settlement, as well as the Debtors' rights to assert that such insurers are obligated to provide such coverage, are fully preserved.

12. The rights, if any, of the Debtors' insurers to contend that the Debtors' are not jointly and severally liable to the Claimants for the payment of 66 and 2/3% of future response costs at the sites identified in recitals D and E of the Settlement, as well as the Debtors' right to contest such contention, are fully preserved.

13. All motions, objections and other pleadings identified in Recital J of the Settlement are hereby deemed withdrawn.

14. The failure of this order to include any provision of the Settlement shall not vitiate the validity or effect or such provision.

15. The rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors regarding the allocation of the Allowed Remediation

7

Claim and the allocation of the insurance proceeds re-
ferred to in paragraph 8 of this Order between them are
fully preserved.

Dated:     Wilmington, Delaware
           January 9, 2004

           _____
           Honorable Peter J. Walsh
           United States Bankruptcy Judge

817124.05-D.C. 81A                    8

# EXHIBIT A

283167.82-Wilmington S1A

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT (the "Agreement") by and between Stone & Webster, Incorporated and its subsidiaries and affiliates that are also debtors and debtors-in-possession in the Chapter 11 cases jointly administered under Case No. 00-02142(PJW) (the "Debtors") and Southern Union Company and its subsidiaries and affiliates ("Southern Union") and The Narragansett Electric Company and its subsidiaries and affiliates ("NEC"):

## RECITALS

**A.**     On June 2, 2000 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code. On July 18, 2000, an order was entered establishing August 25, 2000 as the deadline for timely filing proofs of claim against the Debtors (the "Bar Date").

**B.**     The Fall River Gas Company (f/k/a the "Fall River Gas Works Company" and collectively, "Fall River Gas") and the Blackstone Valley Gas & Electric Company ("BVG&E") were utility companies that operated manufactured gas plants ("MGP's) in Rhode Island and Massachusetts. Valley Gas Company ("Valley Gas") acquired the gas utility assets of BVG&E. In September 2000, Southern Union acquired Fall River Gas and Valley Gas. NEC acquired Blackstone Valley Electric Company in May 2000.

**C.**     Environmental contamination exists or may exist at certain sites in Rhode Island and Massachusetts where Fall River Gas and BVG&E or others manufactured and stored gas and by-products of the MGP process and allegedly deposited such materials. These potentially contaminated sites are referred to in this Agreement as the "Fall River Sites" and the "BVG&E Sites."

**D.**     The Fall River Sites consist of the following: (1) the Charles & Bay former MGP in Fall River, Massachusetts; (2) the 5th and Hartwell former MGP in Fall River, Massachusetts; (3) the Pond & Anawan former MGP in Fall River, Massachusetts; (4) the Robeson & Cherry former manufactured gas holder site in Fall River, Massachusetts; (5) the Turner & Davol former manufactured gas holder site in Fall River, Massachusetts; (6) the Cory's Lane / Andrade alleged disposal site in Tiverton, Rhode Island; (7) the Plympton former MGP in Plympton, Massachusetts; (8) the Plympton alleged disposal site in Plympton, Massachusetts; and (9) the Bay Street Neighborhood Study Area in Tiverton, Rhode Island.

**E.**     The BVG&E Sites consist of the following: (1) the Tidewater former MGP in Pawtucket, Rhode Island; (2) the Hamlet Avenue former MGP in Woonsocket, Rhode Island; (3) the Pond Street former manufactured gas holder site in Woonsocket, Rhode Island; (4) the Exchange Street former manufactured gas holder site in Pawtucket, Rhode Island; (5) the Mendon Road alleged disposal site in Attleboro, Massachusetts;

1

(6) the Lawn Street alleged disposal site in Attleboro, Massachusetts; (7) the Cumberland alleged disposal site in Pawtucket, Rhode Island; and (8) the High Street former MGP in Central Falls, Rhode Island.

F.    To date, NEC claims to have incurred $13,083,911.00 in costs of "response" (as defined for purposes of this Settlement Agreement, in the Comprehensive Environmental Response, Compensation and Liability Act, as amended) to actual and/or threatened releases of hazardous substances at or from the BVG&E Sites.  To date, Southern Union claims to have incurred an additional $979,651.10 in costs of response to actual and/or threatened releases of hazardous substances at or from the BVG&E Sites.  Investigation and remediation of the BVG&E Sites is ongoing.  To date, Southern Union claims to have incurred $1,066,883.90 in costs of response to actual and/or threatened releases of hazardous substances at or from the Fall River Sites.  Investigation and remediation of the Fall River Sites is ongoing.

G.    NEC and Southern Union believe that BVG&E was under the management, operation and control of Stone & Webster, Incorporated ("SWINC"), Stone & Webster Engineering Corporation ("SWEC") and Stone & Webster Management Consultants ("SWMC") when the environmental contamination occurred at the BVG&E Sites.  NEC and Southern Union further believe that these Debtors are jointly and severally liable for the response costs at the BVG&E Sites.  NEC and Southern Union filed proofs of claim (respectively, the "NEC Claims" and the "Valley Gas Claims") against SWINC, SWEC and SWMC asserting that these Debtors are jointly and severally liable to them for indemnity against or contribution to all of their past and future response costs with respect to the BVG&E Sites.  The NEC Claims are claim numbers 2548, 2457 and 4221.  The Valley Gas Claims are claim numbers 2267, 2422 and 2438.  Pursuant to a Bankruptcy Court order entered on December 13, 2000, Valley Gas Claim numbers 2422 and 2438 were expunged as being duplicative of Valley Gas Claim number 2267.

H.    Southern Union believes that Fall River Gas was under the management, operation and control of SWINC, SWEC and SWMC when the environmental contamination occurred at the Fall River Sites.  Southern Union further believes that these Debtors are jointly and severally liable for the response costs at the Fall River Sites.  On May 20, 2003, Southern Union filed proofs of claim (the "Fall River Claims") against SWINC, SWEC and SWMC asserting that these Debtors are jointly and severally liable to it for indemnity against or contribution to all of its past and future response costs with respect to the Fall River Sites.  The Fall River Claims are claim numbers 5424 through 5429.

I.    The Debtors disputed that they managed, operated or controlled BVG&E or Fall River Gas, or that the Debtors are liable for any response costs relating to the Fall River Sites and the BVG&E Sites:

2

J.        On September 16, 2003, the Debtors filed their Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4502) (the "Objection"). On October 1, 2003, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed a Limited Objection [] to Debtors' Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4561). On October 1, 2003, Southern Union filed its Reply and Response to Debtors' Amended Objection and Motion to Estimate Claims of Southern Union Company for Purposes of Voting on a Plan (Docket No. 4562) (the "Response"). Also on October 1, 2003, NEC filed a Motion to Estimate Claims for Purposes of Voting and Establishing Reserves Under the Plan Pursuant to Fed. R. Bankr. P. 3018 and 3020 (Docket No. 4560) (the "NEC Motion"). On October 16, 2003, Southern Union filed its Motion to Deem Certain Proofs of Claim Timely Filed (Docket No. 4605) (the "Timeliness Motion") and its Motion to Reinstate Certain Expunged Proofs of Claim Pursuant to 11 U.S.C. § 502(j) and Fed. R. Bankr. P. 3008 and 9024 (Docket No. 4606) (the "Reinstatement Motion"). On October 20, 2003, Southern Union and NEC each filed objections to the confirmation of the Joint Plan (Docket Nos. 4622 and 4623) (the "Confirmation Objections"). The Creditors' Committee filed an objection to the Reinstatement Motion on October 22 (Docket No. 4634) and an objection to the Timeliness Motion on October 23 (Docket No. 4637). The Official Committee of Equity Security Holders (the "Equity Committee") filed a limited joinder in support of Southern Union's Reinstatement Motion on October 24 (Docket No. 4645). Additionally, the parties served multiple deposition notices in connection with the foregoing motions and objections. This Agreement resolves all of the foregoing motions and objections, without the need for any further discovery in connection thereto.

K.        The Debtors, Southern Union and NEC each conclude that litigation of the above-described motions would be expensive and protracted and pose substantial risks and, therefore, make this Agreement to avoid the cost, risks and delay of continued litigation.

L.        The Debtors, Southern Union and NEC each believe that this Agreement is in the best interest of the Debtors, the Consolidated SWINC Estate (which consolidated estate includes SWINC) and its creditors, the Consolidated SWE&C Estate (which consolidated estate includes SWEC and SWMC) and its creditors, the ratepayers of Southern Union, and the ratepayers of NEC.

NOW, THEREFORE, in consideration of the foregoing, the covenants and releases set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, the Parties agree as follows:

1.        The Parties agree that the above Recitals are incorporated into the body of this Agreement and shall have the same force and effect as if set forth herein.

3

CC 1210030v3

2.      Upon the Parties execution of and Court approval of this Agreement, NEC and Southern Union (together, the "Claimants") will hold an allowed claim against the Debtors, the Consolidated SWINC Estate and the Consolidated SWE&C Estate of $15,000,000.00 for actual response costs incurred to date at the BVG&E Sites and the Fall River Sites (the "Allowed Remediation Claim"), which Allowed Remediation Claim shall be deemed to be a vote to accept the Joint Plan (as defined in paragraph 5 below) in Class 5A and Class 5B.

3.      Upon the Parties execution of and Court approval of this Agreement, Valley Gas Claim numbers 2422 and 2438 will be reinstated and Fall River Claim numbers 5424 through 5429 will be deemed timely filed. In addition, the Allowed Remediation Claim will be an amendment to and consolidation of: (i) NEC Claim numbers 2548, 2457 and 4221; (ii) Valley Gas Claim numbers 2267, 2422 and 2438; and (iii) Fall River Claim number 5424 through 5429.

4.      Upon the Court's entry of a final, non-appealable order approving this Agreement, all motions, objections and other pleadings, including those listed in Recital J, will be deemed withdrawn. Each movant and responding party will be responsible for taking appropriate steps to withdraw such pleadings from the Court's docket.

5.      On the Effective Date and in accordance with the provisions of the Third Amended Joint Plan of Reorganization of the Debtors in Possession, the Official Committee of Unsecured Creditors, Federal Insurance Company, Maine Yankee Atomic Power Company, and the Official Committee of Equity Security Holders for (I) Stone and Webster, Incorporated and Certain of its Subsidiaries and Affiliates and (II) Stone and Webster Engineers & Constructors, Inc. and Certain of its Subsidiaries and Affiliates (the "Joint Plan"), the Claimants will receive a cash distribution of $5,000,000.00 (the "Cash Payment") in payment of the Allowed Remediation Claim. Except as set forth in paragraphs 6 and 7 of this Agreement, the Cash Payment will constitute the only consideration to be paid or payment to be made by the Debtors, the Consolidated SWINC Estate, the Consolidated SWE&C Estate, or their successors with respect to all past, present and/or future claims held or asserted, or which could have been asserted, by the Claimants against the Debtors, the Consolidated SWINC Estate, the Consolidated SWE&C Estate, or their successors.

6.      The Debtors shall use reasonable efforts to obtain recovery from their primary insurers. To the extent the Debtors, through settlement or otherwise, recover any payments from their primary insurers with regard to the Allowed Remediation Claim, the insurance proceeds will be divided and disbursed 50% to the Debtors and 50% to the Claimants until such time as the Claimants are paid an additional $5,000,000.00 (the "Additional Cash Payment"). Until the Additional Cash Payment is received by the Claimants, any settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim will be subject to approval by the Claimants, whose approval will not be unreasonably withheld. The Bankruptcy Court will retain

4

CC 1210030v3

jurisdiction to determine the reasonableness of any proposed settlement between the Debtors and their primary insurers with regard to the Allowed Remediation Claim to the extent that the Claimants disapprove of any such proposed settlement.

7.    With respect to any of the remediation claims related to the sites set forth in Recitals "D" and "E" herein by the Claimants against the Debtors, the Debtors are jointly and severally liable to the Claimants for the payment of 66-2/3% of all future response costs at the BVG&E Sites and the Fall River Sites. However, any such future response costs will be collectible by the Claimants only from proceeds of Debtors' excess insurance, and not from any funds of the Debtors or their successor entities. The maximum amount that the Debtors' estates will pay under this agreement is the Cash Payment. This paragraph does not apply to any bodily injury claims brought against the Debtors that are related to the BVG&E and Fall River Sites. This agreement: (i) has no effect with respect to the allocation of the Allowed Remediation Claim among the Debtors' estates, and the rights of the Consolidated SWINC Estate, the Consolidated SWE&C Estate, and their successors to litigate the issue of such allocation are preserved, and (ii) does not constitute a finding or admission of liability with respect to any bodily injury claims brought against the Debtors.

8.    On the Effective Date of the Joint Plan, the Debtors will assign jointly to the Claimants the right to control assertion and settlement of claims and the right to receive any proceeds from any of the Debtors insurance policies (other than the Debtors' primary insurance policies) with respect to losses, liabilities and expenses relating to the remediation of the BVG&E Sites and the Fall River Sites, and the Debtors will cooperate in good faith with the Claimants in providing copies of the applicable policies, and secondary evidence of the existence and terms of such policies.

9.    Upon execution of this Agreement, or as soon thereafter as is reasonably practicable, Claimants shall provide Debtors with information regarding losses, liabilities and costs related to the BVG&E Sites and the Fall River Sites (the "Sites"), including but not limited to non-privileged: (i) environmental studies conducted on the Sites, (ii) reports of remediation activities, (iii) correspondence with state, local and national environmental agencies regarding the investigation and remediation of the Sites, (iv) invoices/bills documenting past expenditures at the Sites, (v) estimates of potential future costs at the Sites, (vi) orders or directives by governmental entities, and (vii) claims made by other third parties with regard to or related to the Sites. In addition, Claimants will cooperate in good faith with Debtors in their efforts to obtain insurance coverage for the Sites. Debtors will cooperate in good faith with Claimants in their efforts to obtain insurance coverage for the Sites.

10.    This Agreement does not affect Debtors' rights to pursue and/or obtain recovery from any and all of its insurers for any bodily injury claims brought against the Debtors related to the BVG&E Sites and the Fall River Sites or otherwise. This Agreement does not affect Claimants' rights, if any, to pursue and/or obtain recovery

5

from any and all of Debtors' insurers for any bodily injury claims related to the BVG&E Sites and the Fall River Sites or otherwise. Furthermore, nothing in this Agreement or in the Joint Plan will affect or impair the rights of Southern Union or NEC to take direct actions to recover under policies of insurance where Southern Union or NEC is a "co-insured" or "additional insured" with one of the Debtors.

11.     This Agreement may be executed in multiple counterpart originals, each of which will constitute one and the same document and will be deemed an original. This Agreement may be executed by facsimile signatures, which will be deemed to have the same force and effect as an original signature.

12.     This Agreement represents a final and complete expression of the understandings between the Parties and this Agreement may not be contradicted by evidence of any prior oral agreement or of a contemporaneous oral agreement or understanding between the Parties. There are no promises, terms, conditions or obligations other than those contained in this Agreement.

13.     The Parties represent and warrant that they have read and thoroughly understand the terms and conditions of this Agreement.

14.     This Agreement will be binding upon and inure to the benefit of the Parties and their respective heirs, representatives, successors and assigns, including, but not limited to, the Reorganized SWINC, the SWINC Plan Administrator and the SWE&C Liquidating Trust.

15.     No amendments to this Agreement shall be effective unless such amendment is in writing and signed by all Parties hereto.

16.     Whenever possible, each provision of this Agreement will be interpreted to be effective and valid under applicable law. If any provision of this Agreement is held to be prohibited by or invalid under applicable law, the provision will be ineffective only to the extent of the prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Agreement.

17.     This Agreement will be governed by and construed in accordance with the laws of the State of Delaware.

18.     Each Party is to bear its own fees, costs, and expenses in this matter.

6

CC 1210030v3

19.    The Parties hereby agree to execute from time to time all documents that may be necessary or desirable to carry out the terms of this Agreement, or to affect the purpose of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement this _____ day of November 2003.

STONE AND WEBSTER,
INCORPORATED, ET AL

_____
James P. Carroll
President and Chief Restructuring Officer
44 Milk Street
Boston, MA 02109

SOUTHERN UNION

_____
Dennis K. Morgan, Esq.
Executive Vice President – Administration,
General Counsel and Secretary
One PEI Center
535 East Northampton Street
Wilkes Barre, PA 18711

THE NARRAGANSETT ELECTRIC
COMPANY

_____
John F. Sherman, III
Deputy General Counsel
25 Research Drive
Westboro, MA   01582

7

CC 1210030v3

516458.06-D.C. Server 1A - MSW